UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| ERIC DE FORD, et al., | Case No. 6:22-cv-652-PGB-DCI |
| Plaintiffs, | CLASS ACTION |
| v. | |
| JAMES KOUTOULAS, et al., | |
| Defendants. | |

**OPPOSITION TO THE CORAL DEFENDANT'S MOTION TO DISMISS
SECOND AMENDED CLASS ACTION COMPLAINT AND
INCORPORATED MEMORANDUM OF LAW**

Plaintiffs Eric De Ford and Sandra Bader ("Plaintiffs") oppose the Motion to
Dismiss Second Amended Class Action Complaint ("SAC") filed by Defendants
Thomas McLaughlin ("McLaughlin"), Coral Capital LLC ("Coral Capital"), Coral
Capital Management LLC ("Coral Management"), and Coral DeFi LP ("Coral
DeFi") (collectively referred to as the "Coral Defendants") (ECF No. 112).  In
support thereof, Plaintiffs state as follows:

**INTRODUCTION**

The Coral Defendants are not bit players in the alleged conspiracy who are
far outside the jurisdiction of this Court.  Quite the contrary.  In truth, the Coral
Defendants were instrumental in the facilitation of the scheme to defraud investors

with the sale of unregistered securities called LGBCoins. They are alleged to have entered into a conspiracy in Florida. Namely, the Coral Defendants worked closely with two of the key architects of the scheme, Defendants Jeffrey Carter ("Carter") and James Koutoulas ("Koutoulas") of Typhon Capital Management, LLC ("Typhon"). Together, these two hedge funds and their respective executives, are alleged to have collectively engaged in a conspiracy to create the LGBCoin and then dump those LGBCoins onto unsuspecting retail investors.

The Coral Defendants' participation in the scheme was two-fold. First, to bring the unregistered LGBCoin to the market, Defendants Coral DeFi and McLaughlin collectively provided $50,000 of initial "gas fees" that were used by Carter to transfer the originally minted LGBCoins to the various wallet addresses (owned or controlled by Defendants) that ultimately sold those LGBCoins to the public. These overt acts by the Coral Defendants were instrumental in facilitating the subsequent sale of a significant amount of LGBCoins from those various insider wallet addresses. Moreover, the Coral Defendants' gas fee provided the practical ability for the Executive Defendants, including Koutoulas, Carter, and Erik Norden, to sell their portions of the LGBCoin float after Koutoulas (and others) successfully solicited Plaintiffs and the class members. Second, the SAC

alleges that the Coral Defendants also maintained such a level of control over the LGBCoin corporate entity itself that they "attempted to have [Koutoulas] purged from LGBCoin to launch their own LGB 'copycat.'" ¶187. The so-called "guys hanging out in Puerto Rico" (*i.e.*, the Coral Defendants) ultimately caused Koutoulas to relaunch LGBCoin in February 2022 under a new name. ¶¶186-87.[1]

Given that the Coral Defendants are alleged to be both directly responsible for facilitating the sale of originally minted LGBCoins and to have conspired with the Executive Defendants who improperly solicited the sales of those unregistered securities, Plaintiffs submit that the Coral Defendants' motion to dismiss these claims be denied. The Coral Defendants were also unjustly enriched and their claims to the contrary should be rejected.

## RELEVANT FACTS

LGBCoin, and the "Let's Go Brandon" chant upon which it was based, originated from an October 2, 2021, NASCAR racing event won by NASCAR racecar driver Brandon Brown and a misunderstanding that occurred during Brown's post-win interview with NBC Sports reporter, Kelli Stavast. ¶¶1-2, 50. As the "Let's Go Brandon" catchphrase increased in popularity, a group of

---

[1]    "¶" refers to the paragraphs in the Second Amended Complaint ("SAC").

entrepreneurs and cryptocurrency developers, also referred to as the "Executive Defendants" including but not limited to, James Koutoulas ("Koutoulas"), Jeffrey Carter ("Carter"), and Brandonbilt Motorsports, LLC's co-owner Alexander Mascioli, decided to create, promote, and sell ERC-20 tokens to the public that they called LGBCoin.  ¶¶22, 48-57.  On November 2, 2021, the Executive Defendants launched LGBCoin as a bona fide public offering with a transaction volume of $100 million and an opening price of $0.000000034.  ¶¶48-57.

Koutoulas is business partners with Defendants Carter and Aris George Michalopoulos ("Michalopoulos") in his commodity trading advisory firm, Typhon.  Typhon worked closely with the Coral Defendants.  In particular, Koutoulas, together with Carter, Michalopoulos, and the Coral Defendants are alleged to have collectively engaged in a conspiracy to create the LGBCoin, solicited sales using misleading promotions, and dump their unregistered LGBCoins onto unsuspecting retail investors.

Specifically, the SAC alleges that Koutoulas, along with the Coral Defendants and the other Executive Defendants, facilitated the sale of LGBCoin through a complex series of transactions to wallet addresses prior to the token's public launch.   In addition, the SAC alleges that wallet addresses

owned/controlled by Defendants McLaughlin and Coral DeFi sent $10,000 and $40,000, respectively, in gas fees to the Hub Wallet on November 1, 2022. *See* ¶57 n.9. These gas fees, along with the other ether provided by Koutoulas and Michalopoulos, allowed the Hub Wallet (owned/controlled by Carter) to run a test transaction "to confirm that the Hub Wallet could reliably receive, transfer, and/or sell LGBCoins prior to launch." ¶¶56-57. The next day, November 2, 2021, "the Executive Defendants launched LGBCoin for the first time in a bona fide public offering." ¶58. The SAC further alleges that "the complex web of transactions among the wallets described above strongly suggests that this was purposefully designed to obscure the true owners of significant portions of LGB-Coin Float and provide Carter, Koutoulas, Michalopoulos (along with Defendants Thomas McLaughlin and the Coral entities) plausible deniability to investors when those owners sold." ¶177.

## GOVERNING STANDARDS

When a party moves for dismissal under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears burden of establishing a prima facie case of personal jurisdiction over a foreign defendant. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). This prima facie case is met if

the plaintiff "'presents enough evidence to withstand a motion for directed verdict.'"  *Id*. (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)).  When the defendant submits affidavits tending to disprove the plaintiff's showing of personal jurisdiction as alleged in the complaint, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction."  *Id*.  Where the allegations in the complaint and the defendant's proffer of evidence conflict, the court "must construe all reasonable inferences in favor of the plaintiff."  *Id.*

To prevail on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Further, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Twombly*, 550 U.S. at 563 (citing *Sanjuan v. Am. Bd.*

*of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (once a claim for

relief has been stated, a plaintiff "receives the benefit of imagination, so long as the

hypotheses are consistent with the complaint")).

## ARGUMENT

## I.    The Court Has Personal Jurisdiction Over the Coral Defendants

The Eleventh Circuit makes clear that Florida's long-arm statute provides

for personal jurisdiction over any alleged conspirator where any other co-

conspirator commits an act in Florida in furtherance of the conspiracy, even if the

defendant over whom personal jurisdiction is sought individually committed no

act in, or had no relevant contact with, Florida.  *See United Techs. Corp. v. Mazer*,

556 F.3d 1260, 1281-82 (11th Cir. 2009) (citing *Machtinger v. Inertial Airline Servs.,*

*Inc.*, 937 So. 2d 730, 734-36 (Fla. Dist. Ct. App. 2006) (finding personal jurisdiction

existed in Florida where conspiracy was made in Ohio but acts in furtherance of

the conspiracy were done in and directed toward Florida)); *Wilcox v. Stout*, 637 So.

2d 335, 337 (Fla. Dist. Ct. App. 1994) ("if [plaintiff] has successfully alleged that

any member of that conspiracy committed tortious acts in Florida in furtherance

of that conspiracy, then all of the conspirators are subject to the jurisdiction of the

state of Florida through its long-arm statute"); *see also Execu-Tech Bus. Sys., Inc. v.*

*New Oji Paper Co.*, 752 So. 2d 582, 584-85 (Fla. 2000) (finding personal jurisdiction in Florida over a participant in a nationwide price-fixing conspiracy in which some co-conspirators, but not the defendant at issue, made sales into Florida).

Moreover, jurisdiction may be constitutionally asserted over the nonresident defendant under the "minimum contacts" prong whenever he has by his own purposeful conduct created a "substantial connection" with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The Court has made clear, however, that "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Id*. (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

### A. The Allegations in the SAC Satisfy the Florida Long-Arm Statue Because Plaintiffs Adequately Allege a Conspiracy Involving the Coral Defendants Founded on Conduct Committed in Florida

#### 1. Plaintiffs Adequately Pled Civil Conspiracy Against the Coral Defendants

To state a claim for civil conspiracy, the plaintiff must allege: (1) an agreement between two or more parties;[2] (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the

---

[2]     Notably, the Coral Defendants' sole argument for dismissal of the conspiracy claim is that this first element was not pled with the requisite particularity. ECF. No. 112 at 16-20.

conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy. *Mazer*, 556 F.3d at 1271 (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008)).  At its core, a "cause of action for civil conspiracy should allege the scope of the conspiracy, its participants, and when the agreement was entered into." *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08CV466-ORL-28GJK, 2010 WL 1408391, at *23 (M.D. Fla. Apr. 6, 2010), *aff'd*, 451 F. App'x 862 (11th Cir. 2012).  Notably, "participation in a conspiracy may be inferred merely from acts which furthered its object." *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1353 (11th Cir. 2008).

Here, the SAC contains highly-specific factual support for the scope of the conspiracy, the role of its participants (including the Coral Defendants), and when the agreement was entered into (*i.e.*, prelaunch).  At the outset, the first element of a civil conspiracy claim requires allegations of an explicit or implied agreement. *See State Farm Mut. Auto. Ins. Co. v. LaRocca*, No. 8:21-CV-2536-SCB-AEP, 2022 WL 1401565, at *10 (M.D. Fla. May 3, 2022).  Despite the Coral Defendants' argument to the contrary, the SAC satisfactorily pleads this element by alleging that the Coral Defendants collectively agreed with the Executives Defendants to engage in

a scheme to defraud investors through the sale of misleadingly promoted unregistered securities.  The very nature of this scheme depends upon an implied agreement between the co-conspirators to use a smart contract to create the LGBCoin, which can be later sold without restriction to investors.  The SAC alleges that the Coral Defendants, including Defendant McLaughlin, facilitated the sale of LGBCoin through a complex series of transactions between various wallet addresses under the direct control of McLaughlin and the Coral Defendants and those wallet addresses linked to the Executive Defendants prior to the token's public launch.  These specific allegations establish the implied agreement element.

For example, the SAC states that on October 28, 2021, "all 330 trillion LGBCoin were minted as part of the creator smart contract."  ¶51.  Significantly, the SAC notes that it is "best practice for tokens to be sold as part of time-locked smart contracts with controls to prevent fraud.  And although the Executive Defendants were experienced in crypto, they did not implement these fraud prevention controls.  At the same time, the Executive Defendants took steps to conceal their identities from the public."  ¶51.  Furthermore, the SAC states that "best practices" were not followed with respect to the Executive Defendants' choice of code to govern the deployer wallets:

Notably, none of the Carter Wallets are contract-based wallets.  Best practices in cryptocurrency launches include a mechanism in the code of the smart contract itself to "lock" for a certain period of time the portion of the Float given to the developers and other insiders pre-launch.  ***This mechanism is designed to prevent insiders from immediately dumping huge amounts of tokens (acquired at little to no cost pre-launch) onto the market once trading volume from retail investors increases.  The Carter Wallets, instead, are regular cryptocurrency wallets that have no limitations on selling at any point.***

¶53 (emphasis added).

The SAC also alleges that shortly after all of the LGBCoins were minted, the tokens were transferred to four wallet addresses under the ownership and control of Defendant Jeffrey Carter.  *See* ¶¶52-53.  These four addresses served as "de facto deployer wallets of LGBCoin," including Carter Wallet 1 (¶53), which effectuated the sale of their LGBCoins on the open market.

As the SAC further notes, when deployer wallets like the Carter Wallets make the actual transfer of the digital asset, it requires "gas" in the form of cryptocurrency to validate the transaction and process the terms of the smart contract: "'Gas Fees' are fees charged by the Ethereum network to process a transaction to compensate for the computing energy required to process and validate transactions.  Gas Fees are paid in ether, the base currency of the network."  ¶54 n.7.  In order to "conceal their identities from the public" (*see* ¶51),

the Executive Defendants used the unrestricted deployer wallets to disperse the LGBCoins to various wallet addresses that later sold those LGBCoins for profit.

But these transfers, as noted, require gas to facilitate the transactions. The SAC alleges that on October 29, 2021 (the day after the minting of the LGBCoins) a wallet address linked to Defendant McLaughlin and a wallet under the control of Coral DeFi sent two separate gas fees ($10,000 and $40,000, respectively (*see* ¶57 n.9)) to a wallet owned by Defendant Carter "to facilitate the public trading of LGBCoins at launch." ¶¶55-57. Then just four days later, on November 2, 2021, "the Executive Defendants launched LGBCoin for the first time in a bona fide public offering." ¶58. The SAC further alleges that "the complex web of transactions among the wallets described above strongly suggests that this was purposefully designed to obscure the true owners of significant portions of LGBCoin Float and provide the Coral entities and McLaughlin (along with Defendants Carter, Koutoulas, and Michalopoulos) plausible deniability to investors when those owners sold." ¶177.

In sum, the SAC alleges that the Coral entities and Defendant McLaughlin acted in concert with the other Executive Defendants to discreetly facilitate the scheme to transfer LGBCoins to other wallet addresses that sold LGBCoins to

unsuspecting investors.  Moreover, that facilitation of the transfer of LGBCoins allowed for the purposefully included provisions in the actual LGBCoin smart contract to kick in.  Namely, the initial conduct of the Coral entities and Defendant McLaughlin allowed the other Executive Defendants to both (1) transfer the original minted LGBCoins to various wallets in order to avoid disclosing that those wallets secretly belonged to Executive Defendants, and (2) anonymously dump those LGBCoins into the open market without any restrictions.  These allegations readily satisfy the first element of civil conspiracy: an agreement.  *See Santillana v. Fla. State Ct. Sys.*, No. 609CV-2095-ORL-19KRS, 2010 WL 271433, at *13 (M.D. Fla. Jan. 15, 2010) (finding that the "existence of agreement" element was plausibly established by allegations that defendants had "acted in concert and put forth a contrived effort to cover up their wrongdoings"); *see also Wyndham Vacation Ownership, Inc. v. Miller*, No. 619CV817ORL40EJK, 2019 WL 5394074, at *7 (M.D. Fla. Oct. 11, 2019) (concluding that the "Complaint establishes sufficient circumstantial evidence from which the Court can infer an agreement and overarching conspiracy . . . ."); *LaRocca*, 2022 WL 1401565, at *11 (finding the complaint alleged with sufficiently particularity an implied agreement to engage in a scheme to defraud plaintiffs); *Cordell Consultant, Inc. Money Purchase Plan &*

13

*Tr. v. Abbott*, 561 F. App'x 882, 886 (11th Cir. 2014) (reversing dismissal of civil conspiracy claim where the allegations were sufficiently particularized to support "reasonable inferences of agreement and overt act").

The second element of a civil conspiracy claims concerns an "unlawful act" or doing "a lawful act by unlawful means."  Plaintiffs have satisfied this element with the allegations in the SAC that the Defendants violated Florida state law and federal securities laws.  *See Hogan v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1285 (M.D. Fla. 2009) (concluding that the "second element, that the agreement was to do an unlawful act, is plausibly established by the incorporation of the allegations of Counts I and III, which allege that [defendants'] acts violated Florida law").

The Coral Defendants also do not dispute that the third element (an overt act) has been adequately pled.  The SAC contains well-pleaded allegations that the Coral Defendants provided the gas fees to the Carter Wallet that, in turn, was able to use those gas fees to disseminate LGBCoins to insiders.  And while "there is no requirement that each co-conspirator commit acts in furtherance of the scheme," *MP, LLC v. Sterling Holding, LLC*, 231 So. 3d 517 (Fla. Dist. Ct. App. 2017), the SAC

clearly alleges that specific Coral entities and Defendant McLaughlin himself committed an overt act.  As the SAC states:

> Wallet Address 0x9725bdd039fcfe6dee3de5398c3ba06113390aec provides $40,000 in USDC for initial gas fees to the Hub Wallet.  Wallet 0x97 owns the domain name "CoralDefi."  It is owned by Coral Defi. (the "Coral Wallet").   See https://etherscan.io/tx/0xdc0328b 07ae47542a185311ee 4ae36da4e49ae305b595e50b6ccfe25ef5ac86   Wallet   Address 0xaa130e5a43cadbe2eaa4e58ede61e39874e3ead7 provides $10,000 in USDC for gas fees to the Hub Wallet. Wallet 0xaa owns the domains of thomasmclaughlin.eth, tmcg.eth, and tmclaughlin.eth, and owns the same penguin NFT as Thomas McLaughlin displays as his twitter avatar.  It is owned by Thomas McLaughlin.

¶57 n.9.  And the purpose of these overt acts of sending the gas fees to Carter was to facilitate the public trading of LGBCoin at launch.  ¶54-57.

Each coconspirator "need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators."  *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987) (also stating that "[t]he existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence").  Here, the Coral Defendants (by way of Coral DeFi) and Defendant McLaughlin are alleged to have knowingly provided material assistance at the beginning of the scheme with Executive Defendants to defraud investors and sell unregistered securities.  Facilitating the sale of LGBCoin by insiders with unlocked wallets plausibly pleads the third element of a civil

conspiracy claim. *See Hogan*, 665 F. Supp. 2d at 1285 (allegations that defendant implemented the policies and procedures at issue sufficient to satisfy the overt act element).[3]

Put simply, "[t]his is all that is required at the motion to dismiss stage." *Diamond Resorts U.S. Collection Dev., LLC v. Miller*, No. 6:20-CV-1668-PGB-LRH, 2022 WL 445508, at *7 (M.D. Fla. Jan. 11, 2022). Nevertheless, the Coral Defendants insist that Plaintiffs have only asserted conclusory allegations for the civil conspiracy claim and attempt to convince the Court to hold Plaintiffs to an impossibly specific pleading standard. (*See* ECF No. 112 at 19-20). But Plaintiffs are "not required to prove its allegations at this point in the litigation;" they are "merely required to meet the pleading standards." *Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC*, No. 612CV1138ORL36DAB, 2014 WL 12617566, at *5 (M.D. Fla. Mar. 6, 2014). The SAC clearly meets those standards.

2.   **Plaintiffs' Civil Conspiracy Claim is Founded on Conduct Committed by the Co-Conspirators in Florida**

The SAC alleges that the Coral Defendants conspired with the Executive Defendants to fraudulently promote and sell the unregistered LGBCoin in Florida.

---

[3]   Since the Coral entities and Defendant McLaughlin do not seriously contest that the fourth element of the civil claim, Plaintiffs will not argue this point further other than submitting to the Court that this element was also sufficient plead in the SAC.

And many (if not all) of the overt acts in furtherance of the conspiracy were alleged to have been done in and directed toward Florida. For example, many of the statements and promotional activities made in furtherance of the conspiracy were disseminated from Florida. Indeed, there is a plethora of allegations of the tortious acts committed by Koutoulas, as well as the other Executive Defendants and the Racing Defendants, in Florida in furtherance of the conspiracy. *See, e.g.*, ¶¶87-88, 114-16. Similarly, the "agreement" between Koutoulas and the Coral Defendants concerning the relaunch of the LGBCoin was "reached in Miami, Florida" in February 2022. *See* ¶186. These allegations are more than enough to establish this Court's personal jurisdiction over the Coral Defendants within the Eleventh Circuit. *Mazer*, 556 F.3d at 1281-82.

Accordingly, because Plaintiffs adequately pled a civil conspiracy involving the Coral Defendants, and the co-conspirators committed acts in Florida in furtherance of the conspiracy, this Court may properly exercise personal jurisdiction over McLaughlin and the Coral entities (and all other alleged co-conspirators) under Florida's long-arm statute section 48.193, even if Coral "otherwise has no connection to the state." *See AXA Equitable Life Ins. Co. v. Infinity*

*Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. 2009) (quoting *Mazer*, 556 F.3d at 1281-82).

### B.   The SAC Pleads Sufficient Minimum Contacts to Exercise Personal Jurisdiction

In addition to the conspiracy jurisdiction discussed above, the Court may exercise jurisdiction over the Coral Defendants due to their significant contacts with the State.

Here, the Coral Defendants and their executives have a long track record of purposefully availing themselves of Florida such that it would satisfy due process to have them litigate here.  First, two of the three Coral affiliated Coral entities were previously registered to conduct business within the State of Florida.  Coral Capital Management LLC registered to conduct business in Florida on June 12, 2008 and listed Florida Amsouth Holdings Corp as its registered agent.[4]  Similarly, there are four variations of "Coral Capital LLC" business that were previously registered to conduct business within Florida.[5]  Second, co-founder and Managing Partner at Coral, David Namdar serves as a representative and speaker for Coral

---

[4]      According to public records, it appears that this registration is currently invalid. *See* https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C 2008%5C0613%5C80212748.tif&documentNumber=L08000057990.

[5]      https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResults/EntityName/Coral %20Capital/Page1?searchNameOrder=CORALCAPITAL.

at the events in Florida. For example, Namdar was a speaker from "Coral Invest" at the Global Alts 2022 conference held at the Fontainebleau Miami Beach on January 24, 2022.[6]

Besides the corporate entities that have conducted business in Florida, Patrick Horsman, the Managing Partner at Coral, also has deep roots with Miami, Florida in particular.  Horsman operates a "Single Family Office" located in Miami, that manages the investments of "the Horsman Family, Trusts, Insurance Companies, Foundations, and related Entities" since 2008.[7]  This business, much like Coral, focuses on "Digital Assets" and "Technology" and employs "esoteric niche strategies" for its investments.  Horsman is also the founder and Managing Partner of Verified Organic – an Ethereum-based blockchain company similar to LGBCoin.io that has operated out of Miami Beach, Florida since February 2018. From 2009 to 2020, Horsman was the co-founder and served as the Chief Operating Officer of Merion Investment Management LP located in Miami Beach. Likewise, from 2002 to October 2020, Horsman served as the co-founder and Managing Partner of Blue Sand Securities LLC.  This is an "alternative investment firm" with

---

[6]        https://app.qwoted.com/opportunities/event-global-alts-2022

[7]        https://pr.linkedin.com/in/patrickhorsman.

offices in Miami and Naples, and Horsman boasts of its "marketing abilities" and "extensive industry contacts."  Finally, Horsman is a current member of the NEXUS Global Summit's Miami Forum taking place in Miami Beach since 2020.

The Coral Defendants' purposeful conduct created a "substantial connection" with Florida and have conducted business within the state for many years.  These allegations are adequate to establish that the Coral Defendants had more than just minimum contacts with Florida.  *Fru Veg Mktg., Inc. v. Vegfruitworld Corp.*, 896 F. Supp. 2d 1175, 1181 (S.D. Fla. 2012) (finding foreign corporations had sufficient contacts to establish personal jurisdiction in Florida).  Thus, it would be reasonably foreseeable that the Coral Defendants would be brought before a Florida court, especially given that the causes of actions alleged herein arise out of similar financial promotional activities that were utilized in their Florida businesses.

As an emerging center for crypto-related business,[8] Florida has a significant interest in adjudicating what kind of promotional activities surrounding the launch of a new digital asset are appropriate within the State.  Conversely, any

---

[8]     *See, e.g., Miami Is Hosting The World's Biggest Crypto Party*, BLOOMBERG (April 5, 2022) https://www.bloomberg.com/features/2022-miami-crypto-capital-of-us/ (noting that "the Florida city wants to be the center of the Web3 revolution").

burden on the Coral Defendants is minimal.  In conclusion, the SAC adequately

establishes that this Court has personal jurisdiction over the Coral Defendants.

## II.   Plaintiffs Adequately Alleged a Claim for Unjust Enrichment

Defendants next argue that Plaintiffs' unjust enrichment claim should be

dismissed as to the Coral Defendants because the SAC fails to allege that the

Plaintiffs conferred a direct benefit on the Coral Defendants.  (ECF No. 112 at 20-

23.)  This argument should similarly be rejected.

A claim for unjust enrichment is "to prevent the wrongful retention of a

benefit, or the retention of money or property of another, in violation of good

conscience and fundamental principles of justice or equity."  *Marrache v. Bacardi*

*U.S.A., Inc.*, 17 F.4th 1084, 1101 (11th Cir. 2021).  The elements of an unjust

enrichment claim are,

> "a benefit conferred upon a defendant by the plaintiff, the defendant's
> appreciation of the benefit, and the defendant's acceptance and retention of
> the benefit under circumstances that make it inequitable for him to retain it
> without paying the value thereof."

*Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1129 (11th Cir. 2019) (quoting *Fla. Power*

*Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

As this Court has noted, "[i]f a plaintiff alleges all these elements in its

complaint, then it may be inappropriate to dismiss an unjust enrichment claim on

a motion to dismiss because there is a question of fact as to whether the defendant received a direct benefit." *Skytruck Co., LLC v. Sikorsky Aircraft Corp.*, No. 209CV267FTM36SPC, 2011 WL 13137383, at *6 (M.D. Fla. Mar. 16, 2011) (citing *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009)).  Phrased differently, the Coral Defendants' challenges as to the sufficiency and receipt of any direct benefit from Plaintiffs are questions of fact that cannot be resolved on a motion to dismiss.  *See also Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009) ("Although the term 'benefit' has not been specifically defined by Florida courts, if Plaintiffs have alleged that they conferred a benefit, whether a benefit was actually conferred is a factual question that cannot be resolved on a motion to dismiss.").

Moreover, as to the first element — whether a benefit was conferred upon a defendant by the plaintiff — Florida courts recognize that "[w]hen defendants act in concert to unjustly obtain benefits, each can be held to have been unjustly enriched by virtue of the benefit derived from the scheme, even if the benefit was not conferred on them directly."  *State Farm Mut. Auto. Ins. Co. v. Advantacare of Fla., LLC*, No. 619CV1837ORL41LRH, 2020 WL 2630226, at *9 (M.D. Fla. May 22, 2020) (quoting *State Farm Mut. Auto. Ins. Co. v. Brown*, No. 16-80793-CIV, 2017 WL

1291995, at *7 (S.D. Fla. Mar. 29, 2017)).  In addition, "[j]ust because the benefit

conferred by a plaintiff on a defendant did not pass directly from that plaintiff to

that defendant — but instead passed through a third party — does not preclude

an unjust-enrichment claim."  *State Farm Mut. Auto. Ins. Co.*, 2020 WL 2630226, at

*9 (citing *Solidda Grp., S.A. v. Sharp Elecs. Corp.*, 2014 WL 12513613, at *3 (S.D. Fla.

Mar. 6, 2014).  In sum, although whether a direct benefit was conferred is not an

appropriate issue to raise at the motion to dismiss stage, *see Sierra Equity Grp., Inc.*

650 F. Supp. 2d at 1229, Plaintiffs have adequately alleged both that a direct benefit

was conferred, and that the Coral Defendants were unjustly enriched.

Specifically, the SAC states that the Coral Defendants (along with co-

conspirators the Executive Defendants) were unjustly enriched when they

received a monetary benefit from the sale of LGBCoins to Plaintiffs and the class

members at inappropriately and artificially inflated prices.  ¶272; *see also Obermaier

v. Arnett*, No. 2:02CV111FTM29DNF, 2002 WL 31654535, at *2 (M.D. Fla. Nov. 20,

2002) (denying dismissal of the unjust enrichment and securities fraud claims and

finding that it would be "inequitable to permit defendants to benefit from the false

profits because the Receivership Entities did not earn any profits and the false

profits were in reality other investors' capital . . ."); *MacMorris v. Wyeth, Inc.*, No.

2:04CV595FTM–29DNF, 2005 WL 1528626, at *4 (M.D. Fla. June 27, 2005) (denying motion to dismiss claim for unjust enrichment under Florida law).  Plaintiffs provided a direct benefit to the Coral Defendants by providing enough trading volume and exit liquidity with their LGBCoin purchases to allow Defendants to sell their LGBCoin to Plaintiffs and Class members at inappropriately and artificially inflated prices.  Accordingly, Coral's unjust enrichment argument similarly fails.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court deny the Coral Defendant's Motion to Dismiss.

Dated: September 27, 2022          Respectfully submitted,

s/ *John T. Jasnoch*
John T. Jasnoch (admitted *pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: 619-233-4565
Fax: 619-236-0508
jjasnoch@scott-scott.com

Sean T. Masson (admitted *pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: 212-223-6444

Fax: 212-223-6334
smasson@scott-scott.com

Aaron M. Zigler (admitted *pro hac vice*)
Robin Horton Silverman (FL Bar 0027934)
**ZIGLER LAW GROUP, LLC**
308 S. Jefferson Street | Suite 333
Chicago, IL 60661
Tel: 312-673-8427
aaron@ziglerlawgroup.com
robin.horton@ziglerlawgroup.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 27, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

s/ *John T. Jasnoch*
John T. Jasnoch