# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ERIC DE FORD, SANDRA BADER and SHAWN R. KEY,**

        **Plaintiffs,**

**v.**                                     **Case No: 6:22-cv-652-PGB-DCI**

**JAMES KOUTOULAS, NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, LLC, LETSGOBRANDON.COM FOUNDATION, LGBCOIN, LTD and PATRICK BRIAN HORSMAN,**

        **Defendants.**

_____/

## ORDER

This cause comes before the Court on the following:

1.    Defendant National Association for Stock Car Auto Racing, LLC's ("**Defendant NASCAR**") Motion to Dismiss (Doc. 272 (the "**NASCAR Motion**")) and Plaintiffs Eric De Ford, Sandra Bader, and Shawn R. Key's ("**Plaintiffs**") response in opposition (Doc. 290);

2.    Defendant James Koutoulas's ("**Defendant Koutoulas**") Motion to Dismiss (Doc. 301 (the "**Koutoulas Motion**")) and Plaintiffs' response in opposition (Doc. 310);

3.    Defendants LGBCoin, LTD ("**Defendant LGBCoin**") and Letsgobrandon.com Foundation ("**Defendant Foundation**")

(collectively, the "**Defendant Entities**") Motion to Dismiss (Doc. 302 (the "**LGB Motion**")) and Plaintiffs' response (Doc. 309); and

4.   Defendant Patrick Brian Horsman's ("**Defendant Horsman**") Motion to Dismiss (Doc. 334 (the "**Horsman Motion**")) and Plaintiffs' response (Doc. 339);

5.   Plaintiffs' Motion for Judicial Notice (Doc. 337 (the "**Motion for Judicial Notice**")); and

6.   Plaintiffs' Motion for Leave to Conduct Limited Jurisdictional Discovery (Doc. 346 (the "**Motion for Leave to Conduct Jurisdictional Discovery**")), and Defendant Horsman's Response (Doc. 349).

Upon due consideration, the NASCAR Motion is granted, the Koutoulas Motion and LGB Motion are granted in part, and the Horsman Motion, Motion for Judicial Notice, and Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery are denied as moot.

## I.   BACKGROUND[1]

This putative class action stems from the creation, marketing, and sale of the LGBCoin, a cryptocurrency. (Doc. 245). The LGBCoin saga began on October 2, 2021, when a reporter incorrectly described attendees at a NASCAR race as chanting "Let's go Brandon!" in support of NASCAR driver Brandon Brown

---

[1]   This account of the facts comes from the Plaintiffs' Third Amended Complaint. (Doc. 245). The Court accepts the well-pled factual allegations therein as true when considering motions to dismiss. *See Williams v. Bd. of Regents*, 477 F.3d 1282, 1291 (11th Cir. 2007).

("**Brandon**"); in fact, they were chanting a profane pejorative to express displeasure with President Joe Biden. (*Id.* ¶¶ 1–3, 75). The reporter's mistake birthed a common understanding that the phrase "Let's Go Brandon!" (and its shorthand "LGB!") stood for a euphemistic way to express displeasure with the Biden administration: the phrase appeared on, for example, t-shirts, trucker hats, coffee mugs, wrist bands, bumper stickers, and as is relevant here, a cryptocurrency. (*Id.*).

### A.   Cryptocurrency Background

Cryptocurrency, or crypto for short, is a medium of exchange that uses digital cryptography to secure underlying transactions. (*Id.* ¶ 68). Cryptocurrencies use a decentralized system commonly called the blockchain to record these transactions and issue new digital currency units—i.e., crypto tokens. (*Id.* ¶¶ 68, 71). As of March 2022, there are at least thousands of cryptocurrencies in existence. (*Id.*).

Anyone can create a new cryptocurrency. (*Id.* ¶ 69). An internet search will provide you step-by-step instructions with videos for creating a new one. (*Id.*). Once created, the new cryptocurrency can be traded directly on the blockchain or on certain centralized cryptocurrency exchanges. (*Id.*).

Cryptocurrency traded directly on the blockchain is stored in crypto wallets, which are online software used to store the private crypto keys to the owner's crypto assets. (*Id.* ¶ 70). Crypto wallets have unique identifiers called Wallet IDs. (*Id.*). There is no limit on the number of crypto wallets a person can control. (*Id.*).

For example, the Ethereum blockchain source code allows for the creation of cryptocurrencies that can be traded, spent, or otherwise transacted with. (*Id.* ¶ 71). LGBCoin was primarily traded against Ether, the native cryptocurrency of the Ethereum blockchain network used on various decentralized crypto exchanges— where transactions are completed wallet to wallet on the blockchain, not off-chain. (*Id.* ¶¶ 74, 384).

Transactions of cryptocurrencies from wallet to wallet are recorded on the blockchain's distributed public ledger, which is maintained as a database across multiple different computers. (*Id.* ¶¶ 71–72). The amount of cryptocurrency transacted, the sender's wallet address, the recipient's wallet address, the date, and the time of the transfer between wallets can be viewed by various blockchain websites. (*Id.*). Only the Wallet ID, as opposed to the identity of the owner of a particular wallet, is publicly available when users transact wallet to wallet. (*Id.*). The owner or user of a particular wallet may come into public view, however, when he or she transacts off the blockchain with a non-Wallet for various non-blockchain assets (goods, services, non-crypto currency, etc.). (*Id.*). This off-chain transaction sometimes reveals the identity of a Wallet ID owner, or at least provides data points from which viewers of the public blockchain can potentially deduce someone's identity. (*See id.*). For example, sometimes a user's IP address comes into view during off-chain transactions. (*Id.*).

The Ethereum blockchain charges "Gas Fees," which are fees paid in Ether on the Ethereum network and charged to wallets transacting on the Ethereum

4

blockchain to compensate for the computing power and energy expended across the decentralized computer network. (*Id.* ¶ 94 n.12). This network maintains the distributed ledger to both process these transactions and to validate them, so they are then publicly viewable on the Ethereum blockchain. (*Id.* ¶¶ 71–72).

### B.   The Creation of LGBCoin

The LGBCoin cryptocurrency began when its founders, hoping to build on the enthusiasm for the LGB phrase, minted 330 trillion LGBCoins using the Ethereum blockchain source code on October 28, 2021. (*Id.* ¶¶ 75–94). Some of this background discussion occurred on a Telegram chat. (*Id.* ¶¶ 75–94, 119–20). At least Defendant Koutoulas and Defendant Horsman are allegedly founders or closely connected to the founding of the Defendant Entities, which are allegedly responsible for the LGBCoin. (*Id.* ¶¶ 75–93). Both of these individual Defendants at one point held LGBCoin in a wallet they owned, exercised control over the Defendant Entities, and directed or authorized the sale or solicitations of LGBCoin to the public. (*Id.* ¶¶ 23–35).

After being minted originally on October 28, 2021, the 330 trillion LGBCoins were dispersed to four deployer Wallet IDs controlled by founders of the LGBCoin. (*Id.* ¶¶ 94–109). None of these four wallets were locked smart contract wallets—which if in place, would have ensured that for a period of time during the crypto currency's initial sale to the public, insiders could not immediately sell their tokens acquired at low costs to the public when trading volume increases. (*Id.* ¶ 96).

Starting on or around October 29, 2021, the four deployer wallets started to receive gas fee transfers to facilitate the public transfer and sale of LGBCoin upon public launch. (*Id.* ¶¶ 103–10). In exchange, LGBCoins flowed to various wallets, some of which were controlled by Defendants Horsman and Koutoulas. (*Id.*).

On November 1, 2021, Koutoulas received 1 trillion LGBCoins at a wallet which he controlled (the "**Koutoulas Wallet**"). (*Id.* ¶ 109). That day, a pass-through hub wallet was set up to facilitate the public sale of LGBCoins. (*Id.* ¶¶ 109–10). Defendant Koutoulas sent several thousand dollars of gas fees to one of the deployer or hub wallets. (*Id.*). On November 3, 2021, Defendant Horsman received 13.2 trillion LGBCoins at wallets he owned or controlled. (*Id.* ¶ 114). Another 20 billion LGBCoins were again transferred to a Horsman-controlled wallet. (*Id.* ¶ 116).

On November 2, 2021, the Executive Defendants offered LGBCoin for sale to the public with a transaction volume of $100 million and an opening price of $0.000000034. (*Id.* ¶ 111).

## C.   LGBCoin After Launch

Upon launch and throughout the relevant time period, the Defendant Entities, Defendant Koutoulas, and Defendant Horsman launched and promoted LGBCoin through various mediums, including social media, various websites, and in-person events. (*Id.* ¶¶ 118–61). This included various communications to the public that connected LGBCoins to Brandon in his capacity as a NASCAR driver, although this partnership never came to fruition. (*Id.*). Put simply, Plaintiffs allege

that this promotional activity—detailed more specifically below—had an additional financial purpose despite LGBCoin's express admonitions that LGBCoin was just a collectible: to parlay enthusiasm for stockcar racing and a political ethos into ever-increasing demand through the marketing of LGBCoin so that the relevant Defendants could benefit at the expense of those purchasing the LGBCoin at inflated prices. (*See id.* ¶¶ 118–214).

1.    *The LGBCoin Rise*

After launch, Defendant LGBCoin and at least Defendant Koutoulas and Defendant Horsman repeatedly promoted LGBCoin by connecting it to Brandon, Brandonbilt Motorsports, and Defendant NASCAR[2] on social media, national media, and in-person. (*Id.* ¶¶ 118–57). In addition, Defendant Koutoulas promoted LGBCoin in conservative-leaning media or social media by connecting it to or discussing it with prominent conservative politicians or political commentators. (*Id.* ¶¶ 158–214). Some of these politicians and commentators publicly supported LGBCoin on social media as well, including, for example, David J. Harris, Candace Owens, and former Representative Madison Cawthorn. (*Id.*). These promotions included references to LGBCoin's valuations as an asset. (*Id.*). LGBCoin valuations and trading volume demonstrably rose following some of these promotions. (*Id.* ¶¶ 212, 231–32).

---

[2]    Defendant NASCAR is a Florida resident with its principal place of business in Florida. (*Id.* ¶ 37).

Amid these public promotions, on November 11, 2021, the Defendant Entities posted the following message to social media:

> Hi everyone want to give a few project updates – we have about 60 people working on it already on our 10th day in existence, including some serious crypto OGs. We are working on implementing a smart contract vesting and locking mechanism to reduce peoples' concerns regarding the genesis wallets. We are also working on decentralizing those tokens and you'll see some movements of the genesis tokens in preparing them for the smart wallet locks and a major national sponsorship deal. Also, we have several major national media partnerships in the works as well as 10 influencers engaged. Again, please remember this project is a digital collectible and a digital way to express your support for the Let's Go Brandon movement, so please spend only what your budget allows (for some that's a t shirt, for others maybe it's a plane that says LGB on the tail), but do rest assured there's a ton of experienced, honest, and talented people working around the clock to make this the best damn collectible out there with goals of showing America how much we love her.

(*Id.* ¶ 141).

Various Defendants continued to post social media teasers in November and December of 2021 about an impending sponsorship, some of which pictured race cars and/or Brandon. (*Id.* ¶¶ 118–43). On December 23, 2021, former Defendant Mascioli[3] posted a grayed picture of Brandon's NASCAR car with the caption: "Pumped for the 2022 NASCAR Xfinity season. What will be the new paint scheme for the season on [Brandon and Brandonbilt Motorsports'] car? You'll know soon enough." (*Id.* ¶ 147). Some conservative commentators and politicians also expressly teased an upcoming announcement around this time. (*Id.* ¶¶ 158–214).

---

[3] Defendant Mascioli was voluntarily dismissed without prejudice from the case. (Docs. 193, 194).

While discussing LGBCoin with some of these commentators, Defendant Koutoulas touted the cryptocurrency's massive growth as he stated: "the [LGBCoin's] five weeks old, we've been trading around $340 million in market cap" around December 14, 2021. (*Id.* ¶¶ 164–65). One other promoter similarly said it had gone from "$0 to $330 million" on December 28, 2021. (*Id.*). Moreover, Representative Madison Cawthorn posted "Tomorrow we go to the Moon!" on one of Defendant Koutoulas's social media pictures, which Plaintiffs allege indicates that Representative Cawthorn had insider information so he could sell into the rising demand before bad news would soon strike. (*Id.* ¶ 203). Plaintiffs further allege that the Defendant Entities and/or the Individual Defendants gave compensation to some of these public figures in exchange for its promotion. (*Id.* ¶¶ 158–214).

On December 29, 2021, Defendants Brandon and Brandonbilt Motorsports posted a teaser about an impending announcement the following day. (*Id.* ¶¶ 149–50). The news was posted the next day to Defendant LGBCoin, Brandon, Defendant Koutoulas, and Brandonbilt Motorsports' social media accounts that LGBCoin would be Brandon's sponsor in the upcoming NASCAR season; this announcement included pictures of Brandon's car with the LGBCoin logo. (*Id.* ¶¶ 149–58). Defendant Koutoulas informed the media in an article published the next day on December 31, 2021, that he and the Defendant Entities had "put together proposed car designs a month or so ago before any of this happened because we

thought [Brandon] was obviously the best guy to naturally do a national sponsorship with. So we had it ready to go." (*Id.* ¶ 156).

In the 24 hours leading up to Brandonbilt Motorsports, Brandon, and LGBCoin's sponsorship announcement and the subsequent twenty-four hours, the value of a single LGBCoin increased 64%—from $0.00000098 on December 29, 2021, to $0.000001646 the morning of December 31, 2021. (*Id.* ¶ 157). On January 1, 2022, LGBCoin reached a maximum price of $0.000001734, which represents a 510% increase from its initial price of $0.00000034. (*Id.* ¶ 232). There were also 5,281 unique account holders of LGBCoin the day before the sponsorship announcement and 10,257 unique account holders of LGBCoin by January 4, 2022. (*Id.*). At its height, LGBCoin reached a market value of more than $570 million with a liquidity pool of $6.5 million. (*Id.*).

2.    *The LGBCoin Fall*

On January 4, 2022, Defendant NASCAR announced that the sponsorship was not approved, and by the end of that day, LGBCoin had fallen 63% to a low of $.0000005992. (*Id.* ¶ 308). Prior to this point, various discussions had been held with Defendant NASCAR as to the Defendant Entities' sponsorship of Brandon and Brandonbilt Motorsports. (*Id.* ¶¶ 215–25). Specifically, Defendant NASCAR, through one of its agents, at least once stated in a December 26, 2021 email that "the sponsors are approved." (*Id.*). Plaintiffs allege Defendant NASCAR negligently misrepresented that it would approve the sponsorship to the detriment of Plaintiffs

and that Defendant NASCAR should have reasonably expected Plaintiffs to rely on this statement. (*Id.* ¶¶ 420–47).

The promotion of LGBCoin—both before and after Defendant NASCAR's announcement—allegedly provided sufficient LGBCoin trading volume for Brandon, Defendant Koutoulas, and Defendant Horsman to sell their LGBCoins at a significant profit. (*Id.* ¶¶ 233–94). Defendant Koutoulas allegedly made gains of about $1.6 million on sales from the wallets, which he owned or controlled between November 2021 to January 2022. (*Id.* ¶¶ 233–42). Defendant Horsman allegedly made gains of about $1.14 million on sales from the wallets, which he owned or controlled between November 2021 to January 2022. (*Id.*). These sales by the relevant Defendants were allegedly followed by low daily trading volume, and the low price caused LGBCoin to become functionally worthless. (*Id.* ¶ 318). Indeed, on January 28, 2022, the individuals controlling the Defendant Entities took a snapshot of LGBCoin and then drained its remaining liquidity as part of a plan to remint and relaunch the LGBCoin into a second cryptocurrency playing off the "LGB!" phenomena; this caused both the price and transaction volume of LGBCoin to plummet to near $0 by January 30, 2022. (*Id.* ¶ 331). LGBCoin relaunched in late February of 2022, but Plaintiffs would completely lose the value of their initial investment. (*Id.* ¶¶ 344–47).

During this time, Plaintiff Eric De Ford, a resident and citizen of Missouri, purchased LGBCoins in several transactions dating December 31, 2021, January 1, 2022, January 11, 2022, January 26, 2022, and January 28, 2022. (*Id.* ¶ 19).

Plaintiff Sandra Bader, a resident and citizen of Idaho, purchased LGBCoins on January 1, 2022. (*Id.* ¶ 20). Plaintiff Shaw R. Key, a resident and citizen of Virginia, purchased LGBCoins on December 30, 2021. (*Id.* ¶ 21). All Plaintiffs allege they suffered investment losses as a result of Defendants' conduct. (*Id.* ¶¶ 19–21).

### D. Procedural Posture

Plaintiffs filed this putative class action to recover their and the potential class's losses. (Doc. 1). After amending the Complaint once as a matter of course (Doc. 21) and the Court dismissing the Amended Complaint as an impermissible shotgun pleading (Doc. 63), Plaintiffs filed a Second Amended Complaint. (Doc. 74). After several motions to dismiss, the Court dismissed various claims therein, some with leave to replead. (Doc. 229). Plaintiffs replead the instant Third Amended Complaint which contains nine counts against the various Defendants. (Doc. 245).

Count I alleges a Section 12(a)(1) violation of the Securities Act against Defendant Koutoulas. (*Id.* ¶¶ 369–81). Count II alleges a violation of the Florida Securities and Investment Protection Act against Defendant Koutoulas, Defendant Horsman, and the Defendant Entities. (*Id.* ¶¶ 382–94). Count III alleges a civil conspiracy to violate federal and state securities laws against all Defendants except Defendant NASCAR. (*Id.* ¶¶ 395–403). Count IV alleges a Florida common law claim of unjust enrichment against Defendant Koutoulas. (*Id.* ¶¶ 404–07). Count V alleges the same against Defendant Horsman. (*Id.* ¶¶ 408–11). Count VI alleges the same against Defendant Foundation. (*Id.* ¶¶ 412–15). Count VII alleges the

same against Defendant LGBCoin. (*Id.* ¶¶ 416–19). Count VIII alleges a claim of negligent misrepresentation against Defendant NASCAR. (*Id.* ¶¶ 420–35). Count IX alleges a claim of promissory estoppel under Florida common law against Defendant NASCAR. (*Id.* ¶¶ 436–47).

The following Defendants now seek dismissal of various claims against them: Defendant NASCAR seeks dismissal of Counts VIII and IX both for failure to state a claim and for lack of subject matter jurisdiction (Doc. 272); Defendant Koutoulas seeks dismissal of Counts I, II, III, and IV for failure to state a claim (Doc. 301);[4] Defendant Entities seek dismissal of Counts II, III, VI, and VII for failure to state a claim (Doc. 302); and Defendant Horsman seeks dismissal of Counts II, III, and V for lack of personal jurisdiction and for failure to state a claim (Doc. 334). After responsive briefing (Docs. 290, 309, 310, 339), these matters are now ripe for review.

The Court also addresses Plaintiffs' Motion for Judicial Notice (Doc. 337) and Motion for Leave to Conduct Limited Jurisdictional Discovery (Doc. 346).

## II.   STANDARDS OF REVIEW

### A.   Subject Matter Jurisdiction

Article III, Section 2 of the United States Constitution limits federal courts' jurisdiction to actual cases and controversies. Standing is part of this limitation, as

---

[4]   Plaintiffs first attempt to parry away this assault on their claims by pointing out that Defendant Koutoulas failed to raise its Rule 12(b) defenses with its Motion to strike brought under Rule 12(f). (Doc. 310, p. 3). Assuming without deciding this should have been done, the Court would nevertheless consider Defendant Koutoulas's arguments as they could still be brought through a motion for judgment on the pleadings.

a "threshold jurisdictional question" that must be resolved before a court can turn to a claim's merits. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). Courts determine standing at the time of filing. *Id.* at 976.

Under Rule 12(b)(1), a party may challenge subject matter jurisdiction on facial or factual grounds. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). For facial challenges as here, the court looks to the face of the complaint and determines whether the plaintiff sufficiently alleges standing. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys. Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008). In doing so, the court is limited to the complaint's allegations and exhibits, which the court must accept as true. *Id.* at 1232. Factual challenges, in contrast, allow a court "to consider extrinsic evidence such as deposition testimony and affidavits." *Carmichael*, 572 F.3d at 1279.

## B.   Failure to State a Claim

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Thus, to survive a motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court must view the complaint in the light most

favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994) (per curiam). However, though a complaint need not contain detailed factual allegations, pleading mere legal conclusions, or "a formulaic recitation of the elements of a cause of action," is not enough to satisfy the plausibility standard. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 679; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

In sum, the court must: reject conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; accept well-pled factual allegations as true; and view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 678–79.

### C.   Pleading Claims of Fraud With Particularity

Claims of fraud in federal court are subject to the Federal Rules of Civil Procedure's heightened pleading standard under Rule 9(b) which requires that plaintiffs plead these claims "with particularity;" this means "identifying the who, what, when, where, and how of the fraud alleged." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022) (citing *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008)). "Malice intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally." FED. R.

CIV. P. 9(b). This heightened pleading standard ensures a dual purpose: first, it "alert[s] defendants to the precise misconduct with which they are charged" and second, it "protect[s] defendants against spurious charges of immoral and fraudulent behavior." *Id.* (quoting *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

## III.   DISCUSSION[5]

The Court preliminarily addresses the impropriety of Defendant Horsman and Defendant Foundation as newly added parties in the Third Amended Complaint. The Court next addresses the sufficiency of the securities law violations and the related civil conspiracy claim. Following this, the Court inspects the four unjust enrichment claims. Finally, the Court explains why the claims against Defendant NASCAR both fail.

### A.   Defendant Horsman & Defendant Foundation

In the Order addressing the pleadings regarding the Second Amended Complaint (Doc. 74), the Court granted Plaintiffs leave to file a Third Amended Complaint "consistent with the directives of [the] Order and Rule 11." (Doc. 229, pp. 42–43). Therein, the Court granted Plaintiffs leave to replead their claims against specific Defendants, which did not include Defendant Horsman or

---

[5] Plaintiffs moved for this Court to take judicial notice of (1) several docket entries related to Florida state court cases involving Defendant Horsman, and (2) documents from the Florida Division of Corporations and the Illinois Secretary of State. (Doc. 337). To the extent Plaintiffs request judicial notice of such information in relation to claims and/or parties that this Order herein dismisses, the Motion for Judicial Notice is denied as moot.

Defendant Foundation. (Doc. 229, pp. 41–43). The Court did not grant Plaintiffs leave to add new parties. (*Id.*).

Moreover, the Case Management and Scheduling Order provides a deadline for motions to add parties or to amend pleadings, which was originally set for January 27, 2023. (Doc. 85, p. 2). Upon Plaintiffs' requests, the Court granted two (2) extensions of time for this deadline. (Docs. 180, 181, 219, 226). Ultimately, the parties had until April 27, 2023, to file motions to add parties. (Doc. 226). Yet, Plaintiffs did not file a motion to add Defendant Horsman or Defendant Foundation. Instead, without leave of court, Plaintiffs filed the Third Amended Complaint alleging counts against Defendant Horsman and Defendant Foundation. (Doc. 245).

These additions do not comport with the Court's Order and consequently, Defendant Horsman and Defendant Foundation are due to be stricken as parties. (Doc. 229); *see Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (noting that filing a replead complaint that does not comply with a court's order gives courts discretion to impose a sanction including striking the same).[6] As such, all respective counts against Defendant Horsman and Defendant Foundation are dismissed without prejudice.[7]

---

[6] While the Court undoubtedly has authority to strike the entire pleading, the Court finds that doing so would be too drastic a remedy. *Vibe Micro*, 878 F.3d at 1295.

[7] Considering the Court's decision with regard to Defendant Horsman, Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery as to Defendant Horsman (Doc. 346) is denied as moot. *See supra* Section III.A.

**B.      Securities Law Violations**

In turn, the Court addresses the sufficiency of Plaintiffs' federal securities, Florida securities, and civil conspiracy claims.

1.      *Count I: Federal Securities Violation Under § 12(a)(1)*

Section 12(a)(1) of the Securities Act of 1933 provides a private right of action against any person who offers or sells a security in violation of § 5 of the Securities Act. 15 U.S.C. § 77l(a)(1). The following elements must be established to prevail on a § 5 claim: "(1) absence of an effective registration statement covering the securities in question; (2) the offer or sale of the securities; and (3) the use of the mails, or any means or instruments of transportation or communication in interstate commerce in connection with the sale or offer." *Hodges v. Harrison*, 372 F. Supp. 3d 1342, 1347–48 (S.D. Fla. 2019). A threshold issue in federal securities law is whether the offering in question qualifies as a "security" under § 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1). To that end, Plaintiffs allege LGBCoins are "investment contracts" under § 77b(a)(1). (Doc. 245, ¶ 372). Defendant Koutoulas yet another time attacks this count by asserting that LGBCoin is not a security.[8][9]

---

[8]     Defendant Koutoulas also argues that Plaintiffs must pierce the corporate veil to proceed individually against him. (Doc. 301, p. 3). Based as it is on extrinsic considerations beyond the four corners of the Third Amended Complaint, while nothing raises an inference therein that this would be necessary, the Court disagrees. Nonetheless, Defendant Koutoulas is welcome to bring this defense later at a different procedural posture if he can marshal record evidence to warrant such a conclusion. The Court further rejects Defendant Koutoulas assertions that the claims are inherently contradictory or that they amount to harassment. (Doc. 20, pp. 6–9).

[9]     Additionally, Defendant Koutoulas again raises the argument that the Court should dismiss Count I because of Plaintiffs' initial failure to comply with the procedural requirements of the

(Doc. 301, pp. 10–14). The Court previously determined just the opposite at this procedural stage and finds no occasion to reconsider its prior ruling as the relevant allegations are substantially similar to those pled previously. (Doc. 229, pp. 34–37). As such, the law of the case applies. *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987) ("The law of the case doctrine, self-imposed by the courts, operates to create efficiency, finality and obedience within the judicial system."); *Johnson v. Specialized Loan Servicing, LLC*, No. 3:16–cv–178, 2017 WL 4877450, at *2 (M.D. Fla. Oct. 24, 2017) ("The Court already rejected SLS's argument in this regard in its prior Order on the first motion to dismiss; therefore, the Court rejects SLS's argument for the same reasons here."). Consequently, Plaintiffs' claim against Defendant Koutoulas under federal securities law again survives.

### 2. *Count II: Florida Securities Fraud*

Plaintiffs further alleges a violation of the Florida Securities and Investor Protection Act ("**FSIPA**"), FLA. STAT. § 517.211, for the sale of unregistered securities. (Doc. 245, ¶¶ 382–94). Defendant Koutoulas, Defendant Horsman, and the Defendant Entities all move to dismiss this claim. (Docs. 301, 302, 334). Before addressing issues that are individual to each Defendant, the Court addresses common issues.

---

Private Securities Litigation Reform Act of 1995. (Doc. 301, pp. 4–7). For the same reasons already stated, the Court again rejects these arguments. (Docs. 284, 300).

With some exceptions that do not arguably apply here, FLA. STAT. § 517.07 "requires every security sold in Florida to be registered with the [Florida] Office of Financial Regulation." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323 (S.D. Fla. 2018) (quoting *Musolino v. Yeshiva Machzikei Hadas Belz*, 137 F. App'x 321, 323 (11th Cir. 2005)). "Failure to register [a security] results in strict liability for the recission of the transactions." *Musolino*, 137 F. App'x at 323.[10] "The definition of 'security' under the Florida statute is the same as that under federal law, so [the Court] look[s] to federal law" to determine whether an instrument is a security. *Honig*, 339 F. Supp. 3d at 1335 (quoting *Phillips v. Kaplus*, 764 F.2d 807, 814–15 n.8 (11th Cir. 1985)) (cleaned up). In short, Plaintiffs must demonstrate that 1) LGBCoins were securities; 2) LGBCoins were not registered with the appropriate Florida office; and 3) Defendants sold LGBCoins. *Hodges*, 372 F. Supp. 3d at 1350. Here, the Court has already determined that LGBCoin is plausibly a security under federal law based on substantially similar allegations. (*See* Doc. 229, pp. 34–37). Consequently, under Florida state law, LGBCoin is a security pursuant to FLA. STAT. § 517.07. Furthermore, Plaintiffs plausibly allege LGBCoins were not registered with the Florida Office of Financial Regulation. (Doc. 245, ¶ 388). Consequently, the Court turns to remaining issues individual to the relevant Defendants.

---

[10] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

### a. *Defendant Koutoulas*

Defendant Koutoulas raises no arguments that undercut the aforementioned conclusions and fails to proffer other arguments that speak to the plausibility of whether Plaintiffs' allegations state a claim under FLA. STAT. § 517.07. (Doc. 301, p. 13). Moreover, Plaintiffs plausibly allege Defendant Koutoulas sold these unregistered securities. (Doc. 245, ¶¶ 100–214, 233–42, 394). Count II as to Defendant Koutoulas thus survives.

### b. *Defendant LGBCoin*

Defendant LGBCoin argues that Plaintiffs fail to allege that it or anyone acting on its behalf ever sold securities. (Doc. 302, p. 7). The Court agrees. After a thorough review, the Court cannot find any instance where Plaintiffs allege in the Third Amended Complaint that Defendant LGBCoin or someone acting on its behalf (rather than in an individual capacity) ever sold LGBCoins—although there was an alleged donation of LGBCoins. (*See* Doc. 245). Consequently, Count II must be dismissed with prejudice as to Defendant LGBCoin.

### c. *Defendant Horsman & Defendant Foundation*

For the reasons discussed in Section III.A, the Court need not address the merits of such claims as to Defendant Horsman and Defendant Foundation.

### 3. *Count III: Civil Conspiracy*

To state a claim for civil conspiracy, a plaintiff must allege: 1) an agreement between two or more parties; 2) to achieve an illegal objective; 3) an overt act in furtherance of that illegal objective; and 4) resulting injury. *Tucci v. Smoothie King*

*Franchises, Inc.*, 215 F. Supp. 2d 1295, 1300 (M.D. Fla. 2002) (citing *Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 912 (11th Cir. 1998)); *Mazer*, 556 F.3d at 1271 (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)).

The Court previously found Plaintiffs' fraud based civil conspiracy claim against Defendant Koutoulas to not satisfy Rule 9(b)'s heightened pleading requirement as the allegations were "consistent with parallel conduct and accompanied only by general allegations of conspiracy." (Doc. 229, p.31). The Court stated, however, that "[b]ecause Plaintiffs may be able to remedy this deficiency, the Court will, however, give leave to replead." (*Id.* at p. 31). The Court further stated, as a condition for repleader, that Plaintiffs could only "do so consistent with directives of [that] Order." (*Id.* at pp. 42–43). Plaintiffs have now scrapped fraud as the basis for the alleged conspiracy and instead, attempt to proceed with the securities law violations as the basis. (Doc. 245, ¶¶ 395–403). This repleader does not comport with the Court's Order and consequently, Count III against Defendant Koutoulas, Defendant Horsman, and the Defendant Entities is due to be stricken and dismissed without leave to replead. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (noting that filing a replead complaint that does not comply with a court's order gives courts discretion to impose a sanction including striking the same).[11]

---

[11]   Again, while the Court undoubtedly has authority to strike the entire pleading, the Court finds that doing so would be too drastic a remedy. *Vibe Micro*, 878 F.3d at 1295.

### C.     Unjust Enrichment Claims

Defendant Koutoulas, Defendant Horsman, and the Defendant Entities move to dismiss the unjust enrichment claims against them. (Docs. 301, 302, 334).

"[A] claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1129 (11th Cir. 2019) (quoting *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*, 43 So. 3d 877, 880 (Fla. 1st DCA 2010)). Under Florida law, a plaintiff stating a claim for unjust enrichment must allege (1) the plaintiff has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained that benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof. *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citing *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

#### 1.     *Defendant Koutoulas: Count IV*

Defendant Koutoulas again challenges the sufficiency of Count IV against him, but the Court previously allowed this claim to survive. (Doc. 229, pp. 31–32). For the same reasons stated in the Court's previous Order based on substantially similar allegations, this claim again survives. (*See id.*).

#### 2.     *Defendant Horsman & Defendant Foundation: Counts V & VI*

For the reasons discussed in Section III.A, the Court need not address the merits of such claims.

### 3. *Defendant LGBCoin: Count VII*

Defendant LGBCoin asserts that it never owned a cryptocurrency wallet and Plaintiffs did not allege any specific sales by Defendant LGBCoin, and thus, it would be "impossible for it to have been unjustly enriched." (Doc. 302, pp. 4–5). For the same reasons stated in the Court's previous Order regarding Defendant Koutoulas's unjust enrichment count, which is based on substantially similar allegations, this claim survives. (Doc. 229, pp. 31–32).

### D.    **Defendant NASCAR**

### 1. *Subject Matter Jurisdiction*

Upon repleader, Plaintiffs dropped their fraud claims against Defendant NASCAR and now proceed on their negligent misrepresentation and promissory estoppel claims. (Doc. 245). Defendant NASCAR asserts Plaintiffs have no standing to bring their promissory estoppel claim by arguing their injuries are not redressable. (Doc. 272, p. 15). The Court disagrees.

To demonstrate standing, a plaintiff must show that 1) they actually suffered or will imminently suffer an injury-in-fact that is concrete and particularized, 2) that the injury is fairly traceable to the defendant's conduct, and 3) that the injury is likely, not merely speculatively, to be redressed by a favorable judgment. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1253 (11th Cir. 2010); *Kelly v. Harris*, 331 F.3d 817 (11th Cir. 2003) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Defendant NASCAR focuses on what effect, if any, the Court enforcing Defendant NASCAR's alleged promise to allow the LGB sponsorship would have that could flow to Plaintiffs. (Doc. 272, p. 15). This narrow focus on the promise itself is misplaced. Instead, Plaintiffs' alleged harms will be redressed assuming a favorable judgment through damages that could provide recompense for Plaintiffs' alleged loss. At the very least, Plaintiffs have standing to assert this claim.

Nonetheless, for the following reasons, the Court agrees with Defendant NASCAR that both the negligent misrepresentation and promissory estoppel claims against it should be dismissed. (Doc. 272).

### 2.   *Negligent Misrepresentation*

"Rule 9(b)'s heightened pleading standard applies to negligent misrepresentation claims asserted under Florida law because such claims sound in fraud." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014); *cf. Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007) (noting under Rule 9(b), a party alleging fraud must "state with particularly the circumstances constituting fraud" and a complaint must contain facts which establish (1) the precise statements, documents, or misrepresentations made, (2) the time and place of, and person responsible for the statement, (3) the content and manner in which the statements misled the plaintiff, and (4) what the Defendant gained by the alleged fraud). Such claims require that:

> (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the

> representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation.

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 607 F.3d 742, 747 (11th Cir. 2010) (quoting *Baggett v. Electricians Local 915 Credit Union*, 620 So. 2d 784, 786 (Fla. 2d DCA 1993)).

Among other things, Defendant NASCAR calls the Court's attention to the fourth element: justifiable reliance. (Doc. 272, pp. 9–11). The Court finds that third parties such as Plaintiffs were not justified in relying upon the misrepresentation (assuming one was made). While firsthand knowledge is not necessary, the attenuated game of telephone through which Plaintiffs claim they are entitled to justifiably rely upon is too diffuse. Here, Plaintiffs make much of the communications Defendant NASCAR employee Dale Howell had with representatives of the Defendant Entities and Brandonbilt Motorsports, who stated that the sponsorship was approved. (Doc. 245, ¶¶ 226, 298, 301). Defendant NASCAR, however, never communicated this approval itself to the public. (*See id.*). Instead, Plaintiffs emphasize that "NASCAR did not deny it had given its approval or publicly issue a withdrawal of that approval until seven days later on January 5, 2023." (*Id.* ¶ 230). At the same time, Plaintiffs acknowledge in the Third Amended Complaint that this approval was not iron-clad as reporters checked with Defendant NASCAR itself to confirm. (*Id.* ¶ 296). Full confirmation was not given. (*Id.* ¶ 297). Instead, internal communications show the topic was not settled at Defendant NASCAR, and this was known to the public at the very least by

26

December 30, 2021. (*Id.* ¶ 301). Indeed, Defendant NASCAR took actions to correct this public misperception, which led a representative for Brandonbilt Motorsports to request that Defendant NASCAR "correct the misleading narrative that [Defendant] *NASCAR had leaked to the media*." (*Id.* ¶ 302).

In short, Plaintiffs' conclusory allegations to the contrary, it was not reasonable nor justifiable for third parties such as Plaintiffs to rely on intermediaries' representations that Defendant NASCAR had approved the sponsorship when Defendant NASCAR was working to at least quell this misperception. (*Id.* ¶¶ 301–03). Defendant NASCAR finally corrected the public record days later. (*Id.* ¶ 230). This makes the idea that Defendant NASCAR sought tangible gain from its employee's misrepresentation through "exposure and marketing advantages" flatly contradictory—if anything, Defendant NASCAR harmed its reputation through this equivocal episode. (*Id.* ¶¶ 216–17); *Ambrosia*, 482 F.3d at 1316–17. Contradictory allegations are not plausible. Plaintiffs' negligent misrepresentation claim thus fails.

### 3.   *Promissory Estoppel*

To establish liability for promissory estoppel under Florida law requires "(1) a promise made by the promisor, (2) 'which the promisor should reasonably expect to induce action or forbearance on the part of the promisee' (or third-person), (3) that in fact induced such action or forbearance, and that (4) 'injustice can be avoided only by enforcement of the promise.'" *White Holding Co., LLC v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, 947 (11th Cir. 2011) (quoting *W.R.*

*Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989)); *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 302 (Fla. 1st DCA 1999). Similar to Plaintiffs' negligent misrepresentation claim, the Court agrees that, even when viewed in the light most favorable to Plaintiffs, Plaintiffs fail to plausibly establish it was reasonable for Defendant NASCAR to expect the Plaintiffs to rely on any statements it or its agents may have made. For one, Defendant NASCAR never made any public pronouncements in the Third Amended Complaint that reasonably would have created such an expectation as the statements allegedly made were all part of the internal process between Defendant NASCAR, the individuals associated with LGBCoin, and Brandonbilt Motorsports. (*See* Doc. 245). Normally, it is not reasonable for the general public, including Plaintiffs, to rely on statements made by a promisee *who is simply passing on their interpretations of the alleged promisor's statements*. Perhaps the promisees have such a claim for promissory estoppel, but third parties, such as Plaintiffs, do not, unless there is some other more reasonable basis to support the claim. Count IX is due for dismissal with prejudice.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.      The NASCAR Motion (Doc. 272) is **GRANTED;**

    a.      Counts VIII and IX are **DISMISSED WITH PREJUDICE**;

2.      The Koutoulas Motion (Doc. 301) is **GRANTED IN PART AND DENIED IN PART**;

    a.      Count III is **DISMISSED WITH PREJUDICE**;

    b.      The Koutoulas Motion is otherwise **DENIED**;

3.      The LGB Motion (Doc. 302) is **GRANTED IN PART AND DENIED IN PART;**

    a.      Count II as to Defendant LGBCoin is **DISMISSED WITH PREJUDICE;**

    b.      Count II as to Defendant Foundation is **DISMISSED WITHOUT PREJUDICE;**

    c.      Count III is **DISMISSED WITH PREJUDICE**;

    d.      Count VI is **DISMISSED WITHOUT PREJUDICE**;

    e.      The LGB Motion is otherwise **DENIED;**

4.      The Horsman Motion (Doc. 334) is **DENIED AS MOOT**;

    a.      Counts II and V are **DISMISSED WITHOUT PREJUDICE**;

    b.      Count III is **DISMISSED WITH PREJUDICE**;

5.      Plaintiffs' Motion for Judicial Notice (Doc. 337) is **DENIED AS MOOT**;

6.      Plaintiffs' Motion for Leave to Conduct Limited Jurisdictional Discovery (Doc. 346) is **DENIED AS MOOT**; and

7.      The Clerk of Court is **DIRECTED** to terminate Defendants Patrick Horsman, Letsgobrandon.com Foundation, and National Association for Stock Car Auto Racing, LLC from the file.

**DONE AND ORDERED** in Orlando, Florida on March 29, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties