**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ERIC DE FORD, et al.,
    Plaintiffs,

v.                          Case No. 6:22-cv-00652-PGB-DCI

JAMES KOUTOULAS, et al.,
    Defendants.

---

**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT BASED ON INTERVENING CHANGE IN INTERPRETIVE LEGAL STATEMENT**

---

## I. INTRODUCTION

Defendants James L. Koutoulas and LGBcoin, Ltd. respectfully move for renewed summary judgment pursuant to Federal Rule of Civil Procedure 56. There is no dispute as to whether LGBcoin is a meme coin. The Court also acknowledged LGBcoin is a "meme cryptocurrency" in its Order dated September 27, 2022 on Defendant's Motion for Sanctions (Dkt. 121, p. 1).

As a result of the Court's December 2, 2025 Order on Summary Judgement, the remaining ambiguity pertains to the third prong of *Howey.* (Dkt. 531). However, on March 17, 2026, the Securities and Exchange Commission and the Commodity Futures Trading Commission jointly issued Release Nos. 33-11412; 34-105020, titled *"Application of the Federal Securities Laws to Certain Types of Crypto*

*Assets and Certain Transactions Involving Crypto Assets*" (the "Joint Release"), available at https://www.sec.gov/files/rules/interp/2026/33-11412.pdf.

The Joint Release is not a staff statement. It is a formal interpretive release adopted by the Commissioners of both expert agencies and published in the Federal Register at 17 CFR Parts 231 and 241. It constitutes an official interpretation of existing federal securities law as applied to crypto assets—including, with precise applicability, the type of asset at issue in this case. The Joint Release classifies meme coins as "digital collectibles" that are "typically . . . acquired for artistic, entertainment, social, and cultural purposes, and their value is driven by supply and demand, rather than any essential managerial efforts of others." (Joint Release at 18). It establishes that "[a] digital collectible itself . . . is not a security because it does not have the economic characteristics of a security." (Id.). The Joint Release further provides that promotional activities—marketing, community engagement, social media advocacy—do not constitute the "undeniably significant" managerial efforts required under *Howey*'s third prong. This is consistent with Defendants' arguments throughout this entire case.

This Joint Release resolves the very ambiguity this Court identified in its summary judgment Order (Dkt. 531). The Court found a genuine dispute of material fact as to whether Defendants' promotional materials attracted Plaintiffs with an expectation of profits or motivated them to obtain LGBcoin as a meme coin for advocacy of conservative values. (Dkt. 531, pp. 26–27). The Court never even reached the second sub-inquiry—whether any expectation of profits derived from the "efforts of others." (Id. at 27). The Joint Release provides the expert

agency framework that, when afforded appropriate *Skidmore* deference, resolves both inquiries in Defendants' favor.

Moreover, the Joint Release provides the analytical foundation for the SEC's prior case-specific determination—after a multi-year investigation across two administrations, with full access to the discovery and record in this case—that LGBcoin cannot even support an allegation of being a security. (Dkt. 579; USCA11 Case: 24-12376, Dkt. 30). This Court previously declined to afford those findings any weight, characterizing the SEC's positions as "unconvincing" (Dkt. 531, p. 14) and the Staff Statement as having "no legal force or effect." (Id. at 15). The Joint Release demands reconsideration of that determination. It is a formal Commissioner-level interpretation to be published in the Federal Register—not a staff statement, not a no-action letter, and not a litigation settlement. Under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), this Court must evaluate the Joint Release based on "the thoroughness evident in its consideration, the validity of its reasoning, and, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. at 140. The Joint Release now provides the formal basis for that analysis and demands that it be conducted.

## II.  PROCEDURAL STANDARD FOR RENEWED SUMMARY JUDGMENT
### A.  Rule 54(b) Grants Plenary Authority to Reconsider Interlocutory Orders

This Court's summary judgment Order (Dkt. 531) is an interlocutory order, not a final judgment. Federal Rule of Civil Procedure 54(b) provides that any order

"that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Eleventh Circuit recently clarified that Rule 54(b)—not Rules 59(e) or 60(b)—"governs a district court's reconsideration of interlocutory orders," explaining that the standards of Rules 59(e) and 60(b) "do not apply here" because those rules "only come into play after a final, appealable judgment is entered." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1379 (11th Cir. 2024) (citing *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 & n.5 (11th Cir. 1993); *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000)).

The Eleventh Circuit has long recognized that district courts have "plenary power" over interlocutory orders, and that "this power to reconsider, revise, alter or amend the interlocutory order is not subject to the limitations of Rule 59." *Toole*, 235 F.3d at 1315 (quoting *Gallimore v. Mo. Pac. R.R. Co.*, 635 F.2d 1165, 1171–72 (5th Cir. 1981)); *see also Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559 (11th Cir. 1990) (recognizing that successive summary judgment motions are permissible, particularly when justified by good reason such as an expanded factual record or intervening changes in law). This Court itself exercised such discretion in this case when it entertained Plaintiffs' untimely Rule 56(f) cross-motion for summary judgment despite Plaintiffs' failure to file a timely dispositive motion or comply with Local Rule 3.01. (Dkt. 531, p. 6 n.2). The same plenary authority permits this

Court to consider a renewed motion predicated on intervening legal authority that did not exist when the original motions were briefed.

## B.    An Intervening Change in Controlling Law Authorizes Renewed Consideration

The law of the case doctrine provides that "an issue decided at one stage of a case is binding at later stages of the same case." *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997). The Eleventh Circuit recognizes three exceptions: "(1) the existence of new evidence; (2) an intervening change in controlling law that dictates a different result; or (3) where the prior decision is clearly erroneous and its implementation would cause manifest injustice." *United States v. Lovelace*, 842 F. App'x 439, 440 (11th Cir. 2021); *see also United States v. Anderson*, 772 F.3d 662, 668–69 (11th Cir. 2014) (to the same effect). The Joint Release constitutes precisely such an intervening change. It is a formal joint interpretation by both expert agencies directly addressing the central legal question in this case—whether a functionless meme coin, promoted through social media and community engagement, constitutes a security under the *Howey* test— issued after this Court's summary judgment Order.

## C.  This Motion Is Distinct from the Denied Motion for Reconsideration

To be clear, this is not a motion for reconsideration under Rules 59(e) or 60(b), although the relief requested by Defendants is also supported under 60(b)(6). Defendants' prior Motion for Reconsideration (Dkt. 535) was filed on December 24, 2025 and subsequently denied. That motion challenged the Court's

summary judgment Order based on arguments and authority available at the time of the original briefing. This motion is fundamentally different: it is predicated on a formal interpretive release issued on March 17, 2026—more than three months after the Court's Order and more than two months after the denied reconsideration—that constitutes a new and authoritative analysis by both expert federal agencies. The Joint Release did not exist when this Court ruled, when Defendant moved for reconsideration, or when that reconsideration was denied. Under Rule 54(b), this Court retains plenary authority to revisit its interlocutory Order in light of this intervening legal development.

The Joint Release constitutes precisely such an intervening change. It is a formal agency interpretation of existing law that directly addresses the central question in this case: whether a functionless meme coin, promoted through social media and community engagement, constitutes a security under the Howey test. The Joint Release was issued after this Court's summary judgment Order (Dkt. 531, filed December 2, 2025) and provides the authoritative legal framework this Court lacked when it identified a genuine dispute of material fact on Howey's third prong.

## III.  THE JOINT RELEASE IS QUALITATIVELY DIFFERENT FROM WHAT THIS COURT PREVIOUSLY CONSIDERED

This Court has twice declined to give weight to the SEC's position on LGBcoin. In its summary judgment Order, the Court dismissed the SEC Staff Statement on Meme Coins as having "no legal force or effect" (Dkt. 531, p. 15) and found Defendants' arguments about the SEC's Stipulated Order "unconvincing"

and "inappropriate." (Id. at 14–15). Those characterizations may have been defensible as to a staff statement. They are not defensible as to the Joint Release. Indeed, the Joint Release itself expressly states that "the views expressed by the Commission in this release supersede any prior statements by the Commission or its staff on these topics." (Joint Release at 18 n.62).

The Staff Statement was issued by the SEC's Division of Corporation Finance and expressly disclaimed any legal force. The Joint Release, by contrast, was adopted by the Commissioners of both the SEC and CFTC—the two federal agencies with statutory authority over securities and commodities, respectively. It was published in the Federal Register as a formal interpretive release spanning 68 pages of detailed legal analysis. It is the product of over thirteen months of work by the SEC's Crypto Task Force—established on January 21, 2025—which hosted a series of public roundtables (including one specifically titled "How We Got Here and How We Get Out – Defining Security Status"), received over 300 written submissions from issuers, investors, law firms, academics, and market participants, and held meetings with hundreds of members of the public. (Joint Release at 6). On January 29, 2026, SEC Chairman Paul S. Atkins and CFTC Chairman Michael S. Selig announced that the effort would proceed as a joint initiative between the two agencies under "Project Crypto" to harmonize federal oversight of crypto asset markets. (Id. at 7). It carries the institutional weight of both expert agencies' considered judgment on the application of existing law to the very category of digital asset at issue here.

The distinction is dispositive under *Skidmore*. The persuasive weight of an agency interpretation depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) (overruling *Chevron* but reaffirming *Skidmore* deference). A formal interpretive release published in the Federal Register, representing the considered judgment of both expert agencies, satisfies every factor *Skidmore* identifies. Additionally, since the SEC would have to have a process to register a meme coin for Plaintiff's unregistered securities counts to have any merit – which it does not – the official categorization of meme coins as commodities is even more persuasive.

## IV. THE JOINT RELEASE RESOLVES THE DISPUTED ISSUES AS A MATTER OF LAW

There is no dispute as to whether LGBcoin is a meme coin. Plaintiffs explicitly made judicial admissions that LGBcoin is not a security and the lead Plaintiff in the instant action admitted that Petitioner reasonably relied on NASCAR and was not at fault in the decline of LGBcoins' aggregate worth. See (Dkt. 1, ¶27), (Dkt. 74 at ¶¶ 85, 120, 215, 216). As previously referenced, the Court also acknowledged LGBcoin is a "meme cryptocurrency" in its Order dated September 27, 2022 (Dkt. 121, p. 1).

### A. The Joint Release Resolves the Expectation of Profits Inquiry

This Court found a genuine dispute of material fact on the third prong of Howey because "there is a dispute over whether Defendants' promotional

materials for LGBCoin attracted Plaintiffs with an expectation of profits or motivated Plaintiffs by a desire to obtain LGBCoin as a meme coin for advocacy of conservative values." (Dkt. 531, pp. 26–27). The Court noted that Plaintiffs expressed "significant non-investment reasons for obtaining LGBCoin, such as 'fight[ing] back against cancel culture,' 'help[ing] bring our Conservative party into the 21st century,' and 'donating to charity.'" (Id. at 24). The Court further found that "Plaintiffs were not promised—either directly from Defendant Koutoulas or indirectly through social media and internet posts—any profits, dividends, transaction fees, or appreciation on their investment in LGBCoin." (Id.).

The Joint Release provides the authoritative framework for resolving this ambiguity. It establishes that "[a] digital collectible's value is not based on the expectation of profits from any essential managerial efforts of its creator following creation but rather on supply and demand." (Joint Release at 19). "Absent such representations or promises being conveyed to purchasers, it would not be reasonable for a purchaser to expect profits from the contract, transaction, or scheme." (Id. at 25). The Joint Release further explains that "representations or promises that are vague or contain no semblance of an actionable business plan, such as those lacking milestones, funding, or other plans for needed resources, likely would not create reasonable expectations of profit." (Id. at 27).

This is precisely the situation here. The undisputed record—including Plaintiffs' own sworn testimony—confirms the absence of any reasonable expectation of profits:

As Plaintiffs admitted that "LGBcoin is a digital commodity that's value rises with demand." (Dkt. 74, ¶3). The SEC and CFTC concurred in the Joint Release that almost all cryptocurrencies are similarly commodities including meme coins DOGE and SHIB,

> "A digital commodity does not have intrinsic economic properties or rights, such as generating a passive yield or conveying rights to future income, profits, or assets of a business enterprise or other entity, promisor, or obligor, but may have certain other rights (as discussed below). Examples of digital commodities include Aptos (APT); Avalanche (AVAX); Bitcoin (BTC); Bitcoin Cash (BCH); Cardano (ADA); Chainlink (LINK); Dogecoin (DOGE); Ether (ETH); Hedera (HBAR); Litecoin (LTC); Polkadot (DOT); Shiba Inu (SHIB); Solana (SOL); Stellar (XLM); Tezos (XTZ); and XRP (XRP)."

Similar to LGBcoin, all of the meme coins cited had humans mint them, list them on exchanges, setup liquidity pools, and discuss them on social media.

This Court itself found that the LGBcoin website explicitly stated: "LGBCoin has no intrinsic value and you should not purchase it with any expectation that you will be able to resell it. Please do not spend money that you cannot afford." (Dkt. 531, pp. 24–25). The Court further found that promotional materials "did not necessarily 'emphasize the investment value of [LGBCoins]' such that Plaintiffs or other investors would expect a profit." (Id. at 24).

Second, Plaintiffs' own Class Representatives testified under oath to non-investment motivations. Plaintiff De Ford explicitly admitted he purchased LGBcoin for advocacy reasons. (Dkt. 477-3, 31:9–32:24) and that Defendant Koutoulas was helping "bring our Conservative party into the 21st century" and to "donate to charity." (Dkt. 477-4, 33:12–36:5). Plaintiff Key testified that LGBcoin

is not a security. (Dkt. 477-5, 74:3–13). Notably, all three Class Representatives conceded they were not promised—by anyone—any profits, dividends, or returns on their purchases. (Dkt. 477-3, 32:4–24; Dkt. 477-4, 34:23–35:12; Dkt. 477-5, 74:2–13). They all admitted that none of them had any direct communication with Defendant Koutoulas before purchasing. (Dkt. 531, p. 24). Furthermore, there is a complete lack of evidence to demonstrate that LGBcoin Ltd. conducted any operations or that it even owned a crypto wallet – because it did not.

Under the Joint Release's framework, these undisputed facts are dispositive. Where the asset's own promotional materials disclaim investment value, where the expert agencies have determined that market-driven price appreciation alone is insufficient to create an expectation of profits, and where the named Plaintiffs themselves testified to non-investment motivations and the absence of any profit promises, no reasonable jury could find the "expectation of profits" element satisfied as a matter of law.

## B. The Joint Release Resolves the "Efforts of Others" Inquiry

This Court expressly declined to reach the second sub-inquiry under Howey's third prong—whether Plaintiffs' expectation of profits (if any) derived solely from the efforts of others. (Dkt. 531, p. 27 ("the Court need not move to the second step and evaluate whether Plaintiffs derived an expectation of profits solely from Defendants' managerial and promotional efforts")). The Joint Release resolves this inquiry independently.

The Joint Release explicitly distinguishes promotional activities from the "undeniably significant" managerial efforts required under *Howey*'s third prong. It provides that "the creator of a digital collectible typically does not make representations or promises to undertake essential managerial efforts from which a purchaser would reasonably expect to derive profits." (Joint Release at 19). Marketing, community engagement, social media advocacy, arranging exchange listings, and similar promotional conduct do not constitute the entrepreneurial or managerial efforts of others contemplated by the investment contract analysis. (Id. at 18–19; see also Id. at 19 n.65 ("If the creator of a digital collectible facilitates network effects, including through the use of a digital collectible, such activities do not constitute essential managerial efforts.")). This distinction is fatal to Plaintiffs' case. Plaintiffs' entire theory of "efforts of others" rests on allegations of promotion—social media posts, sponsorship negotiations, influencer partnerships, and community engagement. (*See, e.g.,* Dkt. 486 at pp. 21–25; Dkt. 74 at ¶¶ 85, 120, 215, 216). Under the Joint Release, these activities are categorically insufficient to satisfy *Howey*.

This Court's own findings confirm this result. The Court acknowledged that Defendant Koutoulas's social media posts "could be interpreted as either promoting LGBCoin as an investment or, as Defendants assert, promoting LGBCoin as a 'meme coin' for 'charitable and political advocacy.'" (Dkt. 531, p. 25). The Court distinguished the facts here from cases like *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023), and *Harper v. O'Neal*, 746 Supp. 3d 1360 (S.D. Fla. 2024), where promotional materials "clearly articulated profit-driven

outcomes to potential consumers." (Dkt. 531, p. 26). The Joint Release confirms that where, as here, promotional activities do not involve ongoing managerial control over the asset—no technology development, no profit-sharing mechanisms, no yield generation, no governance rights—they cannot satisfy *Howey* regardless of how they are characterized.

### C.  The Joint Release's Framework Applies Directly to LGBcoin

LGBcoin is the paradigmatic asset the Joint Release addresses. Defendants posit that the undisputed record establishes that LGBcoin is a functionless ERC-20 digital collectible with no intrinsic value, as reflected, in part, in Dkt. 477-3, 25:4–17 and Dkt. 531 at 24–25. The record further confirms no pooling of investor funds into a common enterprise directed toward generating profits; no promises of profits, dividends, transaction fees, revenue sharing, or appreciation (Dkt. 531 at 24); no whitepaper or articulated technology development plan; no governance or voting rights for purchasers; and no ongoing managerial or entrepreneurial obligations promised to coinholders. This Court itself described LGBcoin as a "meme cryptocurrency." (Dkt. 121, p. 1).

The Trust Agreement (Ex. 12)—the only contractual document in the record—describes LGBcoin as a "functionless digital collectible with no intrinsic value." This agreement was non-public and never disclosed to or relied upon by any purchaser. Under the Joint Release's framework, a non-public agreement granting protective trustee rights does not transform a digital collectible into a security. *Howey* requires that purchasers invest *with an expectation of profits* derived

from others' entrepreneurial efforts. Where purchasers had no knowledge of the Trust Agreement, which was only between the Developer and Defendant Koutoulas's law firm- not purchasers, and were promised no profits, it cannot supply the missing elements of an investment contract.

The Joint Release's classification further underscores the practical impossibility of treating LGBcoin as a security. There is no mechanism by which a meme coin can be registered as a security with the SEC—no issuer can file a registration statement for a decentralized, functionless token with no ongoing enterprise, no financial statements, and no management structure to report on. LGBcoin trades exclusively on decentralized exchanges, none of which are registered with the SEC as national securities exchanges or alternative trading systems, and none of which permit the trading of securities. It was already impossible to register a meme coin as a security or trade it on a platform that allows securities before the Joint Release; the Joint Release, written by the only agency that allows one to register a security, makes this even more clear by formally classifying such assets outside the securities framework entirely. Treating LGBcoin as a security would impose regulatory obligations that are structurally impossible to satisfy—a result that the Joint Release's taxonomy expressly avoids.

**D.    The Joint Release Also Defeats Plaintiffs' Uncertified Florida State Securities Fraud Claim**

Plaintiffs' remaining state-law claim for securities fraud under the Florida Securities and Investor Protection Act, Fla. Stat. § 517.07, was not certified as a

class claim and depends on the same threshold determination: that LGBcoin is a "security." Florida courts apply the federal *Howey* test to determine whether an instrument qualifies as a security under Chapter 517. *See Fla. Stat. § 517.021(33)(q)* (defining "security" to include "investment contract[s]"). Because the Joint Release's framework establishes that LGBcoin is not a security under the *Howey* test, Plaintiffs' uncertified Florida state securities fraud claim fails as a matter of law for the same reasons. Summary judgment should be granted on this claim as well.

## V.    SKIDMORE DEFERENCE COMPELS THE COURT TO CREDIT THE JOINT RELEASE AND THE SEC'S CASE-SPECIFIC FINDINGS

The Joint Release does not exist in a vacuum. It provides the analytical basis for the SEC's prior determination—after a two-and-a-half-year investigation across two administrations—that LGBcoin cannot even support an allegation of being a security. (Dkt. 579; USCA11 Case: 24-12376, Dkt. 30). The SEC "formally concurred with Mr. Koutoulas's position, admitting it could not allege that LGBcoin was a security and closed its investigation without issuing any findings of wrongdoing." (*Koutoulas v. SEC*, Case: 1:23-cv-22345-JEM, Dkt. 15-1, p. 2, ¶4).

This Court declined to afford the SEC's findings any weight, in part because the Staff Statement disclaimed legal force. (Dkt. 531, pp. 14–15). But the Joint Release carries no such disclaimer. It is a formal interpretation of existing law by both expert agencies, published in the Federal Register. Under *Skidmore*, the persuasive weight of an agency interpretation depends on its thoroughness,

reasoning, and consistency. *Skidmore*, 323 U.S. at 140; *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). The Joint Release satisfies every *Skidmore* factor:

Thoroughness: The Joint Release is a 68-page comprehensive interpretive framework classifying crypto assets into five formal categories—digital commodities, digital collectibles, digital tools, stablecoins, and digital securities—based on their characteristics, uses, and functions. (Joint Release at 13–23). It is the product of over thirteen months of deliberation by the SEC's Crypto Task Force, which hosted a series of public roundtables, received over 300 written submissions from a broad cross-section of market participants, and held meetings with hundreds of members of the public. (Id. at 6). It was developed as a joint initiative between the SEC and CFTC under "Project Crypto," announced by both agency Chairmen on January 29, 2026. (Id. at 7). It represents the coordinated judgment of the Commissioners of both expert agencies—and explicitly states that "[t]he Commission and its staff will administer the Federal securities laws consistent with the interpretation, including with respect to enforcement actions." (Id. at 8). This is not a hastily issued staff opinion; it is the most thorough agency analysis of crypto asset classification ever produced.

Validity of reasoning: Across 68 pages of detailed analysis, the Joint Release articulates principled distinctions—between market-driven appreciation and entrepreneurial profit expectations, between promotional activities and managerial efforts, between functionless collectibles and investment contracts—that directly apply the governing Howey standard consistent with binding Supreme Court and circuit court precedent. The Joint Release itself acknowledges

that "[t]he interpretation in this release does not supersede or replace the Howey test, which is binding legal precedent." (Joint Release at 8). It does not create new law; it applies existing law to a new asset class with the rigor and specificity that only the two expert agencies with statutory authority over the subject matter can provide. This is not a political whim—it is a reasoned application of the framework the Supreme Court established in 1946, informed by over a decade of agency experience with crypto assets and extensive public input.

Consistency: The Joint Release addresses and applies the governing Howey standard consistent with binding legal precedent. It is consistent with the SEC's case-specific conclusion that LGBcoin cannot be alleged to be a security, the SEC Staff Statement on Meme Coins (which it also cites), the broader regulatory shift reflected in the SEC's dismissal of enforcement actions against other crypto entities, and the interpretive framework developed through decades of case law. *See, e.g., SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975); *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C. Cir. 1996); *Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir. 1980); *SEC v. Belmont Reid & Co.*, 794 F.2d 1388 (9th Cir. 1986).

The combination of the Joint Release and the SEC's case-specific findings creates a *Skidmore* case of extraordinary strength. The SEC did not merely issue a general policy statement—it conducted a multi-year investigation of this very asset, obtained the discovery and entire record of this case, and concluded that LGBcoin does not even support an allegation of being a security. The Joint Release now provides the formal interpretive framework effectively confirming that

conclusion. The record is devoid of a reasoned basis for this Court to send *Howey*'s third prong to a jury in the face of both the expert agencies' formal interpretation and the SEC's case-specific finding. It would be inappropriate at this juncture to decline to extend *Skidmore* deference to the interpretive release published in the Federal Register.

## VI. CONCLUSION

The Joint Release constitutes a formal articulation by both expert agencies of the legal principles Defendants have advanced throughout this litigation. It resolves the genuine dispute of material fact this Court identified on *Howey*'s third prong by providing the authoritative framework for analyzing meme coins under the federal securities laws. Combined with the SEC's case-specific determination that LGBcoin cannot even be alleged to be a security, the Joint Release compels reconsideration and summary judgment in Defendants' favor.

Defendants respectfully request that this Court: (1) reconsider its prior determination declining to afford weight to the SEC's findings in light of the Joint Release's formal interpretive framework and the Skidmore factors; (2) grant summary judgment in Defendants' favor on Howey's third prong, finding that LGBcoin is not a security as a matter of law; and (3) grant summary judgment on Plaintiffs' uncertified Florida state securities fraud claim under Fla. Stat. § 517.07, which depends on the same threshold security determination.

**Dated:** March 31, 2026

## LOCAL RULE 3.01(G) CERTIFICATION

Rule 3.01(g) provides an exception to conferring prior to the filing of a motion for summary judgement.

Respectfully submitted,

/s/ *Nicole Martell*
**NICOLE MARTELL, ESQ.**
Florida Bar No.: 100172
nicole@ddpalaw.com

**DI    PIETRO    PARTNERS, PLLC**
901 East Las Olas Blvd, Suite 202
Fort Lauderdale, FL 33301
Primary Email Address:
service@ddpalaw.com
Secondary Email Address:
paralegal@ddpalaw.com
Telephone: (954) 712-3070
Facsimile: (954) 337-3824

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, a copy of the foregoing Defendants' Renewed Motion for Summary Judgment Based on Intervening Change in Interpretive Legal Authority was filed with the Clerk of Court for the United States District Court for the Middle District of Florida using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Nicole Martell*
**NICOLE MARTELL, ESQ.**
Florida Bar No.: 100172