Case 6:22-cv-00652-PGB-DCI Document 651-6 Filed 06/12/26 Page 1 of 82 PageID 15950

# IN THE DISTRICT COURT OF APPEAL OF FLORIDA
# THIRD DISTRICT

## Case No. 3D26-0564
## L.T. Case No. 2023-002831-CA-01

### LETSGOBRANDON.COM FOUNDATION,

Appellant,

v.

### NATIONAL ASSOCIATION FOR STOCK CAR RACING, LLC,

Appellee.

### INITIAL BRIEF OF APPELLANT

On Appeal from the Circuit Court of the Eleventh Judicial Circuit,

in and for Miami-Dade County, Florida, Complex Business

Litigation Division

The Honorable Lisa S. Walsh, Circuit Judge

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED................................................................1

STATEMENT OF THE CASE AND FACTS .........................................................4

    I.    Introduction and Nature of the Appeal. .......................................................4

    II.    Factual Background .....................................................................................5

        A.    The Foundation was created to protect LGBcoin holders and existed as of October 29, 2021.....................................................................5

        B.    LGBcoin was never mentioned at the Phoenix meeting NASCAR later claimed put the Foundation "on notice" .......................................6

        C.    NASCAR Approved the LGBcoin Sponsorship in Writing on December 26, 2021. ...................................................................................7

        D.    Under Broadcaster Pressure, NASCAR Reversed Course and Made False Public Statements. ...............................................................9

        E.    NASCAR's Internal Communications Reveal Animus, a "Libel List," and a Refusal to Correct. ..............................................................12

        F.    The Foundation's Damages. ..............................................................13

    III.    Course of Proceedings Below....................................................................13

SUMMARY OF ARGUMENT ............................................................................17

        1.    Summary Judgment on Defamation and Defamation by Implication.17

        2.    Denial of Leave to Amend to Add Punitive Damages.......................18

        3.    Denial of Motion for New Trial. .......................................................19

STANDARD OF REVIEW ..................................................................................20

ARGUMENT .......................................................................................................21

    I.    THE TRIAL COURT ERRED BY GRANTING NASCAR'S MOTIONS FOR SUMMARY JUDGMENT................................................21

A.   The existence and falsity of the alleged false statements..........................22

    i.  The statement that NASCAR's decision reflected "no rescission or backtracking" was false on its face. ...................................................22

    ii. The trial court is wrong about the false statement that "the sponsorship was never approved."..................................................24

    iii.The trial court is wrong about the false statement that LGBcoin and BMS were told in November 2021 that a sponsorship would never be approved. ................................................................................28

    iv. The trial court was wrong to refuse to consider the Washington Post articles on the grounds that they were hearsay....................................30

B.   The trial court erred because NASCAR's statements about the sponsorship were also "of and concerning" the Foundation....................30

C.   The trial court erred because causation for the defamation claims was a jury question. ..................................................................................35

D.   The court also erred by granting summary judgment on defamation by implication. ..................................................................................37

E.   The court also erred by granting summary judgment on actual malice. ..38

F.   The trial court erred by granting summary judgment and reversing its earlier holding the Foundation lacked standing. ......................................39

G.   At minimum, any standing limitation should have capped damages—not eliminated the defamation claims.........................................................44

II.   THE COURT APPLIED THE WRONG STANDARD AND WEIGHED EVIDENCE AGAINST THE FOUNDATION ON PUNITIVE DAMAGES. ..........................................................................................45

A.   Section 768.72(1) requires only a "reasonable showing," not clear and convincing proof, at the leave-to-amend stage.........................................45

B.   The trial court drew every disputed inference against the Foundation....48

C.   The proffer satisfies the "reasonable showing" standard several times over. ..................................................................................49

ii

III.   MULTIPLE TRIAL ERRORS, INDIVIDUALLY AND CUMULATIVELY, REQUIRE A NEW TRIAL.......................................52

A.   The two-issue rule does not apply to a single cause of action with multiple elements..................................................................................52

B.   NASCAR's closing argument that the Foundation "did not exist" was an improper legal argument that prejudiced Question 2. ............................53

C.   NASCAR's closing reference to the excluded Latona text messages was incurable, and the issue was preserved without a motion for mistrial. ....56

D.   The court erred by excluding the Washington Post articles.....................58

i.   The statements in the Washington Post articles were not hearsay because they were adopted by Nyquist and NASCAR. .......................60

ii.  The statements in the Washington Post articles are not hearsay because they were being offered to prove their effect, ......................63

iii. The statements in the Washington Post articles are not hearsay because they were being offered to prove detrimental reliance..........64

iv.  The statements in the Washington Post articles were also not hearsay because they were admissible impeachment evidence. ......................65

v.   The exclusion of the articles was harmful...........................................65

E.   The court erred by refusing to permit the mid-trial deposition of NASCAR President Steve Phelps. ............................................................66

F.   The errors were prejudicial individually and overwhelming cumulatively. ...........................................................................................69

CONCLUSION.................................................................................................69

CERTIFICATE OF SERVICE .........................................................................72

CERTIFICATE OF COMPLIANCE..................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*940 Ocean Drive, LLC v. Sobe USA, LLC,*
403 So. 3d 1048 (Fla. 3d DCA 2025) ........................................... 47

*Aarmada Prot. Sys. 2000, Inc. v. Yandell,*
73 So. 3d 893 (Fla. 4th DCA 2011) ............................................ 60

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) .............................................................. 21

*Baker v. SeaWorld Entm't, Inc.,*
423 F. Supp. 3d 878 (S.D. Cal. 2019) ......................................... 63

*Comway Trade Logistics, LLC v. Curet,*
404 So. 3d 596 (Fla. 3d DCA 2025) ........................................... 47

*Correa v. Tovar-Restrepo,*
409 So. 3d 651 (Fla. 3d DCA 2025) ...................................... 35, 40

*DK Arena, Inc. v. EB Acquisitions I, LLC,*
112 So. 3d 85 (Fla. 2013) ................................................... 54, 55

*Don King Productions, Inc. v. Walt Disney Co.,*
40 So. 3d 40 (Fla. 4th DCA 2010) ............................................. 51

*Dyck-O'Neal, Inc. v. Norton,*
267 So. 3d 478 (Fla. 2d DCA 2019) ........................................... 64

*Engle v. Liggett Group, Inc.,*
945 So. 2d 1246 (Fla. 2006) .................................................... 57

*Estate of Bisignano by & through Huntsman v. Exile Brewing Co., LLC.,*
694 F. Supp. 3d 1088 (S.D. Iowa 2023) ...................................... 63

*Fed. Ins. Co. v. Perlmutter,*
  376 So. 3d 24 (Fla. 4th DCA 2023) ..................................... 46, 47

*Five Fran, LLC v. Davis,*
  404 So. 3d 581 (Fla. 3d DCA 2025) ......................................... 47

*Gattorno v. Souto,*
  390 So. 3d 134 (Fla. 3d DCA 2024) ................................... passim

*Glickman v. Potamkin,*
  454 So. 2d 612 (Fla. 3d DCA 1984) ......................................... 22

*Grenitz v. Tomlian,*
  858 So. 2d 999 (Fla. 2003) ..................................................... 53

*Herbits v. City of Miami,*
  207 So. 3d 274 (Fla. 3d DCA 2016) ......................................... 27

*In re Amendments to Fla. R. Civ. P. 1.510,*
  317 So. 3d 72 (Fla. 2021) ........................................... 20, 21, 24

*In re Kalobios Pharm., Inc. Sec. Litig.,*
  258 F. Supp. 3d 999 (N.D. Cal. 2017) ...................................... 64

*Jews for Jesus, Inc. v. Rapp,*
  997 So. 2d 1098 (Fla. 2008) ......................................... 22, 34, 37

*Juega ex rel. Estate of Davidson v. Davidson,*
  8 So. 3d 488 (Fla. 3d DCA 2009) ............................................ 42

*JVA Eng'g Contractor, Inc. v. Doral 10, LLC,*
  402 So. 3d 1175 (Fla. 3d DCA 2025) ....................................... 47

*Kumar Corp. v. Nopal Lines, Ltd.,*
  462 So. 2d 1178 (Fla. 3d DCA 1985) ..................... 39, 40, 42, 44

*McLane Foodservice, Inc. v. Wool,*
  400 So. 3d 757 (Fla. 3d DCA 2024) ......................................... 67

*Mercury Ins. Co. of Fla. v. Moreta,*
  957 So. 2d 1242 (Fla. 2d DCA 2007) ....................................... 57

*Miami Herald Pub. Co. v. Ane,*
  423 So. 2d 376 (Fla. 3d DCA 1982) ............................. 32, 33, 34

*Mitchell v. Parker,*
  271 F. Supp. 3d 1364 (N.D. Ga. 2017) ...................................... 35

*Murphy v. Int'l Robotic Sys., Inc.,*
  766 So. 2d 1010 (Fla. 2000) .................................................... 54

*Nodar v. Galbreath,*
  462 So. 2d 803 (Fla. 1984) ...................................................... 52

*O'Neal v. Tribune Co.,*
  176 So. 2d 535 (Fla. 2d DCA 1965) .................................... 32, 33

*Palm Bay Towers Condo. Ass'n, Inc. v. Marrazza,*
  404 So. 3d 552 (Fla. 3d DCA 2025) ..................................... 45, 46

*Pet Supermarket, Inc. v. Eldridge,*
  360 So. 3d 1201 (Fla. 3d DCA 2023) ........................... 20, 39, 43

*Philip Morris USA, Inc. v. Pollari,*
  228 So. 3d 115 (Fla. 4th DCA 2017) ........................................ 62

*Readon v. WPLG, LLC,*
  317 So. 3d 1229 (Fla. 3d DCA 2021) ................................... 38, 49

*Rich v. Kaiser Gypsum Co.,*
  103 So. 3d 903 (Fla. 4th DCA 2012) ........................................ 62

*Rierson v. Deveau,*
  273 So. 3d 1041 (Fla. 3d DCA 2019) ....................................... 57

*Robinson v. State,*
  989 So. 2d 747 (Fla. 2d DCA 2008) ......................................... 57

*Roller v. Collins,*
  373 So. 3d 35 (Fla. 5th DCA 2023) ..................................... 35, 41

*Scott v. Busch,*
  907 So. 2d 662 (Fla. 5th DCA 2005) ................................... 33, 34

*Special v. W. Boca Med. Ctr.,*
   160 So. 3d 1251 (Fla. 2014) ............................................... 57, 65

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) ......................................................... 38, 50

*State Farm Fire & Cas. Co. v. Pettigrew,*
   884 So. 2d 191 (Fla. 2d DCA 2004) ............................. 65, 66, 57

*Tracinda Corp. v. DaimlerChrysler AG,*
   362 F. Supp. 2d 487 (D. Del. 2005) ......................................... 62

*Van v. Schmidt,*
   122 So. 3d 243 (Fla. 2013) ..................................................... 20

*Volusia Cnty. v. Aberdeen at Ormond Beach, L.P.,*
   760 So. 2d 126 (Fla. 2000) ..................................................... 21

*W.R. Grace & Co. v. Geodata Servs., Inc.,*
   547 So. 2d 919 (Fla. 1989) ..................................................... 66

*Walsh v. Miami Herald Publ'g Co.,*
   80 So. 2d 669 (Fla. 1955) ....................................................... 32

*Werner Enterprises, Inc. v. Mendez,*
   362 So. 3d 278 (Fla. 5th DCA 2023) ....................................... 27

*Wolfson v. Kirk,*
   273 So. 2d 774 (Fla. 4th DCA 1973) ................................. 32, 34

*Young v. Kopchak,*
   368 So. 3d 1001 (Fla. 4th DCA 2023) ..................................... 30

## **Statutes**

Section 90.803, Fla. Stat ................................................... 60, 62

Section 768.72, Fla. Stat ................................................... 18, 45

Section 768.72, Fla. Stat ............................................... 14, 47, 48

Section 90.608, Fla. Stat ............................................................. 65

## **Rules**

Florida Rule of Appellate Procedure 9.045 .................................... 73

Florida Rule of Appellate Procedure 9.210 .................................... 73

Florida Rule of Civil Procedure 1.210 ............................................ 1

## STATEMENT OF ISSUES PRESENTED

1. On December 26, 2021, NASCAR's Director of Sponsorship Approval approved the LGBcoin sponsorship in writing. A prominent reporter sent NASCAR the press release while it was embargoed, and a senior communications executive did not object to its publication. Four days later, NASCAR's Chief Communications Officer told reporters it had never been approved—and Howell himself later testified that telling the press the team had "jumped the gun" would be false. The trial court resolved that head-on contradiction in NASCAR's favor on summary judgment, then held that NASCAR's public statements about "the LGBcoin sponsorship" were not "of and concerning" the sponsor behind the sponsorship. Did the trial court reversibly err by granting summary judgment when it construed the complaint narrowly, resolved credibility determinations against the nonmovant, and ruled that statements about a sponsorship do not concern the sponsor?

2. The Foundation succeeded to an express trust whose governing document—the October 29, 2021 LGBcoin Trust Agreement—charged the trustee "to protect and/or enforce the rights of all LGBcoins collectively." Florida Rule of Civil Procedure 1.210(a)

lets a trustee of an express trust sue in its own name without joining the beneficiaries, and this Court has held in *Correa v. Tovar-Restrepo* that a successor trustee inherits the predecessor's standing and in *Kumar Corp. v. Nopal Lines* that an action "cannot be terminated on the ground that it lacks standing" where the plaintiff is a proper party to assert at least some of the injuries pleaded. The trial court nonetheless granted summary judgment on claims on behalf of non-party owners for lack of standing. Did the trial court reversibly err by reversing its earlier decision that the Foundation has standing?

3.      Section 768.72(1) requires only a "reasonable showing" for leave-to-amend to plead punitive damages. The trial court nevertheless denied leave to amend on the express ground that the Foundation's proffered evidence "could never meet the clear and convincing evidence standard *at trial*"—the exact standard this Court has twice held does not apply at the pleading stage. Did the trial court commit reversible error under *Gattorno* and *Palm Bay Towers* by importing the trial-stage burden into the leave-to-amend inquiry and then drawing every disputed inference against the non-movant?

4.      The jury rejected one element of the Foundation's promissory-estoppel claim—whether NASCAR should have expected

2

its promise to alter the Foundation's behavior. On that element, NASCAR's counsel told the jury in closing that the Foundation "did not exist" (a legal point the court had already foreclosed by letting the claim go to trial); read in closing from a text exchange the court had excluded from evidence; obtained the exclusion of two *Washington Post* articles containing NASCAR's own statements that Nyquist confirmed under oath; and prevented the deposition of the NASCAR executive whom Nyquist himself testified had made "the final call." The trial court denied a new trial in a one-page order without analysis. Did the court abuse its discretion in letting that verdict stand on errors that, individually and cumulatively, struck at the only element the jury actually decided?

3

## STATEMENT OF THE CASE AND FACTS

### I.     Introduction and Nature of the Appeal.

On December 26, 2021, NASCAR's Director of Sponsorship Approval told BrandonBilt Motorsports in writing: "The sponsors are approved." The team issued a press release announcing the sponsorship to NASCAR, a prominent reporter sent NASCAR the press release while it was still embargoed, and a senior communications executive did not object to its publication.

NASCAR's then-Managing Director of Racing Communications thought that the BMS press release "position[ed] [the Let's Go Brandon connection] OK." Oct. 3, 2025 Trial Tr. 67:12-73:8; R.1008 (3AC Ex. 23); R.2733–2737 (Forde Depo. 54:25–58:23).

But within hours of the announcement, NASCAR came under fire from important broadcast partners like NBC/Comcast, who were upset about the connection to the Let's Go Brandon meme their own reporter had inspired. So NASCAR's communications chief lied to reporters about what happened, including telling the Washington Post that NASCAR's decision reflected 'no rescission or backtracking, given that the sponsorship had never been properly approved'—a statement that, on its face, treats Howell's written approval as if it

4

never happened. LGBCoin's market capitalization collapsed $390 million in the day after the publication, and went to $0 within three weeks.

The Foundation appeals from (1) an order granting NASCAR partial summary judgment on the defamation claims (2) an order denying leave to seek punitive damages for the defamation claims, and (3) the order denying Plaintiff's motion for new trial. R.8131–8169. R.8170–8184. R.8126–8127.

This Court should reverse.

## II.   Factual Background

### A.   The Foundation was created to protect LGBcoin holders and existed as of October 29, 2021.

On October 2, 2021, NASCAR driver Brandon Brown won the Xfinity Series race at Talladega Superspeedway. During his post-race interview, a crowd chant of an anti-Biden expletive was misreported on-air as "Let's Go Brandon," and went viral. R.8132 (SJ Order, Findings re: October 2, 2021); R.1613 (J. Brown Depo. 24:6–27); R.1783–1784 (B. Brown Depo. 22:2–23:4). On October 27, 2021, 330 trillion LGBcoins were minted as a "digital expression" of the meme. R.8133 (SJ Order); R.1925–1926 (Koutoulas Depo., Vol. 1, 47:1–

48:6). On October 29, 2021, James Koutoulas, as Managing Partner of Koutoulas Law, LLC, drafted the "LGBcoin Trust Agreement," under which Koutoulas Law was engaged as trustee "to enter into legal agreements on behalf of LGBcoins" and "to protect and/or enforce the rights of all LGBcoins collectively." R.8134 (SJ Order, quoting Trust Agreement); R.902–1196 (3AC Ex. 9). The Foundation—a Cayman Islands non-profit foundation—was formally incorporated on January 5, 2022 as the successor-in-interest to the trust. R.8134; R.906 (3AC ¶¶ 19–21).

### B.  LGBcoin was never mentioned at the Phoenix meeting NASCAR later claimed put the Foundation "on notice"

On November 6, 2021, NASCAR met in Phoenix with BrandonBilt Motorsports ("BMS") representatives Jerry Brown, Brandon Brown, and Alex Mascioli. R.8135–8136. Attending for NASCAR were Eric Nyquist, then Chief Communications Officer, and two other employees. R.8135–8136. Dale Howell was not there. R.8136. Neither was anyone from the Foundation. R.8136. The trial court found that "LGBCoin was not discussed at all at the meeting, and Mr. Nyquist was not asked whether LGBCoin—or the name or moniker LGBCoin—would or could be permitted as a sponsor."

6

R.8136 (SJ Order); *see* R.2509, R.2623 (Nyquist Depo. 27:3–5, 141:2–22); R.1629–1630, R.1709 (J. Brown Depo. 40:7–41:13, 120:9–16) ("At that meeting, no, it was never brought up. … No it never got – LGBCoin never got mentioned."). Nyquist told the BMS attendees only that the political phrase "Let's Go Brandon" would not be permitted on a racecar, fire suit, or hauler, but that BMS and Brandon Brown could do whatever they wanted with the phrase away from the racetrack. (R.8176; R.2508–2509, R.2518–2519, R.2523–2527 (Nyquist Depo. 26:2–27:2, 36:6–37:7, 41:2–45:6)).

### C.  NASCAR Approved the LGBcoin Sponsorship in Writing on December 26, 2021.

On November 21–22, 2021, BMS and the Foundation executed a Sponsorship Agreement providing for $5 million in LGBcoin compensation and use of LGBcoin trademarks on the racecar. R.8137 (SJ Order) (citing R.944 (3AC Ex. 1); R.2901 (NASCAR MSJ Ex. 12). On December 25, 2021 (Christmas Day), BMS's Mac MacLeod emailed Dale Howell—NASCAR's Director of Licensing and Sponsorship Approval—requesting approval of a paint scheme "for Daytona." R.8137; R.2912–2913 (NASCAR MSJ Ex. 14); R.953 (3AC Ex. 2). The email and attachment identified "LGBCoin.io" as the

7

primary sponsor and noted "They are a Cryptocurrency." R.8137. On December 26, 2021, Howell replied in writing: "[t]he sponsors are approved." R.8137 (SJ Order) (quoting R.2914–2916 (NASCAR MSJ Ex. 15) and R.955 (3AC Ex. 3); *see* R.2964–2965 (Howell Depo. 44:24–45:17). Howell testified that he had authority to approve the sponsorship, that he had approved "close to 5,000 sponsorships" during his tenure, and that telling the press that BMS had "jumped the gun" would be a false statement. R.2969, R.2981-2984, R.3032-3033 (Howell Dep. 49:21–50:4, 61:24–64:8, 112:22-113:2); *see also* R.8137–8138 (SJ Order); R.8178–8179 (Order Denying Punitive Damages).

BMS issued a press release on December 30, 2021, and a reporter sent it to NASCAR while it was embargoed. NASCAR did not object, did not request changes, and did not tell BMS to hold the announcement. R.2914–2916 (NASCAR MSJ Ex. 15); R.2964–2965, R.2982–2984 (Howell Depo. 44:24–45:17, 62:10–64:8).

On December 30, 2021, at 10:00 a.m. EST, BMS issued the press release announcing LGBcoin as its primary partner for the 2022 Xfinity Series Season. R.8138 (SJ Order) (citing R.2917–2919 (NASCAR MSJ Ex. 16); R.2330–2332, R.2335–2337, R.2340

8

(MacLeod Depo. 83:12–85:19, 88:25–90:23, 93:4–7)). That announcement "was the first time that Mr. Nyquist—or anyone else at NASCAR other than Mr. Howell—learned that BMS had requested approval for a LGBCoin paint scheme," and that Howell had approved it. R.8138 (SJ Order); R.2547–2548 (Nyquist Depo. 65:17–66:5). After the announcement, LGBcoin's market capitalization rose to approximately $571 million. R.904, R.915, R.919–920 (3AC ¶¶ 12, 66, 79–80); R.902–1196.

### D. Under Broadcaster Pressure, NASCAR Reversed Course and Made False Public Statements.

Within hours of the BMS press release, NASCAR faced inquiries from journalists—and pressure from its broadcast partners like Comcast, who were upset about the connection to the Let's Go Brandon meme. R.8138 (SJ Order) (citing R.2534 (Nyquist Depo. 52:2–24); R.2733–2736 (Forde Depo. 54:25–57:5); R.921–923 (3AC ¶¶ 83–93). Rather than acknowledge that NASCAR's own Director of Sponsorship Approval had approved the sponsorship in writing, NASCAR launched a coordinated campaign of false public statements to appease its corporate partners.

9

On December 30, 2021, Nyquist emailed reporter Jim Utter: "Sponsorship has not been approved—team jumped the gun." R.918, R.1017 (3AC ¶ 76, Ex. 26); *see also* R.3085 (NASCAR MSJ Ex. 18) (Def.'s Resp. to Interr. No. 2); R.2556–2557 (Nyquist Depo. 74:24–75:6). Utter republished the statement on Twitter; it was viewed, reposted, and quoted hundreds of times. R.918, R.923, R.1045 (3AC ¶¶ 76, 90–91, Ex. 35.) Nyquist himself acknowledged internally that Howell had "jumped the gun," not the team. R.918–920 (3AC ¶¶ 76–80); R.2981–2982 (Howell Depo. 61:24–62:9) (Howell drafted internal language stating he "may have jumped the gun"). Howell testified that telling the press "the team jumped the gun" would be false. R.2982–2984 (Howell Depo. 62:10–64:8).

Nyquist repeated the falsehood to a national outlet. He told Liz Clarke of The Washington Post that the sponsorship had not been "properly approved" and that NASCAR's decision "was not a reversal" but its "first and final word on the matter." R.8146–8147 (SJ Order) (quoting Washington Post article published as 3AC Ex. 6); R.2581–2583, R.2585–2588 (Nyquist Depo. 99:18–101:17, 103:15–106:9)). Nyquist later confirmed in deposition that he was the NASCAR source

10

for those quotations. R.2582, R.2594–2595 (Nyquist Depo. 100:13–21, 112:2–113:19.)

NASCAR also told multiple outlets that the Foundation and BMS had been "on notice since November" that the sponsorship would never be approved—a statement directly contradicted by the trial court's own finding that "LGBCoin was not discussed at all" at the November 6 meeting. R.8136 (SJ Order); R.928–929, R.963, R.1013, R.1045 (3AC ¶¶ 95–99, Exs. 6, 25, 35). It also contradicted the sworn testimony of three witnesses who agreed that Nyquist never said "derivatives" of Let's Go Brandon would be prohibited. R.1932–1937, R.1962–1965 (Koutoulas Depo., Vol. 1, 54:7–59:23, 84:1–87:6); R.1613–1622 (J. Brown Depo. 24:6–33:18); R.1783–1799 (B. Brown Depo. 22:2–38:15). In fact one witness testified that Nyquist had told them derivatives <u>would</u> be allowed, by giving the example Trump Hotel would be permitted, but not the Trump campaign. R.1705–1706 (J. Brown Depo. 116:24–117:25).

On January 4, 2022, NASCAR formally rescinded: "upon further review of LGBCoin.io, the sponsor is not approved." R.8138 (SJ Order).

11

### E. NASCAR's Internal Communications Reveal Animus, a "Libel List," and a Refusal to Correct.

NASCAR's internal communications are damning. Senior NASCAR executives privately referred to the Foundation's principals as "quick-buck cryptocurrency hucksters," R.8182 (Order Denying Punitive Damages); R.1071 (3AC Ex. 40), described the sponsorship as a "rogue sponsor" arrangement, R.8182; R.989 (3AC Ex. 14), called Koutoulas a "bad human," R.8182 (Order); R.989 (3AC Ex. 14), and labeled LGBcoin a "grift," R.8182; R.928 (3AC). NASCAR executives also discussed a "libel list" of reporters with whom NASCAR would speak "on background." R.8182 (Order Denying Punitive Damages) (noting both Koutoulas's public use of the phrase and the subsequent NASCAR internal email between Forde and Nyquist); R.1351 (Plaintiff's Punitive Damages Ex. 15). When coin holders later sued the Foundation for fraud, a NASCAR executive wrote internally: "LGB Coin holders filed a lawsuit lol." R.933 (3AC ¶ 122); R.1419–1420 (Pl.'s Mtn. for Leave Ex. 39).

BMS and the Foundation repeatedly informed NASCAR in writing that its public statements were false, attaching Howell's December 26 approval. NASCAR never issued a corrective statement

12

and never retracted any of its statements. R.929–930, R.934–935 (3AC ¶¶ 100–104, 132–135); R.1277–1289 (Pl.'s Mtn. for Leave.). The false statements remain published to this day.

On January 5, 2022, Koutoulas—acting on behalf of the Foundation and the LGBcoin holders the Foundation was created to protect—publicly announced the Foundation's intent to sue NASCAR. He did so on Twitter, in a post that named NASCAR, identified the Foundation as the prospective plaintiff, and referenced the rescinded sponsorship. That tweet was republished nationally in *USA Today*. R.928–929 (3AC ¶¶ 95–99); R.1045 (3AC Ex. 35).

### F.  The Foundation's Damages.

After NASCAR's false statements, LGBcoin's market capitalization collapsed from approximately $571 million to effectively zero in three weeks. R.904–906, R.920, R.934–935 (3AC ¶¶ 13–16, 80–82, 130–135).

### III.  Course of Proceedings Below

The Foundation filed this action on February 17, 2023, in the Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Complex Business Litigation Division. R.39–40 (Civil Cover Sheet). After two rounds of motion practice on the pleadings, the Third

Amended Complaint (R.902–1196) asserted four counts: (I) Defamation; (II) Defamation by Implication; (III) Promissory Estoppel; and (IV) Breach of Contract, plus claims under the wrongful-act doctrine.[1] NASCAR answered on September 26, 2024. R.1200–1219.

On January 8, 2025, the Foundation moved for leave to amend the operative complaint to add a claim for punitive damages under section 768.72, Florida Statutes, with a 181-page motion-and-evidence package. R.1240–1421. NASCAR responded on January 21, 2025 (R.1422–1481), and the Foundation replied on January 31, 2025 (R.1487–1530). The trial court heard oral argument on March 28, 2025 (transcript filed at R.5703–5780). On April 22, 2025, the court denied the motion in a 15-page written order. R.8170–8184.

On February 14, 2025, NASCAR filed three motions for summary judgment—on standing (R.1544–1552), on the defamation counts (R.1553–1569), and on the promissory-estoppel and breach-of-contract counts (R.1570–1585)—supported by a 1,540-page exhibit package (R.1589–4128) and a Supporting Factual Statement

---

[1] This claim sought damages incurred by the Foundation and Koutoulas in connection with the four years of business-destroying reputation-ruining legal proceedings and investigations that were caused by NASCAR's false statement.

(R.1531–1543). The Foundation cross-moved for partial summary judgment (R.4129–4158) and filed point-by-point oppositions and a Statement of Undisputed Material Facts (R.4159–4165) supported by the Declaration of Joseph M. Delich and exhibits (R.4166–4291; R.4326–4413). The court heard argument on April 1, 2025. On May 25, 2025, the court entered a 39-page Order Granting in Part and Denying in Part NASCAR's Motions for Summary Judgment. R.8131–8169. The order: (i) held that the Foundation lacked standing to sue for harms suffered by non-party coin holders; (ii) granted summary judgment on Counts I and II (defamation and defamation by implication); (iii) granted summary judgment on Count IV (breach of contract) and the wrongful-act doctrine; and (iv) denied summary judgment on Count III (promissory estoppel) and permitted that single claim to proceed to trial. R.8131–8169.

Trial began September 29, 2025 and concluded October 6, 2025. The certified trial transcripts for September 29, September 30, October 1, October 3, and October 6, 2025 were transmitted to this Court under separate cover. Clerk's Note, R.8186. All citations herein to the trial transcript are to those certified transcripts, by trial date and the court reporter's page and line (e.g., "Oct. 6, 2025 Trial Tr.

15

205:25–206:9"). The jury was given a two-question verdict form on promissory estoppel: (1) whether NASCAR made a promise to the Foundation; and (2) whether NASCAR should have expected the promise to alter the Foundation's behavior. R.7995–7996 (Verdict Form); R.7989–7990 (Verdict). The jury answered Question 1 "Yes" and Question 2 "No." (R.7995–7996.) Final Judgment for NASCAR was entered October 8, 2025. R.8128–8130.

On October 21, 2025, the Foundation moved for a new trial. R.7997–8034. The motion identified four trial errors: (1) NASCAR's improper closing argument that the Foundation "did not exist" at the relevant time; (2) NASCAR's closing-argument reference to a Latona text-message exchange that had been excluded from evidence; (3) the trial court's exclusion of two Washington Post articles offered as adoptive admissions and for non-hearsay purposes; and (4) the denial of a mid-trial deposition of NASCAR President Steve Phelps after Nyquist testified at trial that Phelps had "the final call." NASCAR responded November 14, 2025 (R.8059–8079), and the Foundation replied November 26, 2025 (R.8099–8109). On February 16, 2026, the trial court denied the motion in a one-page summary order

16

without substantive analysis. R.8126–8127. This appeal followed. R.8118–8123 (Notice of Appeal).

## SUMMARY OF ARGUMENT

The trial court resolved a credibility contest between two NASCAR witnesses on summary judgment. It demanded clear-and-convincing proof at the leave-to-amend stage for punitive damages. And it let NASCAR's counsel argue in closing both a legal point the court had foreclosed and the contents of evidence the court had excluded.

### 1. Summary Judgment on Defamation and Defamation by Implication.

The trial court erred by ruling Plaintiff could not establish the falsity element as a matter of law. NASCAR's Director of Sponsorship Approval, Dale Howell, approved the sponsorship in writing on December 26, 2021, and testified telling the press BMS had "jumped the gun" would be false. NASCAR's Communications Chief, Eric Nyquist, told reporter Jim Utter the team jumped the gun, also told Liz Clarke of *The Washington Post* that the sponsorship had never been "properly approved," which "reflected no rescission or backtracking."

17

Nyquist also told Clarke the team had been informed in November no derivatives of Let's Go Brandon would be allowed. Three witnesses contradicted Nyquist, testifying if anything he had specifically suggested derivatives were fine, by giving the example of Trump Hotel versus of Trump 2024. To grant summary judgment, the trial court had to credit Nyquist's testimony and ignore everyone else. That was error.

For similar reasons the Court erred in granting summary judgment on the defamation by implication claim and in its findings that causation and actual malice could not be established.

The court also held that NASCAR's statements about "the sponsorship" were not "of and concerning" the sponsor for the sponsorship. That too was error.

Finally, the court erred by holding the Foundation lacked standing to sue on behalf of non-party coinholders. As the successor-in-interest to the Trust, the Foundation had standing to pursue claims on behalf of non-party owners.

## 2. Denial of Leave to Amend to Add Punitive Damages.

The trial court applied the wrong standard when it denied leave to plead punitive damages on the defamation counts. Section

18

768.72(1) requires only a "reasonable showing" that there is a "reasonable basis for recovery" of punitive damages. The trial court instead demanded clear and convincing proof, holding that the Foundation's evidence "could never meet the clear and convincing evidence standard at trial." R.8181–8182. This court has repeatedly held that is the wrong standard at the pleading stage. *Gattorno v. Souto*, 390 So. 3d 134, 137–38 (Fla. 3d DCA 2024), and *Palm Bay Towers Condo. Ass'n v. Marrazza*, No. 3D2023-1952 (Fla. 3d DCA Jan. 2, 2025).

### 3. Denial of Motion for New Trial.

Finally the trial court erred in denying the motion for new trial because improper closing arguments and the exclusion of critical evidence prejudiced Plaintiff.

NASCAR's counsel argued in closing that the Foundation "did not exist"—a legal point the court had already foreclosed by allowing the promissory-estoppel claim to proceed to the jury. During closing NASCAR also read from a text-message exchange that had been excluded from evidence.

Additionally, the court erred by excluding two *Washington Post* articles as hearsay. The articles were admissible as adopted party-

opponent admissions and also being offered for non-hearsay purposes.

Finally after Nyquist testified that NASCAR President Steve Phelps had personally made the final call, the trial court still erred by refusing to allow Plaintiff to depose NASCAR President Steve Phelps, even after it was uncovered at trial that he possessed unique relevant knowledge about the approval process and press strategy. .

## STANDARD OF REVIEW

The Court reviews de novo (1) the order granting summary judgment, *In re Amendments to Fla. R. Civ. P. 1.510*, 317 So. 3d 72, 75 (Fla. 2021); (2) the order denying leave to amend to add a punitive-damages claim, *Gattorno v. Souto*, 390 So. 3d 134, 134 (Fla. 3d DCA 2024); and (3) the trial court's standing ruling, *Pet Supermarket, Inc. v. Eldridge*, 360 So. 3d 1201, 1205 (Fla. 3d DCA 2023).

The Court reviews for abuse of discretion the denial of a motion for new trial, *Van v. Schmidt*, 122 So. 3d 243, 246 (Fla. 2013), but underlying legal rulings—including evidentiary rulings and rulings on improper closing argument—are reviewed de novo, *id.* In conducting de novo review of the punitive-damages and summary-judgment determinations, this Court "views the record evidence and

20

the proffered evidence in the light most favorable to the [non-movant] and accepts said evidence as true." *Gattorno*, 390 So. 3d at 137.

## ARGUMENT

### I. THE TRIAL COURT ERRED BY GRANTING NASCAR'S MOTIONS FOR SUMMARY JUDGMENT.

Summary judgment is proper only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *In re Amendments to Fla. R. Civ. P. 1.510*, 317 So. 3d 72, 75 (Fla. 2021). "[T]he correct test for the existence of a genuine factual dispute is whether 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). All facts and inferences must be viewed in the light most favorable to the nonmoving party. *Volusia Cnty. v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000).

Defamation has five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5)

21

statement must be defamatory." *Jews for Jesus, Inc. v. Rapp*, 997 So.
2d 1098, 1106 (Fla. 2008).

### A. The existence and falsity of the alleged false statements.

The element of falsity and corresponding "affirmative defense[]
of truth" are "questions for resolution by the jury." *Glickman v.
Potamkin*, 454 So. 2d 612, 613 (Fla. 3d DCA 1984).

The trial court granted summary judgment for NASCAR holding
that the Foundation could not establish the falsity element for its
alleged false statements. The court's grant of summary judgment on
these statements depends on construing the Foundation's pleading
narrowly (instead of liberally), resolving a credibility dispute between
Howell and Nyquist in NASCAR's favor (rather than against it) and
ignoring admissible evidence.

### i. The statement that NASCAR's decision reflected "no rescission or backtracking" was false on its face.

The clearest false statement in the record is one the trial court
did not address at all. Nyquist told *The Washington Post* that
NASCAR's January 4, 2022 announcement reflected "no rescission
or backtracking, given that the sponsorship had never been properly
approved." R.963 (3AC Ex. 6). Clarke published that statement on

January 4, 2022, attributed to "an official with direct knowledge of the process." *Id.* Nyquist confirmed under oath that he was that official, that he made the statement to Clarke, and that he stood by it as "accurate." R.2591, R.2595–2596 (Nyquist Depo. 109:21–23, 113:20–25, 114:12–15).

The statement is false on its face. Howell—NASCAR's Director of Sponsorship Approval, with authority to approve sponsorships and a history of doing so "close to 5,000" times—approved the LGBcoin sponsorship in writing on December 26, 2021. R.2914–2916 (NASCAR MSJ Ex. 15); R.2964–2965, R.2969–2970 (Howell Depo. 44:24–45:17, 49:21–50:4). On January 4, 2022, NASCAR formally rescinded that approval: "upon further review of LGBCoin.io, the sponsor is not approved." R.8138 (SJ Order). A statement that there was "no rescission or backtracking" on January 4 is irreconcilable with an actual rescission on that same day. The only way the statement could be true is if Howell's December 26 approval was a legal nullity—and Howell testified it was not. R.2982–2984 (Howell Depo. 62:10–64:8) (telling the press the team had "jumped the gun" would be false).

23

The trial court's summary-judgment order does not address this statement, the Washington Post article in which it appeared, or Nyquist's deposition testimony confirming it. R.8144–8148. That silence is reversible error on its own: a reasonable jury could find the "no rescission or backtracking" statement false, and the trial court was required to view that evidence in the light most favorable to the Foundation. *In re Amendments to Fla. R. Civ. P. 1.510*, 317 So. 3d at 75.

### ii. The trial court is wrong about the false statement that "the sponsorship was never approved."

One alleged defamatory statement was that NASCAR falsely stated to various media outlets "something to the effect that the 'LGBcoin.io sponsorship was never approved.'" R.931 (3AC ¶ 110); R.8144 (SJ Order).

In terms of the record evidence, Howell testified that he approved the LGBcoin sponsorship in writing on December 26, 2021, R.2964–2965 (Howell Depo. 44:24–45:17); R.1589–4128 (Exhibits to MSJ); R.8137 (SJ Order), and that he had authority to do so, R.2969–2970 (Howell Depo. 49:21–50:4). Howell also testified that telling the press "the team jumped the gun" would be false. R.2982–2984

24

(Howell Depo. 62:10–64:8). In an internal email on December 30, 2021, Howell acknowledged that he himself "may have jumped the gun." R.2970–2971 (Howell Depo. 50:5–51:3 & Ex. 9).

After the team issued the press release, NASCAR's -Managing Director of Racing Communications Mike Forde commented internally that the Let's Go Brandon connection had been "position[ed] ok." R.1008 (3AC Ex. 23); R.2736–2737 (Forde Depo. 57:25–58:23)       (NASCAR_LGBFoundation_000079).       That contemporaneous communication — between NASCAR's own communications director and the NASCAR employee who would imminently take over the sponsorship-approval role — is a written confirmation that NASCAR positioned the BMS press release as OK before it was published.

Nyquist told reporter Jim Utter that the "team jumped the gun" R.902–1196 (3AC ¶ 76, Ex. 26); R.4312–4325 (Pl.'s MSJ Opp.), and told *Washington Post* reporter Liz Clarke that the sponsorship had not been "properly approved" and that NASCAR's position "was not a reversal" but its "first and final word." R.931, R.963 (3AC ¶ 111, Ex. 6); R.2581–2583, R.2585–2588, R.2594–2595 (Nyquist Depo. 99:18–101:17, 103:15–106:9, 112:2–113:19).

25

The Court nonetheless held that there was no evidence Nyquist or Forde ever told a journalist that the sponsorship was never approved. R.8144–8145.

One reason for its ruling was that the court drew a distinction between a statement that the sponsorship was "never approved" versus a statement that it had "never been properly approved," was "not yet approved," or that the team had "jumped the gun," all of which Nyquist admitted telling reporters. R.8145 (SJ Order) ("Plaintiff's attempt to change the statement it is suing upon - from the sponsorship was 'never approved' to 'never been properly approved' - fails because '[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment.'"); R.8148.

But whether NASCAR characterized its position as "never approved" or "never properly approved," "not yet approved," or that the "team jumped the gun," the published meaning was the same: no valid approval of the LGBcoin sponsorship ever issued.

Howell even testified—point-blank—that telling the press the team had "jumped the gun" (i.e., that the sponsorship had not been properly approved) would be false. R.2982–2984 (Howell Depo. 62:10–64:8). He also testified that his approval was both authorized

26

and routine. *E.g.* R.2964-2965, 2969-2970 (Howell Dep. 44:24-45:17, 49:21-50:4).

On this record, a reasonable jury could find that NASCAR's public statements were false. To reach the opposite conclusion, the trial court treated Nyquist's testimony as undisputed and ignored any contradictory evidence.

The court's parsing of the statement was also irreconcilable with the reported statement—adopted by Nyquist—that the decision reflected "no rescission or backtracking." The trial court entirely ignored that statement and Nyquist's testimony about it.

The trial court was obligated to construe the Foundation's allegations liberally and in its favor. *Werner Enterprises, Inc. v. Mendez*, 362 So. 3d 278 (Fla. 5th DCA 2023) ("the trial court makes a legal determination that is similar to the standard that is applied to determine whether a complaint states a cause of action"); *Herbits v. City of Miami*, 207 So. 3d 274, 281 (Fla. 3d DCA 2016) ("all ambiguities and inferences drawn from the recitals in the complaint, together with the exhibits attached, must be construed in the light most favorable to the plaintiff").

27

Insisting on a distinction without a difference is the opposite of that requirement.

The same analysis applies to the trial court's conclusion that the "team jumped the gun" was not the same statement as "the sponsorship was never approved." R.8145, R.8147–8148. The only reason the announcement would be premature is that there was no valid approval, and the defamatory meaning is inherent in both formulations.

### iii. The trial court is wrong about the false statement that LGBcoin and BMS were told in November 2021 that a sponsorship would never be approved.

Another false statement was that NASCAR "falsely stated to various media outlets something to the effect of: "LGBcoin and BMS were told in November 2021 that a sponsorship would never be approved." R.931 (3AC ¶ 113).

The trial court found it "undisputed" that NASCAR told BMS, the Foundation, and Koutoulas at the November 5, 2021 Phoenix meeting that no "Let's Go Brandon" sponsorship or any "derivative" of that slogan—including LGBcoin—would be approved. R.8136–8137; R.8146–8147 (SJ Order).

28

That finding rests entirely on the testimony of one witness: Eric Nyquist. R.2549–2552, R.2556–2558 (Nyquist Depo. 67:1–70:14, 74:24–76:8). It is squarely contradicted by three witnesses on the other side: Koutoulas, Jerry Brown, and Mac MacLeod, each of whom testified that LGBcoin was never mentioned at the November meeting and that NASCAR said nothing about "derivatives" or the LGBcoin sponsorship. R.1932–1937, R.1962–1965 (Koutoulas Depo., Vol. 1, 54:7–59:23, 84:1–87:6); R.1613–1622 (J. Brown Depo. 24:6–33:18); R.1783–1799 (B. Brown Depo. 22:2–38:15). Other NASCAR executives attended the meeting but none of them testified to corroborate Nyquist's version of events.

The trial court even contradicted itself by finding that "LGBCoin was not discussed at all" on November 6. R.8136 (SJ Order). That finding is impossible to reconcile with the court's simultaneous treatment of Nyquist's contrary account as "undisputed" for falsity purposes.

Even setting aside the trial court's internal inconsistency, crediting one witness over three contrary witnesses on a contested historical fact is the paradigm of impermissible credibility weighing at the summary-judgment stage.

29

### iv. The trial court was wrong to refuse to consider the Washington Post articles on the grounds that they were hearsay.

The trial court also rejected considering the articles as "hearsay, (R.8144–8148), which is incorrect for all the reasons outlined in Part III.D.

\*    \*    \*

"On this record, the contradictory testimony created a genuine issue of material fact that cannot be resolved by the trial court on summary judgment." *Young v. Kopchak*, 368 So. 3d 1001, 1007 (Fla. 4th DCA 2023).

A reasonable jury could find that NASCAR's Director of Sponsorship Approval approved the sponsorship in writing, R.2914–2916 (NASCAR MSJ Ex. 15), and that NASCAR's Chief Communications Officer lied to reporters in response to negative pressure from the press and broadcast partners like Comcast, R.918, R.931, R.963 (3AC ¶¶ 76, 111, Exs. 6, 26); R.2964–2965, R.2969–2970, R.2982–2984 (Howell Depo. 44:24–45:17, 49:21–50:4, 62:10–64:8).

### B. The trial court erred because NASCAR's statements about the sponsorship were also "of and concerning" the Foundation.

30

In the alternative, the trial court held that NASCAR's statements were not "of and concerning" the Foundation because, in the court's view, the statement that the "team jumped the gun" in announcing the sponsorship was not "of and concerning" the Foundation, NASCAR's communications were "with BMS" and not the Foundation. R.8147 (SJ Order).

On the "on notice since November" statement, the court relied on the undisputed evidence that LGBcoin specifically was not discussed at the November 6, 2021 meeting and that the Foundation had no representative there, concluding the statement therefore could not be defamatory of the Foundation. R.8136, R.8148–8152.

The net effect of the court's falsity ruling was to credit Nyquist's and Forde's deposition denials — and Nyquist's explanation that Howell had merely made a "mistake" — as a matter of law, while excluding the Washington Post articles offered to show what NASCAR had actually communicated to the public.

That conclusion ignores both the content of the statements and Florida law. A plaintiff need not be named in the defamatory statement. "The defamed person need not be named in the defamatory words if the communication as a whole contains

31

sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Wolfson v. Kirk*, 273 So. 2d 774, 779 (Fla. 4th DCA 1973). The governing standard is the "common mind" rule: defamatory words "should be given a reasonable construction in view of the thought intended to be conveyed and that which would be a reasonable construction of the language by those who heard same." *Id.* at 778; *see also Miami Herald Pub. Co. v. Ane*, 423 So. 2d 376, 389 (Fla. 3d DCA 1982) (language "should be 'construed as the common mind would normally understand it'" (quoting *Walsh v. Miami Herald Publ'g Co.*, 80 So. 2d 669, 671 (Fla. 1955))), *approved,*, 458 So. 2d 239 (Fla. 1984).

Identification need not come from the face of the statement alone. "It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to." *O'Neal v. Tribune Co.*, 176 So. 2d 535, 548 (Fla. 2d DCA 1965).

32

In *O'Neal,* the court upheld a libel judgment where the defamatory article did not name the plaintiff at all, because readers who knew the surrounding circumstances could identify her from contextual details. *Id.* at 547–48. Similarly, in *Scott v. Busch,* 907 So. 2d 662, 666 (Fla. 5th DCA 2005), the court held the "of and concerning" element was satisfied where the audience understood the defendant was speaking about the plaintiff even though the defendant never named the plaintiff.

And where a statement is susceptible of two reasonable interpretations, one of which identifies the plaintiff, the question is for the jury, not the court. *Ane,* 423 So. 2d at 389; *Scott,* 907 So. 2d at 667 (where the statement "can be understood one of two ways, only one of which is defamatory to the plaintiff, it is normally a decision for the fact-finder to determine what a reasonable person hearing the statement would likely have understood it to mean, based on the circumstances and audience involved").

Here, the identification of the Foundation is far stronger than in *O'Neal* or *Scott.* NASCAR's statements were about "the sponsorship," "the LGBcoin sponsorship," and the value of LGBcoin itself. R.8146–8147 (SJ Order) (quoting *Washington Post* article that describes

33

LGBcoin as "a near-valueless cryptocurrency"); R.928–933 (3AC ¶¶ 95–122). The Foundation was the sponsor; LGBcoin was the very project the Foundation was incorporated to support. When NASCAR told reporters the sponsorship was "never approved" and that the Foundation had been "on notice since November," "the common mind" would naturally understand those statements as referring to the Foundation. *Wolfson*, 273 So. 2d at 778. At minimum, the "of and concerning" question presents a "quintessential question of fact" for the jury. *Jews for Jesus*, 997 So. 2d at 1108; *Ane*, 423 So. 2d at 389; *Scott*, 907 So. 2d at 667.

The court's contrary view—reflected in its punitive-damages order, where it held that the statements "were made before Plaintiff came into existence and were not about the Plaintiff" (R.8181)—is also wrong as a matter of fact. The Foundation existed as a trust under the LGBcoin Trust Agreement dated October 29, 2021 (R.8134 (SJ Order) (quoting Trust Agreement); R.970 (3AC Ex. 9), and was "charged with performing operational functions to support LGBcoin" (R.906 (3AC ¶ 19)).

34

The Foundation has standing as the successor-in-interest to that trust. *Correa v. Tovar-Restrepo*, 409 So. 3d 651, 656 (Fla. 3d DCA 2025); *Roller v. Collins*, 373 So. 3d 35, 43 (Fla. 5th DCA 2023).

Statements about LGBcoin and its sponsorship were statements about the very enterprise the Foundation was created to protect.

### C. The trial court erred because causation for the defamation claims was a jury question.

The trial court also granted summary judgment on Counts I and II for the additional and independent reason that, in its view, the Foundation could not show whether the LGBcoin market collapse was caused by NASCAR's allegedly defamatory characterizations of the sponsorship—or, instead, by the simple fact that NASCAR did not approve the sponsorship. R.8153–8154 (SJ Order). That ruling cannot stand for three reasons.

First, the trial court itself recognized the governing rule: "causation may … be inferred from a temporal sequence of events" in cases like this one. R.8153 (SJ Order) (citing *Mitchell v. Parker*, 271 F. Supp. 3d 1364 (N.D. Ga. 2017). Having stated that proposition

35

correctly, the trial court then granted summary judgment by resolving the temporal-sequence inference against the Foundation.

Second, the trial court's framing of the causation question is itself a contested fact. The court assumed that a coin holder's reaction to "NASCAR is rejecting a sponsorship" would be identical to a coin holder's reaction to "the foundation and its trustee and the team faked the sponsorship and are fraudsters like the majority of the ever-scamming crypto world."

That premise is not self-evident. Markets distinguish between deals that fall through (neutral) and deals that collapse because of perceived fraud, illegitimacy, or wrongdoing (devastating), hence coin holders bringing fraud suits against the Foundation and its trustee causing them severe reputational damage, loss of business, and legal costs.

Third, the Foundation came forward with affirmative evidence of causation. The Foundation's expert, Dr. Adam Werner, calculated the loss in LGBcoin's market capitalization and tied it temporally to the publication of NASCAR's statements. R.8154 (Order summarizing Werner testimony); Werner Decl. ¶¶ 1, 38–42. NASCAR's denials were republished and viewed hundreds of thousands of times across

36

multiple national outlets. R.918, R.923, R.1045 (3AC ¶¶ 76, 90–91, Ex. 35). On that record, a reasonable jury could find that the published characterizations of the sponsorship's collapse—not the collapse alone—drove the market's reaction. Summary judgment on causation was therefore improper.

### D. The court also erred by granting summary judgment on defamation by implication.

Defamation by implication arises when a defendant "juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts." *Jews for Jesus*, 997 So. 2d at 1108. NASCAR did exactly that. It took three true premises (rescission of an approval, a November meeting, market collapse of LGBcoin), combined with the false statements that the sponsorship was "never approved" and that the Foundation had been "on notice since November," and implied that the Foundation had fraudulently misrepresented an approval it knew did not exist. R.928–933 (3AC ¶¶ 95–122); R.4312–4325 (Pl.'s MSJ Opp.). The trial court's grant of summary judgment swept this independent theory aside. R.8148–8152.

37

### E. The court also erred by granting summary judgment on actual malice.

Actual malice is "knowledge that the statement was false or reckless disregard of whether it was false or not." *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1233 (Fla. 3d DCA 2021). Reckless disregard requires that "the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 1235 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). BMS and the Foundation repeatedly informed NASCAR that the public statements were false, attached Howell's written approval, and asked for a correction. NASCAR refused. R.929–930 (3AC ¶¶ 100–104); R.1240–1421 (Pl.'s Mtn. for Leave to Add Punitive Damages Exs. 5, 9, 14.) Nyquist's own contemporaneous internal communication acknowledged that it was Howell—not the team—who acted prematurely (R.2970–2971 (Howell Depo. 50:5–51:3 & Ex. 9)), yet Nyquist told reporters the opposite. That alone supplies a jury issue. The trial court took the contrary view by crediting Nyquist and treating his testimony as undisputed while ignoring Howell and others. That kind of credibility judgment belongs to the jury.

### F.  The trial court erred by granting summary judgment and reversing its earlier holding the Foundation lacked standing.

The trial court also held that the Foundation lacked standing to recover for losses suffered by non-party LGBcoin holders. R.8140–8144 (SJ Order). That ruling rested on a fundamental misunderstanding of Florida's real-party-in-interest framework. Standing is a question of law reviewed de novo. *Pet Supermarket*, 360 So. 3d at 1205. The Foundation is the successor to an express trust whose governing document charged the trustee "to protect and/or enforce the rights of all LGBcoins collectively." Even apart from trustee standing, the Foundation is authorized to maintain this action as an agent acting for the real parties in interest.

Florida Rule 1.210(a) lets a "trustee of an express trust" sue "in [his or her] own name without joining the party for whose benefit the action is brought," and its reach extends well beyond formal trustees.

Under this Court's precedent, an action "cannot be terminated on the ground that it lacks standing" where the plaintiff is the real party in interest or is acting on its behalf. *Kumar Corp. v. Nopal Lines, Ltd.*, 462 So. 2d 1178, 1183 (Fla. 3d DCA 1985).

39

Florida's real-party-in-interest rule "is permissive only"—"an action to be prosecuted in the name of someone other than, but acting for, the real party in interest." *Id.* at 1183. Under *Kumar*, "a nominal party, such as an agent, may bring suit in its own name for the benefit of the real party in interest." *Id.* at 1185. The Foundation satisfies this framework on multiple independent grounds.

*1. The Foundation is the successor to an express trust and stands in the trustee's shoes.* The Trust Agreement dated October 29, 2021 established the organizational structure for the LGBcoin project, with Koutoulas Law LLC serving as trustee. R.8134 (SJ Order, quoting Trust Agreement); 3AC Ex. 9. The Foundation was formally incorporated on January 5, 2022 as the successor-in-interest. R.8134.

Under Florida law, a successor trustee inherits the standing of its predecessor. In *Correa*, 409 So. 3d at 656, this Court held that a successor trustee "obtained standing to continue to prosecute the underlying action as successor trustee," and that Rule 1.210(a) authorized the successor to maintain the action without joining the beneficiaries.

40

The Fifth District has likewise held that "Florida law has long recognized that it is generally the trustee, and not a beneficiary, who is the real party in interest with authority to bring an action on behalf of the trust." *Roller*, 373 So. 3d at 40, 43 (successor trustee "would be considered the real party in interest" and "would have been the proper party to bring the action on behalf of the Trust").

The Trust Agreement here expressly vested the trustee with authority to enter legal agreements, manage liquidity pools, engage counsel, and "protect and/or enforce the rights of all LGBcoins collectively." R.8135 (SJ Order, quoting Trust Agreement). Upon incorporation, the Foundation assumed those rights and obligations and now stands in the trustee's shoes.

The Foundation's public conduct confirms this analysis. On January 5, 2022, Koutoulas publicly announced on Twitter, on behalf of the Foundation, the Foundation's intent to pursue claims against NASCAR arising from the rescinded sponsorship. That announcement was republished in *USA Today*. R.928–929 (3AC ¶¶ 95–99); R.1045 (3AC Ex. 35). An entity that has publicly identified itself as the party-in-interest—by name—to a national audience is not a non-entity for standing purposes.

41

*2. Even apart from trustee standing, the Foundation is authorized to maintain this action as an agent acting for the real parties in interest.* Even if the Foundation's relationship to the coin holders were characterized as something other than a formal trust, the result would be the same.

Under *Kumar*, Rule 1.210(a) is a rule of enlargement, not limitation. 462 So. 2d at 1184. An agent with authority to act for the real party in interest may bring suit in its own name. *Juega ex rel. Estate of Davidson v. Davidson*, 8 So. 3d 488, 489 (Fla. 3d DCA 2009) (reversing dismissal for lack of standing where "the plaintiff is an agent who had been granted full authority to act for the real party in interest"). *Juega* also confirms that "a principal may subsequently ratify its agent's act, even if originally unauthorized, and such ratification relates back and supplies the original authority." *Id.* at 490 (quoting *Kumar*, 462 So. 2d at 1185).

The Foundation was created specifically as the vehicle to represent and advocate for the interests of all LGBcoin holders; supporting LGBcoin, managing its marketing and technical development, and engaging counsel on behalf of the project is the very definition of acting on behalf of the real parties in interest. Under

42

*Kumar* and *Juega,* the Foundation's action on behalf of the coin holders cannot be terminated on standing grounds.

The trial court initially agreed, denying NASCAR's motion to dismiss on standing grounds. R.1197 (Order Denying MTD). In reversing on summary judgment, the court found there was a lack of notice to coinholders, R.8143 (SJ Order). But that finding improperly ignores the notice evidence proffered by the Foundation, namely the public post that was republished in USA Today. R.928–929 (3AC ¶¶ 95–99); R.1045 (3AC Ex. 35).

*3. The Foundation independently satisfies Florida's three-part standing test.* Florida courts also assess standing using the three familiar concepts of injury, causation, and redressability. *Pet Supermarket,* 360 So. 3d at 1205. The Foundation satisfies all three with respect to the coin holders' losses: the coin holders suffered a concrete injury (the collapse of LGBcoin's market capitalization from approximately $571 million to near zero), caused by NASCAR's defamatory campaign, that would be redressed by a judgment against NASCAR. The Foundation—as the entity created to represent the coin holders' collective interests—is the proper party to seek that redress.

### G. At minimum, any standing limitation should have capped damages—not eliminated the defamation claims.

Even if the trial court were correct that the Foundation cannot recover for losses suffered by non-party coin holders, that conclusion goes only to the scope of recoverable damages—not to whether Counts I and II could be tried at all. Under *Kumar*, an action "cannot be terminated on the ground that it lacks standing" where the plaintiff is a proper party to assert at least some of the injuries pleaded. 462 So. 2d at 1183. The orthodox remedy for a partial-injury standing problem is a damages limitation or a tailored jury instruction, not summary judgment for the defendant on the entire claim. The Foundation pleaded two distinct categories of injury: its own direct injuries and the derivative losses suffered by the coin holders it was formed to protect. Even on the trial court's view of standing, only the latter category was affected; the former plainly belonged to the Foundation alone.

The Foundation suffered its own direct injuries from NASCAR's false statements—reputational harm, the inability to pursue its mission, and the collapse of the project it was created to support. Counts I and II should have gone forward, with any scope-of-damages

44

issue handled at trial or in the instructions. Wholesale dismissal on standing grounds was independently reversible error.

## II. THE COURT APPLIED THE WRONG STANDARD AND WEIGHED EVIDENCE AGAINST THE FOUNDATION ON PUNITIVE DAMAGES.

Since summary judgment was improperly granted on the defamation counts, the Court should also reverse the trial court's order denying leave to seek punitive damages for those defamation claims.

### A. Section 768.72(1) requires only a "reasonable showing," not clear and convincing proof, at the leave-to-amend stage.

Section 768.72(1), Florida Statutes, allows a claim for punitive damages where "there is a reasonable showing by evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages." The "clear and convincing" evidentiary standard does not apply at the leave-to-amend stage. It is the standard the plaintiff will have to satisfy at trial—and the Third District has now repeatedly held that conflating the two is reversible error. *Gattorno*, 390 So. 3d at 137–38 ("the statute does not require the plaintiff to prove an entitlement to punitive damages by clear and convincing evidence at this pleading stage of the case"); *Palm Bay*

45

*Towers Condo. Ass'n, Inc. v. Marrazza*, 404 So. 3d 552, 556 n.2 (Fla. 3d DCA 2025) (same).

The Order Denying Punitive Damages did precisely what *Gattorno* and *Palm Bay Towers* forbid. The court framed its inquiry as "whether a reasonable jury, viewing the totality of proffered evidence in the light most favorable to the Plaintiffs, could find **by clear and convincing evidence** that punitive damages are warranted." R.8174 (Order) (quoting *Fed. Ins. Co. v. Perlmutter*, 376 So. 3d 24, 34 (Fla. 4th DCA 2023)); R.8181 (Order) (same). And the court denied leave with the express conclusion that the proffered evidence "could **never** meet the clear and convincing evidence standard at trial." R.8181–8182 (Order) (quoting *Perlmutter*). That is the wrong standard. Independent of the merits, applying the wrong standard requires reversal. *Gattorno*, 390 So. 3d at 137–38.

NASCAR will invoke the Fourth District's en banc decision in *Perlmutter*, 376 So. 3d 24, which the trial court cited below. R.8174; R.8181. *Perlmutter* does not help NASCAR for three reasons. First, this Court's own precedent controls. *Gattorno* and *Palm Bay Towers* squarely hold that the clear-and-convincing burden applies at trial,

not at the leave-to-amend stage. 390 So. 3d at 137–38; *Palm Bay Towers*, 404 So. 3d at 556 n.2.

This Court has reaffirmed that standard in every section 768.72 decision since, applying the "reasonable showing" / "reasonable basis" framework without adopting *Perlmutter*'s heightened pleading-stage standard. *See Five Fran, LLC v. Davis*, 404 So. 3d 581 (Fla. 3d DCA 2025); *940 Ocean Drive, LLC v. Sobe USA, LLC*, 403 So. 3d 1048, 1055-57 (Fla. 3d DCA 2025).

Second, even the Third District opinions that have cited *Perlmutter* have done so only for the uncontroversial proposition that the trial court serves a gatekeeping function—not for the proposition that clear-and-convincing proof is required at the pleading stage. *See Comway Trade Logistics, LLC v. Curet*, 404 So. 3d 596, 597 (Fla. 3d DCA 2025) (citing *Perlmutter* with "accord" signal for general gatekeeping role only); *JVA Eng'g Contractor, Inc. v. Doral 10, LLC*, 402 So. 3d 1175, 1176-78 & n.3 (Fla. 3d DCA 2025) (expressly declining to address the certified *Perlmutter* issue and noting the Florida Supreme Court has accepted jurisdiction). The Florida Supreme Court has accepted jurisdiction in *Perlmutter v. Federal Insurance Co.,* No. SC2024-0058 (Fla. Dec. 3, 2024), and heard oral

47

argument on October 9, 2025. But until the Supreme Court resolves the inter-district conflict, this Court's own precedent in *Gattorno* and *Palm Bay Towers* remains the governing law.

### B. The trial court drew every disputed inference against the Foundation.

Section 768.72 permits the trial court to weigh the evidence in the gatekeeping role, but the trial court must do so "in the light most favorable to the plaintiff." *Gattorno*, 390 So. 3d at 137 (in conducting de novo review, the appellate court "views the record evidence and the proffered evidence in the light most favorable to the plaintiffs and accepts said evidence as true for the purpose of reviewing whether a reasonable basis exists for punitive damages").

The Order Denying Punitive Damages took NASCAR's side on every disputed inference. For example, the court found that the "libel list" email was merely "tongue-in-cheek" (R.8180), characterized the internal "grift" and "bad human" communications as inactionable "pure opinion" (R.8181-8182), and concluded that the LGBcoin sponsorship statements "were not about the Plaintiff" because the Foundation supposedly "did not exist" at the time (R.8181). Each of those conclusions resolves a contested inference in NASCAR's favor.

48

### C. The proffer satisfies the "reasonable showing" standard several times over.

Viewed properly—in the light most favorable to the Foundation—the proffer establishes a more than reasonable basis for a jury to find by clear and convincing evidence that NASCAR engaged in intentional misconduct.

*1. Knowledge of Falsity.* Howell testified he approved the LGBcoin sponsorship in writing on December 26, 2021 and that telling the press "the team jumped the gun" would be false. (Howell Depo. 44:24–45:17, 49:21–50:4, 62:10–64:8 (collected at R.1589–4128 (Exhibits to MSJ); summarized in Order Denying Punitive Damages at R.8178–8179).) Howell's contemporaneous internal email acknowledged that he himself "may have jumped the gun." (Howell Depo. 50:5–51:3 & Ex. 9.)

Yet Nyquist told reporter Jim Utter the opposite—that the team "jumped the gun." (3AC ¶ 76, Ex. 26.) Nyquist also told the *Washington Post* that the sponsorship had not been "properly approved." R.963 (3AC Ex. 6; R.2581–2583, R.2585–2588 (Nyquist Depo. 99:18–101:17, 103:15–106:9). Knowing falsity is established (or at a minimum reasonably inferable). *Readon v. WPLG, LLC*, 317

So. 3d 1229, 1233–35 (Fla. 3d DCA 2021); *St. Amant v. Thompson,*
390 U.S. 727, 731 (1968).

2. *The "On Notice Since November" Fabrication.* NASCAR told
multiple media outlets that the Foundation and BMS had been "on
notice since November" that any LGBcoin sponsorship would never
be approved. R.928–929, R.963, R.1013, R.1045 (3AC ¶¶ 95–99, Exs.
6, 25, 35).

That statement is false on its face: every witness who attended
the November 6 meeting—and the trial court's own findings on
summary judgment—confirm that "LGBCoin was not discussed at all
at the meeting." R.8136 (SJ Order, citing Nyquist Depo. 27:3–5,
141:2–22; R.2276–2277, R.2280–2281 (MacLeod Depo. 29:4–30:20,
33:21–34:14); R.1804 (B. Brown Depo. 43:9–17); R.1629–1630,
R.1709 (J. Brown Depo. 40:7–41:13, 120:9–16). A statement that the
Foundation had been "on notice since November" about something
never discussed in November is, by definition, knowingly false.

3.     *Internal    Evidence    of    Malice.*    NASCAR's    internal
communications during the relevant period repeatedly disparaged
the Foundation. The trial court itself recounted that NASCAR's senior
executives called Koutoulas a "bad human" (R.8181 (Order Denying

50

Punitive Damages)); described the Foundation as a "rogue sponsor" (*id.*); called LGBcoin a "grift" (*id.*); and referred to the Foundation's principals as "quick-buck cryptocurrency hucksters" (*id.*).

In response to an inquiry from USA Today, NASCAR executives suggested they add the publication to the "libel list" of reporters to whom NASCAR agreed to speak "on background" about the controversy. R.8182 (Order) (noting NASCAR's internal email between Forde and Nyquist, R.1351 (Pl.'s Punitive Damages Ex. 15). The inquiring USA Today reporter, in fact, proceeded to republish false statements about the Foundation after obtaining confirmation from a senior NASCAR official, in addition to the Foundation's notice giving its intent to sue NASCAR R.928–929 (3AC ¶¶ 95–99); R.1045 (3AC Ex. 35).

And when LGBcoin holders later sued the Foundation, a NASCAR executive wrote internally: "LGB Coin holders filed a lawsuit lol." R.933 (3AC ¶ 122); R.1419–1420 (Pl.'s Mtn. for Leave to Add Punitive Damages at Ex. 39).

Florida law treats such evidence as probative of malice. *Don King Productions, Inc. v. Walt Disney Co.,* 40 So. 3d 40, 44 (Fla. 4th DCA 2010) ("ill will or motive, when combined with other evidence,

51

may amount to actual malice"). The trial court's contrary characterization—that these statements were "pure opinion" or "tongue-in-cheek" (R.8182–8183)—drew inferences against the non-movant in violation of *Gattorno*.

*4. Refusal to Correct.* After receiving documentary proof that Howell had approved the sponsorship in writing, NASCAR refused BMS's repeated demands for a corrective statement and never retracted any of its public statements. R.1289–1294 (Pl.'s Mtn. for Leave to Add Punitive Damages Exs. 9, 14). Accordingly, these defamatory statements are still published and come up on search results about plaintiff causing ongoing damages. A defendant's refusal to retract once put on notice of falsity is powerful evidence of reckless disregard. *Nodar v. Galbreath*, 462 So. 2d 803, 811 (Fla. 1984).

## III. MULTIPLE TRIAL ERRORS, INDIVIDUALLY AND CUMULATIVELY, REQUIRE A NEW TRIAL.

### A. The two-issue rule does not apply to a single cause of action with multiple elements

NASCAR has argued that the two-issue rule bars relief because the jury's "No" on Question 2 could rest on any of several defense theories. R.8059–8079. That is wrong. The two-issue rule "does not

52

apply where, as here, the two 'defenses' involved comprised separate elements of proof ... necessary for the plaintiffs to prevail on a single cause of action." *Grenitz v. Tomlian*, 858 So. 2d 999, 1006 (Fla. 2003). The rule "applies only to actions brought on two theories of liability." *Id.* The Foundation tried a single theory—promissory estoppel—on a verdict form with a single liability question (Question 1) and a single reliance-foreseeability question (Question 2). R.7995–7996. NASCAR's "varied factual arguments" for a No answer were arguments about a single element, not independent theories of defense.

### B. NASCAR's closing argument that the Foundation "did not exist" was an improper legal argument that prejudiced Question 2.

NASCAR's counsel argued in closing that the Foundation "didn't exist at the time" and that Koutoulas "was acting as a trustee of this entity that wasn't created yet." (Oct. 6, 2025 Trial Tr. 205:25–206:9.) This argument was improper for two related reasons. First, the trial court had already adjudicated the legal question of the Foundation's existence and capacity to sue—the Foundation's promissory-estoppel claim survived summary judgment in the same May 25, 2025 order that addressed standing (R.8131–8169). NASCAR cannot relitigate to

53

the jury a question already decided by the court. *Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1028 (Fla. 2000) (attorneys must "confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence"). Second, the argument was factually incorrect: the Foundation was the successor-in-interest to the trust created by the October 29, 2021 Trust Agreement (R.8134 (SJ Order) (quoting Trust Agreement)). The trial court itself relied on the Foundation's existence as a trust in its summary-judgment ruling. R.8131–8169.

The error was preserved. Before trial, the Foundation moved in limine to bar NASCAR from arguing or implying to the jury that the Foundation "did not exist" at the time of the relevant events. (Sept. 29, 2025 Trial Tr. 148:25-152:1.) The Foundation re-raised the motion at the close of evidence after NASCAR's cross-examination of Koutoulas signaled that NASCAR intended to press the existence point in closing. (Oct. 3, 2025 Trial Tr. 367:24–373:23.) The court permitted the closing argument over the Foundation's objection. (*Id.*)

The error went straight to Question 2. The "should have expected" element of promissory estoppel is an objective standard that looks to what the promisor reasonably should have expected. *DK*

54

*Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 93 (Fla. 2013); Fla. Std. Jury Instr. (Contract & Bus.) 416.46. A jury told that the promisee "did not exist" would naturally conclude that NASCAR could not have expected its promise to alter the promisee's behavior. That is the precise prejudice.

The prejudice was compounded by the way NASCAR tried the case. During the cross-examination of Koutoulas, NASCAR published the sponsorship agreements to the jury, but refused to show Koutoulas or the jury the portions of the document that identified the LGBcoin Foundation as the sponsor, literally zooming in and moving the view to obscure it to such an extent that Mr. Koutoulas had to object from the witness stand. (Sep. 29, 2025 Trial Tr. 131:13-17 ("Q. So first of all, this doesn't say the agreement is with the plaintiff in this, LetsgoBrandon.com Foundation, correct? A. It does, but you zoomed out so people can't see that."); *id.* 133:12-17 ("Q. At this time the plaintiff in this case, LetsgoBrandon.com Foundation, did not exist, did it? A. It existed as a constructive trust which is clearly indicated on the first page that you're refusing to show the jury."); *id.* 122:9-124:18 ("Well, if you skip ahead on a couple pages it's very clear that the sponsor is LGBcoin Foundation...I think if you go two

55

pages previous where there's actually room, it says LGBcoin Foundation…you're mischaracterizing what you're seeing and I'm trying to clarify that.").)

Having confused the jury about what it saw, NASCAR then told the jury in closing that the Foundation "did not exist" and argued there never was a Foundation to promise anything.

### C.  NASCAR's closing reference to the excluded Latona text messages was incurable, and the issue was preserved without a motion for mistrial.

Mid-trial, NASCAR attempted to cross-examine Koutoulas using a text-message exchange between Koutoulas and Rick Latona. The Foundation objected on the ground that the document was not in evidence. The court sustained the objection on the record, instructing counsel: "you may ask him questions, but you can't just read an entire text string." (Sept. 30, 2025 Trial Tr. 119:4–22.) In closing, NASCAR's counsel nevertheless read from and characterized the same excluded text exchange—repeatedly. (Oct. 6, 2025 Trial Tr. 187:2–10 (introducing the text by identifying "Mr. Latona" as one of the negotiators); *id.* 188:2–15 (paraphrasing the excluded text: "I'm comfortable we can do LGBcoin"); *id.* 189:3–22 (imputing Latona's communications to Mascioli); *id.* 200:11–17 (closing reinforcement).)

56

The Foundation's contemporaneous objection during closing was not sustained: the court simply reminded the jury that attorneys' statements are not evidence. (*Id.* 187:11-20.) A mistrial motion is not required to preserve an issue where the objection is not unequivocally sustained. *Robinson v. State*, 989 So. 2d 747, 750 (Fla. 2d DCA 2008); *Rierson v. Deveau*, 273 So. 3d 1041, 1044 (Fla. 3d DCA 2019).

Reading the contents of excluded evidence to the jury during closing argument is highly prejudicial. *Mercury Ins. Co. of Fla. v. Moreta*, 957 So. 2d 1242, 1250–51 (Fla. 2d DCA 2007) (improper to argue facts not in evidence; new-trial standard is whether the argument was "so highly prejudicial … that it denied the opposing party its right to a fair trial") (quoting *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246, 1271 (Fla. 2006)); *Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1257 (Fla. 2014) (harmful error standard places burden on beneficiary of error). The text exchange allowed NASCAR to suggest, without evidence, that Koutoulas and Mascioli had pre-coordinated to push the sponsorship forward regardless of approval—directly relevant to Question 2.

57

### D. The court erred by excluding the Washington Post articles.

The Foundation attempted to offer into evidence two *Washington Post* articles, both by reporter Liz Clarke, both reporting NASCAR's own statements about the LGBcoin sponsorship. The first, published January 1, 2022, reported categorically that, "[a]ccording to a NASCAR employee familiar with the governing body's deliberations, it has not yet approved the LGBcoin sponsorship." R.1022 (3AC Ex. 29).

The second, published January 4, 2022, reported that "the announcement was premature, apparently based on an okay granted over the Christmas holidays by a NASCAR employee who was not authorized to sign off on the relationship," and that "NASCAR's decision reflects no rescission or backtracking, given that the sponsorship had never been properly approved." R.963 (3AC Ex. 6).

The articles were not collateral. The Foundation's damages expert testified at trial that LGBcoin's price decline began on the very day the January 1 article was published. (Oct. 3, 2025 Trial Tr. 159:1–6.) That timing went directly to causation. The articles were also the most direct evidence of what reached the market and of

58

NASCAR's own awareness that its conduct mattered enough to warrant public messaging.

The articles were also central to Question 2 of the verdict form—whether NASCAR "reasonably should have expected the promise to alter the Foundation's behavior"—because the statements NASCAR made to the *Post* demonstrate how the team and approval were intertwined with the sponsor itself, which goes to whether NASCAR should have reasonably expected its approval to change the Foundation's behavior.

NASCAR obtained the exclusion ruling by misrepresenting the scope of its own pretrial motion in limine. On the first day of trial, the Foundation pointed out that NASCAR's MIL covered only "Republished Newspaper Articles" written by reporters with whom NASCAR did not speak; NASCAR's counsel denied this and told the court the MIL covered all articles. (Sept. 29, 2025 Trial Tr. 155:22–156:5 ("THE COURT: So there are articles coming in without objection? MS. MERCIER: No. No.").)

Contrary to NASCAR's representation, its motion in limine expressly excluded reports published by journalists who spoke with NASCAR directly. R.4506-4507 (Def. MIL).

59

This was not lost on Plaintiff. In fact, it was such a conspicuous omission from the motion in limine, that Plaintiff included a footnote in its opposition, to explain why it was not directly addressing the admissibility of that evidence. *See* R.5561 (Pl. Opp. to Def. MIL) ("NASCAR is not moving to exclude articles published by the five reporters that NASCAR admits it spoke to.").

The trial court nonetheless excluded them as hearsay, reasoning that the Foundation must be offering them "for the truth of the matter asserted." (Sept. 29, 2025 Trial Tr. 175:13–177:8.) The motion in limine arguments preserved the issue. *Aarmada Prot. Sys. 2000, Inc. v. Yandell*, 73 So. 3d 893, 898 (Fla. 4th DCA 2011) ("if an adequate record of excluded evidence has been made at the hearing on the motion in limine, it is not necessary to make an offer of proof at trial").

The articles were independently admissible on four grounds, any one of which required admission.

### i. The statements in the Washington Post articles were not hearsay because they were adopted by Nyquist and NASCAR.

*First*, the articles were not hearsay because they were adoptive admissions of a party opponent under section 90.803(18)(b), Florida

Statutes. Nyquist confirmed in deposition—repeatedly and specifically—that he was the NASCAR source for the statements Clarke reported and that her descriptions accurately reflected what he told her.

For the January 1 article, Nyquist testified that the article "make[s] note of the fact that it was not yet approved, which was a correct and factual statement." R.2583-2586 (Nyquist Dep. 100:7-101:17, 102:10–16; 104:3-15.)

For the January 4 article, the exchange was even more direct: "Q. 'But the announcement was premature, apparently based on an okay granted over the Christmas holidays by a NASCAR employee who was not authorized to sign off on the relationship.' Is that something you told Ms. Clarke? A. Yes. Q. Is that something you told Ms. Clarke? A. Yes." R.2592 (Nyquist Dep. 110:6–14.) And again: "Q. Are you the NASCAR official with direct knowledge of the deliberations? A. Correct." R.2591 (Nyquist Dep. 109:21–23.) When asked whether the "never been properly approved" paragraph contained anything inaccurate, Nyquist answered: "No. Yeah. Yes. It had not been properly approved. Yeah. I think it's accurate." R.2596 (Nyquist Dep. 114:12–15.)

The January 4 article also reported that "according to an official with direct knowledge of the process, NASCAR's decision reflects no rescission or backtracking, given that the sponsorship had never been properly approved." R.962-965. Nyquist admitted to telling Clarke that too. R.2591, R.2595-2596 (Nyquist Dep. Tr. 109:15-23; 113:20-25; 114:1-15.)

A party's adopted statements are admissible. § 90.803(18)(b), Fla. Stat. Where a party statement is reported in a news article, and the declarant subsequently confirms that statement, such as during a deposition, it is considered an adoptive admission and is no longer hearsay. *Philip Morris USA, Inc. v. Pollari*, 228 So. 3d 115, 124 (Fla. 4th DCA 2017) (analyzing adoption-by-use).

Decisions applying the Federal Rules of Evidence are considered persuasive authority in Florida. *Rich v. Kaiser Gypsum Co.*, 103 So. 3d 903, 908 (Fla. 4th DCA 2012) ("The federal courts' interpretation of the Federal Rules of Evidence may be relied upon as a persuasive authority when interpreting the corresponding provisions of the Florida Evidence Code."). And a survey of federal cases confirms that adopted statements from a newspaper article are not hearsay. *See Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 495 (D.

62

Del. 2005) ("Schrempp adopted the statements he made during the interview that were printed in The Financial Times article. As such, those statements are not hearsay, but are admissions of a party opponent."); *Estate of Bisignano by & through Huntsman v. Exile Brewing Co., LLC.*, 694 F. Supp. 3d 1088, 1099 (S.D. Iowa 2023) (news articles admitted because party "through its conduct, manifest[ed] its adoption or belief of the article's truth."). The Foundation has located no Florida decision excluding a news article on hearsay grounds where the declarant has admitted speaking to the reporter and confirmed the article's accuracy.

### ii. The statements in the Washington Post articles are not hearsay because they were being offered to prove their effect,

*Second*, the articles were non-hearsay for the independent purpose of showing what information reached the market at the moment LGBcoin's price began to decline. News reports introduced to show what was "in the public realm at the time" are routinely admitted on that non-hearsay theory, particularly in cases turning on market reaction. *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 927 (S.D. Cal. 2019) (articles admitted "not for the truth of the matter asserted in the reports . . . but rather to demonstrate how the

63

market understood and interpreted" the issuer's disclosure); *In re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1004 (N.D. Cal. 2017) (articles admitted via judicial notice to prove "what was in the public realm at the time").

That purpose was indispensable here: NASCAR's causation theory at trial blamed the Foundation's own trades for the price collapse, and the only way to rebut that theory was to show the jury what the market was actually reading at the relevant moment.

### iii. The statements in the Washington Post articles are not hearsay because they were being offered to prove detrimental reliance.

*Third*, the articles were independently admissible to prove the "detrimental" component of detrimental reliance, an essential element of promissory estoppel. *Dyck-O'Neal, Inc. v. Norton*, 267 So. 3d 478, 482 (Fla. 2d DCA 2019) ("[T]he reliance must also yield some manner of an adverse or detrimental change in the party's position."). Reliance is one thing; detrimental reliance—the change in position that left the Foundation exposed when NASCAR's contradictory statements emerged in print—is the other. The articles were the contradictory statements. They were the direct evidence of why the

64

Foundation's reliance proved detrimental. They were what made the reliance detrimental.

### iv. The statements in the Washington Post articles were also not hearsay because they were admissible impeachment evidence.

*Fourth*, the articles were admissible to cast doubt on Nyquist's and Forde's trial testimony and as corroborative evidence on the central credibility contest in the case. §§ 90.608, 90.803, Fla. Stat.; *State Farm Fire & Cas. Co. v. Pettigrew*, 884 So. 2d 191, 198 (Fla. 2d DCA 2004) ("[T]he excluded evidence was not merely cumulative. The limitation imposed by the trial court thwarted the efforts of the defense to attack the credibility of the [opposing witnesses] . . . . The improper exclusion of evidence substantially interfered with the insurers' ability to present a crucial element of their defense.").

### v. The exclusion of the articles was harmful.

The exclusion was harmful, and the burden to show otherwise lies with NASCAR. *Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1256 (Fla. 2014) ("the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict").

NASCAR cannot carry that burden. The Foundation bore the heightened "clear and convincing" burden on its promissory-estoppel

65

claim, *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 925 (Fla. 1989), and the articles were the clearest and most convincing evidence available to it: NASCAR's own contemporaneous statements to a national newspaper, adopted and never renounced, directly contradicting the position NASCAR took at trial. Forcing the Foundation to rely on witness recollection of articles when the articles themselves were available substantially impaired the Foundation's ability to make its case on Question 2. *Pettigrew*, 884 So. 2d at 198. The grant of summary judgment on the defamation counts (based in part on finding the articles hearsay) also significantly prejudiced the Foundation, as the Court barred it from seeking reputational damages.

### E. The court erred by refusing to permit the mid-trial deposition of NASCAR President Steve Phelps.

Before trial, Phelps avoided deposition by declaring he had no "unique, personal knowledge or information" regarding the facts at issue in this litigation." R.3870-3871, R.3887 (Nov. 8, 2024 Hrg. Tr. 3:14-4:8, 20:5-15).

At trial, however, Nyquist testified that the LGBcoin sponsorship decision had been escalated to Phelps and CEO Jim

66

France, that Phelps and France met privately about the decision, and that the matter "ha[d] gone all the way to the very top." (Oct. 3, 2025 Trial Tr. 19:14–20:22.) The court itself characterized the testimony as Phelps having "the final call, the final decision." (Oct. 3, 2025 Trial Tr. 211:19–20.)

That testimony directly contradicted Phelps's declaration. The Foundation accordingly moved on the record for a brief mid-trial deposition (Oct. 3, 2025 Trial Tr. 58:7–15) and made a detailed offer of proof (*id.* 209:7–210:13). The court refused: "I'm not pausing this trial for an apex deposition for that reason. So your issue is preserved." (*Id.* 212:1–3.)

The apex-deposition doctrine permits the deposition of a high-level executive on a showing of "unique, personal knowledge" unobtainable from lesser officials, employees, or documents. *McLane Foodservice, Inc. v. Wool*, 400 So. 3d 757, 760 (Fla. 3d DCA 2024). Nyquist's testimony established exactly that: only Phelps could speak to his private conversation with Jim France and his role in the "final call."

The "unobtainable" element of the apex inquiry was particularly strong here because NASCAR's own trial witnesses confirmed that

67

the internal communications had been kept off paper. Nyquist testified that NASCAR's internal communications about the sponsorship were conducted by telephone (Oct. 1, 2025 Trial Tr. 86:19–22), and the record reflects that NASCAR personnel deliberately avoided putting these communications in writing (Oct. 3, 2025 Trial Tr. 50:1–51:17). On a record like that, no document discovery could substitute for testimony from the executive who made the "final call."

The value of Phelps' testimony is far from speculative. After trial, in an unrelated case, NASCAR produced multiple text messages in discovery show that Phelps exhibiting malice towards conservatives.[2] Phelps subsequently was forced to resign as Commissioner of NASCAR.[3] Plaintiff was deprived of the opportunity to depose Phelps about his views of conservatives and perhaps that evidence would have come into this case.

---

[2] https://www.outkick.com/sports/nascar-execs-exposed-after-leaked-texts-show-disgraceful-messages-some-about-trump-stupid-redneck.

[3] https://www.espn.com/racing/story/_/id/47526903/nascar-commissioner-steve-phelps-resigns-amid-backlash-texts.

Phelps's deposition was the only available source of his unique knowledge. Refusing to reopen the protective order on a record that directly contradicted Phelps's declaration was an abuse of discretion.

## F. The errors were prejudicial individually and overwhelming cumulatively.

Each error independently warrants a new trial. Together they ensured the jury answered Question 2 on a record stripped of the Foundation's most compelling evidence and saturated with improper legal arguments and excluded material. The denial of a new trial was an abuse of discretion.

## CONCLUSION

The trial court resolved a credibility contest on summary judgment, demanded trial-grade proof at the pleading stage, and let counsel argue excluded evidence in closing. Each error is independently reversible. Together they ensured that a $571 million project—and the Foundation created to protect its holders—never received the trial the law requires.

For the foregoing reasons, the LetsGoBrandon.com Foundation respectfully requests that this Court (1) reverse the May 25, 2025 Order Granting Summary Judgment as to Counts I and II

69

(defamation and defamation by implication), and remand for trial on the merits; (2) reverse the May 25, 2025 summary judgment standing ruling and hold that the Foundation has standing to recover for losses suffered by all LGBcoin holders, or in the alternative hold that any standing limitation should not have resulted in dismissal of the defamation claims; (3) reverse the April 22, 2025 Order Denying Motion to Amend to Add a Claim for Punitive Damages and remand with instructions to permit the amendment; (4) reverse the February 16, 2026 Order Denying Plaintiff's Motion for New Trial and order a new trial on Count III (promissory estoppel); and (5) award appellate costs and attorney's fees as authorized by law.

Dated: May 26, 2026                  Respectfully Submitted,

/s/ *Joseph M. Delich*
Joseph M. Delich, Esq. (*pro hac vice*)
10 Grand Central
155 E. 44th Street, Suite 915
New York, New York 10017
Tel: (646) 970-7541
Fax: (646) 392-8842
Email: jdelich@fnf.law

Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
1815 Purdy Ave.
Miami Beach, FL 33139
Tel: (305) 924-2900

70

Fax: (646) 392-8842
Email: vel@fnf.law

71

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of May, 2026, a true and correct copy of the foregoing Initial Brief of Appellant was furnished by electronic transmission through the Florida Courts E-Filing Portal to: Judith M. Mercier, Esq. (judy.mercier@hklaw.com), Scott D. Ponce, Esq. (scott.ponce@hklaw.com), Holland & Knight LLP, 701 Brickell Avenue, Suite 3000, Miami, Florida 33131, counsel for Appellee.

/s/ Joseph M. Delich
Joseph M. Delich, Esq.

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the font requirements of Florida Rule of Appellate Procedure 9.045(b) in that it is set in Bookman Old Style, 14-point font, and that it complies with the word-count limitation of Florida Rule of Appellate Procedure 9.210(b)(1) in that, exclusive of the cover page, table of contents, table of authorities, certificate of service, and certificate of compliance, it contains fewer than 13,000 words.

<u>/s/ Joseph M. Delich</u>
Joseph M. Delich, Esq.