**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| ERIC DE FORD, SUSAN BADER, SHAWN R. KEY, Individually and on Behalf of All Others Similarly Situated, | ) Case No.: 6:22-cv-00652-PGB-DCI ) ) ) |
| Plaintiffs, | ) CLASS ACTION ) |
| v. | ) ) |
| JAMES KOUTOULAS, LGBCoin, LTD. | ) JURY TRIAL DEMANDED ) |
| Defendants. | ) |

**ATTORNEY NICOLE MARTELL'S NOTICE OF**
**CANDOR WITH THE COURT REGARDING COURT'S**
**REFERENCE TO ALLEGED "AI HALLUCINATIONS" (DOC. 531)**

**COMES NOW**, Nicole Martell, Esquire on behalf of Di Pietro Partners, PLLC proceeding and hereby respectfully files this Notice of Candor with the Court Regarding the Court's Reference to Alleged "AI Hallucinations" (Doc. 531), and states as follows:

1. On December 2, 2025, the Court entered an Order on Defendants' Amended Motion for Summary Judgement (Doc. 477 the "Motion"). (Doc. 531 the "Order").

2. In Footnote 9 of the Order, the Court addressed three (3) citations used in support of Defendant's Motion that the Court believed were "AI Hallucinations" and issued a caution regarding sanctions for making alleged

1

misrepresentations to the Court.

3. The three cases the Court cited are as follows:

   a. *In re Dogecoin Securities Litigation*, No. 23-cv-03984, 2024 WL 3409758 (S.D.N.Y. June 24, 2024);

   b. *In re Shiba Inu Securities Litigation*, 2024 WL 2978901 (S.D.N.Y. May 15, 2024);

   c. *In re Uniswap Labs Litigation*, 2023 WL 3478680 (S.D.N.Y. May 16, 2023).

4. Attached hereto is a copy of the relevant orders relied upon, which formed the basis for Defendants' arguments in their Motion. These citations were inadvertent clerical errors due to these cases being recent, active and, in some instances, unreported rulings. The citations were in fact an unintentional *human* error.

5. The lower court case names and numbers for each case is as follows:

   a. *In re Dogecoin Securities Litigation*: *Gorog et al v. Musk et al*, U.S. District Court, Southern District of New York, 1:22-cv-05037-AKH (**See Exhibit "A")**;

   b. *In re Shiba Inu Securities Litigation: Securities and Exchange Commission v. Coinbase, Inc. et al.*, U.S. District Court, Southern

2

District of New York, 1:23-cv-04738-KPF (**See Exhibit "B"**)[1];

c. *In re Uniswap Labs Litigation*: *Risley v. Universal Navigation Inc. et al*, U.S. District Court, Southern District of New York, 1:22-cv-02780-KPF (**See Exhibit "C"**).

6. Additionally, each of these citations was to a Westlaw ("WL") document citation. Westlaw is considered a "closed source" that requires a subscription. AI tools cannot access closed sources such as Westlaw. As such, AI would not have referenced a "WL" document citation, further supporting an inadvertent clerical error.

**WHERFORE,** the undersigned respectfully files this Notice of Candor to address the Court's allegation regarding the undersigned's professional conduct before this tribunal.

Respectfully Submitted,

**DI PIETRO PARTNERS, LLP**
901 East Las Olas Blvd.
Suite 202
Fort Lauderdale, FL 33301
Primary Email Address:
*service@ddpalaw.com*
Secondary Email Address:
paralegal3@ddpalaw.com
Telephone: (954) 712-3070
Facsimile: (954) 337-3824

*/s/ Nicole Martell*
**NICOLE M. MARTELL, ESQ.**

---

[1] This case was identified early on in Defendants' research, at which time the lower court had initially dismissed Plaintiffs' claims, however the 2nd Circuit subsequently partially reversed and remanded.

Florida Bar No.: 100172
*nicole@ddpalaw.com*
*Counsel for Defendants*


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed and served through the Florida Courts E-Filing Portal to the Service List below on January 14, 2025.

*/s/ Nicole Martell*
**NICOLE M. MARTELL, ESQ.**
Florida Bar No.: 100172

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                :

COLBY GOROG, JOSHUA FLINT, LOUIS   :
ROBINSON, and MICHAEL LERRO, individually :
and on behalf of all others similarly situated,   :
                :
           Plaintiffs,   :
     -against-   :
                :
ELON MUSK and TESLA, INC.,   :
                :
           Defendants.   :
-------------------------------------------------------------- x

**ORDER GRANTING
DEFENDANTS' MOTION TO
DISMISS**

22 Civ. 5037 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

Defendants move to dismiss the Fourth Amended Complaint ("4AC") for a number of

reasons, only one of which needs to be discussed. The 4AC contains the allegations of material

misrepresentations by Defendants for Elon Musk's tweets about Dogecoin, in violation of

Section 10(b) of the Securities and Exchange Act and Rule 10b-5, that Defendants Elon Musk

and Tesla manipulated the Dogecoin market in violation of Section 10(b) and Rules 10b-5(a) and

(c), that Defendants traded on insider information in violation of 15 U.S.C. § 78t-1, and state law

claims. For the reasons below, Defendants' motion to dismiss is granted.

Plaintiffs allege false and misleading statements at FAC ¶¶ 60, 68, 82, 84, 85, 87, 90, 92–

94, 98, 103, 120, 124, and 223. ECF No. 108. These paragraphs allege statements by Musk on

"Twitter" to the effect that Dogecoin might be his favorite currency and that he had purchased

some for his son, that Dogecoin is the people's crypto and the future currency of Earth, that

Dogecoin might become the standard for the global financial system and the currency of the

internet, that Musk agreed to become Dogecoin's CEO, and that Musk might put a "literal"

Dogecoin in SpaceX and fly it to the moon and that Dogecoin would pay for the mission, that

Tesla vehicles could be bought with Dogecoin, and the like. These statements are aspirational

1

and puffery, not factual and susceptible to being falsified. They cannot be the basis of 10b-5 lawsuit, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), and no reasonable investor could rely upon them. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007).

As for Musk and Tesla's alleged "pump and dump" scheme, it is not possible to understand the allegations that form the basis of Plaintiffs' conclusion of market manipulation, a "pump and dump" scheme, a breach of a fiduciary duty amounting to insider trading, or the state law claims. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).

Defendants' motion to dismiss the Fourth Amended Complaint is granted with prejudice. The Clerk shall enter judgment in Defendants' favor and tax costs, dismiss the Fourth Amended Complaint with prejudice, terminate all open motions, and mark the case closed.

SO ORDERED.

Dated:     August 29, 2024
          New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COLBY GOROG, JOSHUA FLINT, LOUIS ROBINSON, and MICHAEL LERRO, individually and on behalf of all others similarly situated, | Civil Action No.: 1:22-cv-05037-AKH |
| Plaintiffs, | ECF Case |
| v. | |
| ELON MUSK and TESLA, INC., | |
| Defendants. | |

**STIPULATION RESOLVING PLAINTIFFS' NOTICE OF APPEAL
AND THE PARTIES' POST-JUDGMENT MOTIONS**

Plaintiffs Colby Gorog, Joshua Flint, Louis Robinson, and Michael Lerro, individually and on behalf of all others similarly situated ("Plaintiffs"), by and through their undersigned counsel, and Defendants Elon Musk and Tesla, Inc. ("Defendants"), by and through their undersigned counsel, respectfully submit this stipulation withdrawing Plaintiffs' notice of appeal from this Court's order dismissing the Fourth Amended Complaint with prejudice (Dkt. No. 115) and withdrawing all of the parties' outstanding motions and requests for post-judgment relief in the above-captioned action (Dkt. Nos. 116-127, 136-142, and 144-145).

WHEREAS, on August 29, 2024, this Court entered an order dismissing Plaintiffs' Fourth Amended Complaint with prejudice (Dkt. No. 113);

WHEREAS, on August 30, 2024, the Clerk of Court entered Final Judgment in Defendants' favor, taxed costs, dismissed the Fourth Amended Complaint with prejudice, and closed the case (Dkt. No. 114);

WHEREAS, on September 19, 2024, Plaintiffs filed a notice of appeal from this Court's Order dismissing the Fourth Amended Complaint ("Notice of Appeal") (Dkt. No. 115);

WHEREAS, on September 27, 2024, Defendants filed a Motion to Amend, Make Additional Findings, and Amend the Final Judgment Pursuant to Federal Rules of Civil Procedure 52(b) and 59(e) and 15 U.S.C. § 78u-4(c) (the "Motion to Amend the Judgment") (Dkt. Nos. 116-118, 136-138), which Plaintiffs opposed (Dkt. Nos. 119-124, 140);

WHEREAS, on October 10, 2024, Plaintiffs filed a Cross-Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927, Disqualification of Defense Counsel and to Seal Document (the "Cross-Motion") and a Declaration of Plaintiffs' Attorney Evan Spencer in Support of Cross-Motion to Disqualify, Sanction, and Seal Document ("Spencer Cross-

1

Motion Declaration") (Dkt. Nos. 125-127), which Defendants opposed and moved to strike (Dkt. Nos. 139, 141-142);

WHEREAS, on October 22, 2024, the United States Court of Appeals for the Second Circuit issued a Notice of Required Case Status Update staying the Appeal pending resolution of Defendants' Motion to Amend the Judgment and directing Appellant to provide status updates to the Second Circuit at 30-day intervals beginning 30 days from the date of the notice and within 14 days after final disposition of the last outstanding motion (Dkt. No. 134);

WHEREAS, on October 25, 2024, Defendants filed a Notice of Motion and Motion to Strike the Declaration of Plaintiffs' Attorney Evan Spencer and Plaintiffs' Cross-Motion to Disqualify, Sanction, and Seal and all arguments based on the Spencer Declaration ("Motion to Strike") and opposed Plaintiffs' Cross-Motion (Dkt. Nos. 139, 141-42), which Plaintiffs opposed (Dkt. No. 144-145);

WHEREAS, on October 28, 2024, Plaintiffs served Defendants with "a confidential 21-day safe harbor notice under FRCP Rule 11," and publicly docketed the notice with the Court on November 8, 2024 (Dkt. Nos. 145-4 & 145-5); and

WHEREAS, Defendants' reply memorandum of law in support of Defendants' Motion to Strike is due on November 15, 2024.

NOW, THEREFORE, THE PARTIES HEREBY STIPULATE AND AGREE AS FOLLOWS, subject to this Court's endorsement:

1. Defendants' time to file their reply memorandum of law in support of Defendants' Motion to Strike (currently due November 15, 2024) is suspended, pending this Court's endorsement of this Stipulation Resolving Plaintiffs' Notice of Appeal and the Parties' Post-Judgment Motions;

2

2.     Plaintiffs withdraw their Notice of Appeal (Dkt. No. 115) with prejudice;

3.     On or before the 30-day Status Update date (November 21, 2024), Plaintiffs will inform the United States Court of Appeals for the Second Circuit that they have withdrawn their Notice of Appeal and that Plaintiffs will not perfect their Appeal;

4.     Within 2 business days after this Court's memo endorsement of this Stipulation Resolving Plaintiffs' Notice of Appeal and the Parties' Post-Judgment Motions, Plaintiffs will provide the United States Court of Appeals for the Second Circuit with a copy of the Court's order.

5.     Plaintiffs withdraw the Cross-Motion (Dkt. Nos. 125-127) with prejudice;

6.     Defendants withdraw the Motion to Amend the Judgment (Dkt. Nos. 116-118, 136-138) with prejudice;

7.     Defendants withdraw the Motion to Strike (Dkt. Nos. 139, 141-142) with prejudice.

8.     Plaintiffs will not seek or file any further motions for any further post-judgment relief, in this Court or in the United States Court of Appeals for the Second Circuit, including, but not limited to any motion pursuant to Federal Rule of Civil Procedure 11.

9.     Plaintiffs will not challenge, in this Court, the United States Court of Appeals for the Second Circuit, or any other court, this Court's order dismissing the Fourth Amended Complaint with Prejudice or the Final Judgment closing this case (Dkt. Nos. 113-114).

DATED:  New York, New York
        November 14, 2024


QUINN EMANUEL URQUHART &                    EVAN SPENCER LAW, PLLC
SULLIVAN, LLP


_____                     /s/ Evan Spencer


3

Alex Spiro
Sarah Heaton Concannon
Brenna Nelinson
51 Madison Avenue, 22nd Floor
New York, New York 10038
Tel: 202-538-8122
Fax: 202-538-8100
alexspiro@quinnemanuel.com
sarahconcannon@quinnemanuel.com
brennanelinson@quinnemanuel.com

Allison Huebert (*pro hac vice*)
TESLA, INC.
1 Tesla Road
Austin, TX 78725
Tel: 512-557-8797
ahuebert@tesla.com

*Attorneys for Defendants Elon Musk
and Tesla, Inc.*

Evan Spencer
305 Broadway, 7th Floor
New York, New York 10007
Tel: 917-547-4665
Evan@EvanSpencerLaw.com

*Attorney for Plaintiffs*

**SO ORDERED.**

DATED: _11-18-24_

Hon. Alvin K. Hellerstein
U.S. District Judge

4

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHRISTOPHER UNDERWOOD et al., *Individually and on Behalf of All Others Similarly Situated*,

Plaintiffs,

-v-

COINBASE GLOBAL, INC., COINBASE, INC., and BRIAN ARMSTRONG,

Defendants.

---

21 Civ. 8353 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to dismiss a putative class action brought under the federal securities laws against defendants Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong ("Armstrong") (collectively with Coinbase Global, Inc., and Coinbase, Inc., "Coinbase" or "defendants").

Coinbase operates two online digital trading platforms on which users can transact in the cryptoeconomy. The Amended Complaint ("AC"), Dkt. 43, alleges that among the assets that Coinbase enables customers to buy and sell on these platforms are ones qualifying as securities. It alleges that these include 79 digital assets known as the "Tokens." It alleges that, notwithstanding Coinbase's practice of transacting in these securities with plaintiffs and other users, Coinbase is not registered with the U.S. Securities and Exchange Commission ("SEC") as an exchange or broker-dealer.

On this basis, lead plaintiffs here—each of whom transacted in the Tokens on the Coinbase platform—bring three sets of claims: (1) under Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), for damages arising from Coinbase's sale or solicitation of

unregistered securities, AC ¶¶ 931–41; (2) under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), arising from illegal contracts Coinbase entered into with its users to purchase and sell securities in violation of the Exchange Act's registration requirements, *id.* ¶¶ 956–88; and (3) under state law, based on Coinbase's sale of unregistered securities and failure to register as a broker-dealer, *id.* ¶¶ 1016–1106. They also bring control-person claims against Coinbase Global and its Chief Executive Officer, Armstrong, who allegedly orchestrated Coinbase's strategy to profit by violating the securities laws, *id.* ¶¶ 942–55, 1002–15, 1038–49, 1094–1106. These claims are brought on behalf of a nationwide class consisting of all persons or entities who transacted in the Tokens on the Coinbase trading platforms between October 8, 2019 and the AC's filing on March 11, 2022 (the "class period"), and of subclasses keyed to citizens of three states who so traded during that period.

Pending now is defendants' motion to dismiss the AC for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 8(a). Dkt. 69. For the reasons that follow, the Court grants in full the motion to dismiss. The Court dismisses the federal claims with prejudice and the state claims without prejudice.

## I. Background

### A. Factual Background[1]

#### 1. Crypto-Assets and Blockchains

This case involves the modern financial concoctions known as crypto-assets. Also sometimes called "cryptocurrencies," "tokens," or "crypto-securities," these are digital assets created and traded in the digital world. AC ¶ 19. Crypto-assets often rely on a technology

---

[1] The summary is drawn from the AC. Dkt. 43. For the purposes of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

2

known as "blockchain" to "secure transactions, control the creation of additional units, and verify their transfer." *See id.* Blockchain is a digital ledger system that tracks the ownership and transfer of different kinds of crypto-assets. *See id.* ¶¶ 20–21.

Users on the blockchain have a "public key" and a "private key." *See id.* ¶¶ 24–26. A user can publicly identify herself to other users with her "public key," which is akin to a conventional bank account number an individual might share with another who wishes to send the individual funds. *See id.* ¶¶ 24–25. A user also retains a "private key," which is akin to a pin code associated with the "bank account" public key. *See id.* The blockchain makes use of the public keys and unique addresses associated therewith to document transactions. *See id.* ¶¶ 20–21. For example, with the well-known crypto-asset known as "Bitcoin," "[a] transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred." *Id.* ¶ 27. By tracking who owns any given unit of a crypto-asset at any given time, the blockchain allows for the secure exchange of crypto-assets, enabling users to verify each transaction involving that particular unit. *Id.* ¶ 22. This system, by documenting ownership, aims to prevent counterfeiting. *Id.*

### 2. Crypto-Exchanges

The crypto-asset ecosystem depends on digital exchanges known as "crypto-exchanges." "Crypto-exchanges emerged to enable smoother and faster trading between investors, just as stock and commodities exchanges emerged to enable easy trading of securities." *Id.* ¶ 28. Crypto-exchanges come in two primary forms: decentralized and centralized. *Id.* ¶ 29.

Decentralized exchanges use different approaches. "[W]hat they have in common is that the crypto-assets are transferred between individual accounts." *Id.* ¶ 30. Such exchanges may be analogized to Craigslist.com, the website that allows users to match directly with other users to

3

enable individualized transactions. *See id.* ¶ 31. Decentralized exchanges, "like Craigslist, do not own or hold the assets in question—they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (for example, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee." *Id.*

Centralized exchanges play a more substantial role in transactions between individuals. First, a customer must "create an account" on the centralized exchange. *Id.* ¶ 32. "The exchange will then provide that customer with a deposit address that the exchange controls." *Id.* Then "[w]hen the customer deposits crypto-assets into that deposit address, the exchange will credit her trading account with the corresponding crypto-asset." *Id.* "The exchange will typically then transfer the crypto-assets into one of its other addresses for storage." *Id.* When that customer wants to make a transaction—say, to transfer one Bitcoin to the address of someone else—the centralized exchange "then debits the [customer's] account and transfers a corresponding amount of crypto-asset from the exchange's reserves to that address" of the user with whom he or she wishes to transact. *Id.* ¶ 42.

### 3.    The Coinbase Exchanges

Coinbase operates two digital asset trading exchanges: Coinbase (the "Coinbase Platform") and Coinbase Pro (the "Coinbase Pro Platform"). *Id.* ¶ 5. The Coinbase Platform is "marketed towards newer users," *id.* ¶ 35, and "allows users to place only market orders"— transactions of digital assets "at the digital assets' market price as displayed on the Coinbase Platform at the time of placement of the order," *id.* The Coinbase Pro Platform, in contrast, "is designed for use by advanced and active digital asset traders," *id.* ¶ 37. It "allows three types of orders: a market order, . . . a limit order to buy or sell a digital asset at a specific price or better,

4

or a stop order to buy or sell a digital asset if the market price of the digital asset falls to a specified price." *Id.*

The AC alleges that the Coinbase platforms operate as centralized exchanges. *Id.* ¶¶ 32, 34. Trades "do not in fact happen on the blockchain and do not actually involve the transfer of any assets between users. Instead, it is Coinbase that faces both the buyer and the seller." *Id.* ¶ 33. If two users wish to transact, each does so by transacting with Coinbase directly—not with each other. *Id.* "Thus, if [a customer] wishes to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to debit [that customer's] account one Bitcoin and credit it 10 Ethereum; no actual crypto-assets are moved on the blockchain." *Id.* Customers are charged fees on both Coinbase platforms. *See id.* ¶¶ 34–40.

### 4. Coinbase's Alleged Failure to Register as a Securities Exchange or Broker-Dealer

The AC's central premise is that Coinbase lists and sells securities but is not registered as a securities exchange or as a broker-dealer. Plaintiffs purchased and sold the Tokens[2] on the Coinbase platforms during the Class Period,[3] *id.* ¶¶ 1, 918–19, during which neither Coinbase Platform was registered with the SEC as a securities exchange, *id.* ¶ 64; *see* 15 U.S.C. § 78c (registration requirements of "exchange" under Exchange Act), or broker-dealer, AC ¶ 64; *see* 15 U.S.C. § 78o(a)(1) (registration requirements for "brokers" and "dealers" under Exchange Act),

---

[2] Specifically, this action concerns the 79 digital assets traded under the following symbols: 1INCH, AAVE, ACH, ADA, AGLD, ALGO, AMP, ANKR, ARPA, ATOM, AUCTION, AXS, BAL, BAND, BAT, BNT, BOND, BTRST, CGLD, CLV, COMP, CRO, CRV, CTSI, CVC, DNT, DOGE, DOT, ENJ, EOS, FARM, FET, FIL, FORTH, GNT, GRT, GTC, ICP, IOTX, KEEP, KNC, LINK, LOOM, LRC, MANA, MATIC, MKR, MLN, NKN, NMR, NU, OGN, OMG, ORN, OXT, PLA, POLY, QNT, QUICK, RARI, REN, REP, RLC, SHIB, SKL, SNX, SOL, STORJ, SUSHI, TRB, TRIBE, UMA, UNI, XLM, XRP, XTZ, XYO, YFI, and ZRX (collectively, the "Tokens").

[3] For each Token, the AC alleges that at least one plaintiff has purchased or sold it during the Class Period. *See* AC ¶¶ 77–908.

5

nor "subject to exemptions from such registrations," AC ¶ 5. "Because Coinbase brings together buy and sell orders for the Tokens[,] and the Tokens are securities," *id.*, the AC alleges, Coinbase "stands between the buyer and seller in each trade on its platform, meaning that is the actual seller of the unregistered securities that transact each day on its platform," *id.* ¶ 6.

### 5.    The Class Allegations

Plaintiffs bring this action as a putative class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3). *Id.* ¶ 917. Plaintiffs seek certification of a nationwide class defined as "all persons or entities who transacted in the Tokens on the Coinbase Platform and/or the Coinbase Pro Platform during the Class Period." *Id.* ¶ 918. Plaintiffs also seek certification of three subclasses: (1) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of California"; (2) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of Florida"; and (3) "all persons or entities who transacted in the Tokens on a Coinbase platform during the Class Period while in the State of New Jersey." *Id.* ¶ 919.

### B.    Procedural History

On October 8, 2021, three plaintiffs—Christopher Underwood ("Underwood") of Florida, Louis Oberlander ("Oberlander") of California, and Zeneyda Patin of New York (collectively, the "original plaintiffs")—initiated this case by filing the Complaint, *see* Dkt. 1. On October 12, 2021, counsel for the original plaintiffs published the requisite Private Securities Litigation Reform Act notice of this action through PR Newswire. *See* Dkt. 18.

On December 13, 2021, two original plaintiffs—Underwood and Oberlander—along with a new plaintiff, Henry Rodriguez ("Rodriguez"), moved to be appointed lead plaintiffs. Dkt. 15. On January 11, 2022, the Court granted an unopposed motion to name Underwood, Oberlander, and Rodriguez as lead plaintiffs and appoint Silver Golub & Teitell LLP and Selendy & Gay as

6

co-lead counsel. Dkt. 21. On January 28, 2022, plaintiffs moved for a temporary restraining order regarding amendments to Coinbase's user agreement that the original plaintiffs represented were to take place on January 31, 2022, and stood to affect the pending litigation. *See* Dkts. 24–26. On January 30, 2022, Coinbase opposed the motion, *see* Dkts. 28–30, to which the original plaintiffs replied that same day, *see* Dkts. 31–32.

On February 4, 2022, the Court held a hearing on the motion for injunctive relief. There, defendants agreed to drop any reliance on the new January 2022 dispute resolution provisions altogether for the purposes of this litigation, that is, as these provisions might apply to any named plaintiff or putative class member extant as of February 4, 2022. Such mooted plaintiffs' bid for emergency relief. *See* Dkt. 41 at 28–32 (hearing transcript). At the hearing, plaintiffs' counsel stated that plaintiffs intended to file an amended complaint with additional federal claims under the Securities Act. *See id.* at 34.

On February 7, 2022, the parties filed a proposed stipulation, Dkt. 38-1, that defendants would not seek to enforce alternative dispute resolution provisions of the user agreement against plaintiffs in this or any related action, *see id.* at 2, and the Court entered the stipulation, Dkt. 39.

On March 11, 2022, Underwood, Oberlander, and Rodriguez filed the AC. Dkt. 43. It changed plaintiffs' claims in nature and scope by, *inter alia*, (1) adding Coinbase, Inc. as a defendant; (2) adding to the digital assets within the scope of the lawsuit, in connection with the addition of Rodriguez as a named plaintiff; and (3) adding federal claims, including those relating to control-person liability, and state claims. *Compare* Dkt. 1, *with* AC.

On May 10, 2022, defendants moved to dismiss the AC in its entirety. *See* Dkts. 58–60. On July 11, 2022, plaintiffs filed an opposition. *See* Dkts. 62–63. On August 5, 2022, defendants replied. *See* Dkts. 67–68.

7

## II.     Legal Standards Governing the Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.    Discussion

The Court first considers the AC's claims under the Securities Act, then those under the Exchange Act, and then its state-law claims.  Relevant to all is a single premise—that the Tokens are securities.  The AC alleges that each of the 79 Tokens is a security pursuant to the Securities Act, the Exchange Act, and the test articulated for "investment contracts" in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  In support, the AC, for each Token, alleges that this digital asset has characteristics indicative of a security.  To this end, the AC alleges how the Token was introduced to the public; whether investors expected to receive profits from it; whether any marketing has been performed for it, and if so, by whom; which entities, if any, centrally manage it; and, during the Class Period, which plaintiffs engaged in "losing transactions" involving it. *See, e.g.*, AC ¶¶ 86–90 (for Token AAVE), 338–50 (for Token DOGE), 452–87 (for Token ICP).

8

Were this case to reach summary judgment, this contention would emerge as a central battleground. Defendants maintain that "[t]he Tokens are not 'securities,'" for reasons that, they state, "will become evident if this case proceeds." Dkt. 59 ("Defs. Mem.") at 1 n.2. However, defendants state, in light of other dispositive arguments—and presumably because whether the Tokens are securities presents a question of fact more suitably litigated at summary judgment— "the Court need not address this issue for purposes of this motion." *Id.* In the analysis that follows, the Court accordingly assumes *arguendo*, as do the parties in their briefing, that the Tokens are *bona fide* securities.

## A.    Claims Under the Securities Act

The AC brings two claims under the Securities Act: in Count One, for the offer and sale of unregistered securities against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5 and 12(a) of the Securities Act, *see* AC ¶¶ 931–42; *see also* 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1); and, in Count Two, for control-person liability by Coinbase Global, Inc. and Brian Armstrong, under Section 15 of the Securities Act, based on the violations in Count One, *see* AC ¶¶ 942–55; *see also* 15 U.S.C. § 77o(a). Because Count Two is derivative of Count One, the Court addresses Count One first.

### 1.    Allegations Relating to the Offer and Sale of Unregistered Securities

#### a.    *Applicable Legal Standards*

Sections 5(a) and (c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration. 15 U.S.C. § 77e(a), (c). To prove a violation of Section 5, the plaintiff must show that "(1) no registration statement was in effect for the securities at issue; (2) the defendant sold or offered the securities; and (3) interstate transportation, communication, or the mails were used

9

in connection with the offer or sale." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020). If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies. *Id.* Section 5 is a strict liability statute that does not require a showing of scienter or negligence. *SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

Section 12(a)(1) of the Securities Act creates a private right of action for the purchaser against the seller in any transaction that violates Sections 5(a) or (c). 15 U.S.C. § 77*l*(a)(1). It includes the right to sue for damages or rescission. *See, e.g., Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission, which limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77*l*(a))). "[T]he list of potential defendants in a section 12(a)[(1)][4] case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

Under the Supreme Court's decision in *Pinter v. Dahl*, an individual is a "statutory seller" under either of two scenarios. 486 U.S. 622, 642, 647 (1988). First, liability attaches if the defendant "passed title, or other interest in the security, to the buyer for value"; such "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Id.* at 642, 644 n.21. Second, liability attaches if the defendant "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those

---

[4] The Second Circuit has held that the identical language in Section 12(a)(2) has the same meaning, and therefore applies *Pinter* to Section 12(a)(1) and 12(a)(2) claims alike. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991); *Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001).

10

of the securities' owner." *Id.* at 647; *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359.

In sum, plaintiffs may recover from defendants under Section 12(a)(1) only if: (1) defendants were the direct sellers of the Tokens to plaintiffs; or (2) defendants actively solicited the sale of the Tokens to plaintiffs and did so for financial gain. Defendants challenge the adequacy of the AC's pleadings under each theory.

> b. *Pinter's First Prong: Whether Coinbase Passed Title to the Tokens*

Plaintiffs argue that the AC adequately alleges that Coinbase is a statutory seller under *Pinter*'s first prong—that is, that Coinbase "passed title, or other interest" in the Tokens as the "immediate seller." *Pinter*, 486 U.S. at 642, 644 n.21. This theory pivots on the factual premise that Coinbase, as opposed to some other "selling" party, held title to the Tokens at the time of these transactions.

Relevant to this point, the AC alleges that Coinbase "place[s] all deposited assets into a centralized wallet," AC ¶ 34, thereby controlling the title to all the digital assets. As a result, it alleges, in every transaction involving these digital assets, "[t]he only blockchain address with which a customer ever interacts is the wallet deposit address provided by Coinbase itself and that Coinbase owns." Dkt. 62 ("Pl. Opp") at 6; *see* AC at 32. The AC thus posits that, in these transactions, Coinbase transacts with the user—as opposed to two users transacting with each other. "The buyer and seller are not in privity with one another," the AC alleges, AC ¶ 910; each instead is in privity with Coinbase. It alleges that a Coinbase user who wishes to make a transaction "never interacts with . . . [an]other user, sends no asset to the other user, receives no asset from the other user, and has no blockchain-recorded interaction with the other user." Pl.

11

Opp. at 6. Based on the premise that "[c]ustomers on Coinbase transact *solely with Coinbase itself*," it alleges, "Coinbase is thus a seller of the Tokens." AC ¶ 936 (emphasis added).

These allegations would ordinarily assist plaintiffs in pleading this theory. But plaintiffs' bid is complicated because the AC's above allegations effectively repudiate diametrically contrary allegations in plaintiffs' original Complaint, in an apparent attempt to evade dismissal.

Ordinarily, an amended complaint "supersedes the original, and renders it of no legal effect." *Dluhos v. Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks omitted). However, "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading." *Wheeler v. Slanovec*, No. 16 Civ. 9065 (KMK), 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019) (cleaned up); *see also Poindexter v. EMI Rec. Grp. Inc.*, No. 11 Civ. 559 (LTS) (JLC), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("[E]ven though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits."); *Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.*, No. 08 Civ. 588 (KMK), 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012) ("[A] court may disregard amended pleadings when they directly contradict facts that have been alleged in prior pleadings."). As the Second Circuit has put the point: "A party . . . cannot advance one version of the facts in its pleadings, conclude that [his] interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984); *cf. Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) (district court's failure to permit jurors to examine original complaint, where amended complaint was in contradiction, was substantial abuse of discretion).

Such is the case here. Although the AC casts Coinbase as the *only* counterparty to each transaction, *see* AC ¶¶ 6, 32–33, 910, 936, and as title holder to the Tokens, *see id.* ¶ 34, the Complaint painted a very different portrait of Coinbase, with factual allegations that undermine the AC's thesis that Coinbase was a statutory seller. That is so in two respects.

***Privity***: The Complaint's factual allegations directly contradict the AC's claim that privity existed only between Coinbase and users, and not between users for the purposes of any individual transaction. It alleged that "[o]nce money or digital assets had been sent to the Coinbase Platform and credited to the wallet of a Coinbase Platform user, a Coinbase Platform [user] *can enter into trade agreements with other Coinbase Platform users for purchases and sales of digital assets.*" Compl. ¶ 27 (emphasis added); *see also id.* ¶ 32 (same allegation for Coinbase Pro platform). This allegation is flatly opposite to the Amended Complaint's allegation that "[t]he buyer and seller are *not* in privity with one another," AC ¶ 33, and that "[c]ustomers on Coinbase transact *solely with Coinbase itself,*" AC ¶ 936 (emphasis added).

***Title***: The Complaint's factual allegations about *who* holds title to the Tokens also conflict with those in the AC. The Complaint makes these allegations by referencing and incorporating the December 2020 version of the user agreement between Coinbase users and defendants, *see* Dkt. 26-3 (December 2020 version) (the "User Agreement").

That agreement is cognizable here for two reasons.[5] First, the Complaint states that "Coinbase entered into contracts [with plaintiffs] via the Coinbase User Agreement . . . pursuant

---

[5] In briefing on the motion to dismiss, the parties dispute whether the User Agreement binds the three lead plaintiffs, inasmuch as the plaintiffs created accounts at different times in the years before this litigation, and defendants periodically updated and revised the user agreement. *See* Pl. Opp. at 12–16; Dkt. 67 at 2–5. In resolving the motion, the Court's charge is not to make a plaintiff-specific inquiry as to the operative agreement. *See Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 113 (2d Cir. 2012). The Court is instead to accept *plaintiffs'* well-pled allegations as true. Here, the Complaint expressly references the User Agreement as covering the class period:

to which [p]laintiffs purchased Digital Asset Securities," Compl. ¶ 273, and asserts claims based

on this contractual relationship between plaintiffs and Coinbase, *see id.* ¶¶ 262–68. The User

Agreement is thus "incorporated by reference," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104,

111 (2d Cir. 2010). Insofar as plaintiffs sought contractual recission of the transactions, the

contractual obligations between Coinbase and plaintiffs—as set out in the User Agreement—are

central to plaintiffs' claims in the Complaint, which "rel[ies] on the terms and effect of" the User

Agreement "in drafting the Complaint," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d

Cir. 2002). Second, the Court "may consider any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and *documents possessed by or known to the plaintiff*

*and upon which it relied in bringing the suit.*" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 98 (2d Cir. 2007) (emphasis added); *see Sun Micro Med. Techs. Corp. v. Passport*

*Health Commc'ns, Inc.*, No. 06 Civ. 2083 (RWS), 2007 WL 2230082, at *3 (S.D.N.Y. Aug. 2,

---

> *During the Class Period, Coinbase entered into contracts* with issuers of Digital
> Asset Securities Coinbase and made available for sale the issuer's Digital Asset
> Securities on Coinbase's unregistered exchanges, in violation of Section 5 of the
> Exchange Act. Additionally, *Coinbase entered into contracts via the Coinbase*
> *User Agreement*, with Plaintiffs and the members of the Class and Subclasses,
> pursuant to which Plaintiffs purchased Digital Asset Securities through Coinbase
> and paid Coinbase fees for the use of its securities exchanges despite their lack of
> registration with the SEC in violation of section 5 of the Exchange Act.

Compl. ¶¶ 272–73 (emphases added). The AC again eludes these issues, by eliminating all
references to the User Agreement. And insofar as plaintiffs argue that considering the Complaint
and User Agreement would unfairly injure Rodriguez, the new plaintiff the AC added to succeed
an earlier plaintiff, that is wrong, as plaintiffs do not—and cannot—dispute that the plaintiff
added by the AC "ha[d] his interests adequately represented by someone with the same interests
who [was] a party." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999). The Court therefore
considers the December 2020 User Agreement in effect during the Class Period, as cited in the
Complaint. The predecessor versions contain substantially similar relevant language. *See, e.g.*,
Dkt. 35-16 (January 2019 user agreement version).

14

2007) ("When ruling on a motion to dismiss, the Court may take judicial notice of . . . items in the record of the case."). The User Agreement was put on the case record *by plaintiffs*, soon after they filed the Complaint, in seeking emergency relief. *See* Dkt. 26; *see also Avila v. Comm'r of Soc. Sec.*, No. 15 Civ. 2456 (JGK), 2016 WL 1562944, at *1 (S.D.N.Y. Apr. 18, 2016). They sought to enjoin defendants from enforcing an updated user agreement against plaintiffs with respect to its dispute resolution provisions, which directed disputes of this nature to mandatory arbitration. *See* Dkt. 38-1. In so doing, plaintiffs asserted the primacy of the pre-January 31, 2022 user agreement (that is, the agreement from December 20, 2020). Plaintiffs thus both "possessed," *ATSI Commc'ns, Inc.*, 493 F.3d at 98, that agreement, *see* Dkt. 26-3, and "relied [on it] in bringing the suit" in this Court, *ATSI Commc'ns, Inc.*, 493 F.3d at 98. They "cannot plead around it by refusing to make reference to it" in the AC. *Van Houtven v. Adams*, No. 13 Civ. 1964 (CM), 2014 WL 1338066, at *2 (S.D.N.Y. Apr. 3, 2014), *aff'd*, 605 F. App'x 37 (2d Cir. 2015).

The User Agreement's terms flatly contradict the AC's allegations that Coinbase holds title to the digital assets. The User Agreement—in language directed to the user—states that "[t]itle to Digital Currency shall at all times remain with you and shall not transfer to Coinbase." User Agreement § 2.6.1. It adds: "You control the Digital Currencies held in your Digital Currency Wallet." *Id.* § 2.6.2.

The User Agreement also reinforces the Complaint's pleading that, by using Coinbase, the user does not transact directly with, or pass title to or from, a Coinbase entity when they purchase a Token. It states: "When you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying Digital Currency from Coinbase or selling Digital Currency to Coinbase.

Coinbase acts as the agent, transacting on your behalf, to facilitate that purchase or sale between you and other Coinbase [Inc.] customers." *Id.* § 3.2.

For these reasons, the Court need not, and does not, accept the AC's contrary allegations, which unavoidably emerge as strategically added to elude the facts pled in the Complaint and contained in the User Agreement that checkmate plaintiffs from adequately pleading the first prong of *Pinter*'s statutory seller inquiry. "While the Court must accept the facts as alleged in the complaint, when any allegations contradict the evidence contained in the document[] relied upon by . . . plaintiff[s], the document[] control[s], and the Court need not accept the allegations contained within the complaint as true." *Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) (internal quotations omitted). And "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading." *Wheeler*, 2019 WL 2994193, at *6 (cleaned up). The Court therefore declines to credit the AC's allegations as to privity and title.

Without these allegations, the AC fails to plead the first prong of *Pinter*'s statutory seller inquiry. The Court cannot credit the AC's allegations that privity was solely between defendants and plaintiffs for each of the transactions at issue, nor can it credit the AC's allegations to the effect that defendants, as opposed to the sellers, held title to the assets that were the subjects of these transactions. Such is clear, in fact, from a recent on-point decision from this District, resolving a motion to dismiss a complaint against a cryptocurrency digital exchange alleged to be a Section 12 statutory seller. That decision, by Judge Carter, resolved a motion to dismiss on a similar theory, litigated during the period spanning the filing of the AC here. *See Anderson v. Binance*, No. 20 Civ. 2803 (ALC), 2022 WL 976824, at *3 n.2 (S.D.N.Y. Mar. 31, 2022). In the pertinent part of the analysis in *Binance*, Judge Carter rejected the theory that a digital exchange

16

was a "statutory seller[] because [it] passed title to Plaintiffs," noting that the complaint's factual allegations did not support this assertion. The same is so here.

The Court accordingly—holding plaintiffs to the allegations in their Complaint and to the provisions of the User Agreement that the Complaint incorporates—holds that plaintiffs have not pled that Coinbase either qualified as the user's "immediate seller," *Pinter*, 486 U.S. at 642, or "passed title, or other interest in the security, to the buyer for value," *id.* at 644 n.21. Because "remote purchasers are precluded from bringing actions against remote sellers" and "a buyer cannot recover against his seller's seller," *id.*, the AC fails *Pinter*'s first requirement.

> c. *Pinter's Second Prong: Whether Coinbase Solicited the Transactions*

Plaintiffs argue that the AC adequately alleges that Coinbase solicited plaintiffs' purchases of the Tokens. *See* Pl. Opp. at. 17. In *Pinter*, the Supreme Court narrowly construed "solicitation" under the Securities Act, mindful that "Congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer." *Pinter*, 486 U.S. at 647. The Court reasoned: "When a person who urges another to make a securities purchase acts merely to assist the buyer, not only is it uncommon to say that the buyer 'purchased' from him, but it is also strained to describe the giving of gratuitous advice, even strongly or enthusiastically, as 'soliciting.'" *Id.*

To hold a defendant liable under Section 12 as a seller, a purchaser such as plaintiffs must, therefore, demonstrate its direct and active participation in the solicitation of the immediate sale. *See, e.g., Capri*, 856 F.2d at 478–79 (plaintiffs must show that the particular defendant actually solicited their investment); *Holsworth v. BProtocol Found.*, No. 20 Civ. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (dismissing Section 12 claim where plaintiff failed to allege that he "was directly contacted by Defendants or that he purchased

17

securities as a result of any active solicitations by Defendants"); *Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, No. 19 Civ. 9270 (DLC), 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) ("[P]laintiffs must show that [defendant] actually solicited their investment."); *Griffin v. PaineWebber, Inc.*, No. 99 Civ. 2292 (VM), 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) ("[Plaintiff] must allege not only that [defendant] actively solicited investors with respect to this transaction but that he purchased securities as a result of [the] solicitation.").

Measured against that standard, the AC's allegations regarding Coinbase's "solicitation" of the transactions involving the Tokens fail, because they do not describe conduct beyond the "collateral" participation that *Pinter* and its progeny exclude from Section 12 liability. *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) ("[C]ollateral participants who do not solicit sales cannot be liable under Section 12(1) . . . ."). The AC alleges that Coinbase was an exchange that "promote[d] the sale of Tokens by providing users with descriptions of each Token and its purported value proposition," AC ¶ 911; "participated in direct promotions, including 'airdrops' of free Tokens designed to increase trading volume," *id.*; "wr[ote] news updates on price movements of the Tokens," *id.*; and "link[ed] to stories about the Tokens published across the internet," *id.* These activities of an exchange are of a piece with the marketing efforts, "materials," and "services" that courts, applying *Pinter*'s second prong, have held insufficient to establish active solicitation by a defendant. *See Youngers v. Virtus Investment Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016); *see also In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1220 (D.N.M. 2010), *on reconsideration in part*, 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); *In re Tezos Secs. Litig.*, No. 17 Civ. 6779 (RS), 2018 WL 4293341, at *3 (N.D. Cal. Aug. 7, 2018);

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10 Civ. 0302 (MRP), 2011 WL 4389689, at *10 (C.D. Cal. May 5, 2011).

And even had the AC pled direct solicitation by Coinbase, it does not plead that plaintiffs purchased and sold the Tokens as a result of such solicitation, as also required. *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058 (NRB), 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001) (dismissing claim where plaintiff "failed to allege that plaintiff in fact purchased the [securities] as a result of [defendant's solicitation").

Because the AC's allegations fall short of the standard set by *Pinter*, the Court dismisses Count One for failure to state a claim.

### 2. Control-Person Liability Under Section 15

It follows from this dismissal that dismissal of the AC's "control person" claims under Section 15 of the Securities Act against Coinbase Global and Brian Armstrong is also required. *See* 15 U.S.C. § 77o. Such claims require a plaintiff to allege "(a) a primary violation by a controlled person, and (b) control by the defendant of the primary violator." *In re Glob. Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *7 (S.D.N.Y. Nov. 7, 2005). The primary violation that is the basis for the Section 15 claims is the Section 12(a) claim against Coinbase in Count One, which the Court has dismissed. The Court accordingly dismisses the derivative Count Two for failure to state a claim.

### B. Claims Under the Exchange Act

The AC brings several sets of related claims under the Exchange Act. First, it brings claims to rescind illegal contracts to pay transaction fees to an unregistered exchange against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5, 15(a)(1) and 29(b) of the Act, *see* AC ¶¶ 956–65 (Count Three); *id.* ¶¶ 966–78 (Count Four); *see also* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b). Second, it brings claims to rescind illegal contracts to purchase securities from an

19

unregistered exchange against Coinbase Global, Inc. and Coinbase, Inc., under Sections 5, 15(a)(1) and 29(b) of the Exchange Act, *see* AC ¶¶ 979–88 (Count Five); *id.* ¶¶ 989–1001 (Count Six); *see also* 15 U.S.C. §§ 78e, 78o(a)(1), 78cc(b). Third, it brings a claim under Section 20 for control-person liability against Coinbase Global, Inc. and Armstrong; this claim is based upon the violations alleged in Counts Three through Six, *see* AC ¶¶ 1002–15 (Count Seven); *see also* 15 U.S.C. § 78t(a). The Court addresses first the claims of direct violations of the Act (Counts Three through Six) and then addresses the control-person claim (Count Seven).

### 1. Allegations Relating to the Illegal Contracts

The AC's substantive claims under the Exchange Act seek rescission of the transactions involving the Tokens under Section 29(b). Section 29(b) provides in part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule, or regulation thereunder, shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract.

15 U.S.C. § 78cc(b). To establish a violation of Section 29(b), a plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant[s], and (3) he is in the class of persons the [Exchange] Act was designed to protect." *EMA Fin., LLC v. Vystar Corp., Inc.*, No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at *2 (S.D.N.Y. Mar. 29, 2021).

The AC keys its allegations on the first element—a contract involving a prohibited transaction—to the theory that the Tokens were "prohibited," in violation of two other sections of the Exchange Act. As plaintiffs articulate this theory in their memorandum of law:

> The purchases and sales at issue in this action constitute individual contracts that are voidable because they are entirely premised on the illegal purchase or sale of an unregistered security by an unregistered broker/dealer on an unregistered

exchange, in violation of Sections 5 and 15 of the Exchange Act. Because the contracts at issue are facially unlawful (since each is entirely predicated on violations of federal and state law), they are voidable at [p]laintiffs' election under Section 29(b).

Pl. Opp. at 1–2.

The parties dispute whether Section 29(b) provides a private cause of action to sue for a violation of Sections 5 and 15(a) (or any provision) of the Exchange Act. Defendants argue not. *Compare* Defs. Mem. at 13–17, *with* Pl. Opp. at 17–23.

Regardless, these claims fail, because the AC's allegations as to the first element—that "the contract involved a prohibited transaction," *EMA Fin., LLC*, 2021 WL 1177801, at *2—are deficient. Under Section 29(b), "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F.2d 901 (2d Cir. 1981). "This test manifests the common-law principle that a contract to perform an illegal act is void, *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020), whereas rescission is not available when "the violation complained of is collateral or tangential to the contract between the parties," *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984). A contract can be voided only where "there could be no performance under the contract without violating the [Exchange] Act," *id.* (citing *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)).

The parties disagree as to the "contract" implicated by plaintiffs' claims. Defendants contend that the "contract" that must have "'on its face,' require[d] the performance of an illegal act," *Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, No. 18 Civ. 4201 (LGS), 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019), could only be the user agreement. Plaintiffs, however, take a transaction-specific view. They argue that "[e]ach of [p]laintiffs' transactions on Coinbase is a separate contract between the user and Coinbase to effect a trade at a given

21

price. Those purchase and sale contracts are distinct from the User Agreement [d]efendants argue applies to [p]laintiffs." Pl. Opp. at 20.

Plaintiffs' notion that each transaction involving any one of the Tokens is the "contract" implicated by their Section 29(b) claims lacks factual support—the AC does not, for example, identify any transaction-specific contract. And plaintiffs' notion that, without more, each individual purchase or sale qualifies as a contract within the meaning of Section 29(a) is without support in the case law. This Court, in fact, confronted substantially the same issue in the context of a similar factual pattern, in which securities investors made purchases or sales against the backdrop of a foundational agreement between them and their investment firm that predated (and governed) the individual transactions. *See In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570, 589, 591 n.11 (S.D.N.Y. 2019), *aff'd*, 830 F. App'x 669 (2d Cir. 2020) (citing *Zerman*, 510 F. Supp. at 135) (rejecting recission of transactions where there was "no suggestion that the basic customer agreement plaintiff signed is not lawful"); *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 291 (D. Conn. 1979) (rejecting that "Section 29(b) should not only apply to the basic contract between the parties but also to each transaction that occurs thereunder").

The Court follows suit here. As pled, the only contract capable of rescission here under Section 29(b) is the User Agreement. Plaintiffs' initial Complaint is again telling on this point, on its own terms and insofar as it incorporates by reference the User Agreement, as reviewed above. The Complaint expressly alleges that "Coinbase entered into contracts via the Coinbase User Agreement, with Plaintiffs and the members of the Class and Subclasses, *pursuant to which* Plaintiffs purchased Digital Asset Securities through Coinbase and paid Coinbase fees for the use of its securities exchanges." Compl. ¶ 273 (emphasis added). This allegation destroys the AC's

22

Exchange Act claims, insofar as it tracks, virtually verbatim, the statutory standard. It is again no escape for plaintiffs to have filed an Amended Complaint that excises all references to the User Agreement, for the reasons above. By stripping away all references to the User Agreement, the AC is able to add Exchange Act claims permitting rescission. But once plaintiffs' earlier allegations in the Complaint as to the same transactions regarding the Tokens are treated as cognizable, the AC's bid to pursue claims for rescission based on a course of dealings not involving the User Agreement becomes unsustainable.

Critical to the analysis under Section 29(b), performance of the User Agreement did not necessitate illegal acts. Indeed, as defendants note, plaintiffs admit continuing to use the Coinbase platforms since filing the original lawsuit, and "that the Coinbase 'platform has other uses beyond the trading of securities, including the trading of crypto-commodities (such as Bitcoin or Ethereum), which are not the subject of this suit.'" Defs. Mem. at 18 (quoting Dkt. 31 at 6 n.3). Indeed, as defendants note, because users are free to transact in other assets—including Bitcoin or Ethereum, or not at all—the User Agreement cannot be said to require any party to transact in the Tokens that the AC depicts as unregistered securities. *Id.*; *see* AC ¶ 49. Thus, viewed facially, "the customer agreement at issue here is a lawful one." *In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. at 591.

The Court accordingly dismisses the AC's Counts Three through Six under the Exchange Act. These claims do not identify a contract between plaintiffs and Coinbase that would support rescission. And the agreement that plaintiffs' predecessor pleading identified as covering such transactions, the User Agreement, definitely would not.

### 2. Control-Person Liability Under Section 20

As with its Securities Act claims, the AC brings "control person" claims against Coinbase Global and Armstrong, this time under Section 20 of the Exchange Act. To state a claim under

23

Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 98); *see Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999); *see also In re Lihua Int'l, Inc. Sec. Litig.*, No. 14 Civ. 5037 (RA), 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016). The control-person claims here are premised on the AC's substantive Exchange Act claims, which the Court has dismissed. It follows that the control-person claims must also be dismissed for want of a well-pled primary violation.

## C. State Claims

The Court must next determine whether to exercise supplemental jurisdiction over the AC's state-law claims, brought under California, Florida, and New Jersey laws, *see* AC ¶¶ 1016–49 (California), 1050–71 (Florida), 1072–1106 (New Jersey).

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, such jurisdiction is discretionary, *see City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c)(3).

A district court should, in deciding whether to exercise its supplemental jurisdiction, balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he discretion implicit in the word 'may' in subdivision (c) of

24

§ 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants."). However, both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)); *see also United Mine Workers of Am.*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice."), *aff'd*, 752 F.3d 224 (2d Cir. 2014).

Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over plaintiffs' state-law claims. The Court has not invested the resources necessary to resolve these non-federal claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. The Court accordingly declines to exercise supplemental jurisdiction over these claims. These claims are dismissed without prejudice.

### D. Dismissals With and Without Prejudice

For the foregoing reasons, the Court dismisses the AC.

As to plaintiffs' federal-law claims, the Court's assessment is that granting leave to amend would be futile. Plaintiffs have already had an opportunity to amend their complaint, *see* Dkts. 1, 43, and as reviewed above, they did so by adding numerous allegations that directly contradicted their initial Complaint. And plaintiffs have made only a perfunctory request for leave to amend anew in the event of the AC's dismissal. In their opposition to the motion to

25

dismiss, they ask that "permission to replead be granted" should the Court dismiss the claims. Pl. Opp. at 30. But plaintiffs have not identified any concrete amendments or additions, let alone ones that might cure the deficiencies afflicting their Securities Act and Exchange Act claims. This supports denial of leave to amend. *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments"); *F5 Capital*, 856 F.3d at 89 (affirming denial of leave to amend on futility grounds where plaintiff provided "no clue as to how the complaint's defects would be cured through an amendment" (internal quotation marks omitted)). And given the analysis above, it is difficult to see how any revised such claims could overcome plaintiffs' factual averments in the Complaint and the terms of the User Agreement. "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004); *see also, e.g., Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009) (summary order) ("Granting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim."); *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015).

The Court therefore dismisses plaintiffs' federal claims with prejudice. The dismissal is, however, without prejudice as to plaintiffs' state-law claims, which have been dismissed based on a decision not to exercise supplemental jurisdiction.

## CONCLUSION

For the reasons above, the Court dismisses all claims in the AC. The federal claims are dismissed with prejudice. The state-law claims are dismissed without prejudice.

26

The Clerk of Court is respectfully directed to terminate the motion pending at docket

number 58, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 1, 2023
       New York, New York

MANDATE

1:21-cv-08353-PAE

23-184-cv
*Louis Oberlander v. Coinbase Global Inc.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 5th day of April, two thousand twenty-four.

PRESENT:
> PIERRE N. LEVAL,
> REENA RAGGI,
> JOSEPH F. BIANCO,
> *Circuit Judges*.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED 4/30/2024

---

LOUIS OBERLANDER, on behalf of himself and all others similarly situated, CHRISTOPHER UNDERWOOD, on behalf of himself and all others similarly situated, HENRY RODRIGUEZ,

*Plaintiffs-Appellants*,

ZENEYDA PATIN, on behalf of themselves and all others similarly situated,

*Plaintiff*,

v.                                                                 23-184-cv

COINBASE GLOBAL INC., COINBASE, INC., BRIAN ARMSTRONG,

*Defendants-Appellees*.

---

FOR PLAINTIFFS-APPELLANTS:  JORDAN A. GOLDSTEIN, Selendy Gay PLLC, New York, New York (Steven L. Bloch, Silver Golub & Teitell LLP, Stamford, Connecticut, *on the brief*).

FOR DEFENDANTS-APPELLEES:  LARA A. FLATH (Jay B. Kasner, Alexander C. Drylewski, and Abigail E. Davis, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York.

Appeal from a judgment of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment, entered on February 1, 2023, is **REVERSED** in part and **AFFIRMED** in part.

Plaintiffs-Appellants Louis Oberlander, Christopher Underwood, and Henry Rodriguez (collectively, "Plaintiffs") appeal from a judgment dismissing their amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, against Defendants-Appellees Coinbase Global, Inc., Coinbase, Inc., and Brian Armstrong (collectively, "Coinbase"). Coinbase operates online trading platforms where users can buy and sell cryptocurrencies, also known as crypto-assets. The amended complaint asserts federal claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77*l*(a)(1), 77o(a); and Sections 5, 15(a)(1), 20(a), and 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78e, 78o(a)(1), 78t(a), 78cc(b), on behalf of a nationwide class consisting of all persons or entities who bought or sold certain crypto-assets (the "Tokens") on the Coinbase trading platforms between October 8, 2019 and the filing of the amended complaint on March 11,

2

2022. The amended complaint also asserts state law claims under the securities laws of California, Florida, and New Jersey on behalf of subclasses of citizens of those three states. We review a dismissal under Rule 12(b)(6) *de novo*, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007). In doing so, we assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, which we reference only as necessary to explain our decision.

The amended complaint asserts two claims under the Securities Act: one against Coinbase Global, Inc. and Coinbase, Inc., for the offer and sale of unregistered securities under Sections 5 and 12(a)(1) of the Securities Act; and one against Coinbase Global, Inc. and Brian Armstrong, for control-person liability under Section 15 of the Securities Act, based on the violations in Count One. Section 12(a)(1) of the Securities Act provides that "[a]ny person who[] offers or sells a security in violation of [Section 5 of the Securities Act] . . . shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon . . . ."[1] 15 U.S.C. § 77*l*(a)(1). Section 5(c) provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy . . . any security, unless a registration statement has been filed as to such security . . . ." *Id*. § 77e(c). Importantly, "the list

---

[1] Coinbase does not contest for purposes of the motion to dismiss that the Tokens are "securities" under the Securities Act, as well as the Exchange Act, but reserves the right (as it did in the district court) to address that issue should Plaintiffs' claims survive the motion to dismiss.

of potential defendants in a [S]ection 12(a)([1]) case is governed by a judicial interpretation of [S]ection 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).[2]  Under the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622 (1988), a defendant is a "statutory seller" governed by Section 12(a)(1) if it either (1) "passed title, or other interest in the security, to the buyer for value," *id*. at 642 (analogizing the contemplated "buyer-seller relationship" to "traditional contractual privity"), or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities['] owner," *id*. at 647.

Here, the district court relied on the initial complaint and the December 2021 version of the Coinbase User Agreement (the "December 2021 User Agreement")[3] to find that Coinbase did not hold title to the Tokens that Plaintiffs purchased and, thus, was not a statutory seller subject to liability under prong one of *Pinter*.  *See Underwood v. Coinbase Glob., Inc*., 654 F. Supp. 3d 224, 236–38 (S.D.N.Y. 2023).  More specifically, although the amended complaint does not reference any user agreement—and specifically alleges that privity was solely between Coinbase and Plaintiffs, and that Coinbase held title to the Tokens that were the subject of the transactions at issue—the district court "decline[d] to credit the [amended complaint's] allegations as to privity and title" because it found that those allegations contradicted certain allegations in the initial complaint and provisions of the December 2021 User Agreement, which the district court found

---

[2]  Although the *Morgan Stanley* decision analyzed Section 12(a)(2) of the Securities Act, we have also applied the statutory seller requirement to claims arising under Section 12(a)(1).  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir. 1991).

[3]  The parties agree that the district court relied upon the December 2021 version of the user agreement when it erroneously referred to the December 2020 version as the relevant agreement.

was incorporated by reference in the initial complaint.  *Id*. at 238.  Concluding that Plaintiffs

likewise failed to allege solicitation under prong two of *Pinter*, the district court dismissed the

Securities Act claims.[4]

The district court similarly relied in part on the allegations in the initial complaint and the

December 2021 User Agreement in dismissing the Exchange Act claims against Coinbase Global,

Inc. and Coinbase, Inc.  As relevant here, Section 29(b) provides that "[e]very contract made in

violation of any provision of this chapter or of any rule or regulation thereunder, and every contract

. . . the performance of which involves the violation of, or the continuance of any relationship or

practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be

void . . . ."  15 U.S.C. § 78cc(b).  Plaintiffs alleged that each transaction involving the purchase or

sale of any Token constituted a separate contract for purposes of Section 29(b).  After finding that

the amended complaint did not "identify any transaction-specific contract," *Underwood*, 654 F.

Supp. 3d at 241, the district court concluded that Plaintiffs' initial complaint precluded them, in

any event, from pursuing this theory:

> As pled, the only contract capable of rescission here under Section 29(b) is the User
> Agreement.  Plaintiffs' initial Complaint is again telling on this point, on its own
> terms and insofar as it incorporates by reference the User Agreement, as reviewed
> above.  The Complaint expressly alleges that "Coinbase entered into contracts via
> the Coinbase User Agreement, with Plaintiffs and the members of the Class and
> Subclasses, *pursuant to which* Plaintiffs purchased Digital Asset Securities through
> Coinbase and paid Coinbase fees for the use of its securities exchanges."  Compl.
> ¶ 273 (emphasis added).  This allegation destroys the [amended complaint's]
> Exchange Act claims, insofar as it tracks, virtually verbatim, the statutory standard.
> It is again no escape for plaintiffs to have filed an Amended Complaint that excises
> all references to the User Agreement, for the reasons above[.]  By stripping away
> all references to the User Agreement, the [amended complaint] is able to add

---

[4]  Because of the dismissal of Plaintiffs' claims under Sections 5 and 12(a)(1), the district court also dismissed the Section 15 claim for control-person liability, which was premised upon the alleged primary violation.

> Exchange Act claims permitting rescission.  But once plaintiffs' earlier allegations in the Complaint as to the same transactions regarding the Tokens are treated as cognizable, the [amended complaint's] bid to pursue claims for rescission based on a course of dealings not involving the User Agreement becomes unsustainable.

*Underwood*, 654 F. Supp. 3d at 241–42.[5]

On appeal, as a threshold matter, Plaintiffs argue that the district court erred in relying on allegations in the initial complaint and provisions in the December 2021 User Agreement to dismiss their federal claims because, on a motion to dismiss, a district court must "look only to the allegations in [the plaintiff's] most recent complaint as it is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks and citations omitted).  While Coinbase contends that the district court properly discredited the allegations in the amended complaint that contradicted the initial complaint and the December 2021 User Agreement incorporated therein, Plaintiffs argue that the district court possesses no such discretion under our precedents.

As to the district court's reliance on allegations in the initial complaint, we have long held that an allegation in a superseded pleading "ceases to be a conclusive judicial admission," even as it may remain "competent evidence" for submission to the factfinder.  *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 198 (2d Cir. 1929); *see Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002) (explaining that "[a] statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission," although "the factfinder may very well find that such a contradictory

---

[5] Because of a lack of a primary violation under the Exchange Act, the district court similarly dismissed the Section 20 claim for control-person liability.

statement reduces the credibility of the witness"), *overruled in part on other grounds by Slayton v. Am. Express Co.*, 460 F.3d 215 (2d Cir. 2006).[6]  This principle obtains even where an amended pleading is inconsistent with the original.  *See McCray v. Lee*, 963 F.3d 110, 119 (2d Cir. 2020) ("[E]ven if plaintiff's statements in an earlier complaint are determined to be inconsistent with allegations in the superseding complaint, if not repeated they are not part of the operative complaint.  Though the prior statements may be admissible against the plaintiff in later stages of the proceedings as admissions, consideration of a motion under Rule 12(b)(6) is limited to the contents of the operative complaint and documents attached to it or incorporated into it by reference." (citations omitted)).

As to the December 2021 User Agreement, Coinbase argues that it was properly considered because, *inter alia*, it was integral to the amended complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.  Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks and citations omitted)).  Plaintiffs point out, however, that "[t]he [a]mended [c]omplaint does not mention, attach, or refer to any version of the user agreement."  Appellants' Br. at 37.  Plaintiffs further argue that no version of

---

[6]  Several of our sister circuits and leading commentators agree.  *See, e.g.*, *West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013); *InterGen N.V. v. Grina*, 344 F.3d 134, 145 (1st Cir. 2003); *188 LLC v. Trinity Inds., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002); *Shell v. Parrish*, 448 F.2d 528, 530 (6th Cir. 1971); *see also* Wright & Miller, *Federal Practice and Procedure* § 1476 (3d ed.) ("[A]llegations in a pleading that has been withdrawn may be allowed into evidence as an admission of the party, but ordinarily must be offered in evidence if they are to be used for this purpose.").

the user agreement is integral to the amended complaint because they did not rely upon the terms and effect of any user agreement in support of their claims.

We need not resolve this threshold issue because we conclude that, even assuming *arguendo* that any user agreement was properly considered by the district court on the motion to dismiss, the district court did not properly assess *which version* of the user agreement would be applicable to Plaintiffs' claims, and the differing language in the various user agreements that plausibly apply to Plaintiffs' claims precludes resolution of the title and privity issues on a motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (emphasizing that "even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document" (internal quotation marks and citation omitted)); *see also Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016) (cautioning against "the improper transformation of the Rule 12(b)(6) inquiry into a summary-judgment proceeding—one featuring a bespoke factual record, tailor-made to suit the needs of [the movants]").

The district court acknowledged that Coinbase "periodically updated and revised the user agreement," but considered only the December 2021 version because it was "in effect during the Class Period" and "contain[ed] substantially similar relevant language" to the other versions. *Underwood*, 654 F. Supp. 3d at 236 n.5. However, other versions of the user agreement in effect during the class period in fact contained materially different language. For example, the district court relied in part on language in Section 3.2 of the December 2021 User Agreement, stating, "[w]hen you purchase (buy) or sell Digital Currency on the Coinbase Site, you are not buying

8

Digital Currency from Coinbase or selling Digital Currency to Coinbase." *Underwood*, 654 F. Supp. 3d at 237. However, different language in the same section of the version in effect at the beginning of the class period suggested the opposite. *See* App'x at 661 (October 2019 User Agreement) ("When you purchase (buy) Digital Currency *from Coinbase . . .* this transaction is intended to effect a sale of Digital Currency." (emphasis added)); *see also id*. at 702 (December 2019 User Agreement). In light of the varying language in different versions of the user agreement in effect during the class period, the district court could not treat the December 2021 version as conclusive for purposes of evaluating the legal sufficiency of the amended complaint. In short, based on the allegations in the amended complaint, Plaintiffs have plausibly alleged claims under Section 12(a)(1) that survive a motion to dismiss under prong one of *Pinter* and we conclude that the district court erred in dismissing those claims.[7]

We reach a different conclusion, however, with respect to the Exchange Act claims. The district court correctly determined that the amended complaint failed to "identify any transaction-specific contract" capable of rescission under Section 29. *Underwood*, 654 F. Supp. 3d at 241. The amended complaint only included a variable fee schedule and stated generally that class members purchased various tokens on "one or more occasions." App'x at 812. Plaintiffs suggest that the absence of any allegations regarding the date or material terms of any transaction-specific

---

[7] Plaintiffs also note that we have held that "privity [is] a legal conclusion" and argue that, even if the December 2021 User Agreement is the applicable contract, its language is not controlling as to legal issues such as title and privity at this stage. *See Amalgamated Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir. 1987) (internal quotation marks and citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). We need not resolve this question given our conclusion that Plaintiffs adequately pled that Coinbase was a statutory seller under prong one of *Pinter*. Nor do we reach Plaintiffs' argument that the district court further erred in finding that the amended complaint failed to plead adequately that Coinbase was a statutory seller under prong two of *Pinter*.

contract is not fatal to their Section 29 claims because the terms are "evident" from the amended complaint's allegations that Plaintiffs "paid money to Coinbase in exchange for the Tokens." Appellants' Reply at 27. We disagree. The repetitive, conclusory allegations that Plaintiffs "had one or more losing transactions" in various Tokens are insufficient to plausibly allege a contract that gives rise to rescission under Section 29. App'x at 811 ¶ 85 (1INCH), 812 ¶ 90 (AAVE), 813 ¶ 95 (ACH), 822 ¶ 135 (AGLD), 828 ¶ 163 (ALGO), 835 ¶ 179 (AMP), 836 ¶ 184 (ANKR), 837 ¶ 189 (ARPA) *et alia*; *see also Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 303 (2d Cir. 2023) ("[C]onclusory allegations are not entitled to the assumption of truth, and a complaint will not survive a motion to dismiss unless it contains sufficient factual matter, accepted as true, to state a claim that is plausible on its face." (internal quotation marks and citation omitted)). Accordingly, the district court properly dismissed the Section 29 claims.[8]

Finally, with respect to the state law claims, the district court erred in dismissing those claims under the discretionary doctrine of supplemental jurisdiction under 28 U.S.C. § 1367(c)(3). The amended complaint does not invoke supplemental jurisdiction for the state law claims, but rather properly pled original diversity jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). *See L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 117 (2d Cir. 2020) (holding it was error to dismiss a state law claim for lack of subject matter jurisdiction, after declining to exercise supplemental jurisdiction, where the complaint adequately pled an alternative basis for

---

[8] Because of a lack of a primary violation under the Exchange Act, the district court properly dismissed the Section 20 claim for control-person liability. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022) ("To state a claim under Sections 20(a) and 20A of the Exchange Act, a plaintiff must allege a primary violation . . . ."). We also conclude that the district court properly denied leave to amend with respect to the Exchange Act claims because Plaintiffs did not demonstrate "that the complaint's defects can be cured." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (per curiam).

original jurisdiction under the Class Action Fairness Act).  Indeed, Coinbase concedes that the district court had original jurisdiction to consider Plaintiffs' state law claims.[9]  Because the district court had original jurisdiction over Plaintiffs' state law claims, it should consider them in the first instance on remand.

*          *          *

We have considered the parties' remaining arguments and find them to be without merit. Accordingly, we **REVERSE** in part and **AFFIRM** in part the judgment of the district court and **REMAND** for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[9] Coinbase nevertheless argues that we should affirm the dismissal of the state claims because, "like Section 29(b), each relevant state statute requires contractual privity," and, "[p]ursuant to the terms of the [User Agreement], users transact with each other and not with [Coinbase]." Appellees' Br. at 56-57. But "[i]t is our general policy that the trial court should consider arguments—and weigh relevant evidence—in the first instance." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021) (internal quotation marks omitted).

11

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NESSA RISLEY, JAMES FREELAND, ROBERT
SCOTT, ANNIE VENESKY, ANDREW CARDIS, and
DEAN MEYERS, *individually and on behalf of all
others similarly situated,*

Lead Plaintiffs,

-v.-

UNIVERSAL NAVIGATION INC., *d/b/a Uniswap Labs,*
HAYDEN Z. ADAMS, PARADIGM OPERATIONS LP,
AH CAPITAL MANAGEMENT, L.L.C., *d/b/a
Andreessen Horowitz,* UNION SQUARE VENTURES,
LLC, and UNISWAP FOUNDATION,

Defendants.

22 Civ. 2780 (KPF)

**OPINION AND
ORDER**

KATHERINE POLK FAILLA, District Judge:

In this case of first impression, the Court considers whether the

developers of and investors in the Uniswap Protocol trading platform (the

"Protocol"), a decentralized cryptocurrency exchange, are subject to various

provisions of the federal securities laws as currently written. Specifically, this

Opinion resolves a series of motions to dismiss a putative securities class

action filed against Universal Navigation Inc., doing business as Uniswap Labs

("Labs"), and its CEO Hayden Z. Adams ("Adams"); the Uniswap Foundation

(the "Foundation," and together with Labs, the "Uniswap Defendants");

Paradigm Operations LP ("Paradigm"), AH Capital Management, L.L.C., doing

business as Andreesen Horowitz ("Andreesen Horowitz"), and Union Square

Ventures, LLC ("USV," together with Paradigm and Andreesen Horowitz, the

"VC Defendants," and together with the Uniswap Defendants, "Defendants").

Plaintiffs claim that they lost money after investing in what turned out to

be various "scam tokens" that were issued and traded on the Protocol (the

"Scam Tokens" or "Tokens").  Due to the Protocol's decentralized nature, the

identities of the Scam Token issuers are basically unknown and unknowable,

leaving Plaintiffs with an identifiable injury but no identifiable defendant.

Undaunted, they now sue the Uniswap Defendants and the VC Defendants,

hoping that this Court might overlook the fact that the current state of

cryptocurrency regulation leaves them without recourse, at least as to the

specific claims alleged in this suit.  As set forth in the remainder of this

Opinion, the Court dismisses their complaint in full.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiffs Nessa Risley ("Risley"), James Freeland ("Freeland"), Robert

---

[1]    This Opinion draws its facts from the First Amended Complaint (the "FAC" (Dkt. #46)), the well-pleaded allegations of which are taken as true on this motion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on certain of the exhibits attached to the Declaration of Brandon Fetzer ("Fetzer Decl., Ex. [ ]" (Dkt. #68)), including the v2 Whitepaper ("v2 Whitepaper" (Dkt. #68-1)), the Pools webpage ("Pools" (Dkt. #68-3)), certain July 24, 2021 tweets from Adams ("July 2021 Tweets" (Dkt. #68-4)), and a notice from the Uniswap Interface webpage restricting user access to certain tokens (the "Interface Notice" (Dkt. # 68-5)); as well as certain exhibits attached to the Declaration of James R. Serritella ("Serritella Decl., Ex. [ ]" (Dkt. #83)), each of which is incorporated by reference in the FAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Adams's and Labs's joint memorandum of law in support of their motion to dismiss as "Labs Br." (Dkt. #67); to the VC Defendants' memorandum of law in support of their motion to dismiss as "VC Br." (Dkt. #70); to the Foundation's memorandum of law in support of its motion to dismiss as "Foundation Br." (Dkt. #74); to Plaintiffs' omnibus memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #82); to Adams's and Labs's reply memorandum of law as "Labs Reply" (Dkt. #84); to the VC Defendants' reply memorandum of law as

Scott ("Scott"), Annie Venesky ("Venesky"), Andrew Cardis ("Cardis"), and Dean

Meyers ("Meyers") are individuals who each purchased certain of the Tokens on

the Protocol (the "Tokens") between December 2020 and March 2022.  (FAC

¶¶ 13-18).[2]  Plaintiffs are residents of North Carolina, Idaho, New York, North

Carolina, and Australia, and each has incurred losses in connection with their

Token purchases.  (*Id.*).

Defendants Labs and the Foundation are each incorporated in Delaware

and maintain their principal places of business in New York.  (FAC ¶¶ 19-20).

Adams is a citizen and resident of New York, an equity holder in Labs, and is

both the inventor of the Protocol and the Chief Executive Officer of Labs.  (*Id.*

¶ 21).  According to Plaintiffs, Adams is, upon information and belief, also a

"significant" liquidity provider for certain tokens traded on the Protocol and

holds various UNI governance tokens.  (*Id.*).  VC Defendants Paradigm,

Andreesen Horowitz, and USV are investors in Labs, and assisted in the

drafting of the "smart contracts" that allow the Protocol to self-execute

transactions with little need for human interaction.  (*Id.* ¶¶ 22-24, 81, 103-

104).  Also upon Plaintiffs' information and belief, each of the VC Defendants is

---

"VC Reply" (Dkt. #85); and to the Foundation's reply memorandum of law as
"Foundation Reply" (Dkt. #86).

[2]     The Tokens include: Alphawolf Finance, Bezoge, BoomBaby.io, Ethereum Max, Matrix
Samurai, Rocket Bunny, Akita, Archangel, Ares Protocol, Autz, Cyber Doge, Dent, Dogg
Token, Ethereum Chain Token, Ethereum Max, FEGtoken, Goku Inu, Hoge.finance,
HoloToken, Jupiter, Kawakami Inu, Kishu Inu, The Official Mine Token, Mononoke Inu,
Pundi X Token, Saitama, Sanshu Inu, Smooth Love Potion, StarLink, Stoner Doge,
Vera, YfDai.finance, Dogelon, HuskyToken, Lorde Edge, Shih Tzu, Wise Token, Lukso
Token, Olympus Dao, and Samsung Metaverse.  (*See, e.g.*, FAC ¶¶ 5, 200-696).

a "significant" liquidity provider for various tokens traded on the Protocol and each holds UNI governance tokens. (*Id.*).

**2.      Cryptocurrency, Blockchains, and Decentralized Exchanges**

By way of background, a "cryptocurrency," crypto asset, or token is a digital asset created and traded in the digital world that is designed to be a medium of exchange or a store of value. (FAC ¶ 33). Every crypto asset is powered by a decentralized digital ledger called a "blockchain." (*Id.* ¶ 35). Blockchains consist of "blocks" of data that track the ownership and transfer of crypto assets on a given network, dating back to the first-ever transaction on that network. (*Id.*). Each blockchain is subject to different technical rules, but they generally are all open source — meaning the source code of the software "is available free of charge to the public to use, copy, modify, sublicense, or distribute," *Open-Source*, DICTIONARY.COM, https://www.dictionary.com/browse/open%20source (last visited August 29, 2023) — and each relies on its community to maintain and develop its underlying code. (FAC ¶ 35). The most well-known crypto assets, such as Bitcoin and Ether, are obtained in one of two ways — either by expending resources to validate transactions on the blockchain in exchange for a reward of newly minted tokens (a process known as "mining" or "validating"), or by acquiring them from someone else using, most commonly, an online crypto asset exchange that matches buyers to sellers. (*Id.* ¶¶ 36-37). These exchanges can be either centralized or decentralized.

In a traditional stock or centralized cryptocurrency exchange, buyers and sellers are matched on a one-to-one basis through orders — when a buyer's bid matches the seller's ask, a trade occurs. (FAC ¶ 38). By contrast, in a *de*centralized exchange (also known as a "DeFi" exchange), buyers and sellers are empowered to use nontraditional methods to trade and create tokens including, as relevant here, liquidity pools. (*Id.* ¶ 39). There, instead of users interacting with each other and matching trades, they interact with the pool. (*Id.* ¶¶ 39, 78, 85).

### 3. The Ethereum Blockchain and ERC-20 Coin Offerings

Before diving deeper into liquidity pools, some additional context is necessary. The Ethereum blockchain launched in or around 2015 with the native token Ether or "ETH." (FAC ¶ 41). ETH is the second largest crypto asset, with a market capitalization as of the time of the FAC of more than $160 billion. (*Id.*). The Ethereum blockchain allows for the use of "smart contracts," which are self-executing, self-enforcing programs that write the terms of the agreement between the buyer and seller of tokens directly into the program's code — that is, when a given event occurs, the trade auto-executes, without the need for third-party intervention from banks, lawyers, accountants, or the like. (*Id.* ¶ 42).

Adams first began writing smart contracts for Ethereum in 2017, and, with Labs, launched version one of the Protocol ("v1") on the main Ethereum blockchain on November 2, 2018, and version two ("v2") in May 2020, and

version three ("v3") in May 2021.[3]  (FAC ¶¶ 51, 77, 96).  The Protocol is an "on-chain [(meaning it operates directly on the blockchain)] system of smart contracts" that functions through an "Automated Market Maker" or "AMM," which Uniswap claims replaces the buy and sell orders in an order book market with liquidity pools, as discussed in more detail below.  (*Id.* ¶ 78; v2 Whitepaper 1).

To provide uniform transactions and efficient processes across the blockchain, and to allow for the creation of new crypto tokens, the Ethereum community uses application standards for smart contracts called Ethereum Requests for Comments ("ERCs").  (FAC ¶ 43).  ERC-20 is an application standard that allows for smart contract tokens to be created on Ethereum, each of which creates "ERC-20 tokens."  (*Id.* ¶¶ 44-45).  These tokens, also known as "alt coins," can be created by anyone with a basic understanding of Ethereum and are traded on the Ethereum blockchain.  (*Id.* ¶¶ 44-45).  Issuers who create ERC-20 tokens are known as "developers"; each of them theoretically could register their tokens with the Securities and Exchange Commission (the "SEC"), but such registrations are few, as Congress and the courts have yet to make a definitive determination as to whether such tokens constitute securities, commodities, or something else.  (*Id.* ¶ 45).

---

[3]    While users can still access and use all versions of the Protocol, v2 allows for the deposit and exchange of ERC20/ERC20 pairs, as opposed to just the ERC20/ETH pairs on v1.  (v2 Whitepaper 1; FAC ¶ 77).  v3 operates in a similar manner to v2, but with some additional features.  (FAC ¶ 96).  The record and existence of each, as discussed, lives on the blockchain *ad infinitum.*

In 2021, in an effort to capitalize on increased enthusiasm in the crypto market, companies and issuers sought to raise funds through "initial coin offerings," many if not most of which were launched as ERC-20 tokens and not registered with the SEC. (FAC ¶ 47). Issuers would instead issue whitepapers regarding their new coin offering; these documents provided little if any information that would otherwise be required as part of an SEC registration statement, namely: (i) a "plain English" description of the offering; (ii) a list of key risk factors; (iii) a description of important information and incentives concerning management; (iv) warnings about relying on forward-looking statements; and (v) an explanation of how the proceeds from the offering would be used. (*Id.* ¶ 48). Additionally, token issuers would market their offerings through social media sites, piggybacking off of the "meme stock" craze in 2020, which led to a rise in amateur investor activity. (*Id.* ¶¶ 55-59). Many of these issuers flocked to the Protocol, which allowed them to issue new ERC-20 tokens anonymously, without any sort of conduct verification or background check. (*Id.* ¶ 59). With this context in mind, the Court turns to the liquidity pools that underlie the Protocol's operations.

### 4. Liquidity Pools

Liquidity pools allow an issuer to create a new token by contributing a pair of tokens — token A being a preexisting token with some inherent value (*e.g.*, ETH), and token B being the issuer's new token (often with little to no inherent value) — to a pool where buyers can trade their token A in exchange for the issuer's new token B. (FAC ¶¶ 39, 79; Pools 1). Whoever seeds the pool

7

with an initial deposit of each token — typically the issuer — is the one who sets the initial price of the token, since the pool is created by depositing an equal value (but not necessarily an equal number) of both tokens into the pool. (Pools 1; FAC ¶ 88). In practice, issuers typically launch ERC-20 tokens by placing an extremely large number (more than a trillion) of their tokens into a new pool along with a small amount of ETH, often worth less than $100,000, causing the new token to be valued at some fraction of a penny. (FAC ¶ 88). For this new token to become attractive to traders like Plaintiffs, its value must somehow increase. To accomplish this, outside of issuer advertising and promotion, investors known as "liquidity providers" place additional token A into the pool in exchange for token B, thereby increasing liquidity and driving up the price of token B. (*Id.* ¶ 39). Stated differently, token B derives its market price from the ratio of the two tokens in a given pool; the more liquidity a provider deposits into a given pool, the higher the price of token B. (*Id.*).

Liquidity providers are thus crucial to the functioning of a decentralized crypto exchange, where issuers are creating and listing new tokens every day. (FAC ¶ 40). Exchanges are incentivized to pay the liquidity providers interest in the form of fees, which are charged to traders like Plaintiffs each time they wish to transact in a pool. (*Id.* ¶¶ 91-92). Specifically, written into the code underlying the Protocol is a command that traders pay a thirty-basis-point fee

8

on every transaction, which is auto-routed to liquidity providers on a *pro rata* basis. (*Id.*; v2 Whitepaper 1, 5).[4]

Here is how it works in practice: for issuers and liquidity providers to deposit tokens, and for traders to buy and sell them, each must engage with the Protocol's smart contracts, without which the Protocol could not function. There are various contracts in play at any given time. To begin, with each trade, the relative prices of the two assets shift, and a new market rate for both is determined using a constant formula determined by the core contracts — namely, $x*y=k$, where x and y represent the quantities (and therefore the value) of each token in the pool and k is a constant value representing the total liquidity, including the value relative to the fees owed to liquidity providers. (FAC ¶¶ 78, 86; v2 Whitepaper 1). When a trade is executed, traders like Plaintiffs will send the asset they wish to trade into the core contract before calling the "swap" function that will swap their token for the other token in the pool. (FAC ¶ 81). At that time, the core contract measures how much of that trader's asset it has received, a process that requires calling the pair contract (i.e., the contract that holds the two tokens) through a router contract that computes the trade or deposit amount and transfers the tokens. (*Id.*). Each of these contracts is necessary to facilitate a given trade. Stated differently, for a trader to get token B in exchange for token A, they need to tell the core

---

[4]     While v2 of the Protocol created a "switch" that, when turned on, allows a five-basis-point portion of that fee to be allocated back to the Protocol, that switch has never been turned on. (v2 Whitepaper 1; FAC ¶¶ 63, 91). Nevertheless, Plaintiffs allege that Labs's ability to turn the switch on and off is emblematic of its control over the Protocol. (FAC ¶ 93).

Case 1:22-cv-06502-DLC   Document 95-1   Filed 08/23/22   Page 59 of 112
Case 1:20-cv-05027-DLC   Document 51-8   Filed 06/23/26   Page 10 of 51
PageID 16091

contract the amount of token A they wish to trade in.  Then, the core contract

measures the value of the pair of tokens at that moment through a series of

related contracts.  Finally, the core contract will tell the trader how much of

token B they can purchase with their proffered amount of token A (plus the

trading fee), and the trader can then decide whether they would like to swap.  If

they do, they call the swap function, and the trade is executed through a router

contract.  (*See id.*).  That trade then results in a new price for the token.  (*Id.*

¶ 86).  The below diagram shows this process in action:



(*Id.*).

Once this trade is executed, the fee charged to the trader is distributed *pro rata* to each liquidity provider in a given pool.   Below is a diagram of a trade in practice:



(*Id.* ¶ 78).

Importantly, the liquidity providers for a given pool cannot immediately access the transaction fees.  Instead, at the moment a liquidity provider deposits liquidity into a pool, the Protocol, pursuant to its coded smart contracts, "mints" so-called "liquidity tokens" or "pool tokens," which effectively operate as a receipt, and represent a given provider's percentage contribution to a pool, plus their *pro rata* share of transaction fees for that pool.  (FAC ¶¶ 79, 92).  To retrieve their underlying liquidity — which is held in the pool's reserves pursuant to the smart pair contract — plus any funds accrued through fees, the liquidity provider must "burn" their liquidity tokens, effectively exchanging them for their portion of the liquidity pool, plus the proportional fee allocation.  (*Id.* ¶ 92; Pools 5).  This drain of liquidity can devalue the issuer's token, and liquidity providers may be incentivized to not "burn" their tokens (that is, take their liquidity out), and instead use their liquidity tokens — themselves tradeable assets — elsewhere.  (v2 Whitepaper 1,

5-6; FAC ¶¶ 79, 92).  Conversely, liquidity providers may wish to burn their tokens while the value is high so that another liquidity provider does not beat them to it, even if that conduct operates to the detriment of issuers, other liquidity providers, and purchasers.  (FAC ¶ 92).

Labs touts this decentralized liquidity pool model as comprised entirely of people-free smart contracts, whose self-executing terms provide for an "autonomous and perpetually running virtual machine, and an open, permissionless, and inclusive access model that produces an exponentially growing ecosystem of virtual assets." (Pools 3).  With a stated goal of broad accessibility, the Protocol not only removes the so-called middleman from these transactions, but also allows users to interact with the Protocol through a variety of methods in an easy and efficient manner.  (*Id.*).  One way is through the Labs-developed Uniswap Interface (the "Interface," discussed further *infra*), and another is by developers integrating the Protocol's functionality into their own applications without relying on intermediaries or needing permission. (*Id.*).  Plaintiffs counter that Labs nonetheless controls and maintains the liquidity pools across the Protocol by, among other things, (i) holding liquidity provider funds and newly created tokens in Uniswap's proprietary core contracts, (ii) using routers that Labs controls to process all transactions executed by issuers and users of the Protocol, and (iii) issuing Liquidity Tokens when a pool is created, "without which, pools on the Protocol would not function."  (FAC ¶ 80).

### 5.    Scam Tokens

The Protocol, while innovative and more efficient than centralized systems, is nonetheless subject to fraud, in the form of what Plaintiffs and SEC Chairman Gary Gensler refer to as "scam tokens."  (FAC ¶¶ 175-176). Plaintiffs' injuries here are alleged to arise out of the trading of certain scam tokens.  Two common scams that occur on the Protocol are "rug pulls" and "pump and dumps."  (*Id.* ¶¶ 179-180).  In a rug pull, a new issuer deposits their token pair in a liquidity pool and receives liquidity tokens in exchange. (*Id.* ¶ 179).  Traders like Plaintiffs then buy that token based on its value at the moment of purchase.  In a normal scenario, the issuer and other liquidity providers would continue to provide liquidity, and a trader's just-purchased asset would increase in value.  This is good for the traders, who profit from this increased value, and good for the liquidity provider and issuer, who keep the pool afloat and earn fees each time someone buys the token.  In a rug pull, however, instead of keeping their underlying liquidity assets in the pool, the issuer prematurely withdraws or "burns" their liquidity tokens, thereby removing all liquidity from the pool and leaving other investors with now-worthless tokens.  (*Id.*).

Separately, a pump and dump scheme occurs when, prior to launching a new token on the Protocol (thereby creating a new pool), an issuer sends millions or more of the new token to themselves, a fact rarely disclosed to potential investors.  (FAC ¶ 180).  Then, the issuer "pumps," or loudly promotes, their tokens to potential investors, often through social media,

13

making claims to entice investors to drive up demand. (*Id.*). When demand is at its peak, the issuer "dumps" their holdings on the exchange at the highest possible price and cashes out with the profits, again leaving investors with now-worthless tokens. (*Id.*).

Plaintiffs lay out several other scams that can take place on the Protocol. For example, in what Plaintiffs refer to (somewhat imprecisely) as a Ponzi scheme, an issuer or liquidity provider drains its liquidity from the pool, thereby decreasing the value of the token significantly. (FAC ¶ 181). In such a circumstance, because there is now only limited liquidity remaining, investors race to sell their tokens, with each subsequent sale further draining the token's value. (*Id.*). Whoever is left thus stands to incur substantial losses. (*Id.*). Plaintiffs also refer to instances of malicious traders who use bots that are programmed to buy large amounts of tokens to briefly drive up the token's price and then quickly sell to gain an incremental profit. (*Id.* ¶ 182).

Plaintiffs allege that Labs is aware of these schemes and does nothing to stop them because Defendants stand to profit from the liquidity fees — whether as liquidity providers or as potential or future recipients of smart contract fees. (FAC ¶ 194; *see supra* n.4 (describing the fee switch)). By providing a marketplace for buyers and sellers, by assisting with the drafting of smart contracts, and by and through their ownership of governance tokens (discussed *infra*), Plaintiffs allege that the Uniswap Defendants and the VC Defendants "facilitate[]" these scam trades — and facilitated Plaintiffs' trades of the Tokens. (FAC ¶ 197).

### 6.    The Interface

The Protocol is hosted, in part, on the Interface, a website through which investors can access the Protocol.  (FAC ¶ 64).  Plaintiffs allege that Labs facilitates trading of tokens through its operation of the Interface, though there are other methods by which one can access the Protocol.  (*Id.* ¶ 52; Interface Notice 1).  To access the Interface, users must have a "crypto wallet," a computer application that safeguards holders' private keys, which allow them to send, receive, and access crypto assets.  (*Id.* ¶ 65).  Some of the most popular wallets include Coinbase Wallet, Metamask, and Trust Wallet.  (*Id.*).  Users can get to the Interface (i) through a web browser, by navigating to app.uniswap.org, and clicking "Launch App" and "Connect Wallet" (the "Browser Method"), or (ii) by using the web browser embedded in their wallets to navigate to app.uniswap.org or Uniswap.org and clicking "Launch App" (the "Wallet Method").  (*Id.* ¶¶ 66-67).  Plaintiffs Risley, Freeland, and Meyers conducted their transactions using the Wallet Method, though the putative class is broken into subclasses based on users' various methods of access.  (*Id.* ¶¶ 67, 697).

Once their wallet has been connected, a user can "swap" tokens by identifying which tokens they want to trade in and which they wish to receive.  (FAC ¶¶ 68-69).  Once they have made their selection, the Protocol — pursuant to the core contract — calculates the trading fee and swaps one token for another, determining the trade-in value based on the set formula, described earlier.  (FAC ¶¶ 69, 81, 86).  The first time a user attempts to swap a token or

add liquidity using the Protocol, they must "approve" the transaction, thus "giv[ing] the Uniswap Protocol permission to swap that token from [their] wallet." (*Id.* ¶ 71 (quoting What Is An Approval Transaction?, Uniswap Help Center, https://support.uniswap.org/hc/en-us/articles/8120520483085 (last visited August 29, 2023 ("Approval FAQ"))). Effectively, the user is calling the function "swap" on the Protocol's smart contract, which the code then auto-executes without the involvement of an intermediary. (Pools 3). Before proceeding with their swap, users typically set a "slippage tolerance," which dictates the degree of price fluctuation a trader is comfortable with, and will effectively cancel the transaction should the price drop below that point before the transaction is completed. (FAC ¶ 70).

On April 23, 2021, Labs posted terms of service for the Interface on a page of its website, and subsequently updated those terms on October 25, 2021. (FAC ¶ 74 (citing Uniswap Labs Terms of Service, Uniswap.org, https://uniswap.org/terms-of-service (last visited August 29, 2023 ("Interface Terms")))).[5] At some point after April 23, 2021, the Interface began prompting Browser Method users with a disclaimer that, by transacting, they agreed to the terms of service and acknowledged that they had read and understood the "Uniswap Protocol Disclaimer." (*Id.*). Users accessing the Interface via the Wallet Method are not now prompted with such a disclaimer, nor were they

---

[5]     As of the date of this Court's writing, the terms were last updated on March 3, 2023. (Uniswap Labs Terms of Service, Uniswap.org, https://uniswap.org/terms-of-service (last visited August 29, 2023))).

presented with any terms, disclaimers, or disclosures at any point prior to the filing of the FAC. (*Id.* ¶¶ 73, 75).

The Interface Terms state that Uniswap "do[es] not broker trading orders on your behalf nor do we collect fees from your trades on the Protocol. We also do not facilitate the execution or settlement of your trades, which occur entirely on the publicly distributed Ethereum blockchain." (FAC ¶ 76 (quoting Interface Terms)). Plaintiffs allege that such claims are patently false and legally unenforceable, as "[Labs] collects fees (and can keep a portion of those fees for itself) and undoubtedly acts as the broker, facilitator, and seller in connection with all trades on the Protocol, including, without limitation, through its ownership and operation of the Interface." (*Id.*; *see also id.* ¶ 75). As relevant here, the Interface Terms further provide that:

- The Interface is distinct from the Protocol and is one, but not the exclusive, means of accessing the Protocol. The Protocol itself has three versions, designated as v1, v2, and v3, each of which comprises open-source or source-available self-executing smart contracts that are deployed on … Ethereum. Uniswap Labs does not control or operate any version of the Protocol on any blockchain network. (Interface Terms § 1.1).

- By using the Interface, you understand that you are not buying or selling digital assets from us and that we do not operate any liquidity pools on the Protocol or control trade execution on the Protocol. When traders pay fees for trades, those fees accrue to liquidity providers for the Protocol. As a general matter, Uniswap Labs is not a liquidity provider into Protocol liquidity pools. (*Id.*).

- To access the Interface you must use a non-custodial wallet software, which allows you to interact with public blockchains. … We do not have custody or control over the contents of your wallet and have no ability to retrieve or transfer its contents. (*Id.*).

17

- The [Interface] is a purely non-custodial application, meaning [Uniswap Labs] do[es] not ever have custody, possession, or control of your digital assets at any time. It further means you are solely responsible for the custody of the cryptographic private keys to the digital asset wallets you hold. (*Id.* § 4.3).

### 7. UNI Tokens, Governance, and the VC Defendants

By its very nature, the Protocol has no centralized ownership structure. However, Plaintiffs allege, Labs "is structured and run as a for-profit business, with the Interface, the Protocol[,] and [Labs's] UNI [token] as its primary assets," each of which it manages and controls through its governance structure. (FAC ¶ 98). This structure is described more fully in this section.

Between April 2019 and June 2020, Labs issued over $12 million worth of equity shares to Adams, Paradigm (a crypto asset hedge fund), Andreesen Horowitz, and USV (two venture capital firms). (FAC ¶¶ 99-100, 103).[6] Plaintiffs claim that "[u]pon information and belief, as liquidity providers, [Adams and the VC Defendants] have contributed millions of dollars' worth of tokens to liquidity pools on the Protocol, thus enriching themselves to the tune of millions of dollars in [u]ser [f]ees." (*Id.* ¶ 101). Furthermore, Plaintiffs allege that (i) despite their lack of knowledge as to the terms of the firms' investments in Labs, the VC Defendants have made "significant contributions to the development and expansion of [Labs] and the Protocol," and (ii) Adams and the

---

[6] While Labs filed a Form D with the SEC regarding both of these offerings, the terms of any agreement between Labs and the VC Defendants are not publicly available, and therefore "it is unclear at this time what rights [Adams and the VC Defendants] received in connection with the equity acquisition, or how they acquired the same." (FAC ¶¶ 99-100).

18

VC Defendants, through their equity ownership and "otherwise," were incentivized to — and did — steer Labs to create v2 and v3, thereby allowing for ERC20/ERC20 pairings, all for the purpose of funding more and larger liquidity pools and generating millions in fees.  (*Id.* ¶¶ 102, 106; *id.* ¶ 104 (citing Adams's February 11, 2021 tweets thanking the VC Defendants for their assistance in "[a]dvising, … writing smart contracts, writing whitepapers, reading/explaining other people[']s papers/smart contracts, … breakthrough Uniswap-related math research … educating regulators and institutions, … [n]ot to mention providing millions in funding during the depths of a bear market"); *id.* ¶ 105 (noting that Adams acknowledged that "[Labs] would not be where we are today without our investors.'"))  In discussing Paradigm's involvement in particular, Plaintiffs cite to numerous articles discussing Paradigm's critical research and co-creation of various versions of the Protocol, and whitepapers published in connection therewith.  (*Id.* ¶¶ 108-111).  Indeed, Plaintiffs allege that v2 and v3 of the Protocol were created without input from users or via governance proposals, thus making the case for Paradigm's intimate connection to Labs.  (*Id.* ¶¶ 111-112).

In September 2020, Labs issued its own token, UNI, which can be purchased on the Protocol.  (FAC ¶ 122).  According to Labs, UNI holders would be granted immediate ownership of Uniswap governance and the UNI community treasury.  (*Id.* ¶ 123).  Labs allocated 40% of the total UNI supply to team members and future employees, investors, and advisors to be distributed over a four-year vesting period, and the remaining 60% was to be split amongst

19

"Uniswap community members," which included historical liquidity providers such as Adams and the VC Defendants. (*Id.* ¶¶ 124-126). Plaintiffs allege that in reality, only 15% of this 60% was allocated toward community members, and that of the remaining 45%, the governance treasury retained 43% to be used pursuant to a governance vote. (*Id.* ¶ 127). As such, Plaintiffs allege that Defendants hold at least 88% of the total amount of UNI tokens and thus have a disproportionate amount of power and control over Uniswap governance and, by extension, the Protocol. (*Id.* ¶ 128).[7] While Plaintiffs have no actual knowledge of the number of UNI tokens each Defendant holds, they allege that the VC Defendants and Adams are each "likely top 10 holders" of the token, and thus have control over the Protocol. (*Id.* ¶ 134). Citing to a study of decentralized governance, Plaintiffs aver that "Uniswap is extremely centralized and controlled by a very small number of addresses" that make the platform much more centralized than Defendants let on. (*Id.* ¶¶ 143-148 (citation omitted)).

In February 2021, Defendants were allegedly part of a governance proposal to create a "DeFi Education Fund" as a means of defending against enforcement actions by regulatory bodies such as the SEC, and legal actions like the instant lawsuit. (FAC ¶ 151). The stated goals of the proposal included challenging regulatory efforts to stop or cabin decentralized finance,

---

[7]     Plaintiffs note that Labs actively promotes both UNI and the Protocol to prospective investors on social media, podcasts, websites, and other media, but that is irrelevant to Plaintiffs' claims resulting from their losses from purchases of the Tokens. (*See* FAC ¶ 133).

and the proposal also called for the allocation of one million UNI tokens to the Fund.  (*Id.* ¶ 154).  The proposal was approved in July 2021, and one year later, Defendants created the Foundation.  (*Id.* ¶¶ 155, 158).

The Foundation was formed in June 2022, but voting on its creation was not complete until August 17, 2022.  (FAC ¶¶ 158-161).  Voting, according to Plaintiffs, was "overwhelmingly" cast by just ten wallets.  (*Id.* ¶ 161).  While they cannot identify who owns these wallets, Plaintiffs allege that Adams and the VC Defendants control a significant amount of UNI tokens, each of which provides them with governance power.  (*Id.* ¶¶ 101, 138, 142 (discussing Andreesen Horowitz's alleged "hidden wallets" and delegation scheme, through which they allegedly control voting on governance matters)).  Despite the existence of over 300,000 UNI token holders, Plaintiffs claim that those who purchased the token on a different exchange (that is, not through the Protocol) are unable to vote in governance proposals.  (Id. ¶ 136).

The stated mission of the Foundation is to support the decentralized growth and sustainability of the Protocol and its supporting ecosystem, and the Foundation's proposal sought $74 million in UNI Tokens to support, in part, operating expenses and grants.  (FAC ¶¶ 163, 167).  This, according to Plaintiffs, was Defendants attempting to "raid" the Uniswap treasury.  (*Id.* ¶ 168).

### 8.    Control over the Interface and the Protocol

Plaintiffs allege that, per its name, Labs *uni*laterally controls the Interface, and jointly controls the Protocol with Adams and the VC Defendants.

21

(FAC ¶ 117).  In support of this assertion, Plaintiffs point to the fact that Labs has a software license for the Protocol, and that v3 is subject to a business source license that allegedly limits the use of its source code under terms and conditions that Labs can change at any time.  (*Id.* ¶ 121).  Additionally, Plaintiffs point to the fact that Labs restricted access or "delisted" various tokens from the Interface at different points in time.  (*Id.* ¶¶ 118-120).  This is not to say, however, that the delisted tokens were removed from the Protocol. To the contrary, as Labs noted in a July 23, 2021 post on its website:

> the Uniswap Protocol — unlike the [I]nterface[,] is a set of autonomous, decentralized, and immutable smart contracts.  It provides unrestricted access to anyone with an Internet connection.  Similarly, this action [to restrict access to certain tokens through the Interface] has no impact on the Uniswap Interface code, which remains open source, or the many other portals or locally run instances used to access the Uniswap Protocol.

(Interface Notice).

Adams made clear in a tweet the differences between the Interface and the Protocol:  The Interface is an avenue through which users can access the Protocol, while the Protocol stands on its own on the blockchain and does not change.  (July 2021 Tweets).  As such, while Labs may be able to shut down a user's access to a given token on the Interface, that does not stop the user from finding another way to access and trade that token.  (FAC ¶ 97; July 2021 Tweets).[8]

---

[8]    While Plaintiffs use the term "Uniswap" to at times refer to the Protocol and at other times refer to the Interface, they are indeed distinct, and likely by design.  Particularly given the current state of cryptocurrency regulation, the Court is concerned about

22

### 9.    The Class Allegations

Plaintiffs bring this action as a putative class action under Federal Rule of Civil Procedure 23.  (FAC ¶ 697).  They seek certification of a nationwide class defined to include "all persons who purchased any Tokens on the Protocol, or first learned of the circumstances giving rise to their claims, between April 5, 2021[,] and the present and were harmed thereby."  (*Id.*).  Plaintiffs also seek certification of six subclasses: (i) "[a]ll persons who purchased Tokens using the Wallet Method, other than persons in Subclasses 3 and 5"; (ii) "[a]ll persons who purchased Tokens using the Browser Method, other than persons in Subclasses 4 and 6"; (iii) "[a]ll persons who purchased Tokens using the Wallet Method while in the State of Idaho"; (iv) "[a]ll persons who purchased Tokens using the Browser Method while in the State of Idaho"; (v) "[a]ll persons who purchased Tokens using the Wallet Method while in the State of North Carolina"; and (vi) "[a]ll persons who purchased Tokens using the Browser Method while in the State of North Carolina."  (*Id.*).

### B.    Procedural Background

Plaintiff Nessa Risley ("Risley"), a resident of North Carolina, initiated this action with the filing of a complaint on April 4, 2022.  (Dkt. #1).  On April 8, 2022, counsel for Risley published notice of this action through Business Wire, as required by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (*See* Dkt. #17).  On June 7, 2022, Risley, along with Freeland, Scott,

---

holding parties liable under the federal securities laws for designing a platform that does not implicate the federal securities laws.

23

Venesky, Cardis, and Meyers, moved to be appointed lead plaintiffs, and for the Court to appoint Kim & Serritella LLP and Barton LLP as co-lead counsel. (Dkt. #26-30). On July 27, 2022, the Court scheduled a conference regarding the motion to be held on July 29, 2022. (Dkt. #38). Following that conference, and understanding that Defendants took no position on the lead plaintiff and lead counsel motion, the Court entered an order appointing the above individuals as lead plaintiffs and the above law firms as co-lead counsel pursuant to the PSLRA. (Dkt. #40; *see also* Dkt. #41 (transcript indicating Defendants' position)). On August 16, 2023, the Court entered the parties' stipulation and order setting a deadline for Plaintiffs to file an amended complaint, and for Defendants to respond. (Dkt. #44).

Pursuant to that schedule, Plaintiffs filed the FAC on September 27, 2022. (Dkt. #46). On October 26, 2022, Labs and Adams filed a pre-motion letter regarding their anticipated motion to dismiss (Dkt. #52), as did the VC Defendants (Dkt. #54) and the Foundation (Dkt. #56). Plaintiffs filed an omnibus response in opposition to all three letters on November 4, 2022 (Dkt. #60), and the Court held a pre-motion conference on November 9, 2022 (November 9, 2022 Minute Entry). At that conference, the Court set a briefing schedule for Defendants' respective motions to dismiss and allowed Plaintiffs to file a single omnibus opposition brief. (Dkt. #61). On December 21, 2022, Defendants filed their respective motions to dismiss (Dkt. #66-68 (Labs and Adams); Dkt. #69-71 (VC Defendants); Dkt. #73-74 (Foundation)), and Plaintiffs filed their omnibus opposition brief on February 6, 2023 (Dkt. #82-83).

Case 1:22-cv-06502-DLC Document 95-8 Filed 08/13/26 Page 25 of 45
Case 1:20-cv-02780-KPF Document 95-1 Filed 08/29/23 Page 74 of 112
PageID 16106

Defendants filed their reply briefs on February 28, 2023. (Dkt. #84-86).

Plaintiffs then filed a letter notice of supplemental authority on April 10, 2023

(Dkt. #87), to which Defendants responded on April 14, 2023 (Dkt. #88), and

Plaintiffs filed another such letter notice on August 21, 2023 (Dkt. #89), to

which Defendants did not respond.

## DISCUSSION

The Court first considers Plaintiffs' claims brought under federal

securities law; if those claims are not viable, there is less of an argument for

the Court exercising supplemental jurisdiction over the remaining state law

claims. Preliminarily, the Court observes that all of Plaintiffs' claims proceed

from the premise that the Tokens at issue are securities and, by extension, that

the Uniswap Protocol functions as an exchange of such securities. In this and

other analogous cases, this threshold issue has been hotly contested, as it

determines the applicability *vel non* of the federal securities laws.

Unsurprisingly, Labs "disputes that it is an 'exchange' or 'broker or dealer' as

defined in Section 3 of the Exchange Act, 15 U.S.C. § 78c," but notes that the

Court "need not address those issues in order to decide this motion." (Labs

Br. 9 n.3). In the analysis that follows, the Court accepts Plaintiffs' assertion

that the Tokens are *bona fide* securities, but makes no actual finding on this

basis.

## A.     Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court should "draw all reasonable inferences in [a]

25

[p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the plausibility requirement "is not akin to a 'probability requirement' … it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States ex rel. Foreman* v. *AECOM*, 19 F.4th

26

85, 106 (2d Cir. 2021), *cert. denied,* 142 S. Ct. 2679 (2022).  Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts."  *Becker* v. *Cephalon, Inc.,* No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted).

**B.    Plaintiffs' Federal Securities Claims**

**1.    Overview**

Plaintiffs assert two sets of primary federal securities claims against all Defendants: one for rescission of Plaintiffs' purportedly unlawful "contracts" with Defendants under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78cc, and one for Defendants' alleged violation of Section 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a), (c), 77*l*(a)(1).  (FAC ¶¶ 708-724, 731-740).  Plaintiffs also bring claims against Adams and the VC Defendants for control person liability under the relevant provisions of each Act.  (*Id.* ¶¶ 725-730, 741-745).  The Court addresses the claims in turn, but begins with a broader perspective.

Each of Plaintiffs' claims stems from losses arising out of scams and other misconduct committed by issuers of the Tokens.  (FAC ¶¶ 195-696).  Due to the decentralized nature of the Protocol's platform, the identity of these issuers is largely unknown, not just to Plaintiffs, but to Defendants as well. (*See id.* ¶¶ 89, 199; *see also id.* ¶¶ 200-231 (discussing the various misleading

27

statements EMAX issuers communicated to the public); *id.* ¶¶ 232-249 (noting that AKITA issuers are anonymous and discussing the issuers' material misstatements and failures to warn); *id.* ¶¶ 250-260 (same for the OHM token); *id.* ¶¶ 599-611 (discussing the lack of meaningful disclosures as to the riskiness of the token and anonymity of the issuers of FF.Lorde Edge token); *id.* ¶¶ 635-647 (same for ECT token); *id.* ¶¶ 686-696 (same for STOGE token)). Therein lies Plaintiffs' dilemma. In a perfect (or at least, a more transparent) world, Plaintiffs would be able to seek redress from the actual issuers who defrauded them. In the absence of such information, Plaintiffs are left to argue that Labs facilitated the trades at issue by "providing a marketplace and facilities for bringing together buyers and sellers of securities, in exchange for [it] having the ability to charge a fee on every transaction it made possible on the Protocol" (FAC ¶ 199), and that Labs, Adams, and the VC Defendants, through drafting smart contracts that allow the Protocol to operate and owning UNI governance tokens, somehow "sold" the Tokens as unregistered broker-dealers (*id.*). In a similar vein, unable to sue the issuers for their potentially unlawful solicitation efforts, Plaintiffs are left to sue Defendants for issuing statements on social media that the Protocol was "for many people" and "safe" to trade on, and for "transferring title" of the tokens in each liquidity pool to Plaintiffs in violation of the Securities Act. (FAC ¶¶ 9, 52-53, 133, 198, 735; Pl. Opp. 28-30). As explained below, the Court declines to stretch the federal securities laws to cover the conduct alleged, and concludes that Plaintiffs' concerns are better addressed to Congress than to this Court.

**2.  Plaintiffs Have Not Alleged Defendants' Liability Under Section 29(b) of the Exchange Act**

Plaintiffs begin by seeking rescission of certain "contracts" they allegedly entered into with Defendants in purchasing the Tokens on the Protocol; they claim that these contracts are subject to rescission under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), based on Defendants' operation of an unregistered exchange in violation of Section 5 of the Exchange Act, 15 U.S.C. § 78e, and/or Defendants' conduct as unregistered broker-dealers, in violation of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78*o*(a)(1).[9]  More specifically, Plaintiffs allege that Defendants contracted with Plaintiffs insofar as (i) the Protocol requires its users to buy and sell tokens using smart contracts drafted by Defendants (namely, the core contracts and router contracts) in order to complete the transactions; (ii) Plaintiffs in fact traded the Tokens on the Protocol, thereby assenting to these contracts; and (iii) Plaintiffs paid fees for each transaction they made pursuant to the terms of the smart contracts.  (FAC ¶¶ 711, 722).[10]  The Court is not convinced by Plaintiffs' allegations.

Section 29(b) provides in relevant part:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and

---

[9]  The parties appear to agree that there is no private right of action under Sections 5 and 15(a)(1) of the Exchange Act.  (*See* Labs Br. 9 n.5; Pl. Opp. 20 n.15).

[10]  Plaintiffs also contend in the FAC that Defendants contracted *with the issuers* to list their tokens on the Protocol through the core and router contracts that each Defendant helped draft, and by using those contracts to issue liquidity tokens to issuers.  (FAC ¶¶ 711, 722).  Plaintiffs wisely abandon this claim in their opposition brief, because even accepting their theory as true, it says nothing about Defendants' privity with *Plaintiffs.*

29

> every contract ... the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule, or regulation thereunder, shall be void ... as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract.

15 U.S.C. § 78cc(b). To establish a violation of Section 29(b), a plaintiff must show that "[i] the contract involved a prohibited transaction, [ii] he is in contractual privity with the defendant[s], and [iii] he is in the class of persons the [Exchange] Act was designed to protect." *EMA Fin., LLC* v. *Vystar Corp.*, No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at *2 (S.D.N.Y. Mar. 29, 2021).

With particular respect to the first element, Section 29(b) can only "render[ ] void those contracts which by their terms violate the Act or the rules and regulations thereunder ..., for it is only such contracts which are made in violation of, or the performance of which involves the violation of the statute and the rules and regulations thereunder." *Ema Fin., LLC* v. *Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) (internal quotation marks and citations omitted)). This test manifests the common-law principle that a contract to perform an illegal act is void. *See generally Couldock* & *Bohan, Inc.*, 93 F. Supp. 2d 220, 228 (D. Conn. 2000) ("The federal and state securities statutes codify the common law doctrine invalidating contracts that violate their respective provisions."). However, rescission is not permitted when "the violation complained of is collateral or tangential to the contract between the parties." *Slomiak* v. *Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984). Rather,

30

a contract can be voided where "there could be no performance under the contract without violating the Act." *Id.* (citing *Eastside Church of Christ* v. *Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968)). In other words, "'only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts.'" *Underwood* v. *Coinbase Global, Inc.*, — F. Supp. 3d —, No. 21 Civ. 8353 (PAE), 2023 WL 1431965, *11 (S.D.N.Y. Feb. 1, 2023) (quoting *Zerman* v. *Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.), *aff'd*, 672 F. 2d 901 (2d Cir. 1981)).

Looking at the allegations in the FAC, it defies logic that a drafter of computer code underlying a particular software platform could be liable under Section 29(b) for a third-party's misuse of that platform. As discussed, smart contracts are self-executing, self-enforcing code that contain the terms of the agreement between the buyer and seller. (FAC ¶ 42). These contracts — specifically, the core and router contracts — allow the Protocol to execute trades, determine price models, charge and distribute fees on a *pro rata* basis to liquidity providers, auto-convert a liquidity provider's deposit into liquidity tokens, and hold tokens in pools until they are ready to be transacted pursuant to a given party's request. For example, "[w]hen a trade is executed, 'the seller sends the asset to the core contract before calling the swap function. Then the contract measures how much of the asset it has received, by comparing the last recorded balance to its current balance.'" (*Id.* ¶ 81 (quoting v2 Whitepaper 6)).

31

While Plaintiffs are correct that different smart contracts are in operation for each pool (Pl. Opp. 25), those contracts drafted by *Defendants*, which execute the functions discussed above, remain constant subject to the very "core" and "router" contracts upon which Plaintiffs base their claims, similar to an overarching user agreement. (*See, e.g.,* v2 Whitepaper 1 (discussing the smart contracts that allow for v2 to support ERC20/ERC20 pairs rather than only ERC/ERC20 pairs); *id.* at 2 ("using Uniswap v2 will require calling the pair contract through a 'router' contract that computes the trade or deposit amount and transfers funds to the pair contract"); *id.* at 5 (noting the thirty-basis-point (.03%) fee on all trades and the process through which a liquidity provider can collect their accumulated fees); *id.* at 8 (describing the formula used to determine the number of liquidity tokens to be issued when a new liquidity provider deposits tokens into an existing pool)). These foundational contracts are distinctive from the token contracts unique to each pool and drafted by issuers, as discussed below.

Moreover, Plaintiffs argue that because the execution of the underlying smart contracts was necessary for each separate token purchase or sale within the pools, each trade constituted a separate contract. (Pl. Opp. 25). Each such contract, they claim, is voidable because each renders Defendants unregistered broker-dealers of a given Token, in violation of Sections 5 and 15 of the Exchange Act.

Plaintiffs set forth no non-conclusory allegations that each trade constituted a unique contract. Instead, the core and router contracts at issue

32

here write foundational code that executes a constant formula across the Protocol — the formula merely differs based on the inputs (that is, the pairs in a given pool).  The contracts relevant to Plaintiffs' claims are *not* these overarching codes provided by Defendants, but rather the pair or token contracts drafted by the issuers themselves.  (*See, e.g.*, FAC ¶ 354 ("After this rug pull, the Bunny Issuers re-l[a]unched BUNNY with a new smart contract."); *id.* ¶ 278 (noting that the "fraudulent SAM Issuers deployed SAM on the [P]rotocol but turned off the sell function of the token contract"); *id.* ¶ 325 ("Eventually, all the liquidity in the pool was removed, except for a portion that was locked pursuant to the smart contract for MSX, leaving investors, who were unable to sell their MXS, with worthless tokens."); *id.* ¶ 354 ("The BUNNY Issuers said they would allow investors in BUNNY's smart contract to trade in their tokens for tokens under the new smart contract.  However, the Bunny Issuers gave a very tight deadline for investors to make the trade and … most investors in BUNNY did not trade their holdings and lost their entire investment."); *id.* ¶ 395 ("the Kishu Inu Issuers can alter smart contract at any time, meaning they are still in control of the token.")).  Unable to hold accountable those who drafted the token contracts, Plaintiffs resort to bringing claims against Defendants for drafting code for the Protocol writ large.  Indeed, as Plaintiffs noted, the Ethereum community only created the possibility for ERC-20 tokens out of a desire to standardize protocols for smart contracts across the blockchain.  (*Id.* ¶ 43).

Even if the alleged overarching "contracts" were the relevant agreements (though the Court does not believe them to be so),[11] they are not subject to rescission pursuant to Section 29(b).  Rather, the Court analogizes them to the user agreement in *Underwood* v. *Coinbase Global, Inc.,* which the court found not to be unlawful on its face, and therefore not subject to rescission.  In that case, Judge Engelmayer rejected the plaintiffs' contention that each transaction on the Coinbase platform was a separate contract implicating Section 29(b) because (i) as here, plaintiffs failed to identify a transaction-specific contract and (ii) without more, the "notion that … each individual purchase or sale qualifies as a contract within the meaning of Section 29(a) is without support in the case law."  *Underwood*, 2023 WL 1431965, at *11.  As stated, ERCs stand for "Ethereum Requests for Comments," and are meant to provide a decentralized, community-based way to make transactions uniform across protocols on the blockchain.  (FAC ¶ 43).  This Protocol is part of that system.

This point is further emphasized by the Protocol's transaction approval process.  Plaintiffs note that the first time a user attempts to swap a token or add liquidity using the Protocol, they must "approve" the transaction, thus

---

[11]  The Court notes the recent decision in *Loon* v. *Dep't of Treasury*, No. 23 Civ. 312 (RP), 2023 WL 5313091 (W.D. Tex. Aug. 17, 2023), wherein Judge Pitman found that "smart contracts are merely a code-enabled species of unilateral contracts."  *Id.* at *9-10 (collecting cases noting that smart contracts are self-executing contracts with the terms of the agreement between buyer and seller directly written into lines of code, and likening such contracts to vending machines because they are "tool[s] that carr[y] out a particular, predetermined task").  Even accepting this finding as true, this does not change the Court's analysis of whether such smart contracts are subject to rescission under Section 29(b) as applied to Defendants.

34

"giv[ing] the Uniswap Protocol permission to swap that token from [their] wallet." (FAC ¶ 71 (quoting Approval FAQ)). After doing so once, the user is seemingly not prompted again when trading in a second pool. This is further evidence that the contracts drafted by Defendants — namely, the core and router contracts underlying the Protocol — serve as a single, foundational base, where any token-specific terms are subject to the issuer who drafts them. (*See, e.g.*, FAC ¶ 354 ("After this rug pull, the Bunny Issuers re-l[a]unched BUNNY with a new smart contract."); *id.* ¶ 278 (noting that the "fraudulent SAM Issuers deployed SAM on the protocol but turned off the sell function of the token contract")).

While no court has yet decided this issue in the context of a decentralized protocol's smart contracts, the Court finds that the smart contracts here were themselves able to be carried out lawfully, as with the exchange of crypto commodities ETH and Bitcoin. (*See* FAC ¶ 170 (describing pools of ETH and wrapped Bitcoin pairs[12] on the Protocol)). *See Underwood*, 2023 WL 1431965, at *12 (holding same with respect to Coinbase's centralized user agreements and allegedly unlawful transactions arising thereunder). Accordingly, the Court finds that Defendants' underlying core and router contracts were collateral to the Scam Token activity — which occurred subject to the Token issuers' activity and, for at least some, the issuer-drafted smart contracts — and constituted the sort of tangential activity that falls outside of

---

[12]     Wrapped tokens are tokenized versions of cryptocurrencies that may exist on other blockchains and are pegged to the value of the original coin. (FAC ¶ 82 (internal quotation marks omitted)).

Section 29(b).  *See Slomiak,* 597 F. Supp. at 682-83 (holding that bank's failure to make required disclosures upon opening of account "did not justify rescission of the account agreement itself or transactions undertaken pursuant to that agreement," because the alleged violations were "clearly collateral" to the contract); *see also Berckeley Inv. Grp., Ltd.* v. *Colkitt,* 455 F.3d 195, 206 (3d Cir. 2006) (declining to rescind contracts where "downstream sales" allegedly carried out in violation of Section 5 of the Securities Act "were tangential to the parties' basic obligations under the Agreement"); *Underwood,* 2023 WL 1431965, at *11 ("'only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts'" (quoting *Zerman,* 510 F. Supp. at 135)).

The correctness of the Court's holding is made all the more clear when applied to Plaintiffs' self-driving car theory.  To review, Plaintiffs suggest that a failure to impose liability on the drafters of the code here (*i.e.,* Defendants) would be akin to failing to hold "a technology company that creates self-driving cars with flaws leading to harm or death" liable for those injuries, "regardless of whether they were responsible for such flaws."  (Pl. Opp. 28).  As an initial matter, the Court notes that alleged misdeeds on the Protocol are not analogous to the manufacturing defects Plaintiffs hypothesize.  Nonetheless, and perhaps more critical to this point, Plaintiffs' theory operates on the assumption that the flaw or harm was done *by Defendants* by dint of their creating a system that could allow for the Scam Tokens, and not by the Token issuers themselves.  Indeed, this is less like a manufacturing defect, and more

36

like a suit attempting to hold an application like Venmo or Zelle liable for a drug deal that used the platform to facilitate a fund transfer. There, as here, collateral, third-party human intervention causes the harm, not the underlying platform. In this regard, the Court sees merit in Defendants' counterpoint that this case is more like an effort to hold a developer of self-driving cars liable for a third party's use of the car to commit a traffic violation or to rob a bank. (*See* Labs Reply 6). In those circumstances, one would not sue the car company for facilitating the wrongdoing; they would sue the individual who committed the wrong. Unable to do so given the Protocol's anonymization function, Plaintiffs sue the creators of the Protocol. This they simply cannot do, at least under the current law.

Regulators may someday address this gray area in the securities laws. Indeed, in September 2021, shortly after the SEC announced its investigation of Uniswap, SEC Chairman Gensler warned that decentralized finance projects were under increased scrutiny: "[t]here's still a core group of folks that are not only writing the software, like the open-source software, but they often have governance and fees. There's some incentive structure for those promoters and sponsors in the middle of this." (FAC ¶ 98). This statement alone suggests that, whatever concerns DeFi transactions engender, the law is currently developing around these exchanges, such that Defendants cannot currently be

held liable under a traditional Section 29(b) theory.  In light of the foregoing, Plaintiffs' Section 29(b) claim is dismissed.[13]

### 3. Plaintiffs Have Not Alleged Defendants' Liability Under Section 12(a)(1) of the Securities Act

Plaintiffs alternatively allege that Defendants, as statutory sellers, violated Section 12(a)(1) by offering or selling a security in violation of Section 5 of the Securities Act.  Sections 5(a) and (c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration.  15 U.S.C. § 77e(a), (c).  To prove a violation of Section 5, the plaintiff must show that "[i] no registration statement was in effect for the securities at issue; [ii] the defendant sold or offered the securities; and [iii] interstate transportation, communication, or the mails were used in connection with the offer or sale." *SEC* v. *Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).  If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies.  *Id.*  Of potential note, Section 5 is a strict liability statute that does not require a showing of scienter or negligence.  *See SEC* v. *Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

Section 12(a)(1) of the Securities Act creates a private right of action for a purchaser against the seller in any transaction that violates Sections 5(a) or (c), and includes the right to sue for damages or rescission.  15 U.S.C. § 77*l*(a)(1); *see, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n* v. *Nomura Holding*

---

[13] These same arguments apply to the existence of privity, however the Court need not reach this issue, as Plaintiffs' claims clearly fail as to the first prong of Section 29(b).

*Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission, which limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77*l*(a))).

"[T]he list of potential defendants in a section 12(a)[(1)] case is governed by a judicial interpretation of section 12 known as the 'statutory seller' requirement." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) ("*Morgan Stanley*").[14]  Under the Supreme Court's decision in *Pinter* v. *Dahl*, an individual is a "statutory seller" under either of two scenarios. 486 U.S. 622, 642, 647 (1988).  *First*, liability can attach if the defendant "passed title, or other interest in the security, to the buyer for value"; this theory "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers.  Thus, a buyer cannot recover against his seller's seller." *Id.* at 644 n.21 (citations omitted).  *Second*, liability can attach if the defendant "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve [its] own financial interests or those of the securities' owner." *Id.* at 647; *see also Morgan Stanley*, 592 F.3d at 359.

Plaintiffs allege both theories.  With respect to their passing title theory, Plaintiffs propose that because Defendants wrote, controlled, and maintained

---

[14]  The Court notes that both Sections 12(a)(1) and 12(a)(2) are subject to the statutory seller requirement.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (noting that Section 12 as a whole has a statutory seller requirement) (citing *Pinter* v. *Dahl*, 486 U.S. 622, 643-47 & n.21 (1988)).

the smart contracts, and because Defendants both held the Tokens in the pools through pair contracts and facilitated the Token sales, Defendants necessarily passed title of the Tokens to Plaintiffs.  (Pl. Opp. 27).  Separately, Plaintiffs allege that Defendants sold, promoted, and/or solicited the Tokens to Plaintiffs, at the very least, for purposes of increasing the value of their UNI governance tokens.  (*Id.* at 28; FAC ¶¶ 195, 197-198, 735).[15]  The Court finds neither theory to be plausible.

### a.    Plaintiffs' Transfer of Title Theory Fails

Plaintiffs' transfer of title theory can be summarized as follows: because Defendants wrote the contracts that allow the Protocol to function — including the "pair contracts" (through which the Tokens were held in Pools) and the "router contracts" (through which the Tokens were transmitted to Plaintiffs) — Defendants are statutory sellers for every transaction that takes place on the Protocol.  (Pl. Opp. 27).  Unfortunately for Plaintiffs, this theory misperceives Section 12 liability.

The "purchase from" requirement of Section 12 focuses on the defendant's relationship with the plaintiff-purchaser.  *Pinter*, 486 U.S. at 651.  Critically, *Pinter* refused to extend the definition of seller under Section 12(a)(1)

---

15    Plaintiffs suggest in the FAC that the VC Defendants and Adams have "upon information and belief, contributed millions of dollars to liquidity pools on the Protocol, allowing them to collect substantial fees on all transactions in connection with these pools."  (FAC ¶ 194).  Even if this were true — as the Court accepts for purposes of the instant motion to dismiss — Plaintiffs fail to allege that Adams and the VC Defendants were providers for the Tokens at issue.  Accordingly, there can be no allegation of Token solicitation for financial gain because Adams and the VC Defendants stood to gain nothing from Plaintiffs' specific purchases, other than the remote possibility that the more a given party traded on the Platform, the more UNI tokens Defendants could gain at some later point.

to include "participants' collateral to the offer or sale" of securities, noting that Congress knew how to explicitly do so if it wished. *Id.* at 650 ("Indeed, [Section] 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants' collateral to the offer or sale."). For example, "[u]nder Section 12(a)(1), the 'buyer does not, in any meaningful sense, "purchas[e]" the security from ... participants only remotely related to the relevant aspects of the sales transactions' such as those whose 'involvement is only the performance of their professional services.'" *In re Longfin Corp. Sec. Class Action Litig.*, No. 18 Civ. 2933 (DLC), 2019 WL 1569792, at *6 (S.D.N.Y. April 11, 2019) ("*Longfin*") (quoting *Pinter*, 486 U.S. at 651).

While the cases in this area typically concern lawyers and underwriters, these are precisely the types of individual roles that decentralized exchanges (and the smart contracts that form the basis thereof) were designed to eliminate. (FAC ¶¶ 43, 51; Pl. Opp. 23; Pools 3). Indeed, if those whose role is solely to execute the trades could be held liable under Section 12, shareholders would regularly sue the NASDAQ and/or New York Stock Exchange as a facilitator of any stock purchase that went awry. Just as Section 12(a)(1) does not apply to those who draft base-level agreements for traders to access the stock market, it does not apply to software coders who create an exchange to efficiently facilitate trades. In both circumstances, the party sued facilitated — but was not party to — the contested transaction.

41

Consider, for example, the approval process that a trader must go through the first time it seeks to transact on the Protocol. That approval "gives the … Protocol permission to swap [the token they wish to trade] from [their] wallet" for another token in the pool. (FAC ¶ 71 (quoting Approval FAQ)). Effectively, the user is calling the function "swap" on the Protocol's smart contract, which the code then auto-executes absent an intermediary. (Pools 3). This is to say that the tokens Plaintiffs wished to trade in (call it ETH) for, *e.g.*, BUNNY in the ETH/BUNNY pool, would not be removed from Plaintiffs' wallet until the moment they wished to transact, at which point the formula in the smart contract would reflect a trade-in value, and instantly swap one token for the other. While Plaintiffs do not argue that this side of the transaction constitutes a transfer of title, it is illustrative of the automated and non-custodial nature of the Protocol.

Focusing next on liquidity providers, the Court observes that they deposit their token pairs into a given pool and are issued liquidity tokens in return. But just because the pool then "holds" the initial pair of tokens does not mean that the pool somehow holds title to them, especially as applied to software developers and UNI token holders who, at most, can issue new versions and contracts, but not assume title. This is the purpose for which the liquidity tokens are provided — to give liquidity providers a mechanism not only to accumulate fees and earn passive income, but also to cash in their tokens in exchange for the return of their liquidity once they choose to exit the pool. Given these facts, the Court cannot see how title transfers at any point

42

from liquidity providers.  While Plaintiffs (and traders on the Protocol more broadly) "do not trade with each other directly[,] but instead do so with [Labs] through the liquidity pools [Labs] creates and maintains" (FAC ¶ 78), this does not mean that somehow Defendants have title (even momentarily) over each token on the Protocol.  *See Underwood*, 2023 WL 1431965, at *2 (accepting as true plaintiffs' assertion that "[d]ecentralized exchanges, like Craigslist, do not own or hold the assets in question — they simply provide a platform for exchanges between users, along with some features designed to facilitate trading (for example, Craigslist's creation and maintenance of message boards organized by product type or a decentralized exchange's smart contracts), possibly in exchange for advertising revenue or a transaction fee" (internal quotation marks and citation omitted)).

Moreover, the process by which liquidity providers can withdraw their accumulated fees showcases the absence of title transfer on the Protocol.  Each time that individuals like Plaintiffs wish to trade in one of the liquidity pools, they are charged a fee for use of the Protocol.  Rather than going to Labs, the fee is distributed *pro rata* to each of the liquidity providers in a given pool and held there until the liquidity provider is ready to "burn" their liquidity tokens and effectively exit the pool.  (FAC ¶¶ 91-92 (citing v2 Whitepaper 5)).  In doing so, they drain their liquidity from the pools.  (*Id.* ¶ 92).  This clearly shows that the liquidity providers' tokens remain in the pool at all times, and that each provider maintains title in such tokens.  Otherwise, when a provider burned their tokens, there would be no impact on a given token's price.

43

Every aspect of the liquidity providers' transactions (other than their individual decisions as to when to deposit and when to withdraw tokens and fees) happens automatically through the code baked into the smart contracts. As Plaintiffs themselves note, the "self-executing, self-enforcing" code of the contracts merely sets a given formula for transactions taking place on the Protocol, inputting various unknown variables in place of numbers to be assessed on a transaction-by-transaction basis. (FAC ¶ 42; v2 Whitepaper 1-3). As such, that Defendants may have drafted the contracts underlying the Protocol does not mean that they have title in the assets traded there. Furthermore, neither Labs, nor Adams, nor any Defendant, can be found to directly control the Protocol to the degree that they hold title to assets on the Protocol simply because they hold certain tokens that can impact how the Protocol may function in the future. And while there may be a degree of governance power afforded to Defendants to make new contracts giving them some sort of title ownership, that is not what is at issue in this litigation.

To the extent the Court were to find that title passes from, for example, the pool to the Protocol to one of the Plaintiffs, this split-second, autonomous function would make the Protocol collateral to the transaction. *See Longfin*, 2019 WL 1569792, at *6 ("[u]nder Section 12(a)(1), the 'buyer does not, in any meaningful sense, "purchas[e]" the security from … participants only remotely related to the relevant aspects of the sales transactions'" (quoting *Pinter*, 486 U.S. at 651)); *Wilson* v. *Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1125 (2d Cir. 1989) ("[C]ollateral participants who do not solicit sales cannot be liable

44

Case 1:22-cv-06502-DLC   Document 95-8   Filed 08/23/26   Page 45 of 51
Case 1:20-cv-02027-CBA-RLM   Document 95-8   Filed 08/23/26   Page 45 of 112
PageID 16126

under Section 12(1)[.]").[16]  Any such passage of title would thus be an

insufficient predicate for Section 12 liability.

### b.  Plaintiffs' Solicitation Theory Fails

Perhaps as a last resort, Plaintiffs allege that Defendants sold, promoted,

and/or solicited the Tokens directly to Plaintiffs for purposes of increasing the

value of their UNI governance tokens.  (FAC ¶¶ 195, 197-198, 735; Pl.

Opp. 30).  However, in order to adequately allege solicitation, Plaintiffs must

show that Defendants "successfully solicit[ed] the purchase [of a security],

motivated at least in part by a desire to serve [their] own financial interests or

those of the securities' owner."  *Pinter*, 486 U.S. at 647.  *First*, and fatal to their

claims, Plaintiffs offer nothing more than a conclusory allegation that

Defendants "sold, promoted, and/or solicited the Tokens directly to Plaintiffs

and the Class members."  (FAC ¶ 735).  *Second*, and independently fatal, there

is no allegation that the alleged solicitation was successful.  *See Holsworth* v.

*BProtocol Fund*, No. 20 Civ. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y.

Feb. 22, 2021) (rejecting solicitation claim where plaintiff had not "shown that

---

[16]  And while Plaintiffs seek support in *Underwood*, the Court finds it inapposite.  There, Coinbase, a centralized platform, allowed users to hold their tokens in a Coinbase Wallet, where Coinbase potentially remained in control of that users' funds. *Underwood*, 2023 WL 1431965, at *6.  Here, as Plaintiffs themselves describe, the only wallets are users' own — they connect them to the Protocol pursuant to the more recent Interface agreement, and only allow Uniswap to access the funds when the user is ready to complete the swap or, stated differently, to check out.  This is plainly distinguishable from *Underwood* which, in any event, did not make a legal finding due to those plaintiffs' poor pleading.  *Id.* at *6-7.  Furthermore, the plaintiffs in *Underwood* alleged that customers transacted solely with Coinbase because it used a single centralized wallet that Coinbase controlled, theorizing that Coinbase was thus a seller of the tokens at issue.  *Id.* at *6.  Here, Labs is a mere developer of the smart contracts, and the VC Defendants are merely alleged to be liquidity providers.  There is no allegation that Plaintiffs transacted with Labs or with the VC Defendants themselves, or that the Protocol or any Defendant ever maintained control of Plaintiffs' crypto wallets.

he was directly contacted by [d]efendants or that he purchased securities as a result of any active solicitations by [d]efendants"); *Emps.' Ret. Sys. of the Gov't of the Virgin Islands* v. *J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 151 (S.D.N.Y. 2011) (dismissing Section 12 claim that relied on conclusory allegations, and distinguishing plaintiff's case from one involving an allegation of successful solicitation); *see also Capri* v. *Murphy*, 856 F.2d 473, 478-79 (2d Cir. 1988) (noting that solicitation allegations must establish that particular defendant "actually solicited [plaintiffs'] investment").

Plaintiffs hang their hats on two tweets from Adams suggesting that the Protocol was "secure" and "for many people" to serve as the basis for their solicitation argument. (FAC ¶ 53; Pl. Opp. 30 & n.18 ("Defendants solicited Plaintiffs to purchase fraudulent Tokens on [their] exchange using social media to convince Plaintiffs that [the Protocol] was safe." (citing FAC ¶¶ 9, 133, 198))). From this, Plaintiffs reason, Defendants solicited buyers to purchase the Tokens for their own financial gain. The conduct, however, is too attenuated to state a claim. After all, no plaintiff would sue the New York Stock Exchange or NASDAQ for tweeting that its exchange was a safe place to trade after that plaintiff had lost money due to an issuer's fraudulent schemes. Here too, Plaintiffs are looking for a scapegoat for their claims because the defendants they truly seek are unidentifiable. This is evidenced by Plaintiffs' inclusion of literally hundreds of paragraphs of solicitation claims directed at parties other than Defendants. (*See, e.g.*, FAC ¶¶ 397-398 ("The issuers made misstatements about decentralization in the Kishu Inu whitepaper to induce

46

inexperienced retail investors to invest in the token to inflate the price … [and they] profited handsomely by pumping the price of the token, selling their holdings and pulling their Liquidity Tokens out of the liquidity pool for the token."); *id.* ¶ 447 (same regarding VERA issuers); *id.* ¶¶ 550-553 (same regarding ARES issuers)).

Whether this anonymity is troublesome enough to merit regulation is not for the Court to decide, but for Congress.  Indeed, "[t]he ultimate question [in these cases] is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Pinter*, 486 U.S. at 653 (quoting *Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 578 (1979)); *see id.* ("The broad remedial goals of the Securities Act are insufficient justification for interpreting a specific provision "'more broadly than its language and the statutory scheme reasonably permit.'" (first quoting *Touche Ross*, 442 U.S. at 578, then quoting *SEC* v. *Sloan*, 436 U.S. 103, 116 (1978))).  There is simply no intellectually honest way to read Section 12(a)(1) in a manner that allows the Court to reach Plaintiffs' requested outcome.  *See In re OPUS360 Sec. Litig.*, No. 01 Civ. 2938 (JGK) (JCF), 2002 WL 31190157, at *11 (S.D.N.Y. Oct. 2, 2002) (dismissing Section 12(a)(2) claims because plaintiffs failed to allege that defendants actually solicited the shares that they purchased).

Regarding the financial interest component, Plaintiffs appear to abandon their theory that Labs collected fees for its own financial gain.[17]  Instead, they assert that "Defendants collected transaction fees from Plaintiffs for the issuers of these Scam Tokens and ultimately profited themselves by, at the least, increasing the value of UNI." (Pl. Opp. 30 (citing FAC ¶ 125)).  Plaintiffs' citation to SEC Chair Gensler's conclusory statement that "[t]here's some incentive structure for those promoters and sponsors in the middle of" the decentralized software, cannot support a claim that Defendants had a financial interest in the particular transactions at issue here.  (*See* Pl. Opp. 28 (quoting Serritella Decl., Ex. H)).  Instead, Plaintiffs' allegations that Labs either directly solicited the transactions or did so as a means of obtaining a profit are entirely conclusory and devoid of factual support.  And even if those allegations were adequate, Plaintiffs still fail to allege the first two elements.  Accordingly, Defendants' motions to dismiss both sets of primary federal securities claims are granted.

### 4.    Plaintiffs Have Not Alleged Control Person Liability

Plaintiffs separately allege control person liability claims as to Adams and the VC Defendants: one under Section 20(a) of the Exchange Act, one under Section 15 of the Securities Act.  (FAC ¶¶ 725-730, 741-745; Pl. Opp. 31-38).  To state a claim for control person liability under Section 20(a) of

---

[17]    In the FAC, Plaintiffs assert that Labs charges fees to users of the Protocol and distributes the fees to liquidity providers in the amount of thirty basis points per trade. (*See, e.g.*, FAC ¶¶ 91-92; v2 Whitepaper 1).  As noted earlier and as acknowledged by Plaintiffs (*see* Pl. Opp. 9-10), while Labs has the option pursuant to v2 of the Protocol to turn on a switch to allow a portion of liquidity provider fees to be released to Labs itself, that switch has not been turned on.

the Exchange Act, "a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). The same is true under the Securities Act. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) ("Section 20(a) and Section 15 are parallel provisions, and their terms are interpreted in the same manner." (internal quotation marks omitted)). Having concluded that Plaintiffs here fail to state primary violations of the federal securities laws, the Court dismisses as well Plaintiffs' control person claims. *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) (affirming dismissal of Section 20(a) claim where plaintiff failed to allege a primary violation).

## C. Plaintiff's State Law Claims

Finally, Defendants move to dismiss Plaintiffs' various state law claims — namely, securities violations claims arising under Idaho and North Carolina blue sky laws (FAC ¶¶ 746-793), and aiding and abetting fraud, aiding and abetting negligent misrepresentation, and unjust enrichment claims under New York law (*id.* ¶¶ 794-814; Pl. Opp. 42-48 (specifying New York law)). As a general matter, where federal claims are dismissed before trial, "even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Cap. Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano* v. *Bd. of Trustees*, 937 F.2d 752,

49

758 (2d Cir. 1991)); *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, … the state claims should be dismissed as well."). Here, no circumstances counsel in favor of the Court's exercising supplemental jurisdiction over Plaintiffs' state law claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. Accordingly, the Court declines to exercise its supplemental jurisdiction over the state law claims and dismisses them without prejudice.[18]

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED. In particular, the Court dismisses Plaintiffs' federal claims with prejudice, and dismisses Plaintiffs' state-law claims without prejudice to their refiling in state court.[19] Because the Court dismisses the action, it declines to certify the class.

---

[18] Finally, Plaintiffs bring suit against the Foundation, alleging that it is an alter ego of Labs, and therefore shares liability under each cause of action. (*See, e.g.*, FAC ¶¶ 714, 724, 740). For support, Plaintiffs note that the Foundation has overlapping control and shares a common purpose with Labs. (*Id.* ¶ 20). Because the Court dismisses the FAC as to Labs, it need not reach the issue of alter ego liability as to the Foundation. Furthermore, the Court declines to reach the timeliness arguments that Defendants raise as to certain Token transactions, having concluded that Plaintiffs' claims fail on the merits.

[19] The Court does not consider whether to grant Plaintiffs leave to amend because they have not requested to do so. *See Gallop* v. *Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [to amend] that was not made."); *Sussman Sales Co.* v. *VWR Int'l, LLC*, No. 20 Civ. 2869 (KPF), 2021 WL 1165077, at *21 (S.D.N.Y. Mar. 26, 2021) (dismissing with prejudice where plaintiff did not seek leave to amend in connection with motion to dismiss and declined to amend after receiving defendant's pre-motion letter). Nonetheless, amendment would be futile for the reasons stated above.

The Clerk of Court is instructed to terminate all pending motions,

adjourn all remaining deadlines, and close this case.

SO ORDERED.

Dated:      August 29, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

Case 6:22-cv-21978-KPF Document 650-3 Filed 03/07/25 Page 101 of 112
PageID 16133

MANDATE

23-1340-cv
*Nessa Risley v. Universal Navigation Inc.*

1:22-cv-02780-KPF

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of February, two thousand twenty-five.

PRESENT:    REENA RAGGI,
            RICHARD C. WESLEY,
            MARIA ARAÚJO KAHN,
            *Circuit Judges.*

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/2025

NESSA RISLEY, JAMES FREELAND, ROBERT SCOTT, ANNIE VENESKY, ANDREW CARDIS, DEAN MEYERS, individually and on behalf of all others similarly situated,

*Lead-Plaintiffs-Appellants,*

v.

23-1340-cv

UNIVERSAL NAVIGATION INC., DBA UNISWAP LABS, HAYDEN Z. ADAMS, PARADIGM OPERATIONS LP, AH CAPITAL MANAGEMENT, L.L.C., DBA ANDREESSEN HOROWITZ, UNION SQUARE VENTURES, LLC, UNISWAP FOUNDATION,

*Defendants-Appellees.*[*]

---

| | |
|---|---|
| FOR LEAD-PLAINTIFFS-APPELLANTS: | JAMES R. SERRITELLA, Kim & Serritella, LLP, New York, NY. |
| FOR DEFENDANTS-APPELLEES: | ELLIOT GREENFIELD (Maeve L. O'Connor & Brandon Fetzer, *on the brief*), Debevoise & Plimpton LLP, New York, NY, *for Defendants-Appellees Universal Navigation Inc., DBA Uniswap Labs, Hayden Z. Adams, and Union Square Ventures, LLC.* |

ALEXANDER C. DRYLEWSKI (Tansy Woan, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *for Defendant-Appellee Paradigm Operations LP.*

SAMIR DEGER-SEN, Latham & Watkins LLP, New York, NY (Benjamin Naftalis, Douglas K. Yatter & Peter Trombly, Latham & Watkins LLP, New York, NY; Susan E. Engel, Latham & Watkins LLP, Washington, D.C., *on the brief*), *for Defendant-Appellee AH Capital Management, L.L.C., DBA Andreessen Horowitz.*

JASON P. GOTTLIEB (Michael Mix & Vani Upadhyaya, *on the brief*), Morrison Cohen LLP, New York, NY, *for Defendant-Appellee Uniswap Foundation.*

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Appeal from the August 30, 2023, judgment of the United States District Court for the Southern District of New York (Katherine Polk Failla, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment dated August 30, 2023, is **AFFIRMED** in part and **VACATED** and **REMANDED** in part.

The threshold issue in this case is whether the developers of automated computer codes that facilitate the transfer of cryptocurrency on a decentralized exchange may be held liable under federal securities laws for the alleged fraudulent conduct of third parties on that exchange. Lead-Plaintiffs-Appellants Nessa Risley, James Freeland, Robert Scott, Annie Venesky, Andrew Cardis, and Dean Meyers (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, appeal from an opinion and order dismissing their amended complaint against Defendants-Appellees Universal Navigation Inc., doing business as Uniswap Labs ("Labs"), and its CEO Hayden Z. Adams ("Adams"); the Uniswap Foundation (the "Foundation," and together with Labs, the "Uniswap Defendants"); venture capital firms Paradigm Operations LP ("Paradigm"), AH Capital Management, L.L.C., doing business as Andreessen Horowitz ("Andreessen Horowitz"), and Union Square Ventures, LLC ("USV," together with Paradigm and Andreessen Horowitz, the "VC Defendants," and together with the Uniswap Defendants, "Defendants").

In their amended complaint, Plaintiffs assert federal claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933 ("Securities Act"), and Section 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), on behalf of a nationwide class consisting of all persons or entities who bought tokens on a cryptocurrency trading platform called the Uniswap Protocol ("Protocol"). *See* 15 U.S.C. §§ 77e, 77l(a)(1), 78cc(b). The amended complaint also asserts control person liability claims against Adams and the VC Defendants under Section 15 of the Securities Act and Section 20 of the Exchange Act, averring that, as CEO and venture capital investors of the Protocol, they exert operational control over the Protocol. *See* 15 U.S.C. §§ 77o, 78t. In addition to the federal claims, Plaintiffs assert state law claims under the securities and fraud laws of Idaho, North Carolina, and New York, with certification for subclasses for citizens of Idaho and North Carolina.

Labs operates the Protocol through a system of "smart contracts," which Plaintiffs allege are self-executing and self-enforcing computer programs that autonomously write the terms of an agreement between the traders of a certain cryptocurrency token into the program's code, obviating the otherwise traditional, centralized role that exchanges, broker dealers, and their banks, lawyers, or accountants would play in facilitating trades.[1]

---

[1] As the district court noted, the question of whether cryptocurrency tokens are securities is a "hotly contested" issue. *Risley v. Univ. Navigation Inc.*, 690 F. Supp. 3d 195, 212 (S.D.N.Y. 2023). Like the district court, we assume *arguendo* that tokens are *bona fide* securities.

The smart contracts allow the Protocol to operate as a decentralized exchange.[2] Specifically, users on the Protocol trade tokens through token swaps. The smart contracts perform token swaps through "liquidity pools," where users are matched in a peer-to-peer system. When one token is traded for another in a liquidity pool, the smart contract automatically determines the relative prices of the tokens, sets the rate for the exchange, and facilitates the trade if approved by the user. A trader of tokens on the Protocol has no direct interaction with the original token issuer, the liquidity provider, or with Labs.

Plaintiffs' alleged injuries stem from the trading of certain fraudulent tokens, referred to as "scam tokens," on the Protocol. Two common scams on the Protocol are "rug pulls" and "pump and dumps." In the former, an issuer deposits tokens into a liquidity pool but prematurely "burns" those pool tokens, leaving the purchasers with worthless tokens. In the latter, issuers artificially drive up the demand for their tokens and when the demand peaks, the issuers then "dump" their new tokens, again leaving investors with worthless tokens. Plaintiffs allege that Defendants are aware of and do nothing to stop these fraudulent activities pertaining to scam tokens because Labs and their investors stand to profit from the fees garnered from each trade.

---

[2] In a decentralized exchange, unlike the traditional centralized exchange, buyers and sellers are not matched on a one-to-one basis before a trade occurs between those two parties.

We assume the parties' familiarity with the remaining underlying facts and the procedural history of the case, which we reference only as necessary to explain our decision.

## DISCUSSION

We review *de novo* the district court's dismissal of Plaintiffs' amended complaint. *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011). A complaint is properly dismissed where it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court "accept[s] all factual allegations as true, but giv[es] no effect to legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (internal quotation marks and citation omitted).

## I.      The Securities Act Claims

Plaintiffs allege that Defendants illegally offered and sold securities in violation of Sections 5(a) and (c) of the Securities Act, which generally prohibit the selling of unregistered securities, *see* 15 U.S.C. § 77e(a), (c), and seek to recover damages pursuant to the purchasers' right to bring a private action under Section 12(a)(1). To prove a violation of Section 5, Plaintiffs must establish that Defendants sold or offered to sell the unregistered securities at issue. Section 12(a)(1) of the Securities Act imposes liability on statutory sellers, which the Supreme Court in *Pinter v. Dahl* defined as either (1) the

6

"owner who passed title, or other interest in the security, to the buyer," or (2) the one who "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  486 U.S. 622, 642, 647 (1988); *see* 15 U.S.C. § 77l(a)(1).  To recover under this claim, premised on Defendants' violations of Section 5, Plaintiffs must prove that Defendants either were the sellers of the tokens in question or that, for their own financial gain, actively solicited the sale of the tokens to Plaintiffs.  For the reasons set forth below, Plaintiffs have failed to adequately allege either.[3]

In a decentralized cryptocurrency exchange such as this one, the hosts of the Protocol do not hold title to the tokens placed in the liquidity pool by third party users of the platform.  Rather, the token issuers and liquidity providers make each particular token available for purchase.  As the amended complaint acknowledges, it is the token issuers and liquidity providers who retain title of their tokens through pool tokens that may be turned in at any time of their choosing to recover the value of their originally-deposited tokens that created the trading pool.

The Supreme Court in *Pinter* refused to extend Section 12(a)(1) liability to "participants[] collateral to the offer or sale" of securities.  486 U.S. at 650.  The role of the smart contracts in the Protocol accords with that of base-level agreements for traders who

---

[3] We therefore need not address whether Plaintiffs sufficiently alleged a violation of Section 5.

access the stock market, whose "[function] is solely to execute the trades," and is collateral to the actual token sale. *Risley v. Univ. Navigation Inc.*, 690 F. Supp. 3d 195, 219 (S.D.N.Y. 2023). As the district court noted, extending such liability to that role would be akin to holding the NASDAQ or the New York Stock Exchange liable as facilitators of any fraudulent stock purchase on their exchanges. *See id.* at 219–20.

Even assuming, *arguendo*, that title to the tokens temporarily passed from the issuer to the Protocol and then to Plaintiffs in those split-second autonomous functions, it does not render Defendants sellers of the tokens because they would be "participants only remotely related to the relevant aspects of the sales transaction[s]," such as those whose "involvement is only the performance of their professional services." *Pinter*, 486 U.S. at 651; *see also In re Longfin Corp. Sec. Class Action Litig.*, No. 18 Civ. 2933 (DLC), 2019 WL 1569792, at *6 (S.D.N.Y. Apr. 11, 2019). Plaintiffs have thus failed to adequately allege that Defendants were statutory sellers of the tokens at issue.

Plaintiffs' solicitation theory of liability is equally flawed. Other than conclusory allegations, Plaintiffs' Section 12(a) claim rests on social media posts from Adams touting the safety of the Protocol. Defendants' promotion of their platform on social media or use of the platform to sell their own issued token, UNI, does not render them statutory sellers of securities to warrant liability under the Securities Act. We agree with the district court that such conduct is too attenuated from Plaintiffs' purchase of scam tokens to show that Defendants "successfully solicit[ed] the purchase [of a security], motivated at least

8

in part by a desire to serve [their] own financial interests or those of the securities owner."

*Pinter*, 486 U.S. at 647.  The district court therefore correctly dismissed Plaintiffs' claims

under the Securities Act.

## II.     The Exchange Act Claim

Section 29(b) provides a cause of action for the recission of contracts that were

"made in violation" of the Exchange Act or "the performance of which involve[d]" a

violation of the Exchange Act.  15 U.S.C. § 78cc(b).  However, "'only unlawful contracts

may be rescinded, not unlawful transactions made pursuant to lawful contracts.'"

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 421 (2d Cir. 2023)

(quoting *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir.

1981)). For the reasons set forth below, Plaintiffs have failed to adequately allege the

existence of an unlawful contract between Defendants and Plaintiffs capable of recission

under Section 29(b). [4]

The smart contracts are simply standardized computer codes that allow the

Protocol to fill in the terms for individual trades between and controlled by its users. As

explained in context of Plaintiffs' Section 12(a)(1) claims, the purportedly unlawful

---

[4] Because Plaintiffs failed to state a primary violation under the Securities and Exchange Acts, we need not address the merits of Plaintiffs' control liability and alter ego claims.  *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).

contract is between the token issuer or liquidity provider and the purchaser—not between the purchaser and Defendants.

Even if we agreed with Plaintiffs' contention that the smart contracts are unique to each transaction on the Protocol, we nevertheless agree with the district court that those contracts are not subject to recission because they are more analogous to overarching user agreements than to securities transactions conducted by traditional broker dealers. *Cf. Williams v. Binance*, 96 F.4th 129, 145 (2d Cir. 2024) (explaining that the "Terms of Use did not commit Plaintiffs to making a violative transaction" under Section 29(b) because "the Terms simply outlined the governing rules if Plaintiffs did choose to trade"). The Protocol's transaction approval process underscores this point. Like any typical user agreement requiring users to consent before engaging in conduct covered by those agreements, only a first-time user seeking to swap a token on the Protocol must provide approval before engaging in their first transaction. However, as with other user agreements, Protocol users are not required to continuously approve token-specific "contracts" after their initial use approval. Therefore, the transaction-specific terms of a token swap are not determined as a result of the conduct of Defendants.

In sum, we agree with the district court that it "defies logic" that a drafter of a smart contract, a computer code, could be held liable under the Exchange Act for a third-party user's misuse of the platform. *Risley*, 690 F. Supp. 3d at 215. Accepting Plaintiffs' allegations as true, the district court appropriately determined that Defendants' smart

10

contracts were, at best, collateral to the third parties' scam token activities and the type

of tangential activity that falls outside of Section 29(b).  Accordingly, we affirm the district

court's dismissal of the Exchange Act claim.

### III.    State Law Claims

Finally, Plaintiffs claim that the district court erred in dismissing the state law

claims because it declined to exercise supplemental jurisdiction, even though Plaintiffs

properly pled original diversity jurisdiction over those claims under the Class Action

Fairness Act of 2005 ("CAFA").  Under CAFA, federal district courts are authorized to

exercise original jurisdiction over putative class actions alleging damages above $5

million and a class of more than 100 persons where any member of the alleged plaintiff

class is a citizen of a State different from any defendant.  *See* 28 U.S.C. § 1332(d)(2).

We agree with Plaintiffs and hold that the district court improperly dismissed the

state law claims under the doctrine of supplemental jurisdiction.  *See L.S. v.*

*Webloyalty.com, Inc.*, 954 F.3d 110, 117 (2d Cir. 2020) (vacating judgment dismissing state

law claims where complaint adequately and alternatively pled original jurisdiction under

CAFA).  We respectfully vacate and remand for the district court to consider the state law

claims in the first instance.[5]

*            *            *

---

[5] Indeed, Labs and Adams concede that vacatur and remand are appropriate here.

We have considered Plaintiffs' remaining arguments and conclude that they are without merit.  For the reasons set forth above, the judgment of the district court is **AFFIRMED** in part and **VACATED** and **REMANDED** in part.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

12