**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| ERIC DE FORD, SANDRA BADER, and SHAWN R. KEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES KOUTOULAS and LGBCOIN, LTD,<br><br>Defendants. | Case No. 6:22-cv-652-PGB-DCI<br><br>CLASS ACTION |

**DEFENDANT JAMES KOUTOULAS'S RENEWED MOTION UNDER RULE 23(c)(1)(C) TO ALTER OR AMEND CLASS CERTIFICATION BEFORE CLASSWIDE MONETARY RELIEF, AND INCORPORATED MEMORANDUM OF LAW**

Defendant James Koutoulas moves under Federal Rule of Civil Procedure 23(c)(1)(C) to alter or amend the class certified solely on Count I, Plaintiffs' Section 12(a)(1) claim against him (Doc. 455), and to decertify that class or grant the graduated relief stated in the Conclusion. The Court's post-certification rulings (Docs. 531, 565), the classwide damages positions stated in Plaintiffs' late-July 2026 draft pretrial statements (Exs. A-1, A-2), the representatives' certified transaction schedules (Doc. 320-3 at 3, 5, 7), and the present nonfinal posture establish that the certification premise no longer holds across the 134-day class.

Rule 23(c)(1)(C) provides that an order granting class certification "may be altered or amended before final judgment." Despite its title, Doc. 688 is not a final judgment. It adjudicates no damages, and Plaintiffs' July 31 revised draft confirms that the aggregate rescission computation remained to be served. (Ex. A-2 § VI.A.) On materially similar facts the Eleventh Circuit held that "the entry of default judgment was not final because the amount of damages to be awarded was still outstanding." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1382 (11th Cir. 2024); see also *Anheuser-Busch, Inc. v. Philpot*, 317 F.3d 1264, 1267 (11th Cir. 2003) (judgment "was not a final default judgment, as it provided neither relief nor damages"). What remains as to Defendant is the amount phase, and the certification order determines whose claims any classwide monetary award could cover. Doc. 620 sets August 24, 2026 as the deadline for "All Other Motions." (Doc. 620 at 3.) This Motion addresses the certified class governing the unresolved amount phase under Rule 23(c)(1)(C).

# I. INTRODUCTION

Certification rested on the premise that the same evidence would answer the elements of the certified Section 12(a)(1) claim for every member. (Doc. 455 at 24.) Section 12(a)(1) creates liability only to "the person purchasing such security from him." 15 U.S.C. § 77l(a). Extending a monetary award across the certified class requires a determination, purchase by purchase, that Defendant was that purchaser's statutory seller under *Pinter v. Dahl*, 486 U.S. 622, 642-47 (1988). The certified class was defined by date and token alone, without regard to acquisition venue or to that transaction-level element, and the later record supplies no common method for supplying it. Plaintiffs' present proof changes by transaction, acquisition pathway, channel, and phase of the class period. The operative complaint pleads nine causes of action, none of them a control-person claim. (Doc. 245, First through Ninth Causes of Action.) Count I pleads that Defendant is a seller because he "or his agents" solicited the purchases. (*Id.* ¶ 379.) Either route requires a transaction-specific link to the purchase for which rescission is sought.

The Court's summary-judgment ruling framed the reserved question objectively. It held that "Plaintiffs' subjective intent . . . is not determinative for the expectation of profits analysis," and that the inquiry looks to "the promotional materials associated with the offer and sale at issue." (Doc. 531 at 23.) It found "a dispute over whether Defendants' promotional materials for LGBCoin attracted Plaintiffs with an expectation of profits or motivated Plaintiffs by a desire to obtain LGBCoin as a meme coin for advocacy." (Doc. 531 at 26.)

The measure it applied is objective: the Court treated stated purchaser intent as one consideration in evaluating "the motivations of a hypothetical reasonable purchaser," and asked whether the promotional materials would lead "a reasonable purchaser to expect a profit." (Doc. 531 at 24.) An objective standard keyed to promotional materials requires identifying which dated, source-attributed promotional record governs each offer and sale.

Docs. 682 and 688 do not enlarge the certified claim or resolve the Rule 23 questions. They fix no damages and remain nonfinal. (Doc. 682 at 21-22; Doc. 688 at 1; Ex. A-2 § VI.A.) "A court has an obligation to assure that there is a legitimate basis for any damage award it enters." *Philpot*, 317 F.3d at 1266; see *Hornady*, 118 F.4th at 1385 (quoting the same).

## II. BACKGROUND

### A. The certified claim and post-certification developments.

On March 28, 2025, the Court certified a Rule 23(b)(3) class defined as all persons who purchased LGBCoin between November 2, 2021 and March 15, 2022, but only on Count I, the Section 12(a)(1) claim against Defendant Koutoulas. (Doc. 455 at 4, 32.) The Court expressly denied certification of unjust enrichment. (*Id.* at 24-26, 32.) It did not certify a Florida-securities claim or a claim against LGBCoin, LTD.

The first decertification motion challenged De Ford's adequacy. (Doc. 490.) The Court denied it because the cited circumstances were neither materially changed nor clarified. (Doc. 515 at 6-7.) This motion presents different grounds

arising from later rulings and methodology. Plaintiffs' July 31 draft recast the quantified measure from aggregate swap and liquidity losses to the statutory rescission formula while retaining the $21,306,432 estimate. (Doc. 488-3 ¶¶ 11, 40, 42; Ex. A-1 § VI; Ex. A-2 § VI.A.)

**B. The present posture and the authority for this Motion.**

On August 4, 2026, the Court directed entry of default judgment against Defendant, and the Clerk entered judgment the next day. (Docs. 682, 688.) No amount was adjudicated, Plaintiffs' request against LGBCoin, LTD remains pending, and no judgment resolves all claims against all parties. Defendant's Rule 54(b) motion directed to Docs. 682 and 688 is pending. (Doc. 714.)

On August 18, 2026, the Court struck three filings Defendant had submitted in connection with the joint final pretrial statement, stating that “[d]ue to the Default Judgment entered against Defendant Koutoulas, these filings are not permitted by the Federal Rules of Civil Procedure or the Local Rules,” that “the only remaining defendant for purposes of trial is Defendant LGBCoin, LTD.” (Doc. 724.) A companion order limited attendance at the August 25 status conference to counsel for Plaintiffs and for LGBCoin, LTD. (Doc. 723.)

Doc. 724 addressed three pretrial-statement filings. It did not address Defendant's pending Rule 54(b) motion at Doc. 714. Neither order adjudicates damages against Defendant, alters or withdraws the certified class, or converts the liability-only ruling at Doc. 688 into a final judgment. The Court's own Rule 23 obligation survives entry of default. *Rensel*'s procedural history confirms that

default and class certification remain distinct questions. In *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1368 (11th Cir. 2021), the Clerk had entered default against the corporate defendant, and that defendant "filed its response in opposition" to class certification, arguing "that arbitration provisions barred the action, that the named plaintiffs lacked standing and could not meet the substantive requirements of Rule 23." The Eleventh Circuit vacated the order denying certification and the ensuing final judgment. *Id.* at 1370.

*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992), holds that "a challenge to class certification is not the type of potential defense to the merits which the party loses through its default, except to the extent that it depends on the court's resolution of factual issues which defendants could have addressed at the scheduled hearings or in required filings had they not defaulted." The deposition excerpts identify the acquisition pathways and the periods the representatives cover, which are the Rule 23 facts that determine the reach of any classwide monetary award.

## III. LEGAL STANDARD

A certification order may be altered or amended before final judgment. Fed. R. Civ. P. 23(c)(1)(C). District courts retain the ability, and perhaps even a duty, to alter or amend a certification decision as the case develops. *Shin v. Cobb County Board of Education*, 248 F.3d 1061, 1064 (11th Cir. 2001); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1273 (11th Cir. 2000). In denying the first decertification motion, the Court held that, absent materially changed or clarified

circumstances, courts should not condone serial reargument of certification. (Doc. 515 at 6-7 (quoting *Washington v. Vogel*, 158 F.R.D. 689, 692-93 (M.D. Fla. 1994)).) The circumstances relied on here postdate that motion. Doc. 515 issued on August 24, 2025, and each development relied on here came after it: the summary-judgment ruling on December 2, 2025, the reconsideration ruling on January 21, 2026, the draft pretrial statements in late July 2026, and the default judgment on August 4 and 5, 2026. The certified schedules, the deposition testimony, and Plaintiffs' expert declarations show what those later developments now require.

Rule 23(b)(3) requires common questions to predominate and class treatment to be superior. A question is individual when members must present evidence that varies from member to member. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). A damages model must measure only the damages attributable to the certified theory. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

## IV. ARGUMENT

### A. The pleading and the later record supply no common method for the certified claim's transaction-level predicates.

At certification the Court recorded that Defendants did not then dispute predominance, and it found predominance because the elements appeared to admit a single answer. (Doc. 455 at 23-24.) The question now is whether the later merits rulings and Plaintiffs' later classwide damages positions preserve that premise before final judgment. Those rulings tied the governing proof to each

offer and sale. The Court framed the inquiry by reference to "the promotional materials associated with the offer and sale at issue." (Doc. 531 at 23 (quoting *Fedance v. Harris*, 1 F.4th 1278, 1288 (11th Cir. 2021)).) The promotional record that governs is therefore the record associated with each transaction.

Those inputs are not uniform here. The Court identified two statements and held that "[n]either of these statements emphasize the investment value of LGBCoin": that LGBCoin "has no intrinsic value and you should not purchase it with any expectation that you will be able to resell it," and that it "is a digital collectible and digital way to express your support for the Let's Go Brandon movement." (Doc. 531 at 24-25.) The representatives did not encounter the same set. De Ford identified a Brandon Brown NASCAR marketing video and could not identify who posted the advertisements he saw. (Ex. C, De Ford Dep. 22:16-23:1.) Bader identified Facebook, sponsorship advertising, and the website. (Ex. B, Bader Dep. 13:1-5, 14:5-7, 14:25-15:5.) Key attributed his purchase to "fear of missing out" and to "insider information from Brian," which he later restated as "information received by persons close to the project and company," together with the website, Telegram, and an anticipated announcement. (Ex. D, Key Dep. 20:24-21:9, 25:12-26:5, 27:21-28:4.) No objective rule determines which promotional record defines the inquiry for members who entered through different channels and phases. Applied objectively, the inquiry asks which promotional materials attended each offer and sale. The materials the Court identified as Defendant's are the two it held do not emphasize investment value. (Doc. 531 at 24-25.) The materials the representatives describe are different ones:

a marketing video whose publisher was not identified (Ex. C, De Ford Dep. 22:16-23:1), press releases the pleading attributes to a non-party (Doc. 245 ¶¶ 63, 228, 231), and a domain the pleading never names that reports a different contract address and a total supply of 100,000,000 (Ex. E, BADER 000001-000004). Each of those records presents a different set of materials to the reasonable purchaser the standard posits, and Plaintiffs propose no rule fixing which record governs any absent purchase.

Bader's testimony illustrates the identification problem. Shown the advertisement reproduced at page 6 of the complaint, she answered that it was one of the advertisements she had referenced. (Ex. B, Bader Dep. 15:17-20.) Shown the next image, she answered, "I do not recall that specific image." (*Id.* 17:17-24.) Shown a preserved capture of the website, she answered, "Actually, that is not what I remember it to look like," and she could not say she had preserved anything from the site she reviewed. (*Id.* 21:2-10, 22:5-13.) Her testimony identifies one image without supplying its publishing account, its date, or any method applicable to an absent member's purchase.

The document Bader produced does not close that gap. Plaintiffs plead that the website associated with LGBCoin was LGBCoin.io, and that 330 trillion LGBCoin tokens were minted under the creator smart contract 0x21E783bcf445B515957A10E992aD3c8E9FF51288, which the complaint defines as the "LGBCoin Contract." (Doc. 245 ¶¶ 94, 101, as corrected.) The operative complaint refers to LGBCoin.io twenty-eight times and never refers to lgbcoin.com. Bader's production contains one website document: a four-page

capture of lgbcoin.com printed on December 5, 2022, titled "Let's Go Brandon Coin | LGBC on Ethereum." (Ex. E, BADER 000001-000004.) An archived capture of that domain dated November 8, 2021, six days into the class period, states an "Official $LGBC contract address" of 0xfac79ae042cbd841a69ab84b16dcd803edccf2a1, reports a total supply of 100,000,000, and cautions that "similar tokens may try to fool you." Plaintiffs' event-study expert lists a page from that domain among his sources. (Doc. 374 at 63.) The promotional record for the representative who says she relied on the website is a domain the pleading never mentions, identifying a different contract address and a total supply of 100,000,000 against the 330 trillion tokens the complaint pleads. Plaintiffs propose no objective method for identifying the dated, source-attributed promotional record associated with each materially different offer-and-sale phase.

Plaintiffs' materials supply no common rule for assigning a dated, source-attributed promotional record to transactions in each acquisition and token phase, and the pleading supplies no such rule for absent members. The Court recited the governing standard: the analysis "typically hinges on 'whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" (Doc. 531 at 23.) The pleading's own oversight allegation is stated jointly and without transactional reference. It alleges that "Koutoulas and Norden directly oversaw the promotional activity of LGBCoin" and that they "also managed the recruitment of celebrity influencers to promote LGBCoin,"

and in the next paragraph that Defendant, “Horsman, Latona, Mascioli, Norden, and others under the aforementioned participants' control directed the scheme.” (Doc. 245 ¶¶ 130-31, as corrected.) An allegation that promotion was overseen in common by six named actors and others assigns no identified effort to any particular offer and sale. The operative pleading neither assigns identified efforts and actors to particular transactions nor supplies a common rule for doing so across the certified class, and Plaintiffs' disclosures supply none. Count I's incorporated common-pool allegations also differ from the theory on which Doc. 531 found Howey's second prong satisfied: the Court found that “Plaintiffs did not invest in a common pool or share pro-rata in profits.” (Doc. 531 at 20.)

Plaintiffs' disclosures provide no substitute. Their listed witnesses are the three representatives and Defendant, and the disclosed expert addresses financial outcomes in one pool. (Ex. A-1 §§ IV-VI.) No disclosed testimony, exhibit, or expert method determines for absent members the relevant promotional record, the expected source of profits, the statutory seller, or a solicitation attributable to Defendant.

**B. The prior merits rulings identified no classwide method for the statutory-seller link.**

Section 12(a)(1) imposes liability only on a seller and only “to the person purchasing such security from him.” 15 U.S.C. § 77*l*(a). Under *Pinter*, a defendant is a seller if he passed title to the purchaser or successfully solicited the purchase, motivated at least in part by a desire to serve his own financial interests or those

of the owner. 486 U.S. at 642-47. The relationship among the defendant, the purchaser, and the purchase is part of the statutory claim.

Before entry of default, the Court twice left statutory-seller status unresolved on the merits. It wrote that "the Court does not need to determine whether Defendant Koutoulas is a statutory seller under Section 12(a)(1). This question is to be addressed by the jury when it considers whether LGBCoin is a security." (Doc. 531 at 27 n.10.) Neither the prior merits rulings nor entry of default supplied or altered the classwide method Rule 23 requires for applying either *Pinter* branch across the certified class.

*Wildes v. BitConnect International PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022), states the transaction-level requirements: "the solicitation must succeed, and it must be motivated by a desire to serve the solicitor's or the security owner's financial interests," and "for solicitation to occur, a person must 'urge or persuade' another to buy a particular security." The panel preserved the causation question, explaining that the district court there "dismissed the case because the solicitations weren't 'personal,' not because the solicitations didn't lead to the plaintiffs' purchases." *Id.* at 1347. The public posts attributed to Defendant identify no purchase that any post successfully solicited.

Treating token ownership alone as dispositive would reduce *Pinter*'s motive inquiry to holder status. *Pinter* excludes a solicitor whose motivation is "solely to benefit the buyer," and treats a sale-linked commission as typical rather than indispensable, since its absence "is not conclusive." 486 U.S. at 647, 654-55. *Wildes* fixes the reach of that liability at the buyer: a person who solicits a

purchase to serve his own or the owner's financial interests "is liable to a buyer who purchases those securities." 25 F.4th at 1347. Section 12(a)(1) runs to "the person purchasing such security from him," 15 U.S.C. § 77*l*(a), and reaches only the buyer's immediate seller, *Pinter*, 486 U.S. at 644 n.21. Liability is therefore fixed buyer by buyer. For each purchase included in a classwide award, Plaintiffs must show that a communication by Defendant urged that purchase and that the purchase followed from it. A solicitor is one who "successfully solicits the purchase," *Pinter*, 486 U.S. at 647, and under *Wildes* "the solicitation must succeed" and must "urge or persuade" a person "to buy a particular security," 25 F.4th at 1346. The record shows what that proof looks like. De Ford wrote a Telegram message urging other holders to buy, telling them, "If you're an investor, let's try to encourage everyone," and that "their money is coming back with more potential," and he confirmed at deposition, "I wrote that." (Ex. C, De Ford Dep. 59:4-5, 59:13-14, 59:22.) Plaintiffs identify no communication by Defendant linked in that manner to any member's purchase. The Court has already found that Plaintiffs were not promised, "either directly from Defendant Koutoulas or indirectly through social media and internet posts," any profits, dividends, transaction fees, or appreciation, and that "none of the named Plaintiffs directly communicated with Defendant Koutoulas when they purchased LGBCoin." (Doc. 531 at 24.) No representative identified a communication by Defendant as having urged the purchase he or she made. *Wildes* shows what that record looks like when it exists. There the promoters, "[u]sing publicly available videos," "convinced the plaintiffs to buy BitConnect

through their referral programs and earned a commission on those investments." 25 F.4th at 1347. The channel was impersonal, and the panel still identified who was convinced, what they bought, and what the solicitor earned on it. De Ford answered the question directly. Asked whether any of the purchases on his certification schedule were "specifically between you and Mr. Koutoulas," he answered "No." (Ex. C, De Ford Dep. 116:1-6.) Asked whether Defendant "ever directly ask[ed] you to buy LGBCoin," he answered "No." (Id. 117:9-11.) Asked whether he "ever purchase[d] LGBCoin directly from Mr. Koutoulas," he answered "No." (Id. 117:16-20.) Asked to identify any transaction on the schedule that was between himself and Defendant, he answered, "Never had any direct transactions between Mr. Koutoulas." (Id. 117:22-118:4.) That testimony forecloses title passage as to the representative with fourteen of the eighteen certified purchases, and it supplies no communication by Defendant that urged any of them.

The Court found that "Plaintiffs purchased LGBCoins on cryptocurrency exchanges such as Coinbase and Uniswap," and that "Plaintiffs did not transact directly with Defendant Koutoulas when purchasing LGBCoin." (Doc. 531 at 4.) Their transactions therefore implicate the solicitation branch rather than title passage. For any member who did not acquire title from Defendant, Plaintiffs need a common method that identifies a communication by Defendant, shows that it urged an acquisition, and links that member's purchase to it. That method remains unidentified, and proof of successful solicitation for one pathway does not establish it for the others.

*Rensel* records how plaintiffs in a Section 12(a)(1) token case structured that distinction at certification. They proposed three subclasses: two covering persons who purchased "directly from Defendant Centra Tech" during two defined windows of the offering (approximately June 23 through October 5, 2017, and October 6, 2017 through April 20, 2018), and a third covering "[a]ll persons and entities who purchased CTR Tokens on the open market as a result of Defendant Centra Tech successfully soliciting their purchases of CTR Tokens." *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1369 (11th Cir. 2021). Open-market purchasers were placed in a separate subclass, the direct-purchase subclasses were bounded by the periods in which those sales occurred, and membership in the open-market subclass turned on successful solicitation of each member's own purchase. The class certified here covers every acquisition venue and every purchaser across 134 days, and its definition carries neither that separation nor that element. (Doc. 455 at 32.)

The pleading alleges that Defendant "or his agents solicited Plaintiffs' investments in LGBCoin, including on social media," and elsewhere alleges that he received over $1.6 million from LGBCoin sales. (Doc. 245 ¶¶ 242, 379, as corrected.) It pleads the solicitation in the alternative as the act of unnamed agents and matches no alleged receipt to any member's purchase. Plaintiffs identify no pleaded or proposed common method for proving agency as to unnamed actors and matching any such actor's successful solicitation to particular purchases. Every claim against the LetsGoBrandon.com Foundation

was dismissed and that defendant terminated from the case, without repleading. (Doc. 354 at 17, 29-30.)

**C. The representatives are atypical across the pleaded trading phases.**

Plaintiffs' late-July 2026 drafts now seek one classwide monetary award across the entire 134-day period, while Docs. 531 and 565 frame the governing inquiries at the offer-and-sale and purchase level. Applying those later developments to the certified schedules shows that the proposed aggregate reaches purchase periods and transaction structures no representative covers. (Docs. 531 at 23-27 & n.10; 565 at 7-8; Ex. A-1 § VI; Ex. A-2 § VI.A; Doc. 320-3 at 3, 5, 7.)

Typicality requires that the representative's claims and the class's claims arise from the same event or pattern or practice and rest on the same legal theory, and that they retain the same essential characteristics. *Prado-Steiman*, 221 F.3d at 1279 n.14. The distinctions here run beyond dates. The pleaded phases involve different acquisition routes, promotional sources, token and liquidity structures, *Pinter* branches, and rescissory inputs, and those differences change the proof that determines whether a transaction belongs in the certified claim and in any classwide award.

The class spans November 2, 2021 through March 15, 2022. (Doc. 455 at 32.) The certified schedules record eighteen purchases: three by Key on December 29 and 30, 2021; one by Bader on January 1, 2022; and fourteen by De Ford between January 1 and February 27, 2022. (Doc. 320-3 at 3, 5, 7.) The first

fifty-seven days and the last sixteen contain no purchase by any representative. The pleading describes materially different offers and sales inside that single period. It records an early phase of direct, negotiated sales, allocating "22% - Sold OTC" by November 4, 2021 and a counterparty's instruction of "No more OTC please!" (Doc. 245 ¶¶ 84-85.) Plaintiffs plead that on January 28, 2022 the remaining liquidity was drained "as part of [a] plan to remint and relaunch the LGBCoin into a second meme coin"; that between February 22 and February 24, 2022 the token was "relaunched" into "a second version of the LGBCoin known as '$LETSGO,'"; and that the "new" LGBCoin opened on March 1, 2022 at a price sixty-five percent below its predecessor. (Doc. 245 ¶¶ 331-32, 346, 353.) Plaintiffs identify no method that assigns one promotional record, one *Pinter* branch, and one rescissory computation across those distinctions.

The clearest exclusion is November 2 through December 28. Key first purchased on December 29, one day before the announcement, and he attributed that purchase to private information from a friend that NASCAR support and a public announcement were imminent. (Ex. D, Key Dep. 21:4-9, 25:16-21.) A purchase made on advance private information about an unannounced sponsorship presents a different promotional-record and successful-solicitation inquiry from the earlier public-launch purchases. The window that follows carries a different problem again. Plaintiffs allege that thousands purchased "in reliance on NASCAR's approval of the LGBCoin sponsorship," and they plead that BMS is a non-party, that it "acted as a promotor of LGBCoin," and that it issued both the December 30, 2021 press release announcing the sponsorship and

the January 5, 2022 press release announcing its revocation. (Doc. 245 ¶¶ 63, 228, 231, 306.) The promotional record for the window in which De Ford and Bader purchased therefore includes communications by a non-party, and Plaintiffs supply no rule separating them from communications attributed to Defendant.

The later boundary creates a different problem. De Ford made eleven of his fourteen certified purchases after January 5, 2022, including purchases on January 28 and on February 25, 26, and 27, and his schedule labels the February 25-27 entries as BUY transactions funded with WETH while omitting the venue, pool, token contract, wallet, counterparty, and transaction hash. (Doc. 320-3 at 3.) A swap executed against an existing pool after the pleaded relaunch is a different acquisition from a purchase of a newly minted token, and Plaintiffs' disclosed one-pool model does not state which token contract and liquidity structure it assigns to the February 25-27 transactions or to absent acquisitions after the February 22-24 relaunch. (Doc. 488-3 ¶¶ 15, 32.) Plaintiffs themselves plead that purchasers who entered after the liquidity pull "would completely lose their investments." (Doc. 245 ¶ 347.)

De Ford described the January 28 event as a point at which "the old token liquidity was pulled out of it and then they reissued it again," and identified the actor only "based upon the Third Amended Complaint." (Ex. C, De Ford Dep. 61:5-10.) He placed the reissuance boundary at purchases made "prior to the 28th of January." (*Id.* 61:23-25.) Plaintiffs identify no method for determining, for any pooled acquisition on or after that date, the counterparty from whom title

passed. An upstream transfer into the pool cannot establish that title passed from Defendant to any class purchaser. *Pinter*, 486 U.S. at 644 n.21.

The certification order recorded that courts "must eventually ensure that no relief is granted to absent class members who might later turn out not to have standing." (Doc. 455 at 10.) No representative made a class-qualifying purchase during the opening fifty-seven days or the closing sixteen. Purchases in those periods require materially different proof of acquisition route, promotional source, token and liquidity structure, applicable *Pinter* branch, and rescissory inputs. Those differences concern the claims' essential characteristics under *Prado-Steiman*, 221 F.3d at 1279 n.14, and carry into predominance and superiority.

The certified class also reaches purchasers whose acquisitions were not pool transactions. Plaintiffs plead that twenty-two percent of the supply had been "Sold OTC" by November 4, 2021, and their own filing states that Defendant "sold significant amounts of LGBCoin in over-the-counter transactions directly with purchasers." (Doc. 245 ¶¶ 84-85; Doc. 614 at 16.) Those acquisitions proceed under *Pinter*'s title-passage route, while the Court has found that the representatives purchased on exchanges and did not transact directly with Defendant. (Doc. 531 at 4.) "[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987). No representative acquired by title passage. The simplest alternative is to conform the class period to the representatives' own transactions. The schedules record the first

representative purchase on December 29, 2021 and the last on February 27, 2022. Conforming the class period to those endpoints would remove the two terminal stretches in which no representative purchased at all. (Doc. 320-3 at 3, 5, 7.) Plaintiffs' aggregate is computed across the full 134-day period, so a narrowed period would require a computation Plaintiffs have not performed. (Doc. 488-3 ¶¶ 11, 40, 42.) Failing that, acquisitions from November 2 through December 28, 2021 and from February 28 through March 15, 2022 should be excluded or separately subclassed unless Plaintiffs identify an adequate representative and a common method for each, and Plaintiffs should be required to propose subclasses or exclusions keyed to the December 30 announcement, the January 5 revocation, the January 28 drain and remint, and the February 22-24 relaunch, supported the same way.

**D. The one-pool model is untethered from the certified claim and cannot support a manageable classwide remedy.**

Plaintiffs' quantified model does not identify which modeled transaction, if any, qualifies as a purchase from Defendant under either *Pinter* branch, and it calculates no statutory remedy for any such transaction.

The operative pleading quantifies the sales at issue. It alleges that transactions from two identified wallets "demonstrate that Koutoulas received over $1.6 million for his LGBCoin sales between November 2021 and January 2022," and it ties relief to damages "in connection with his respective purchases of LGBCoin" and to "rescission and/or compensatory damages." (Doc. 245 ¶¶

242, 381, as corrected.) The Court directed that "Plaintiffs shall not file a subsequent amended complaint." (Doc. 313.) Plaintiffs never moved for leave to amend that demand, and the default judgment was entered on the Third Amended Complaint. (Doc. 688.) The classwide measure Plaintiffs now advance reaches every transaction against a pool, whoever the counterparty. Plaintiffs' initial late-July draft pretrial statement stated a classwide position of $21,306,432.12 in losses from swap and liquidity transactions in the LGB-WETH pool. (Ex. A-1 § VI; Doc. 488-3 ¶¶ 11, 40, 42.) Their July 31 revised draft changed the measure to aggregate statutory rescission, stating only that Plaintiffs "will serve a computation of the aggregate rescission amount, presently estimated at $21,306,432, before the final pretrial conference." (Ex. A-2 § VI.A.) An aggregate figure does not identify, for any member, the consideration paid, the income received, the tender or continued ownership, or the amount realized on any sale. A damages model must measure only the damages attributable to the certified theory. *Comcast*, 569 U.S. at 35.

The model is underinclusive as to venues and overinclusive as to seller proof. Doc. 455 covers purchases in any venue, and the model covers one pool. (Docs. 455 at 32; 488-3 ¶¶ 15, 32.) OTC and other direct purchases remain inside the class, and Plaintiffs' own description says those transactions are proved through direct communications and purchaser-specific records. (Doc. 614 at 16-17.) Participation in the pool, standing alone, shows neither that Defendant passed title to the claimant nor that he successfully solicited the claimant's purchase.

Plaintiffs' experts describe different markets. Their event-study expert attributes price declines to a "new alternative $LETSGO token" and a "new LGBCoin." (Doc. 374 at 7, 32.) Their damages expert derived the class list by isolating wallets that "interacted with the LGB-WETH pool." (Doc. 488-3 ¶¶ 12, 32-33.) The certified class covers purchasers of LGBCoin in any venue. (Doc. 455 at 32.) Plaintiffs identify no method reconciling a class defined by purchase with a class list defined by one pool's wallet activity.

Plaintiffs identify the token but not the market. The operative complaint pleads that 330 trillion LGBCoin tokens were minted under a specific creator smart contract, which it defines as the "LGBCoin Contract." (Doc. 245 ¶ 94, as corrected.) The damages declaration states no contract address for that token or for the pair it analyzed, describing only that "a liquidity pool was created, pairing LGB with WETH," with liquidity supplied by providers who "deposit equal values of each token." (Doc. 488-3 ¶ 12.) It records liquidity supplied by participants beyond the defendants, counting eleven class member addresses that provided liquidity across twenty-three transactions. (*Id.* ¶ 33.) Any third party is free to create an additional liquidity pool for any DeFi token. Nothing in Plaintiffs' materials ties the pool they measured to the contract the complaint pleads, or identifies the pool that supplied the tokens for any absent member's acquisition. Determining which pool was the counterparty to a given acquisition, and who supplied that pool's liquidity, is a transaction-specific inquiry that no disclosed method performs.

The certified schedules are no more specific. Each records only a transaction type, a date, a token quantity, the consideration paid, an approximate dollar value, and a fee. (Doc. 320-3 at 3, 5, 7.) None states a contract address, a transaction hash, a wallet, or an acquisition venue. The eighteen transactions of the three representatives, on which certification rests, therefore cannot be matched to the contract the complaint pleads or to the pool the model measures, and Plaintiffs propose no method that would allow an absent member's transaction to be matched either.

Plaintiffs' pool model establishes neither *Pinter* branch. Each modeled swap was executed against the pool, and Section 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n.21. An upstream transfer into the pool cannot establish that title passed from Defendant to any class purchaser. The solicitation branch turns on the particular purchase, and Plaintiffs' model identifies no person from whom a claimant acquired title and contains no field linking any communication to a resulting purchase.

The model also includes entries categorized as liquidity transactions, while the certified class consists of persons who purchased LGBCoin. (Doc. 455 at 32.) A total that combines them with swaps does not measure only the certified claim.

Any classwide monetary relief would first require a protocol identifying, for every absent transaction to be included in any classwide award, the claimant and the qualifying purchase; the applicable dated promotional record; the

applicable *Pinter* branch and the transaction-specific link to Defendant; the consideration paid; current ownership and tender or the proceeds of disposition; income received; interest; and the treatment of the remint and any OTC transfers. A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Fed. R. Civ. P. 54(c); see *Campbell v. Bennett*, 47 F.4th 1362, 1370 (11th Cir. 2022) (Lagoa, J., concurring). The one-pool aggregate answers none of these questions, and the sum it produces is neither the sum the operative pleading demands nor a sum any amended pleading has ever demanded.

The Eleventh Circuit has recognized that individualized damages may defeat predominance when they are coupled with significant individualized questions of liability. *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016). Whether title passed to a given purchaser, and whether a solicitation urged and succeeded as to that purchase for the required financial motive, are transaction-level predicates that determine which absent transactions share the certified Section 12(a)(1) characteristics and may be included in a classwide monetary award.

Without a common method for the membership, seller, and remedy links, any classwide determination would break into claimant-specific proceedings on the issues that establish entitlement and amount. Fed. R. Civ. P. 23(b)(3)(D). Manageability concerns are weighed against the advantages of proceeding as a class. *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1369 (11th Cir. 2021). That is neither a superior nor a manageable use of Rule 23(b)(3).

## V. CONCLUSION

Defendant James Koutoulas respectfully requests that the Court: (1) decertify the Rule 23(b)(3) class certified in Doc. 455 under Rule 23(c)(1)(C); (2) alternatively, modify the class period to December 29, 2021 through February 27, 2022, the interval between the first and last certified purchase by a named representative; (3) alternatively, exclude persons who purchased LGBCoin from November 2 through December 28, 2021 and from February 28 through March 15, 2022, or subclass those periods upon Plaintiffs' identification of an adequate representative and a common method; direct Plaintiffs to state which token and liquidity structure governed each acquisition from February 22, 2022 forward; and require any additional phase-specific subclass or exclusion to be supported the same way; (4) alternatively, under Rules 23(c)(1)(C) and 23(d), direct Plaintiffs to file by a date certain a protocol showing how they propose to determine, for every absent transaction to be included in any classwide award, the applicable dated promotional record, the applicable *Pinter* branch and transaction-specific link to Defendant, class membership, ownership, and tender, and the statutory rescissory computation, and thereafter determine whether certification should be maintained, modified, limited to particular issues, or withdrawn; and (5) grant such further relief as the Court deems just and proper.

Dated: August 24, 2026

Respectfully submitted,

/s/ James L. Koutoulas
James L. Koutoulas, Esq., *Pro se*
10 N. Dearborn St., Suite 400
Chicago, IL 60602
james@koutoulaslaw.com

**LOCAL RULE 3.01(g) CERTIFICATE**

Pursuant to Local Rule 3.01(g) and the Court's Order at Doc. 620 at 6, the undersigned conferred by telephone with counsel for Plaintiffs on August 24, 2026 regarding the relief requested in this Motion. Counsel for Plaintiffs stated that Plaintiffs oppose the relief requested in full. The parties have not resolved all or any part of the Motion.

Dated: August 24, 2026

Respectfully submitted,

/s/ James L. Koutoulas
James L. Koutoulas, Esq.
*Pro se*
10 N. Dearborn St., Suite 400
Chicago, IL 60602
james@koutoulaslaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 24, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ James L. Koutoulas

James L. Koutoulas, Esq.
*Pro se*
10 N. Dearborn St., Suite 400
Chicago, IL 60602
james@koutoulaslaw.com