# EXHIBIT D

## DEPOSITION OF SHAWN R. KEY (EXCERPTS)

December 2024 (DX 0049)

*Cited at 20:24-21:9, 21:4-9, 25:12-26:5, 25:16-21, and 27:21-28:4.*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.: 6:22-CV-00652-PGB-DCI

ERIC DE FORD, SUSAN BADER,
SHAWN R. KEY, Individually and on
Behalf of All Other Similarly Situated,
Plaintiffs,
v.
JAMES KOUTOULAS, and
LGBCoin, LTD,

Defendants.
_______________________________________/

DATE: December 12, 2024
TIME: 10:09 a.m. - 1:32 p.m.
PLACE: Via remote video Zoom

VIDEOTAPED CONFERENCE DEPOSITION OF SHAWN ROY KEY

Kimberly Hacker
United Reporting, Inc.
Litigation Building
633 South Andrews Avenue, Suite 202
Fort Lauderdale, Florida 33301
(954) 525-2221



APPEARANCE FOR THE PLAINTIFFS:
THE ZIGLER LAW FIRM
308 South Jefferson Street, Suite 333
Chicago, Illinois 60661
BY: KEVIN MC CORMACK, ESQUIRE

APPEARANCE FOR THE DEFENDANTS:
DI PIETRO PARTNERS, PLLC
901 East Las Olas Boulevard, Suite 202
Fort Lauderdale, Florida 33301
BY: NICOLE M. MARTELL, ESQUIRE and
TYLER L. MUTSCHLER, ESQUIRE

ALSO PRESENT:
KAMRYN BRODEY, INTERN OBSERVER
JAMES KOUTOULAS, DEFENDANT
PATRICIA PFEIL, VIDEOGRAPHER
UNITED REPORTING, INC.



INDEX


| WITNESS | PAGE |
|---|---|
| SHAWN ROY KEY | |
| Direct Examination by Ms. Martell | 5 |


EXHIBITS


| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| 18 ** | Shawn Key's answers and objections to defendants, James Koutoulas and LGBCoin, Ltd's first set of interrogatories | 23 |
| 10 * | Welcome page to LGB site | 28 |
| 3 * | Sponsorship agreement | 41 |
| 11 * | E-mail document between Dale Howell and Mac MacLeod | 43 |
| 19 | Brandon Built Motorsports press release announcement | 56 |
| 4 * | Coinbase chart document | 74 |
| 20 | Third Amended Complaint | 101 |
| 16 * | Notice of PSLRA compliance | 110 |
| 21 | Declaration certification document | 115 |
| 8 * | NASCAR e-mail document | 115 |


**(Reflects continuation numbering from September 10, 2024 deposition.)

*(Reflects previously marked exhibits.)



VIDEOGRAPHER: We are now on the video record. The time is 10:09:17 a.m. Today is Tuesday, the 10th day of December, 2024.

We are here for the videotaped deposition of Shawn R. Key, Case Number 6: 22-CV-00652-PGB-DCI, Eric De Ford, Susan Bader, Shawn R. Key, Individually and on Behalf of All Others Similarly Situated versus James Koutoulas and LGBCoin, Ltd. Held in the United States District Court, Middle District of Florida, Orlando Division.

The court reporter is Kimberly Hacker, the videographer is Nancy Pfeil; both are of United Reporting.

Will counsel please introduce yourselves for the record? And the court reporter will swear in the witness.

MS. MARTELL: Plaintiff's counsel?

MR. MC CORMACK: This is Kevin Mc Cormack on behalf of the Plaintiffs.

MS. MARTELL: Nicole Martell on behalf of the defendants, along with Mr. Tyler Mutschler.

COURT REPORTER: Very good. Mr. Key, could you please raise your right hand?

Do I have your consent to swear you in via remote video Zoom this morning?



3bbf9897-9ecb-4742-bedd-db04a0f98134

**Q. And how did you come about learning about this topic?**
A. In general crypto currency or LGB specifically?
**Q. In crypto currency in general.**
A. Since I do a lot of IT work, I'm always looking at what's new, what's trending. And somewhere around in 2013, I think I first heard of Bitcoin. I kind of followed it for a few years and ultimately decided there was some benefit in some small investing in my portfolio.
So, again, about in 2017 is when I pulled the trigger and I think I first bought some Ethereum.
**Q. Okay. And based on your understanding of crypto currency, how would you define crypto currency?**
A. Currency should be a decentralized means of distributing articles of value. Typically, they go on what's called a blockchain. So you can view all of the past, current and when they're entered, future transactions. It's an instant means of transferring said chain on chain, as it's called, articles around the world to people free of charge -- until the bureaucrats get their fingers in it and start mucking and meddling with it. And then it becomes centralized, and of course it has it as fee based, and then it acts more like a bank.



**Q. Based on your experience, is there a value assessed to a crypto currency?**
A. There can be. And what I mean by that is if hard currency is invested into an exchange and purchases said coin, or token as it's often called, that token has a value which is only equivalent to the next person that buys or sells it.
I'm not sure if you need an example, but I'll be brief. You buy something for a dollar and you sell it on chain for $1.10 to someone else. Well, you have a 10 percent gain. If someone decides for whatever reason that they're not happy with the coin and sees some news they don't like, they decide they just want to be done with it. They sell it for 90 cents. Now they're at a loss.
So there's definitely ups and downs, just like the stock market. Although it's much, much more volatile with limited regulation than in the stock markets.
**Q. Have you purchased any crypto currencies other than LGBCoin?**
A. Oh, yes.
**Q. Okay, which ones?**
A. Oh, my Lord. Let's start with Ethereum, Tron. I got into XRP, aka Ripple. This was all 2017 Bitcoin. I have gotten into some pretty bizarre ones. One was called XYO. The other Tomo, T-O-M-O. I will give you another example, Jasmy, J-A-S-M-Y. I'm sure there's 50 other currencies that are in my head, with LGB certainly being one. I've had about 50 cryptos overall over the last 7 years.



**Q. And are you familiar with the term Meme coin?**
A. Yes.
**Q. Okay, what does the term Meme coin mean to you?**
A. Usually, there's some phrase or image or both associated with a coin, like any Meme on the Internet. Except these come out with tokens you can purchase to support said Meme or Meme project. And somehow some accumulate in value, as we discussed earlier. Others can lose all of their value.
I would just say it's much more volatile even than, say, something that's been around a while.
**Q. Okay, and how much total do you believe you've spent since 2017 on crypto currencies?**
A. A couple million.
**Q. Have you ever lost money in other crypto currencies?**
A. I have.



**Q. Okay, and how much do you approximate that you've lost?**
A. Offsetting gains, I have probably lost about 700,000.
**Q. Have you filed any lawsuits related to those losses?**
A. No.
**Q. Why not?**
A. The losses were of my own volition and in most cases and in truth, you can't locate these companies anyway. A lot of them are hidden behind numerous corporate shields, numerous locations, Seychelles, BVI. You're just not going to get much traction going after them, typically.
Now, if you're foolish enough to file in the United States where your business is, that's a whole different story.
**Q. Do you have a Coinbase Pro account?**
A. I do, yes.
**Q. What is Coinbase Pro?**
A. It's a sister company of Coinbase, which offers trading at a discount. I primarily use it because my buys and sells have less fees.
**Q. And approximately how much crypto currency have you purchased approximately.**

A. Again, a couple million dollars. On Coinbase itself, probably a couple hundred thousand worth.
**Q. And where do you believe you spent the balance of the money that you said you've used to purchase crypto currencies?**
A. How do you mean spend? Can you --
**Q. Sure. So you said that you've put about $200,000 into purchasing crypto currencies through Coinbase Pro, but you said total you have spent approximately 2 million total. Where is the balance of that? Where has that been spent?**
A. It has been relocated to various exchanges. In some instances, I've converted it to Fiat, aka cash, and purchased various items for myself, just like anyone would. Some went to a car, some went to personal collections, and a lot of it I just still have in the exchanges themselves.
**Q. You mentioned generally earlier that you're in information technology.**
**What exactly is your current job or employment?**
A. Currently, I'm the founder of two companies that do cybersecurity and artificial intelligence. Combining the two, they've just tried to identify what you would call malware or viruses proactively and do it



in a more efficient manner than the old antivirus softwares and things that we've been using for the past 20 years.
**Q. Do you have any business partners in those endeavors?**
A. I have numerous stakeholders, aka investors.
**Q. And what are the names of each of those companies?**
A. One name is Heureka, H-E-U-R-E-K-A, Cyber, C-Y-B-E-R, and it dba's as Cybr, C-Y-B-R; and company two is 21st Century Technologies, plural, Inc.
**Q. And does that operate under any other DBA?**
A. It does not.
**Q. What is your educational background as far as how far -- Let me strike that.**
**How far have you gone as far as your education level?**
A. I have a master's degree from Eastern Michigan University.
**Q. Okay. And what did you obtain your master's in?**
A. Liberal studies with a major in -- what did they call it at the time? I think it was information security.
**Q. Okay. And where did you receive your**



**bachelor's degree?**
A. Eastern Michigan in Ypsilanti, Michigan.
**Q. And what did you get your degree in there?**
A. They again called it a Master of Liberals Studies with a concentration -- that's the word I was looking for, concentration in Information Security.
**Q. And when did you obtain your bachelor's? What year, approximately?**
A. 1997.
**Q. And when did you obtain your master's?**
A. I'm sorry, I must have misunderstood you. 1997 for master's.
What was the first part?
**Q. Oh, I asked first about your bachelor's.**
**What year did you obtain that.**
A. That was 1995.
**Q. Okay. And what year did you obtain your master's?**
A. 1997.
**Q. Have you ever been arrested of any crime?**
A. Yes.
**Q. What crime?**
A. Let's see. I was arrested for a DUI back in 1994. I was arrested for assault, actually, a couple times, I want to say in the early 2000s. All of those



were dismissed. I also was arrested for failing to file a Schedule C in 2008, I believe. And that one stuck. So that's -- Yes, charged, indicted and convicted on that last charge.
**Q. Okay, and what jurisdiction were you charged and indicted?**
A. Prince William County, Virginia.
**Q. And you said it stuck.**
**How exactly did it resolve? Did you plead? Did you go to trial and have a verdict, for example?**
A. I'm trying to think of the word nolo -- help me out here.
**Q. Is it nolo contendre?**
A. I believe so -- when you just agree there's enough evidence that you probably would be convicted, but don't -- don't own up to it.
**Q. Okay, so like a no contest plea?**
A. I believe so, yes.
**Q. And what was the sentence?**
A. The sentence was a fine of $50,000. And I got to do -- well, the sentence was 30 days, but I did 15 days in the -- in the local hotel, aka local jail -- fine cuisine.
**Q. All right. But the DUI in '94 and the two assault charges were dismissed?**

Page 17

A. The DUI actually stuck. I'm sorry, DUI stuck. That basically was -- there was no jail time or anything. It was a fine, a fee, and I think I was ordered to -- it's not even an Alcoholics Anonymous. It's 10 days of a -- it is called a self-worth improvement type class. I can't recall the exact name of it. Actually, I can. I'm sorry, Vaasap, V-A-A-S-A-P, Vaasap.
**Q. And that was also in Virginia?**
A. It was.
**Q. So I understand you went to school in Michigan, but you have a significant history in Virginia.**
**Where are you originally from?**
A. Manassas, Virginia.
**Q. And where do you currently live?**
A. I live in Winchester, Virginia.
**Q. What's your address?**
A. 3545 Back, B-A-C-K, Mountain Road. Again, that's Winchester, Virginia 22657.
**Q. And who is your cell phone carrier?**
A. That's a good question -- Verizon.
**Q. Was Verizon your cell phone carrier during the time frame related to this case, which would have been somewhere between 2021 and 2022?**

Page 18

A. I am fairly certain it was, yes.
**Q. Do you have any particular political party that you identify with?**
A. I identify Republican.
**Q. Aside from the crypto currencies that we've already discussed, can you describe your background with regards to investing?**
A. I have acted as a non -- not certified -- hang on a second. Again, it is an early morning for me.
When you don't essentially put down $200,000 in assets, you would be considered a blank investor -- not institutional. You are accredited. I was invested as a non accredited investor initially. And as my assets grew, I was invested as an accredited investor into some local startups.
I am trying to think. I invested in my own companies of course as a stakeholder -- cryptos. It's been a long time since I invested in shares, but I did that a bit back in the late '90s. That would be about it.
**Q. In your own words, what is LGBCoin?**
A. It is commonly referred to as Let's Go Brandon Meme coin.
**Q. How did you learn about LGBCoin?**
A. So my friend, Brian Ronquest, does the

Page 19

wraps -- that would be what goes on the NASCAR cars for Brandon Brown. And he called me up one evening and said I know you're really into crypto, I want to check this coin out. There is a really good possibility that NASCAR is going to back it. And that's what we call buying on rumor before selling on news. That was very exciting for me. So I bought coinage at that time I want to say from Pancakeswap. I believe that's the exchange it was on.
**Q. You said Pancakeswap?**
A. I believe that was the exchange. There were several exchanges. My apologies, I might have to look it up, but that's the one that's ringing a bell. If not, it could have been Uniswap; that was another one. At that time it would be on chain. So with apologies, I'd have to have to double-check.
**Q. What would you need to look at to double-check?**
A. Just to go back and look at my buy and sell transactions, and it would give me a transaction a TX ID and that would show which exchange it was purchased on and when.
**Q. Have those documents been produced in discovery in this case?**
A. To my knowledge, I have, yes -- the bought and

Page 20

sells.
**Q. To your knowledge, were any of those documents withheld?**
A. No -- not that was not purposely if something was.
**Q. You mentioned that NASCAR backing LGBCoin was exciting to you.**
**Why was that?**
A. Well, if you get a national sports company, for lack of a better word, behind a Meme coin, it's going to gain some traction, it's going to excite people.
Everything in the crypto world revolves around what we call fomo, fear of missing out. So you get a name attached or a company attached to a coin, there's speculation that in this case, maybe NASCAR uses that coin to buy and sell merchandise or buy and sell tickets to events, or you may even get extras if you participate by holding the coin. These are all speculative, of course, but they can certainly make a coin go up exponentially in value. So yeah, it would be considered a pretty hot commodity at the time.
**Q. But as you just stated, this is something speculative, correct?**
A. Yes, at the time it was speculative.

Page 21

**Q. And you understood this at the time that you purchased LGBCoin?**
A. Correct.
**Q. Why did you choose to purchase LGBCoin?**
A. Again, fear of missing out, insider information from Brian, the conversation that he'd keep me in the loop so anything that moved forward or changed, I'd certainly have access to it. And because crypto is not regulated like shares -- that type of stuff's not considered illegal, at the time anyway.
So, yeah, I felt like we really were, pun intended, in the driver's seat here.
**Q. Were you aware of LGBCoins' intended purpose or the type of issues that it was intended to support?**
A. Can you clarify that a bit?
MR. MC CORMACK: I object to the form.
**Q. Sure. Did you purchase LGBCoin in order to support any particular charities, for example?**
A. No.
**Q. Did you buy LGBCoin in order to help support any conservative causes?**
A. No.
**Q. Do you recall which dates you purchased LGBCoin on?**
A. Late December, early January 2020, I

Page 22

believe -- 2020 and into --
**Q. Is there anything you would be able to reference in order to confirm those dates?**
A. Again, it should be the on chain information, and I do believe I've supplied that to Zigler law firm. So I think they have that, and, hopefully, you do as well.
**Q. Do you recall responding to interrogatories in this case?**
A. Yes.
**Q. Give me one moment.**
**Are you able to see my screen?**
A. Yes.
**Q. Okay. Do you recognize this document?**
A. Yes, I do.
**Q. What is this?**
A. This would be when I purchased tokens and such. It appears that the 2021 is correct, but perhaps the 2020 was not -- my apologies.
**Q. So let's start very simply.**
**Can you read the title of the document for the record?**
A. At the very top, plaintiff Shawn Key's answers and objections to defendants, James Koutoulas and LGBCoin, Ltd's first set of interrogatories.

Page 23

**Q. Okay, great. And did you assist in drafting these responses?**
A. Providing the responses, yes.
**Q. And is this your signature verifying these answers?**
A. Yes, it is.
(The plaintiff Shawn Key's answers and objections to defendants, James Koutoulas and LGBCoin, Ltd's first set of interrogatories was marked as Defendant's Exhibit Number 18 for Identification.)
**Q. Just so we don't get lost, for housekeeping purposes, this will be defendant's -- I believe it's 17(sic). We will pick up wherever our last exhibit left off from Ms. Bader's deposition. And for ease of reference, Madam Court Reporter, I'm going to put that here for when I sent it to you.**
**All right. So as you referenced, if we look here to Interrogatory Number 2, it states the deeds, quantities and prices for all purchased purchases and sales of LGBCoin, or Let's Go, made by a plaintiff.**
**And can you please refer to your answer as to the dates that you listed for your purchases or sales of LGBCoin?**
A. It would appear the dates are December 29th and December 30th, 2021.

Page 24

**Q. Thank you. And do you believe that's accurate based on your recollection?**
A. I do, yes. Okay.
**Q. And do you see here the second part of your response?**
**Does it indicate on which exchanges you purchased LGBCoin?**
A. Yes, it looks like Coinbase and Uniswap.
**Q. Understood. And is that accurate to the best of your recollection?**
A. I'm fairly certain now, yes.
**Q. Did that come off the screen just for ease of reference?**
A. Yes, it did.
**Q. Okay. Thank you. Are you familiar with an individual named James Koutoulas?**
A. I'm familiar with the name, yes.
**Q. Okay. Who is James Koutoulas to you?**
A. I believe he is the founder of LGBCoin.
**Q. And what do you base that on?**
A. Information I've seen online, participation in a Telegram group, information from Brian Ronquest, probably those three.
**Q. Which Telegram chat are you referencing? Is there a title for it?**

Page 25

A. At one point, I believe it was called LGBCoin, something to that effect. And they changed the name slightly, but that's pretty spot-on. This would have been in that time frame of December 2021 where it was most active.
**Q. Are you still part of this Telegram chat?**
A. To my knowledge, no.
**Q. Why?**
A. I believe I was dropped. And that was probably a couple years ago. All of a sudden it wasn't there and I wasn't a member.
**Q. Do you recall when you joined the Telegram chat?**
A. It was in that December time frame right before I had purchased the coin.
**Q. And do you recall exactly what Brian Ronquest said that led you to believe that Mr. Koutoulas was the founder of LGBCoin?**
A. Primarily that NASCAR was most likely going to get behind and support the coin and that a public announcement was imminent.
**Q. What about that led you to believe that James Koutoulas founded the coin?**
A. His comments in the Telegram. You could go back and print out the record. He's very excited that

Page 26

it is his project and very excited about what it's going to do. He believes it's going to be, you know, good for ROI. He definitely insinuates, you know, good news and big, big, big, big things are ahead. And it felt pretty good back in December.
**Q. Do you recall if there were any specific messages in which Mr. Koutoulas that he was in fact the founder of LGBCoin?**
A. Pardon me, I'm thinking.
**Q. Take your time.**
A. I believe there were references to him being CEO in those chats because a lot of people would comment and who are you, what's your role? Primarily because he was very communicative in that room. So I'm 99 percent certain you'll find references to him referring to himself either in a founder capacity, CEO, president or something along those lines.
**Q. So you're in business. In your experience, does someone with the title of CEO necessarily correctly relate to a founder?**
A. Typically. Not always if the company's been around for a while. But, you know, this is a new entity. It's rare that you would have a founder not be the CEO, or at least a cofounder.
**Q. To your knowledge, is a Meme coin a company?**

Page 27

A. That's a great question. A proper Meme coin that claims to have value should go back to some entity that can show registration and fundamentals. And fundamentals being a mission, a purpose, a statement, whether you're profit, nonprofit, all those things.
To be one without all that I would personally call a shell company at best. I won't use accusatory words, but it would be a little -- a little more shady if it's not at least that.
**Q. Can you point to somewhere where LGBCoin was claimed to have some sort of an intrinsic value?**
A. So the actual exchange that it was trading on Uniswap being one, Coinbase being the other, would show the value of the coin at any given time.
And, again, it can be extremely volatile in crypto. So that's where we would follow the ups, the downs. That would most likely be the primary area of value. If anybody perceives value elsewhere, they're either a newbie or a fool.
**Q. And so can you --**
**Have you had an opportunity to visit the LGBCoin website?**
A. I had, yes.
**Q. Okay. And do you recall reading anywhere on the website where it explicitly stated that there was an**

Page 28

**intrinsic value to the Meme coin?**
A. All the disclaimers were there, the cut and paste at the bottom. So, no, on the website itself, I think it had a pretty decent C-Y-A.
**Q. Do you see the document I've just put up on your screen?**
A. Mirka, mirka, I sure do. Thank you.
**Q. So you recognize this document?**
A. I do, yes.
**Q. What is it?**
A. This would be at the time, I believe, the front welcome page to the LGB site or very close to the front page.
MS. MARTELL: Okay. For reference, this was previously labeled as Defendant's Exhibit 10 and will maintain the same reference for the purposes of this deposition.
(The welcome page to LGB site was previously marked as Defendant's Exhibit Number 10 for Identification.)
**Q. Can you see my cursor on the screen?**
A. I sure can.
**Q. Can you please read for me, starting with the sentence -- the line where my cursor is indicating on the screen?**

Page 29

A. Yes. LGBCoin has no intrinsic value, and you should not purchase it with any expectation that you'll be able to resell it.
**Q. And what's the next sentence say?**
A. Please do not spend money you cannot afford.
**Q. Earlier, you stated that Meme coins are often purchased based on sentiment.**
**Is this all in line with that opinion?**
A. With respect, are you sure I said --
MR. MC CORMACK: I object to the form.
**Q. Go ahead. You can provide an answer if you have one.**
A. I'm just trying to confirm that I had said on sentiment. With apologies I think that might be rephrased, but I could be wrong.
**Q. Okay. What do you recall that you stated?**
A. Some people will buy it based on the perception -- even if I didn't use that word, it would be the perception. In this example, if I may, you're all about let's go America, let's go Trump, let's go anti-Biden. It is what it is. Some I don't have a problem with.
The problem starts with it saying no intrinsic value -- may not be something to resell. Well, if that's the case, why put it on Uniswap right away when

Page 30

you know that's exactly what people do? Why put it on Coinbase when you know that's what people do?
So what it says here and what actually happened are two different things. It's the start of what I will call a slippery slope for LGBCoin.
**Q. But you do acknowledge that LGBCoin did make all the proper disclosures regarding the lack of value and intent behind LGBCoin, correct?**
MR. MC CORMACK: I object to the form.
**Q. You can still answer.**
A. I think that counsel is advising me not to answer.
MR. MC CORMACK: No, Shawn. When I make an objection unless I instruct you specifically not to answer, you can still give your answer. I'm just preserving the objection for the record.
A. With apologies, folks. I don't do this every day like you do, so if I'm a little rusty, it's not meant to be rude or anything.
Could you please repeat that for me?
MS. MARTELL: Absolutely.
Madam Court Reporter, can you read back my question, please?
COURT REPORTER: Yes. I need to switch screens. Just a minute.

Page 31

MS. MARTELL: No problem.
(The requested portion was read back.)
A. I believe it said that, yes. One moment, please.
As I tell my children, you're judged on what you do, not by what you say. And what subsequently followed to this website was not only a listing on Uniswap and Coinbase, but active activity in the Telegram to buy, buy, buy -- I would call frequent updates by executives and founders within LGB certainly stirring the beehive, getting people excited.
And at the time -- and I don't have copies of them, but there are as I recall some messages on Twitter and some other marketing and paper marketing that's being done. You're starting to see it a lot more places.
So, again, I will give you that I can read, and I can see what the front page says, but the actual actions afterward were exactly in line with any company trying to make a profit for itself and its stakeholders.
**Q. I'm sorry, I don't want to cut you off, but if you give me one moment, we have a really loud alarm going off on our side of the office. Let me just make sure it's nothing that I need to pay attention to.**
VIDEOGRAPHER: Would you like to go off the video record?
MR. MC CORMACK: You're muted.
MS. MARTELL: Sorry, I should be brief. Just give me one moment.
A. Take off if you've got a fire. We will be around.
Are you good for two minutes? I just want to check on my kid up-front here.
MR. MC CORMACK: Yes, Shawn. I think you're okay to check on your kid.
THE WITNESS: I will be right back. Thank you.
VIDEOGRAPHER: We are going off the record. The time is now 10:50:29 a.m.
This is the end of Media One. We are off the record.
(A brief recess was taken at 10:50 a.m.)
VIDEOGRAPHER: We are back on the record. The time is now 10:54:29 a.m. This is the beginning of Media 2. We are on the record.
(The proceedings resumed at 10:54 a.m.)
BY MS. MARTELL:
**Q. So, Mr. Key, did you purchase any of these LGB coins directly from Mr. James Koutoulas?**
A. Directly? No, ma'am.

**Q. Okay. Have you had any personal conversations with Mr. Koutoulas regarding LGBCoin?**

A. Personal chats and Telegram, not personal conversations verbally.

**Q. Okay. And when you say you've had personal chats through Telegram, can you elaborate a little further on that?**

A. Sure. I had mentioned to him at some point in chats that I had a bit of insider info and I was very excited, and I offered if I could help in any way. We were doing cybersecurity audits of coins at this time because their smart contracts were written so poorly -- most -- not just LGB, but most of them, that without our assistance they would ultimately be hacked and the money siphoned out.

So there were some questions, you know, that maybe we could get some extra tokens for this work kind of thing. And as I recall, it was kind of a, well, we're real busy now. Let's punt this until the new year and we'll get it back to you. And within a whirlwind, there wasn't a project to discuss or do any work on.

But that's my recollection of short PM, private messaging, or some of it might have even been public with Mr. Koutoulas.

**Q. Have you provided copies of these chats as**



**part of discovery?**

A. If I had access to anything, it would have been provided, yes. I've given everything I have that I recall having related to LGB.

**Q. What was your username on Telegram?**

A. Oh, gosh, I believe I was ceo underscore cyber or I might have been -- let me think. I might have been cyber token underscore 007 -- something, or some variation of that as I recall.

**Q. When you say cyber, would it have been mimicking the spelling?**

A. Yes, probably, C-Y-B-R. And the same with token. That would have been C-Y-B-R token.

**Q. Are you aware of any place where Mr. Koutoulas personally claimed there was a fundamental value besides the charitable and advocacy functions of LGBCoin?**

A. Not specifically. Not directly, no.

**Q. And you just mentioned once again that you made a purchase based on insider information.**

**Are you aware that you've brought a securities class action claim as part of this case?**

A. At the time this was not a security. So at the time there wouldn't have been any quote, unquote illegal activities going on. I get information from somebody working for company. I don't work for the



company. It's no different than if it's put on Telegram or anywhere else.

Of course, that was a big argument back at the time with what constitutes a security. What's a violation? And the government was too pussyfooted to weigh in on it. So you won't find any record of that being legal or illegal until probably 2023. And it's still kind of questionable.

**Q. How much LBGCoin did you purchase?**

A. I thought at the height it was around $17,000 is what Uniswap showed as the value.

How much did I purchase it for? Closer to 10 or 11 as I recall. I vaguely think I remember having about a 35, 40 percent profit in it.

**Q. Okay. And what percentage of your net worth is that approximately?**

A. Now? Zero.

**Q. What percentage would it have been at the time you purchased it?**

A. My personal portfolio?

**Q. Yes.**

A. Can you do 17 -- I don't have a calculator in front of me. What's 17,000 into 2 million -- 1x -- or maybe I got that reversed. You know what I'm trying to do. 17k over 2 million? Those were the good days



briefly.

**Q. .85 percent?**

A. How much?

**Q. About .85 percent.**

A. I think it'd be less than that even, wouldn't it?

**Q. Well, based on the calculator, because I went to law school. Unfortunately, math is --**

A. 17,000 divided by 2 million, right, that's what we're trying to do?

**Q. Correct. Go ahead. If you have a calculator available, if you'd like to do the math and give us your response, that'd be fine.**

A. We have lawyers and lawyers, and nobody can use a calculator to get a percentage. I'm guilty. I've got a master's degree, I'm almost where you guys are.

Okay, calculator. Here we go .0085. So you're close. We were just off some zeros. So less than a percent, less than one percent.

**Q. Okay. So you -- based on my understanding of your testimony, you thought that you were going to profit by trading on insider information on a non security at the time that you purchased LGBCoin?**

MR. MC CORMACK: I object to the form.

A. I should probably not use the term insider

information. I should have used information received by persons close to the project and company. Yes, 100 percent. I did not get into this for Americana. I did not get into this for any charity. I got in this 100 percent for selfish American profit.

**Q. And you believe that would be a result of the NASCAR ontrack sponsorship?**

A. Absolutely, a huge part of it.

**Q. Okay. If Nike® sponsors NASCAR such as what occurred here and you buy a pair of Air Jordans, does that make Air Jordans a security in your opinion?**

A. No.

MR. MC CORMACK: I object to the form.

**Q. So what did you think you were purchasing?**

A. What I thought I was purchasing were tokens that were tradable on an exchange with the hopes of it making a significant profit, which it did for about a week, week and a half.

**Q. Did you want --**

**So you intended on eventually selling your LGBCoins for profit?**

A. Yes.

**Q. So there came a point where LGBCoins dropped in value?**

A. Yes. Okay, by how much? Do we need the



calculator again or can we just say 99.9 percent.

**Q. And based on the amount of LGBCoins that you purchased, what do you believe your damages financially are from that drop in value?**

MR. MC CORMACK: I object to the form.

A. My embarrassment. You know, it was at 17,000. It should have gone much more than that had the -- I'll use the word now because we're getting ready to get dirty. It's the rug pull. You go to zero, there's no coming back from that.

So, yeah, I mean, I went from 17,000 to zero because all the tokens were, what I understand, sold by everyone on the inside of LGB, including James Koutoulas.

**Q. And what are you basing that information on?**

A. Documents that I've seen and discussion with counsel, discussion with Brian Ronquest. I apologize. Some of these names are going to be loose, but Brandon's father's in the circle with Brian. He has a nickname like Mel or Mo or something. He passed along. In fact, he was equally shocked it went to zero because he was supposed to be one of the first people told when to sell, which was going to then go to Brian and me and everyone else.

And maybe this is karma, but we absolutely



thought we'd have information on when everybody was going to be selling the tokens and woke up one morning, they were gone.

**Q. Do you still own LGBCoin?**

A. Technically. I mean, the short answer is that I never sold, but I don't know if they're still on chain. I think the original project pulled the token, which makes it impossible to resurrect.

**Q. Mr. Key, can you see my screen?**

A. Yes, I can.

**Q. Okay. And can you please tell me the title of the document that I'm showing you?**

A. Brandon Built Motorsports Sponsorship Agreement.

**Q. Have you seen this document before?**

A. One moment, please. I don't recall seeing this exact document. That doesn't mean I haven't, but it's not jumping out at me, ma'am.

**Q. All right. Can you please read the first line of the agreement where my cursor starts?**

A. This sponsorship agreement, when executed, is made by and between Brandon Built Motorsports, LLC, BMS and LGBCoin, the sponsor.

**Q. Okay, and can you please read the second paragraph?**



A. Yes. Sponsors agreed to act as a sponsor of the BMS Number 68 NASCAR Xfinity Series or its successor car should it ascend to the NASCAR Cup Series early in the race events set forth on Exhibit 1, attached hereto incorporated here in events.

Shall I continue?

**Q. You can stop there.**

**So does this appear to be an agreement for LGBCoin to sponsor Brandon Built Motorsports?**

A. Yes.

**Q. And you said you haven't seen this document before?**

MR. MC CORMACK: I object to the form.

A. Some of the lexicon seems familiar, but not in this format.

**Q. And if we scroll to the bottom, you will see here that it's been executed on behalf of LGBCoin.**

**Do you agree?**

A. I see it's -- yes for James Koutoulas, no for Brandon Brown's side.

**Q. But you have information directly from Brandon Brown's team, so to speak, about the intention for this sponsorship?**

A. Yes.

MR. MC CORMACK: I object to the form.

**Q. Do you have any reason to believe that Dale Howell didn't have the authority to approve this sponsorship?**
A. Look, based on my 30 years in the corporate world, if you are a C level and you put something out even if you shouldn't have, you're an agent of that company, maybe you're in hot water. But you absolutely have the authority to put out whatever you want in those C level positions, and Dale certainly had one.
**Q. And are you aware that Dale Howell was the sole authority that approved Brandon's prior and then subsequent sponsorships as well?**
MR. MC CORMACK: I object to the form. Lack of foundation.
A. That, ma'am, I have no knowledge of.
**Q. Understand. So you mentioned that -- if I heard you correctly, you believe NASCAR put out a fraudulent statement regarding what transpired with this approval?**
A. They didn't put out a fraudulent statement to the public. Based on the e-mail from Dale and solely that e-mail that I saw, it looked like it definitely was a go to me. And, you know, having privy to that letter prior to everyone else I know is when I increased the purchase in LGB, and I am surprised that it wasn't more



significant. To be honest, I'm glad it wasn't.
But I think any reasonable person that would have read that e-mail would have thought that they were moving forward with a NASCAR partnership.
**Q. So, in fact, you also relied on having seen that document in purchasing LGBCoin?**
A. I'm sorry, one more time. That ding interrupted.
**Q. Sure. So you in fact also relied on the approval that you saw in Dale Howell's e-mail and statements made by NASCAR in deciding to move forward with your LGBCoin purchase?**
A. It was a reason to and probably a significant one, yes.
**Q. Are you aware that Mr. Koutoulas used $70,000 of his own money to buy back as many coins as possible following this breach?**
MR. MC CORMACK: I object to the form.
A. No.
**Q. Have you had an opportunity to review the complaint that was filed on your behalf in this case?**
A. Yes, I have.
**Q. Okay. Are you aware that on Footnote 14 of Page 41, it's acknowledged that Mr. Koutoulas purchased these coins in light of the breach related to the**



**sponsorship and Brandon Built's sponsorship agreement.**
MR. MC CORMACK: I object to the form.
A. I am not aware of him repurchasing tokens at a bottom dollar price, no.
**Q. Did you ask Mr. Koutoulas any specific questions about LGBCoin before you purchased it?**
A. Again, this is four years. I'm sure in my conversations I would have asked for just some validation, verification that, you know, they were marketing things, doing things right. I vaguely remember something he sent or immediately posted. It was a gentleman in a wheelchair, but I believe he was in Congress at the time, maybe someone out in Florida.
There was an event and there was some -- either a sponsorship that that gentleman had purchased and he was endorsing it, which, you know, again, looks pretty good, especially in 2020, when everything was only speculative in crypto. That added to what felt like justification that this was a legitimate coin.
**Q. So just so I understand, did you ask Mr. Koutoulas any questions personally before buying LGBCoin?**
A. Yes.
**Q. Okay. And what questions were those?**
A. Again, I don't recall. It would have been



something -- something to the effect of can you offer more evidence or examples of the legitimacy of this project? Who do you have perhaps as a coder in it?
Which, surprisingly, he gave me a name that I recognized at the time, Frank -- his last name's gotten on the tip of my tongue.
It was at least justification. I knew the names and I knew the Florida area enough that these were people who really did work on crypto projects, so it felt like it was real.
**Q. Did you discuss with Mr. Koutoulas any risks of buying LGBCoin before you purchased it?**
A. No, I could navigate the crypto landscape just fine.
**Q. And did you ask Mr. Koutoulas or anyone else for that matter, for a prospectus related to LGBCoin before purchasing it?**
A. I think we may have talked about, well, again, fundamentals. What was their plan to keep this ongoing, you know, revenue product? And being that it was a Meme coin, the answers were more about just generating more excitement, growing the community, which, of course, was supply and demand, increase the value of any Meme coin.
And other than that, just, you know, seeing Brandon every Sunday or whatever the season is, you